IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

AKANNI AMBERSLIE,

               Plaintiff,          Civil Action No.
                                 9:17-CV-0564 (TJM/DEP)

     v.

PRISONER TRANSPORT SERVICE
OF AMERICA, LLC, *et al.*,

               Defendants.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

AKANNI AMBERSLIE, *Pro se*
17-B-2005
Groveland Correctional Facility
7000 Sonyea Road
Sonyea, NY 14556

FOR DEFENDANTS:

GOLDBERG SEGALLA LLP       JONATHAN M. BERNSTEIN, ESQ.
5786 Widewaters Parkway      SHANNON T. O'CONNOR, ESQ.
Syracuse, NY 13214-1840

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

This is a civil rights action brought by *pro se* plaintiff Akanni

Amberslie, pursuant to 42 U.S.C. § 1983. Although plaintiff's complaint

originally named Prisoner Transport Service of America, LLC ("PTS"), the State of New York, and the County of Broome as defendants, plaintiff's claims against the two governmental defendants have since been dismissed, leaving only PTS as a defendant in the action. In his complaint, plaintiff alleges that PTS was engaged to transport him in custody from Fayetteville, Georgia to Broome County, apparently to face criminal charges there, and that during the course of the transport he was exposed to inhumane conditions arising to a level of constitutional significance.[1]

Currently pending before the court is a motion brought by defendant PTS seeking dismissal of plaintiff's claims on a variety of grounds. In that motion, defendant argues that (1) plaintiff has failed to allege that the actions of the transport employees in question were taken pursuant to a policy or practice of defendant PTS, sufficient to give rise to *Monell*[2] like liability; (2) plaintiff's complaint fails to set forth facts sufficient to demonstrate the existence of a plausible due process claim; and (3) the

---

[1]     While plaintiff alleges that defendant subjected him to cruel and unusual punishment, in violation of the Eighth Amendment, and in his motion papers he persists in the belief that the Eighth Amendment controls, as was noted in the initial order issued by Senior District Judge Thomas J. McAvoy on June 8, 2017, after reviewing plaintiff's complaint, as a pretrial detainee his claims arise under the due process clause of the Fourteenth Amendment. Dkt. No. 4 at 7-8; *see Caiozzo v. Kormen*, 581 F.3d 63, 69 (2d Cir. 2009).

[2]     *Monell v. Dep't of Soc. Srvcs. of New York*, 436 U.S. 658 (1978).

Northern District of New York is an improper venue for bringing this action.

Alternatively, in the event plaintiff's complaint is not dismissed, defendants

seek a transfer of the action to the Middle District of Tennessee, where

defendant PTS is headquartered, pursuant to 28 U.S.C. § 1404(a). For the

reasons set forth below, I recommend that defendant's motion be granted,

and that plaintiff's complaint be dismissed, with leave to replead.

I.    BACKGROUND[3]

On March 14, 2017, plaintiff was transferred into the custody of

defendant PTS, a company based in Tennessee, to be transported from

Fayetteville, Georgia to Broome County, New York.[4] Dkt. No. 1 at 4. For

the next seven days until his arrival in Broome County, plaintiff was

confined in a van without windows or lights, while shackled, and was

unable to move or stretch and placed near other individuals who were

situated "like sardines in the back." *Id.* at 4-5. One of the other individuals

---

[3]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

[4]    Defendant's transport of plaintiff from Georgia to New York was conducted pursuant to the Interstate Transportation of Dangerous Criminals Act of 2000, or "Jeanna's Act", Pub. L. 106-560, S.18998 (Dec. 21, 2000), codified at 34 U.S.C. § 60601 *et seq.*, and the regulations promulgated under that Act and found at 28 C.F.R. Pt. 97.

also being transported at the time was infected with AIDS and threatened to bite and spit on plaintiff if he was not released. *Id.* at 5.

During the trip, plaintiff was deprived of some meals, sleep, daily medication for his blood pressure, and rest room facilities, and was forced to urinate in empty bottles that remained in the van. Dkt. No. 1 at 4-5. Plaintiff claims that as a result of the events that occurred during his transport, he experienced residual pain in his knees, migraine headaches, anxiety, stress, nightmares, depression, and ongoing bladder issues. *Id.*

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on May 23, 2017. Dkt. No. 1. Plaintiff's complaint named PTS, the State of New York, and Broome County as defendants. *Id.* at 1-2. In his complaint, plaintiff claimed that (1) defendants PTS and Broome County were deliberately indifferent to his serious medical needs, in violation of his rights under the Eighth Amendment; (2) he was subjected to unconstitutional conditions of confinement, also in violation of the Eighth Amendment; (3) defendants State of New York and County of Broome failed to protect him from unconstitutional practices and conditions; and (4) defendants PTS and Broome County violated his Fourteenth Amendment right to equal

protection. *Id.* at 6-7. As relief, plaintiff's complaint demanded damages in the amount of $1,000,000. *Id.* at 6.

Following the grant of plaintiff's application for leave to proceed *in forma pauperis* and the court's review of plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A, Senior District Judge Thomas J. McAvoy issued a decision on June 8, 2017, in which he (1) dismissed all claims against the State of New York, with prejudice; (2) dismissed plaintiff's claims against the County of Broome, without prejudice; (3) dismissed plaintiff's Fourteenth Amendment equal protection claim against defendant PTS, without prejudice; and (4) ordered that plaintiff's Fourteenth Amendment cruel and unusual punishment claims against defendant PTS survive the court's *sua sponte* review. Dkt. No. 4 at 12.

On August 31, 2017, defendant PTS moved to dismiss plaintiff's remaining claims for failure to state a claim upon which relief can be granted and claiming improper venue, or, in the alternative, for a transfer of the action to the United States District Court for the Middle District of Tennessee. Dkt. No. 23. Plaintiff has since filed papers in opposition to defendant's motion, Dkt. No. 26, and defendant has submitted papers in

reply to plaintiff's opposition and in further support of its motion.[5] Dkt. Nos. 27, 28. Defendant's motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and Northern District of New York  Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

   A.    Standard of Review

   A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a

---

[5]    In its reply, defendant argues that plaintiff's opposition papers were untimely and should be stricken. *See* Dkt. No. 28 at 4-5. The court issued a text notice on September 1, 2017, directing that any response to defendant's motion be filed on or before October 10, 2017. *See* Text Re-Notice dated September 1, 2017. Although plaintiff's opposition papers were not received and filed with the court until October 13, 2017, the record reflects that they were mailed by the Groveland Correctional Facility ("Groveland") on behalf of plaintiff to the court on October 10, 2017. Dkt. No. 26 at 3, 5. In addition, plaintiff's opposition papers include an affidavit of service reflecting that on October 8, 2017, he entrusted his motion papers to corrections officials at Groveland. *Id.* at 4. Plaintiff is therefore entitled to the benefit of the prison mailbox rule, under which his papers are deemed to have been "filed" when delivered to prison authorities for forwarding to the court. *See Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005).

pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper*, 378 U.S. at 546; *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting

*Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

B.   Plaintiff's Supervisory Claims Against Defendant PTS

Plaintiff's claims in this action are brought pursuant to 42 U.S.C. § 1983. Section 1983 "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (quoting *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)). It "'is not itself a

source of substantive rights'[,] . . . but merely provides 'a method for vindicating federal rights elsewhere conferred[.]'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In order to state a claim pursuant to section 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.'" *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

Although not a municipality, defendant PTS may nonetheless bear liability under § 1983 as a state actor in the event a sufficient nexus can be established between its challenged actions and a municipal entity. *See Byng v. Delta Recovery Srvcs. LLC*, 568 Fed. Appx. 65, 66 (2d Cir. 2014). Defendant notes that it is a private entity, but does not contend that it is not a state actor for purposes of section 1983 in its motion. Dkt. No. 23-10 at 10-11.

Establishing state action alone, however, does not carry the day for plaintiff. Just as would be the case in attempting to hold a municipality liable for the constitutional torts of one of its employees, plaintiff in this case must also allege and prove facts to show that the actions of PTS employees were taken pursuant to some policy of defendant that caused

the constitutional tort to occur. *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408 (2d Cir. 1990); *see also Bess v. City of New York*, No. 11 Civ. 7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("Despite the fact that it is a private entity, [the private defendant] enjoys the benefit of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983 suit.").[6] Absent such a showing, a private employer cannot be held liable under section 1983 for the constitutional torts of its employees; there is no *respondeat superior* liability under section 1983, whether on the part of a municipality or instead a non-municipal state actor. *Id.*; *see also Whalen v. Allers*, 302 F. Supp. 2d 194, 202-03 (S.D.N.Y. 2003).

Under the *Monell* theory of liability, which was developed in the context of civil rights violations allegedly committed by municipal employees, but which has been extended to private section 1983 actors, an entity may be accountable for a constitution violation that has occurred pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers . . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."

---

[6]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978).

Such liability can be established in various ways, including through "proof

of an officially adopted rule or widespread, informal custom[]

[demonstrating] 'a deliberate government policy or failing to train or

supervise its officers.'" *Bruker v. City of N.Y.* 337 F. Supp. 2d 539, 556

(S.D.N.Y. 2004) (quoting *Anthony v. City of N.Y.*, 339 F.3d 129, 140 (2d

Cir. 2003)). A plaintiff may also show that the allegedly unconstitutional

action was "taken or caused by an official whose actions represent an

official policy," *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000), or when

municipal officers have acquiesced in or condoned a known policy,

custom, or practice that violates federal law. *Amnesty Am. v. Town of W.

Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Reynolds v. Giuliani*,

506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement

is satisfied where a local government is faced with a pattern of misconduct

and does nothing, compelling the conclusion that the local government

has acquiesced in or tacitly authorized its subordinates' unlawful actions.").

A municipality's failure to act "satisfies the policy or custom

requirement only where the need to act is so obvious, and the inadequacy

of current practices [is] so likely to result in a deprivation of federal rights[]

that the municipality . . . can be found deliberately indifferent to the need."

*Reynolds*, 506 F.3d at 192 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). Assuming a plaintiff can prove that a municipality has acquiesced to a pattern of conduct that may result in a violation of federal law, "for liability to attach . . .[,] the identified deficiency . . . must be closely related to the ultimate injury." *City of Canton*, 489 U.S. 391; *accord, Amnesty Am.*, 361 F.3d at 130 ("*City of Canton* requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that . . . it actually caused the constitutional deprivation." (quotation marks omitted)).

Plaintiff's complaint fails to allege facts that would plausibly establish *Monell* liability on the part of defendant. In order to satisfy the pleading requirements imposed under *Twombly* and *Iqbal*, to state a plausible claim under *Monell* "a plaintiff must give a factual description of such a policy, not just bald allegations that such a thing existed." *Bess*, 2013 WL 1164919, at *2 (citing *Davis v. City of New York*, 07 Civ. 1395, 2008 WL 2511734 (S.D.N.Y. June 19, 2008)). Plaintiff has not identified any written policy that would address the violations alleged in his complaint. Similiarly, he has failed to show that the challenged actions were undertaken as a

result of an authorization by a final policy maker at PTS. *See Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 454 (S.D.N.Y. 2012). Although liability can be established by imputing constructive knowledge of the actions of the employees in question, plaintiff must establish that the violations were so persistent and pervasive that they should have been obvious to policy makers at PTS. *Id.* at 454.

To establish liability for failure to supervise or train, a plaintiff must allege and prove facts showing that the failure to supervisor or train amounted to deliberate indifference to the rights of others, and that "the need for more or better supervision to protect against to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 2004) (citations omitted). Plaintiff's complaint in this action contains no such allegations.

Since plaintiff has failed to allege facts that would demonstrate a plausible basis to assign *Monell*-type liability to defendant PTS, I recommend a finding that his remaining claim is subject to dismissal on this basis.

C.   Dismissal for Failure to State a Cognizable Substantive Due Process Claim

As an alternative basis for seeking dismissal, defendant argues that plaintiff's allegations, even if accepted as true, fail to rise to a level of constitutional significance.

As a pretrial detainee, plaintiff's conditions of confinement claims are subject to analysis under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment, which prohibits cruel and unusual punishments. *Darnell v. Pinerio*, 849 F.3d 17, 29 (2d Cir. 2017); *Brown v. City of New York*, No. 13-CV-06912, 2017 WL 1390678, at *10 (S.D.N.Y. Apr. 17, 2017). To establish this type of claim under the Fourteenth Amendment, a pretrial detainee must demonstrate that the defendant responsible for the allegedly unconstitutional conditions of confinement acted with deliberate indifference to the plaintiff's circumstances. *Darnell*, 849 F.3d 17 at 29; *Brown,* 2017 WL 1390678, at *10. The analysis devolves into a two prong inquiry whereby a pretrial detainee must satisfy both an objective prong, showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a subjective prong, entailing examination of the mental state of the defendant accused of deliberate indifference. *Darnell*, 849 F.3d 17 at 29; *Brown,* 2017 WL 1390678, at *10. The

14

subjective element of the controlling test is informed by whether the defendant acted with deliberate indifference, either because he or she knew but disregarded the deprivations alleged, or reasonably should have known, but nonetheless disregarded those conditions. *Darnell*, 849 F.3d at 29.

To establish the objective prong of the test, the plaintiff must allege facts plausibly demonstrating, either alone or in combination, that the conditions he faced posed an unreasonable risk of serious damage to his health. *Darnell*, 849 F.3d 17 at 30. The objective test is evaluated in the context of contemporary standards of decency, and addresses, *inter alia*, whether a plaintiff has been deprived of basic human needs including, for example, food, clothing, shelter medical care, and reasonable safety. *Id.* Under *Darnell*, however, the tests collapse into an objective one under which "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate a risk that the condition imposed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk or safety. In other words 'the subjective prong' (or '*mens rea* prong' of a deliberate indifference claim is defined objectively)." *Id.* at 35.

In his complaint, plaintiff alleges that he was placed in restraints while transported, denied bathroom facilities and forced to urinate into used empty bottles, deprived of medication for high blood pressure, and on some occasions fed only twice rather than being provided three meals in a day. Dkt. No. 1 at 4-5. These allegations, which as they must at this procedural stage have been accepted as true, fail to rise to a level sufficient to sustain a due process violation under the Fourteenth Amendment.[7] *See e.g.*, *Walker v. Schriro*, 2013 WL 1234930, at *12-*13 (S.D.N.Y. Mar. 26, 2013) (finding that a two-day confinement without access to "access to food, shower, linens, running water, and a bathroom" did not amount to a constitutional deprivation); *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 269 (N.D.N.Y. 2008) (finding that an overnight deprivation of food and water did not amount to a constitutional deprivation).  Accordingly, as an alternative basis for dismissal of plaintiff's remaining claims I recommend a finding that the conditions alleged in plaintiff's complaint fail to support a cognizable due process deprivation claim.

---

[7]    Defendant has submitted extensive documents which, they claim, refute plaintiff's claims. *See* Dkt. No. 23-1 through 23-9. Those documents, however, have not been considered since defendant's motion to dismiss tests only the sufficiency of plaintiff's complaint together with any documents attached or referred to in that complaint. *See* p. 6-8, *ante*.

D.   <u>Whether to Permit Amendment</u>

Ordinarily, a court should not dismiss a complaint filed by a *pro se*

litigant without granting leave to amend at least once "when a liberal

reading of the complaint gives any indication that a valid claim might be

stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also*

Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so

requires."); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp.

986, 1003 (E.D.N.Y.1995) (permitting leave to replead where court could

"not determine that the plaintiffs would not, under any circumstances, be

able to allege a civil RICO conspiracy"). An opportunity to amend is not

required, however, where "the problem with [the plaintiff's] causes of

action is substantive" such that "better pleading will not cure it." *Cuoco v.*

*Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v.*

*Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a

plaintiff is unable to allege any fact sufficient to support its claim, a

complaint should be dismissed with prejudice."). Stated differently,

"[w]here it appears that granting leave to amend is unlikely to be

productive, . . . it is not an abuse of discretion to deny leave to amend."

*Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord,*

*Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, although somewhat skeptical, I am unable to conclude with certainty that with better pleading, plaintiff would nonetheless be unable to rectify the deficiencies noted above. Accordingly, I recommend that leave to amend be granted. If plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, plaintiff must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly

connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

IV.    <u>SUMMARY AND RECOMMENDATION</u>

While plaintiff's complaint may contain factual allegations sufficient to demonstrate that defendant PTS, although a private entity, was engaged in state action at the relevant times and is therefore subject to potential liability under 42 U.S.C. § 1983, it does not allege facts plausibly demonstrating a basis for imposing *Monell*-like liability on defendant for the acts of its employees. In addition, plaintiff's complaint fails to allege facts demonstrating the existence of a plausible substantive due process deprivation under the Fourteenth Amendment. Accordingly, I recommend that plaintiff's complaint be dismissed, and that the court not address defendant's alternative arguments concerning lack of venue or the motion to transfer the case to the Middle District of Tennessee.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendant's motion to dismiss (Dkt. No. 23) be GRANTED, and that plaintiff's remaining claims in this action against defendant Prisoner Transport Service of America, LLC, be dismissed, with leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[8]  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

---

[8]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      January 9, 2018
            Syracuse, New York

2013 WL 1164919
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Curtis BESS, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendant.

No. 11 Civ. 7604(TPG).
|
March 19, 2013.

OPINION

THOMAS P. GRIESA, District Judge.

*1 Curtis Bess, *pro se,* brings this action under 42 U.S.C. § 1983 alleging that defendants, the City of New York and Corizon Health Services, failed to provide him adequate medical care during his detention at Otis Bantum Correctional Center on Rikers Island. Bess originally sued the New York City Department of Corrections and Prison Health Services but the court subsequently substituted the City of New York as a party for NYCDOC, and Prison Health Services has subsequently changed its name to Corizon Health Services.

Defendants move to dismiss the complaint. The motion is granted.

The Complaint

Bess alleges that, on an undisclosed date, he was taken into custody by the police, presumably the New York Police Department, and placed in the backseat of a police vehicle. The police vehicle he was riding in, however, was involved in an accident with a taxi cab and, therefore, he was transferred to another vehicle which took him to the police station. Bess alleges that, throughout this process, he made several requests for medical attention, all of which were ignored.

Eventually, for reasons Bess does not explain, he became an inmate at Otis Bantum Correctional Center under the care of NYCDOC. Bess alleges that, while in prison, he

continued to seek medical care. But he alleges that he was repeatedly denied care and at one point was told "that's not our problem. You should've fixed the problem when you [were] in police custody." It appears that Bess was seen by a doctor at least once as evidenced by the "request for a second opinion" form attached to his complaint and his statement on that form that the treatment he received up to that point had not been medically appropriate.

Bess alleges that, due to the automobile accident and lack of subsequent medical care, he suffers from severe back and neck pain as well as nausea, headaches, and sleeplessness. He seeks damages of $3,000,000.

Discussion

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, (2009). In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal conclusions. *Iqbal,* 556 U.S. at 678–79. A court must also draw all reasonable inferences in the plaintiffs favor, and it may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. *ATSI Commc'ns, Inc. v. Shaar Fund. Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). A complaint filed by a *pro se* plaintiff is to be construed liberally and, therefore, interpreted to raise the strongest arguments that it suggests. *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

*2 It is well established that a municipality may not be sued under 42 U.S.C. § 1983 for acts of its employees unless a plaintiff can show that these actions were caused by an official policy or custom of the municipality. *Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658 (1978). And, in keeping with the pleading requirements imposed by *Twombly* and *Iqbal,* a plaintiff must give a factual description of such a policy, not just bald allegations that such a thing existed. *See Davis v. City of New York,* 07 Civ. 1395, 2008 WL 2511734 (S.D.N.Y. June 19, 2008).

2013 WL 1164919

Here, plaintiff brings claims against a municipality, the City of New York, and a private entity performing a municipal function, Corizon. Despite the fact that it is a private entity, Corizon enjoys the benefit of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983 suit. In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality. *See Buckner v. Toro,* 116 F.3d 450, 452 (11th Cir.1997); *Conner v. Donnelly,* 42 F.3d 220, 224 (4th Cir.1994); *Iskander v. Vill. of Forest Park,* 690 F.2d 126, 128 (7th Cir.1982); *Mercado v. City of New York,* 8 Civ. 2855, 2011 WL 6057839 at *7 n. 10 (S.D.N.Y. Dec. 5, 2011).

Thus, to bring a § 1983 action against either the City of New York or Corizon, Bess must plausibly allege that the constitutional violations he alleges were caused by official policies or customs of those entities. But he has not done so. Bess's only allegation that speaks to defendants' liability for the actions of their employees is that "NYCDOC is directly responsible for my well-being and healthcare while in their custody. They employ the services of [Corizon] and all of its staff." But this contains no allegation at all that these employees were acting pursuant to anything like an official policy. Therefore, the allegations in Bess's complaint are not adequate to support an action against the City of New York or Corizon under § 1983.

### Conclusion

Defendants' motion to dismiss is granted and the complaint is therefore dismissed.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1164919

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2511734
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gregory DAVIS, Plaintiff,
v.
CITY OF NEW YORK, New York City Police
Department, Police Officer George Lopez
Police Officer "John Doe", Defendants.

No. 07 Civ. 1395(RPP).
|
June 19, 2008.

**Attorneys and Law Firms**

Mark Lubelsky & Associates, Attn: Mark L. Lubelsky,
New York, NY, for Plaintiff.

Office of the Corporation Counsel, New York City Law
Dep't, Attn: Sabrina Melissa Tann, New York, NY, for
Defendants.

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., District Judge.

**\*1** Plaintiff Gregory Davis filed a complaint against
Defendants City of New York, New York City Police
Department ("NYPD"), Police Officer George Lopez and
Police Officer "John Doe" alleging a cause of action
under 42 U.S.C. § 1983. Defendants City of New York
and NYPD move to dismiss the complaint in its entirety
pursuant to Rule 56(c) of the Federal Rules of Civil
Procedure. For the following reasons, Defendants' motion
for summary judgment (Doc. No. 12) is granted.

BACKGROUND
On February 26, 2007, Plaintiff initiated this action by
filing the complaint with the Court. (Defs.' Rule 56.1 Stmt.
¶ 4; Pl.'s Rule 56.1 Stmt. ¶ 4.) The complaint alleges that
on or about March 16, 2004, Police Officers George Lopez
and "John Doe" used excessive force while arresting
Plaintiff near the intersection of Broadway and 136th
Street for minor drug possession, caused him physical
injury, and subsequently denied him medical treatment

in violation of Plaintiff's constitutional rights. (Compl. ¶¶
15-34; Defs.' Rule 56.1 Stmt. ¶ 2; Pl.'s Rule 56.1 Stmt.
¶ 2.) The complaint also alleges that the City of New
York failed to properly train and supervise its officers,
resulting in the deprivation of Plaintiff s constitutional
rights. (Compl. ¶¶ 65-66; Defs.' Rule 56.1 Stmt. ¶ 3; Pl.'s
Rule 56.1 Stmt. ¶ 3.

By letter dated April 25, 2007 and copied to Plaintiff's
counsel, Sabrina Tann, Esq., counsel for Defendant City
of New York, requested an adjournment of the initial
pretrial conference scheduled for the following day on
the grounds that "none of the named defendants in this
action have been served with a copy of the summons and
complaint." (Tann Decl., Ex. C; Defs.' Rule 56.1 Stmt. ¶
6.) On May 10, 2007, Plaintiff served Corporation Counsel
of the City of New York, located at 100 Church Street,
New York, New York 10007, with two copies of the
summons and complaint. (Tann Decl. ¶ 7; Defs.' Rule
56.1 Stmt. ¶ 7; Pl.'s Rule 56.1 Stmt. ¶ 7.) Each of the
two summons, dated February 26, 2007, were addressed
to "Police Officer George Lopez," "Police Officer John
Doe," "City of New York," and "The New York City
Police Department" at "100 Church Street, Fourth Floor,
New York, New York 10026." [1] (Tann Decl., Ex. D; *id.*
¶ 8; Defs.' Rule 56.1 Stmt ¶ 8; Pl.'s Rule 56.1 Stmt. f
8.) Plaintiff never filed any affidavits of service of the
summons and complaint with the Court. (Tann Decl. ¶ 11;
Defs.' Rule 56.1 Stmt. ¶ 10; Pl.'s Rule 56.1 Stmt. ¶ 10.)

On June 12, 2007, Defendants City of New York and
NYPD filed their answer to the complaint. (Tann Decl.
¶ 12; Defs.' Rule 56.1 Stmt. ¶ 11; Pl.'s Rule 56.1 Stmt.
¶ 11.) In their answer, Defendants City of New York
and NYPD stated "[u]pon information and belief, the
individual identified in the caption of the complaint as
George Lopez, has not been served with a copy of the
Summons and Complaint or requested representation
from the office of Corporation Counsel." (Tann Decl., Ex.
E; Defs.' Rule 56.1 Stmt. ¶ 12; Pl.'s Rule 56.1 Stmt. ¶ 12.)

**\*2** On September 11, 2007, at an initial conference
with both counsel present before the Court, Defendants'
counsel stated that service of process had not been effected
on the named defendant George Lopez. (Tann Decl. ¶ 13;
Defs.' Rule 56.1 Stmt. ¶ 13.) At that conference, the Court
set a briefing schedule for Defendants' proposed motion
to dismiss the complaint pursuant to Federal Rule of Civil
Procedure 12(c). (Tann Decl. ¶ 15; Defs.' Rule 56.1 Stmt.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

¶ 15; Pl's Rule 56.1 Stmt. ¶ 15.) By letter dated September 26, 2007, Defendants withdrew their request to submit the motion to dismiss, and by order dated September 26, 2007, the Court directed the parties to complete discovery by January 1, 2008 and submit a proposed Pre-Trial order by January 18, 2008. (Tann Decl., Ex. F; Defs.' Rule 56.1 Stmt. ¶¶ 16-17; Pl's Rule 56.1 Stmt. ¶¶ 16-17.)

Following the Court's September 27, 2007 Order, Plaintiff failed to seek leave from the Court for a further period in which to serve Defendant George Lopez with process. (Tann Decl. ¶ 18; Defs.' Rule 56.1 Stmt. ¶ 18.) Ms. Tann, counsel for Defendants City of New York and NYPD, has not contacted Mr. Lopez with respect to the claims asserted against him in the complaint, nor has Mr. Lopez contacted the office of Corporation Counsel to request legal representation in this matter. (Tann Decl. ¶ 19; Defs.' Rule 56.1 Stmt. ¶ 19.) Upon information and belief of Defendants, to date, George Lopez has had no notice of this action. (Tann Decl. ¶ 20; Defs.' Rule 56.1 Stmt. ¶ 20.)

On November 19, 2007, Plaintiff served the City of New York with a first demand for production of documents and first set of interrogatories. (Pl's Affirmation, Ex. C.) On December 12, 2007, Plaintiff's counsel sought a two-month stay of discovery on the grounds that counsel, despite ardent efforts, was unable to contact Plaintiff to assist him with the prosecution of this matter. (Tann Decl., Ex. G; Defs.' Rule 56.1 Stmt. ¶ 23; Pl's Rule 56.1 Stmt. ¶ 23.) By letter dated December 18, 2007, Defendants opposed Plaintiff's application for a stay and sought leave to file a motion pursuant to Federal Rule of Civil Procedure 56. (Tann Decl., Ex. H; Defs.' Rule 56.1 Stmt. ¶ 24; Pl.'s Rule 56.1 Stmt. ¶ 24.) By order dated December 20, 2007, the Court granted Plaintiff's application in part and stayed discovery until February 12, 2008. (Pl.s' Affirmation, Ex. B; Pl.s' Rule 56.1 Stmt. ¶ 25.)

Defendants City of New York and NYPD filed the instant motion for summary judgment on January 18, 2008. At the time the motion was filed, Plaintiff had not sought to depose any witnesses in this matter or identified "Police Officer John Doe." (Tann Decl. ¶¶ 21, 22; Defs.' Rule 56.1 Stmt. ¶ 21, 22; Pl.s' Rule 56.1 Stmt. ¶ 21, 22.) Nor had Defendants responded to Plaintiffs' document demands and interrogatories. (Pl.s' Rule 56.1 Stmt. ¶ 21 .)

Defendants City of New York and NYPD move for summary judgment on the grounds that the NYPD is not

a suable entity and that the complaint fails to state a claim against the City of New York for failure to properly train and supervise the defendant officers. Defendants also argue that the claims against Officers Lopez and "John Doe" should be dismissed pursuant to Federal Rule of Civil Procedure 4(m) because Plaintiff failed to properly to serve Officer Lopez within 120 days of filing this action despite having notice that his service was defective and also failed to apply for an order extending the 120-day period.

## DISCUSSION

### I. Summary Judgment Standard

**\*3**  A court may grant summary judgment only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Braham v. Clancy,* 425 F.3d 177, 181 (2d Cir.2005). Summary judgment is inappropriate if, after resolving all ambiguities and drawing all inferences against the moving party, there remains a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

### II. Plaintiff's Claim against Police Officers George Lopez and "John Doe"

Defendants move for summary judgment in favor of the individual police officers against whom Plaintiff alleges § 1983 violations on the grounds that they were never served with the summons and complaint. Defendants argue that the claim against the defendant officers should be dismissed with prejudice because Plaintiff cannot show good cause for his failure to timely serve, the statute of limitations ran on Plaintiff's claim on March 16, 2007, and Officer Lopez would be prejudiced by an extension for service at this time.

### A. Whether service was effected on the defendant officers

Federal Rule of Civil Procedure 4(e)(1) provides that service of process is effected on an individual in one of three ways: (1) pursuant to the law of the state in which the district court is located, or in which the service is effected; (2) by delivering a copy of the summons and complaint to the individual personally, or by leaving copies at the individual's "dwelling house or usual place of abode with some person of suitable age and discretion then residing therein"; or (3) by delivering a copy of the summons and complaint to an agent authorized by law to receive service of process. Under New York law, service can be made by delivering the summons "to a person of suitable age and discretion at the actual place of business ... and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business." N.Y. C.P.L.R. 308 (McKinney 2007). Under this section, " 'actual place of business' shall include any location that the defendant, through regular solicitation or advertisement, has held out as its place of business." *Id.*

Plaintiff argues that he complied with New York law by serving Police Officers George Lopez and "John Doe" at the office of Corporation Counsel. Under C.P.L.R. § 311, Corporation Counsel is an authorized agent permitted to accept service on behalf of the City of New York. N.Y. C.P.L.R. § 311. Plaintiff contends because the police officers are employees of the City of New York, service on the City is proper. Section 311 of the C.P.L.R., however, pertains to "personal service upon a corporation or governmental subdivision" and does not authorize the City of New York to accept service on behalf of individuals. See *id.* Nor is the office of Corporation Counsel the "actual place of business" for Officer Lopez or the unnamed officer "John Doe," under C.P.L.R. § 308. The police precinct to which they report and where they conduct their business is their actual place of business. Moreover, Plaintiff made no effort to serve the officers personally or at their actual residences. Under these circumstances, service on the City of New York constitutes improper service on the defendant police officers. *See Moultry v. City of Poughkeepsie,* 154 F.Supp.2d 809, 811 (S.D.N.Y.2001) (holding that service on the police officers who allegedly violated plaintiff's civil rights was not proper where the summons and complaint were served on an official in a city office never frequented by the officers, and no effort was made to serve them personally or leave papers at their residences).

**B. Whether an extension for service should be granted**
**\*4** Under Rule 4(m) of the Federal Rules of Civil Procedure, a plaintiff must properly serve the defendants within 120 days of filing of the complaint. Fed.R.Civ.P. 4(m). If a plaintiff fails to timely serve, the district court must either "dismiss the action without prejudice as to that defendant or direct that service is effected within a specified time." *Id.* The district court is required to grant an appropriate extension of time to effect service if the plaintiff shows good cause for failure to serve and has discretion to grant such an extension even in the absence of good cause. *Id.; Zapata v. City of New York,* 502 F.3d 192, 197 (2d Cir.2007) (holding that under Rule 4(m) "district courts have discretion to grant extensions even in the absence of good cause" but are not required to do so). The policy behind Rule 4(m) and the statute of limitations is to promote the "diligent prosecution of civil cases." *Nat'l Union Fire Ins. Co. v. Sun,* No. 93 Civ. 7170, 1994 U.S. Dist. LEXIS 11934, at \*7 (S.D.N.Y. Aug. 18, 1994); *accord Gordon v. Hunt,* 116 F.R.D. 313, 320 (S.D.N.Y.1987) (noting that the policy behind Rule 4(m) and the statute of limitations is "to encourage prompt movement of civil actions in the federal courts").

In this case, Plaintiff cannot show good cause for failure to serve the defendant police officers within the 120-day period. Plaintiff and Plaintiff's counsel were put on notice on June 8, 2007, when Defendants filed their answer, and again on September 11, 2007, at the initial pretrial conference before the Court, that the defendant police officers had not been served. (Tann Decl. ¶¶ 12, 13.) Despite this notice, Plaintiff took no steps to serve Officer Lopez, request an extension of the 120-day period (Tann Decl. ¶ 18), or request assistance in locating the officers. An attorney's inadvertence, neglect, or ignorance of the rules does not constitute good cause for untimely service. *McKibben v. Credit Lyonnais,* No. 98 Civ. 3358, 1999 U.S. Dist. 12310, at \*9 (S.D.N.Y. Aug. 9, 1999) (citing *Klein v. Williams,* 144 F.R.D. 16, 19-20 (E.D.N.Y.1992)). Under the circumstances in this case, Plaintiff fails to establish good cause for untimely service. *See Bogle-Assegai v. Connecticut,* 470 F.3d 498, 508 (2d Cir.2006) (holding that the plaintiff failed to establish good cause where she knew that defendants thought service was improper and made no effort to remedy this defect or ask the court to extend her time to effect service).

Nor is this a case where an extension should be granted in the Court's discretion despite the absence of good cause. In considering whether or not to grant an extension absent a showing of good cause, the Court must weigh the impact a dismissal or extension would have on the parties. *Zapata, 502 F.3d at 197*. Dismissing the complaint without prejudice in this case would have serious consequences for Plaintiff because the statute of limitations would bar him from re-filing. On the other hand, these consequences are attributable in large part to Plaintiff and his counsel's neglect and failure to prosecute. Plaintiff's counsel filed the complaint on February 16, 2007, only three weeks shy of the expiration of the three-year statute of limitations on his § 1983 claims. Even after being notified that the defendant officers had not been served, Plaintiff's counsel failed to make any further attempts to effect service or seek an extension of the 120-day period. Importantly, Plaintiff's counsel did not inform the Court that he had lost contact with Plaintiff until his December 12, 2007 letter requesting a stay of discovery, which the Court had ordered completed by January 1, 2008. In his letter, Plaintiff's counsel stated that he had "recently attempted to contact Mr. Davis on numerous occasions in order to respond to defendant's [discovery] demands" but had been unable to reach him by either phone or mail. (PL's Affirmation, Ex. B.) Although the Court granted counsel's request for a 60-day stay of discovery to "provide plaintiff the needed time to effectuate contact" (*id.*), counsel has not informed the Court that any contact has been restored. Furthermore, more than four years have passed since the alleged incident took place. Officer Lopez never received notice of this litigation, as he was never served and no depositions were ever taken to make him aware of the case against him. Were Plaintiff granted leave to effect service at this point, Officer Lopez would suffer considerable prejudice in defending against the case, as the facts would have certainly faded from memory. Under these circumstances, the Court declines to exercise its discretion to grant an extension for service under *Zapata*.

### III. Plaintiff's Claim against the City of New York

**\*5** Plaintiff alleges that the City of New York failed to properly train and supervise the police officers who deprived Plaintiff of his constitutional rights. (Compl.¶¶ 65-66.) Defendants seek to dismiss Plaintiff's claim against the City of New York on the grounds that the complaint fails adequately to state a claim for municipal liability and that, even if the claim is adequately plead, Plaintiff fails to proffer any evidentiary support for the claim.

A municipality may not be held liable under 42 U.S.C. § 1983 for the conduct of its employees based on a theory of respondeat superior. *Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).* Municipal liability attaches only if the plaintiff can show that a municipal policy or custom caused the deprivation of his constitutional rights. *Id.* at 690-91. Where a plaintiff alleges municipal liability based on a failure to train and supervise, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and therefore amounts to an actionable city "policy or custom." *City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).*

In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)*, the Supreme Court held that district courts may not apply a "heightened pleading standard" beyond what is generally required by Federal Rule of Civil Procedure 8(a) to Section 1983 complaints alleging municipal liability. *Id.* at 164. *Leatherman* appears to reject the pleading standard applied by the Second Circuit in *Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993)*, which held that the allegation of a single incident involving only actors below the policymaking level does not suffice to state a claim of municipal liability under Section 1983. *See Simpkins v. Bellevue Hosp., 832 F.Supp. 69, 73 n. 3 (S.D.N.Y.1993); see also Cooper v. Metro. Transp. Auth.,* 2006 U.S. Dist. LEXIS 47970, at \*9-10 (S.D.N.Y. July 13, 2006). Since *Leatherman*. courts in this district have denied motions to dismiss complaints alleging that an individual officer's conduct conformed to official policy or custom or that an individual officer was empowered to make policy decisions on behalf of the municipality. *See, e.g., Cooper,* 2006 U.S. Dist. LEXIS 47970, at \*9-10 (holding that "[u]nder the *Leatherman* rule ... Plaintiff's bare allegations that Harrington was a "policy maker" and that both Harrington and Paul were empowered to make policy decisions on behalf of Metro-North/MTA are sufficient" to withstand a motion to dismiss); *Lucas v. New York City,* 1995 U.S. Dist. LEXIS 17017, at \*7, 1995 WL 675477 (S.D.N.Y. Nov. 14, 1995) (denying the motion to dismiss plaintiff's § 1983 claim under *Leatherman* to the extent plaintiff alleges he was arrested pursuant to the long established policy of racially selective law enforcement attributable to the

City). Plaintiff, represented by counsel in this case, fails adequately to plead a claim of municipal liability against the City of New York. Even the usual pleading standard of Rule 8(a) still requires more than conclusory allegations. *Bell Atlantic v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (stating that Rule 8(a) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (stating that on a motion to dismiss, a district court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Plaintiff makes only the conclusory allegation that the City of New York "failed to properly train the person(s) who deprived [Plaintiff] of his civil rights" and "failed to properly supervise the person(s) who deprived [Plaintiff] of his civil rights ."

**\*6** Such conclusory allegations that a municipality failed to train and supervise its employees is insufficient to state a *Monell* claim. *See McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 705 (S.D.N.Y.1999) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation."); *Oparaji v. City of New York,* 1997 U.S. Dist. LEXIS 23686, *10, 1997 WL 139160 (E.D.N.Y. Mar. 21, 1997) (dismissing a *Monell* claim for failure to state a claim where plaintiff alleged only that the City had a policy, practice or custom of failing to adequately screen, hire and train police officers which resulted in the violation of his constitutional rights).

Plaintiff argues that summary judgment is inappropriate at this stage because no discovery has taken place. The Court granted Plaintiff's request for a stay of discovery from December 20, 2007 to February 12, 2008, and prior to the stay, Defendants had not responded to Plaintiff's document demands and interrogatories served on November 19, 2007.

Generally, before summary judgment may be granted, the nonmoving party "must have had the opportunity to discover information that is essential to his opposition to the motion ... [and] only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veteran Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (internal quotations omitted). If, however, the allegations of a plaintiff's Section 1983 claim are

insufficient as a matter of law or could not be aided by discovery, a district court may grant summary judgment even without discovery. *M.B. v. Reish,* 119 F.3d 230, 232 (2d Cir.1997) (concluding that the district court's denial of discovery was within its discretion because plaintiff's claims were insufficient as a matter of law and plaintiff failed to present a credible basis to suggest discovery would produce favorable evidence). In rejecting the heightened pleading standard for Section 1983 claims in *Leatherman,* the Supreme Court noted that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman,* 507 U.S. at 168-169.

In this case, Plaintiff has not made any showing that further discovery is likely to lead to evidence supporting Plaintiff's claim against the City of New York. Moreover, because Plaintiff's complaint fails to state a claim of municipal liability upon which relief may be granted, Plaintiff's claim against the City of New York is insufficient as matter of law. On these grounds, Defendant City of New York's motion for summary judgment is granted.

### IV. Plaintiff's Claim against NYPD

It is well settled that NYPD, as an agency of the City of New York, lacks independent legal existence and is therefore not a suable entity. *Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007); *see also* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."). In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff concedes that NYPD is a non-suable entity and discontinues his claim against NYPD. Accordingly, the claim against NYPD is dismissed.

### CONCLUSION
**\*7 For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 12) is granted. The claims against Defendant Police Officers George Lopez and "John Doe" are dismissed for non-service, the claims against Defendant City of New York for failure to state a claim and insufficiency as a matter of law, and the claims against NYPD because it is not a suable entity.**

2008 WL 2511734

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2511734

Footnotes

1    Plaintiff acknowledges that the zip code was written as "10026" in error and that the correct zip code is 10007. (Tann Decl. at 2 n. 1.)

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1390678
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Shone BROWN, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

13-cv-06912
|
Signed 04/17/2017

**Attorneys and Law Firms**

Ugochukwu Uzoh, UGO Uzoh, P.C., Brooklyn, NY, for
Plaintiff.

Ashley Rebecca Garman, New York City Law
Department, New York, NY, for Defendants.

## OPINION

THOMAS P. GRIESA, United States District Judge:

Plaintiff Shone Brown brings this action pursuant to 42
U.S.C. § 1983 against the City of New York (the "City")
and eleven individuals employed by the New York City
Department of Correction (the "DOC").[1] Brown alleges
that Defendants violated his constitutional rights while
he was a pretrial detainee at Rikers Island. Brown also
brings claims against Defendants under New York State
law. Defendants move to partially dismiss the complaint[2]
pursuant to Federal Rule of Civil Procedure 12(b)(6). For
the reasons stated below, Defendants' motion is granted
in part and denied in part.

## BACKGROUND

### I. The Complaint[3]

Brown was arrested in April 2012 following a domestic
dispute with his ex-wife. Compl. ¶ 22. After his
arraignment, Brown was held as a pretrial detainee at
the Otis Bantum Correctional Center, a DOC facility on
Rikers Island. Id. ¶ 23-24. On July 7, 2012, the DOC

moved Brown to a different facility on Rikers Island: the
George Motchan Detention Center ("GMDC"). Id. ¶ 24.

### A. Attack on Brown in GMDC's Dayroom

At approximately 4:30 PM on July 15, 2012, Brown
entered a dayroom at GMDC and sat down in a chair. Id.
¶¶ 46-47. After Brown sat down, four inmates who were
members of the Bloods gang approached him and told him
to get up because "the chair belonged to Bloods." Id. ¶ 48.
Brown did not get up and instead asked why he could not
sit in the chair. Id. ¶ 49. The four inmates then attacked
him. Id. The attack lasted for about twenty minutes and
rendered Brown unconscious. Id. ¶¶ 50-51.

Correction Officer ("CO") Regina James and CO
Kenyonda Grinkley witnessed the attack but did not
intervene. Id. ¶¶ 52, 54. They "merely stood idly by
and watched." Id. ¶ 54. After Brown had been severely
wounded, CO James and CO Grinkley called for aid.
Id. Brown's attackers then left the area. Id. ¶ 57. Before
assistance arrived, Brown regained consciousness and
asked CO James why she did not protect him. Id. ¶ 55.

A group of additional DOC personnel, known as a "probe
team," responded to the dayroom. Id. ¶ 56. The probe
team was led by Captain Ronald Rudolph. Id. ¶ 16. Brown
told Captain Rudolph that he had been attacked by four
members of the Bloods. Id. ¶ 58. Brown also told Captain
Rudolph that he wanted to press charges against the four
Bloods members, but Brown did not know their names
because he had just been transferred to GMDC. Id. ¶
60-61. Brown asked Captain Rudolph and CO James to
help him identify the four inmates who attacked him. Id. ¶
61. Brown also complained to Captain Rudolph that CO
James saw the attack but did not intervene.[4] Id. ¶ 59.

 **\*2** DOC personnel took Brown to GMDC's medical
clinic. The doctor who saw Brown at the clinic noted
that Brown had visible injuries to his back, lips, jaw, and
ankle. Id. ¶ 72. At approximately 6:15 PM, Brown was
transported from GMDC to Elmhurst Hospital Center,
and later to Bellevue Hospital, for additional treatment.
Id. ¶¶ 73, 132-33. Brown was diagnosed with a broken jaw
and a fractured ankle. Id. ¶¶ 50, 134. Doctors performed
surgery on Brown and implanted a plate, wires, and screws
into his ankle. Id. ¶¶ 142-143. Brown was confined to a
wheelchair for several months. Id. ¶ 144.

Captain Edwin Skepple was a supervisor on duty at the time of the incident. *Id.* ¶¶ 15, 105. Assistant Deputy Warden Raymond Beltz was the commanding officer on duty. *Id.* ¶¶ 14, 105. Assistant Deputy Warden Beltz tasked Captain Skepple with investigating the incident. *Id.* ¶ 105. Brown contends, however, that Captain Skepple did not conduct an investigation. *Id.* ¶ 106.

### B. Post-Attack Events and Incident Reports

After the incident, CO James prepared and signed a handwritten report, dated July 15, 2012, detailing what she had observed. *Id.* ¶ 62. In the report, CO James wrote that she saw Brown and another inmate, "D.T.," engaged in a fist fight. *Id.* CO James said she ordered Brown and D.T. to stop fighting but they ignored her commands. *Id.* ¶ 63. According to the report, CO James then warned Brown and D.T. that she would use pepper spray if they continued fighting. *Id.* ¶ 64. CO James wrote that the fight then ended, and both inmates were escorted out of the area without further incident. *Id.* ¶¶ 64, 67. CO James also noted in her report that CO Grinkley witnessed the fight. *Id.* ¶ 65. Brown claims that CO James lied in this report to cover up the attack and to retaliate against him for his complaint about her to Captain Rudolph. *Id.* ¶ 62.

A similar report about the incident, also dated July 15, 2012, bears CO Grinkley's signature. *Id.* ¶ 69-70. Brown says this report, despite purporting to be authored by CO Grinkley, was really prepared by CO James as well. *Id.* ¶ 69.

On July 20, 2012, CO Jose Freire met with Brown to discuss the incident. *Id.* ¶ 166. At this meeting, Brown prepared a handwritten complaint stating that he was attacked by four members of the Bloods while CO James stood by and watched. *Id.* ¶ 79. Brown also wrote that he wanted to press charges against CO James and the gang members. *Id.* CO Freire told Brown that he would show Brown a photo array of GMDC inmates to help Brown identify his attackers. *Id.* ¶ 166. CO Freire also said he would investigate Brown's complaint and assist Brown in pressing charges against CO James and the gang members. *Id.* ¶ 167.

Brown speculates that, after this exchange, CO Freire met with CO James, CO Grinkley, and Captain Skepple

(the supervisor) to discuss the situation. *Id.* ¶ 168. Brown claims that, during this discussion, CO James, CO Grinkley, and Captain Skepple told CO Freire that they were working with other DOC personnel to cover up the truth about the incident. *Id.* ¶ 169. Specifically, Brown contends that CO James, CO Grinkley, and Captain Skepple informed CO Freire that Captain Rudolph (the probe team leader), Assistant Deputy Warden Beltz (the commanding officer), Deputy Warden Daniel O'Connell, and Deputy Warden Felipe Laboriel [5] were all part of the conspiracy to cover up the incident. *Id.* According to Brown, once CO Freire learned that these seven DOC personnel were working together to hide the truth, CO Freire agreed to join the effort to conceal the actual facts of the incident. *Id.* ¶ 170. Thus, after the discussion, CO Freire refused to meet with Brown again, did not provide Brown with the promised photo array, and did not assist Brown in pressing charges against CO James and the four gang members. *Id.* ¶ 171.

**\*3** On July 23, 2012, Captain Rudolph filed a report about the incident. *Id.* ¶ 77. Captain Rudolph wrote that he responded to the dayroom with the probe team on July 15, and Brown told him at the scene that he was involved in a fight with one other inmate. *Id.* ¶ 78. Brown contends that Captain Rudolph submitted this false report as part of his collusion with CO James, CO Grinkley, Captain Skepple, and other DOC personnel. *Id.* ¶¶ 77, 79.

On July 30, 2012, Captain Skepple submitted a report detailing the findings of his investigation.[6] *Id.* ¶ 107. In his report, Captain Skepple wrote that he attempted to question Brown on July 15 at GMDC's medical clinic but Brown refused to provide a statement or any information as to how he got hurt. *Id.* ¶ 108. Captain Skepple also noted that he told Brown that fighting was not tolerated in DOC facilities, and that Brown would be "infracted" for violating DOC rules. *Id.* ¶ 109. Captain Skepple wrote that he tried to give Brown a formal notice of the infraction during the morning of July 20, 2012—i.e., just before CO Freire went to meet with Brown—but Brown refused to sign and take a copy. *Id.* ¶¶ 110-11. Captain Skepple concluded in his report that no other inmates besides Brown and D.T. were involved in the altercation. *Id.* ¶¶ 113, 118. Captain Skepple speculated that Brown lied in his statement to CO Freire on July 20 because Brown had just been given notice of the infraction and wanted to make himself look like a victim to avoid discipline. *Id.* ¶¶ 115-17. Moreover, Captain Skepple praised CO James

Brown v. City of New York, Slip Copy (2017)
Case 9:17-cv-00564-TJM-DEP   Document 33   Filed 01/09/18   Page 32 of 75
2017 WL 1390678

for her quick response to the situation. *Id.* ¶ 120. Brown claims that he never spoke to Captain Skepple and that this report, like the others, is inaccurate. *Id.* ¶¶ 107, 110.

Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz reviewed all of the reports, agreed with their findings, and "signed off" on them. *Id.* ¶ 150. Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz also praised their staff for responding quickly to the incident, exonerated CO James of any wrongdoing, and summarily dismissed Brown's complaint against CO James and the gang members. *Id.* ¶ 151. As the commanding officer, Assistant Deputy Warden Beltz submitted a final report about the incident. *Id.* ¶ 152. Beltz wrote that Brown and D.T. were "horse playing" when the situation escalated and turned into a fist fight. *Id.* ¶ 154. Brown contends that Beltz's report contains numerous lies and was fabricated to cover up the incident.

Brown supports his allegation that Defendants' fist-fight theory is implausible by highlighting D.T.'s physical traits and medical records. D.T. is 5 feet, 7 inches tall and weighs 140 pounds. *Id.* ¶ 140. Brown, on the other hand, is 5 feet, 9 inches tall and weighs 180 pounds. *Id.* ¶ 139. Like Brown, D.T. was seen by a doctor at GMDC's clinic after the incident. *Id.* ¶ 135. But unlike Brown, D.T. did not sustain any visible injuries and did not need treatment. *Id.* ¶¶ 135-36. Brown says it is impossible that D.T., who weighs less than Brown, inflicted such severe injuries on Brown without sustaining any injuries of his own. *Id.* ¶ 146.

On September 18, 2012, Brown met with Captain Rudolph to complete an application for protective custody. *Id.* ¶ 81. Brown wrote that he was attacked by four members of the Bloods gang, and that he was worried the Bloods would target him again. *Id.* ¶ 84. Captain Rudolph signed Brown's application as a witness. *Id.* ¶ 85. Captain Rudolph wrote in his own separate form, though, that Brown was involved in an altercation with just one other inmate who is a known member of the Bloods. *Id.* ¶¶ 86-87.

**\*4** The DOC did not hold a hearing to adjudicate the merits of the misbehavior report filed against Brown. *Id.* ¶¶ 157, 159, 163. The infraction remained in Brown's official inmate file. *Id.* ¶¶ 161-62. Defendants relied on the misbehavior report to maintain Brown's custody level at a classification that deprived him of several

benefits available to inmates with a lower custody level classification. *Id.* ¶ 164.

### C. Screening for Gang Membership

Brown claims that D.T. did not belong in GMDC's general population. Brown says CO Tietjen, [7] who processed D.T.'s inmate classification, failed to screen D.T. for gang membership. *Id.* ¶ 187. Further, Brown alleges that Warden Brian Suprenant, the individual responsible for approving D.T.'s initial placement, also improperly reviewed D.T.'s criminal history and missed D.T.'s gang membership. *Id.* ¶¶ 188-89. According to Brown, had CO Tietjen and Warden Suprenant properly evaluated D.T., then D.T. would have been placed in a special housing area away from the general population. *Id.* ¶¶ 190-92.

### D. Allegations of Violence and Corruption at GMDC

Brown further alleges that GMDC is known for inmate assaults. Brown says that DOC Commissioner Joseph Ponte and other DOC officials are aware of gang-related violence at GMDC but do not take corrective action. *Id.* ¶¶ 35-44, 197-98. Moreover, Brown claims that correction officers regularly recruit inmates who are gang members to help control the general prison population. *Id.* ¶¶ 27-28, 45. Brown contends that correction officers give these gang members exclusive use of common areas, including dayrooms and chairs, and allow gang members to attack other inmates who attempt to use these areas. *Id.* ¶¶ 32-34. According to Brown, a few days before he was attacked, another inmate at GMDC was attacked by the Bloods in a similar manner. *Id.* ¶ 193.

### II. Procedural History

Brown brought this lawsuit on September 30, 2013. Defendants answered the original complaint and, on April 16, 2015, moved for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Brown responded on June 2, 2015 by moving for leave to amend his complaint. The court granted Brown's motion for leave to file an amended complaint on November 13, 2015. ECF No. 49. In light of that decision, the court denied Defendants' motion for partial judgment on the pleadings.

Brown filed his amended complaint on November 17, 2015 and listed the following parties as defendants: the City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO James, CO Grinkley, CO Tietjen, and CO Freire. Each of the Individual Defendants is named in his or her official capacity and individual capacity. Six of these defendants—Ponte, Suprenant, Laboriel, O'Connell, Rudolph, and Tietjen were not listed in the original complaint. On the other hand, some defendants listed in the original complaint were not named in the amended complaint, including former DOC Commissioner Dora Schriro and numerous "John Doe" and "Jane Doe" defendants.

In his amended complaint, Brown brings various claims against Defendants through eight causes of action. The first four causes of action arise under 42 U.S.C. § 1983 and allege as follows:

**\*5** (1) Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and CO Tietjen engaged in conduct that "amounted to deliberate indifference to a serious threat to the health or safety, cruel and inhuman treatment, cruel and unusual punishment and denial of due process rights." *Id.* ¶¶ 204-07.

(2) Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and Captain Rudolph engaged in conduct that "amounted to first amendment retaliation and denial of due process rights." *Id.* ¶¶ 208-11.

(3) Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, Captain Rudolph, and CO Freire engaged in conduct that "amounted to conspiracy, denial of equal protection of the laws and denial of due process rights." *Id.* ¶¶ 212-15.

(4) The City is liable for having an unconstitutional municipal policy or custom, and for failing to properly train, supervise, or discipline its correction officers. *Id.* ¶¶ 216-45.

The remaining four causes of action arise under state law and make the following allegations:

(5) All defendants violated Brown's rights under various provisions of the New York State Constitution. *Id.* ¶¶ 246-50.

(6) All defendants are liable for "other New York torts," including "negligence, assault and battery, and breach of special duty or relationship." *Id.* ¶¶ 251-53.

(7) Unspecified defendants are liable for intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* ¶¶ 254-57.

(8) The City negligently hired and retained DOC employees. *Id.* ¶¶ 258-62.

On March 16, 2016, all defendants except for CO James and CO Grinkley moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b) (6). Specifically, the City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire seek dismissal of all Brown's claims against them.

## DISCUSSION

### I. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### II. Claims Against the Individual Defendants in their Official Capacities

The court notes that Brown has sued the Individual Defendants in both their official and individual capacities. Compl. ¶¶ 10-20. Brown's claims against the Individual

2017 WL 1390678

Defendants in their official capacities are duplicative of his claims against the City because "a suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." *McMillian v. Monroe Cty.,* 520 U.S. 781, 785 n.2 (1997) (internal quotation marks and citations omitted). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *see also Davis v. Stratton,* 360 Fed.Appx. 182, 183 (2d Cir. 2010) ("[I]n a suit against a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit." (internal quotation marks and citation omitted)). "Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Phillips v. Cty. of Orange,* 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012). Thus, Brown's claims against the Individual Defendants in their official capacities are dismissed.

### III. Section 1983 Claims

**\*6** As outlined above, Brown asserts four causes of action against Defendants pursuant to 42 U.S.C. § 1983. "Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Id.* (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)). The City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire (i.e., all defendants except for CO James and CO Grinkley) move to dismiss Brown's § 1983 claims.

#### A. Timeliness

As a preliminary matter, the six individuals added as defendants in the amended complaint—Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO

Tietjen contend that all of Brown's claims against them are time-barred. The statute of limitations for claims brought pursuant to § 1983 is determined by state law. *Owens v. Okure,* 488 U.S. 235, 249-51 (1989). In New York State, the statute of limitations for personal injury actions under § 1983 is three years. *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir. 2009). The incident that is the subject of this lawsuit occurred on July 15, 2012. Brown filed his original complaint on September 30, 2013—well within the limitations period. But the original complaint did not name Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen as defendants. On June 2, 2015, Brown moved to amend his complaint to add these six individuals. The court granted Brown's motion to amend on November 13, 2015, and Brown promptly filed his amended complaint on November 17, 2015. [8] Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen argue that Brown's § 1983 claims against them are time-barred because the amended complaint was filed more than three years after the date of the incident.

"When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *Nw. Nat'l Ins. Co. v. Alberts,* 769 F. Supp. 498, 510 (S.D.N.Y. 1991). Here, Brown filed his motion to amend on June 2, 2015, which was within the three-year limitations period that began to run on July 15, 2012. The fact that the amended complaint was not actually filed until November 17, 2015 is irrelevant. Brown's § 1983 claims against the six new defendants in the amended complaint are, therefore, timely.

Having determined that all of the § 1983 claims in Brown's amended complaint are timely, the court turns to their merits. The court first considers Brown's claims against the Individual Defendants, followed by his claims against the City.

#### B. Claims Against the Individual Defendants

##### 1. Personal Involvement

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citation omitted). Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire argue that Brown cannot state claims against them under § 1983 because they were not personally involved in any violation of his constitutional rights. The court will address the personal involvement of each of these defendants in turn. Before examining the specific allegations about each defendant, though, the court notes that Brown alleges generally that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Freire were "were working in cahoots ... to cover up the actual facts of the incident." Compl. ¶¶ 169. This broad assertion does not establish their personal involvement.

**\*7** "To state a legal truism, just because a litigant posits the existence of a conspiracy does not make it plausible." *McIntosh v. United States,* No. 14-cv-7889, 2016 WL 1274585, at \*15 (S.D.N.Y. Mar. 31, 2016). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983). Thus, Brown's assertion that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Freire were part of a conspiracy is insufficient to state a claim under § 1983 because it is conclusory, vague, and unsupported by specific factual allegations.

Having disposed of Brown's vague allegations about a conspiracy, the court turns to his specific allegations about each of the Individual Defendants seeking dismissal.

### a. Commissioner Ponte

Ponte became DOC Commissioner in April 2014—i.e., nearly two years after the incident. Accordingly, Commissioner Ponte could not conceivably have had any personal involvement in the constitutional violations Brown claims to have suffered in July 2012. Brown's §

1983 claims against Commissioner Ponte are therefore dismissed.

### b. Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple

Brown contends that he has "adequately pleaded supervisory liability" against Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple. Pl.'s Br. 23. Brown cannot, however, state § 1983 claims against these defendants merely because they were supervisors at GMDC. *See Hernandez v. Keane,* 341 F.3d 137, 144-45 (2d Cir. 2003) (noting that a supervisory official cannot be held liable under § 1983 simply because he had a position of authority). Instead, to establish their liability, Brown must show that they were personally involved in the allegedly unlawful conduct. *See id.* Proof of "linkage in the prison chain of command" is insufficient. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985).[9]

**\*8** Brown alleges that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple (1) allowed the Bloods to control aspects of GMDC, (2) authored or "signed off" on false reports, and (3) failed to hold a hearing to adjudicate the misbehavior reports. Compl. ¶¶ 32, 75, 150, 157. Brown's first allegation about these defendants—that they created or acquiesced in an unconstitutional policy by allowing the Bloods to control GMDC's common areas—is insufficient to establish personal involvement. "[T]o hold supervisors liable for creating a custom or policy fostering a constitutional violation, courts in this Circuit have required that plaintiffs plead more than conclusory allegations of the existence of the custom or policy." *Lindsey v. Butler,* 43 F. Supp. 3d 317, 330 (S.D.N.Y. 2014); *see also Burgis v. Dep't of Sanitation City of New York,* No. 13-cv-1011, 2014 WL 1303447, at \*6 (S.D.N.Y. Mar. 31, 2014) ("[I]ncluding boilerplate language alleging the existence of a policy, without factual allegations to support it, is not enough at the pleading stage."). "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013).

Brown v. City of New York, Slip Copy (2017)
Case 9:17-cv-00564-TJM-DEP    Document 33    Filed 01/09/18    Page 36 of 75
2017 WL 1390678

Brown contends that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple gave gang members special privileges and responsibilities at GMDC. But Brown has not pled any specific facts that, if accepted as true, would establish that these defendants created this policy or allowed it to continue under their watch. For example, Brown does not allege that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple instructed specific correction officers to behave this way, nor does Brown claim that Laboriel, O'Connell, Beltz, and Skepple learned of and ignored specific instances of correction officers condoning attacks by the Bloods. The complaint's conclusory statements that these defendants' created an unconstitutional policy are thus insufficient to demonstrate their personal involvement in this case.

Brown's allegation that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple failed to arrange a disciplinary hearing is also insufficient to establish their personal involvement. Although a prisoner has "a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report," *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997), the complaint here does not contain any specific description of the liberty interest that Brown allegedly lost. In fact, all Brown says is that he was deprived of "several benefits available to an inmate with lower custody level classification." *See* Compl. ¶ 164. This vague assertion does not establish a constitutional violation. Moreover, there is no indication that these defendants were even responsible for scheduling disciplinary hearings at GMDC. Thus, Brown's claim that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple failed to arrange a disciplinary hearing is insufficient to establish their personal involvement in a constitutional violation.

Brown's allegations about the false reports, though, are sufficient to establish the personal involvement of Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple. Brown contends that Assistant Deputy Warden Beltz and Captain Skepple authored false reports, and that Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz "signed off" on false reports prepared by others. Compl. ¶¶ 75, 150. Defendants

cite the Second Circuit's decision in *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) for the proposition that "the creation of an inaccurate report alone" does not constitute a constitutional violation. Defs. Br. 15. Here, however, Brown alleges not only that the incident reports were inaccurate, but also that the Individual Defendants who authored and reviewed them did so to retaliate against him for his complaint about CO James. Although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," the creation of a false report can infringe on an inmate's constitutional rights when it is used to retaliate against him for exercising a constitutional right. *Boddie,* 105 F.3d at 862. Since the complaint here plausibly suggests that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple had a retaliatory motive, the court cannot dismiss Brown's § 1983 claims against them for lack of personal involvement. *Cf. Heyliger v. Gebler*, No. 06-cv-6220L, 2010 WL 7746201, at *2 (W.D.N.Y. July 30, 2010) (dismissing a § 1983 claim against a correction officer that was premised on the officer filing a false report because there was "no suggestion in the complaint that [the defendant] acted out of any retaliatory motive").

**\*9** To summarize, at this stage in the litigation, Brown's allegation that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple had a retaliatory motive in drafting and approving false reports is sufficient to establish their personal involvement in a constitutional violation. Brown's other allegations about these defendants, though, are insufficient to show personal involvement.

### c. Captain Rudolph

Brown alleges that Captain Rudolph was personally involved in violating his constitutional rights in two ways. First, Brown contends that Captain Rudolph filed a false report to cover up the attack and to retaliate against him. Compl. ¶¶ 75, 95. Second, Brown alleges that Captain Rudolph lied on the protective custody application. *Id.* ¶¶ 86-87.

As discussed above, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie,* 105 F.3d at 862. "There must be more, such as retaliation against the prisoner

for exercising a constitutional right." *Id.* Here, Brown claims that Rudolph lied in the incident report and on the protective custody application to retaliate against him for complaining about CO James. At this point in the litigation, these allegations are sufficient to establish Captain Rudolph's personal involvement in a violation of Brown's constitutional rights.

### d. CO Freire

Brown contends that CO Freire violated his constitutional rights by failing to investigate the incident. Brown alleges that CO Freire originally promised to provide him with a photo array to help identify the attackers and press charges against them, but decided not to after speaking with other DOC personnel and agreeing "to work in cahoots" with them. There is, however, no constitutional right to an investigation by government officials. *See Hayes v. Cty. of Sullivan,* 853 F. Supp. 2d 400, 433 (S.D.N.Y. 2012); *Carrasquillo v. City of New York,* 324 F. Supp. 2d 428, 438 (S.D.N.Y. 2004). "Furthermore, a victim of allegedly criminal conduct is not entitled to a criminal investigation or the prosecution of the alleged perpetrator of the crime." *Johnson v. Ruiz,* No. 3:11-cv-542, 2012 WL 90159, at *4 (D. Conn. Jan. 10, 2012). Accordingly, Brown cannot establish CO Freire's personal involvement in any violation of his constitutional rights by alleging that CO Freire failed to properly investigate Brown's complaint.

Brown makes a related argument that, because CO Freire did not uncover the identities of the Bloods members, Brown has been deprived of his opportunity to sue them, which he says is a violation of his constitutional rights. To support his claim, Brown cites the Supreme Court's decision in *Bounds v. Smith,* 430 U.S. 817 (1977), and the Second Circuit's decision in *Ayers v. Ryan,* 152 F.3d 77 (2d Cir. 1998). These cases, though, do not support Brown's claims.

In *Bounds,* the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828. Brown does not allege that he was hindered from accessing legal materials or lawyers, so *Bounds* is irrelevant.

In *Ayers,* the Second Circuit held that a prison official violated an inmate's due process rights by not following through on a promise to assist the inmate in preparing his defense for a disciplinary hearing. 152 F.3d at 80-81. *Ayers* is distinguishable because Brown does not allege that CO Freire promised to help with a disciplinary hearing, but rather that CO Freire promised to act as Brown's personal investigator for a potential civil lawsuit or criminal action. Even assuming CO Freire made this promise, it would be insufficient to make him personally involved in any violation of Brown's constitutional rights.

**\*10** Brown, therefore, has not pled facts sufficient to establish CO Freire's personal involvement in any violation of his constitutional rights. The § 1983 claims against CO Freire are dismissed.

### e. Warden Suprenant and CO Tietjen

Brown says that Warden Suprenant and CO Tietjen caused D.T. to be improperly placed in the general prison population, which jeopardized Brown's health and safety. This allegation plausibly suggests that Warden Suprenant and CO Tietjen were personally involved in a violation of Brown's rights under the Fourteenth Amendment. Whether their conduct actually amounted to a constitutional violation is discussed below. The court cannot, however, dismiss the complaint against them for lack of personal involvement.

### f. Summary

Having determined that Brown has alleged facts sufficient to support the personal involvement of Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Tietjen, the court will now address the substance of Brown's § 1983 claims against them.

### 2. Deliberate Indifference

In his first cause of action pursuant to § 1983, Brown alleges, among other things, that Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell,

Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen engaged in conduct that amounted to deliberate indifference to his health or safety. Brown's deliberate indifference claims arise under the Due Process Clause of the Fourteenth Amendment because he was a pretrial detainee at the time of the incident. *See Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017). While a convicted prisoner's claim of deliberate indifference arises under the Eighth Amendment's prohibition on cruel and unusual punishment, this proscription does not apply to a pretrial detainee because a pretrial detainee is not being punished. *Id.* A pretrial detainee's rights under the Fourteenth Amendment, though, "are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.' " *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983)).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell,* 849 F.3d at 29. The claim consists of two prongs. The first is the "objective prong," which requires the pretrial detainee to show "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." *Id.* The second is the "subjective prong," under which the pretrial detainee must prove "that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* The Second Circuit has suggested that the subjective prong is "perhaps better classified as a '*mens rea* prong' or 'mental element prong.' " *Id.*

To establish an objective deprivation under the first prong, a plaintiff must show that he was detained under conditions posing an unreasonable risk of serious damage to his health, including his "physical and mental soundness." *Id.* at 30 (citations omitted). The parties here dispute whether Brown was subject to an unreasonable risk of serious harm. Defendants argue that such a risk can only be demonstrated where there is evidence of a previous altercation between an inmate and his attacker, coupled with a request by the inmate to be separated from the attacker. Brown counters that evidence of a specific risk is not required. The court need not decide this issue because, as explained below, Brown has not sufficiently alleged that Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen

acted with deliberate indifference as contemplated by the subjective prong.

**\*11** To show deliberate indifference under the subjective prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." [10] *Id.* at 35. Therefore, the pretrial detainee must prove that the prison official acted with "a *mens rea* greater than mere negligence," *id.* at 36, because "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process," *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2472 (2015). "Absent clear notice of a risk of harm to the prisoner, [c]ourts routinely deny deliberate indifference claims based upon surprise attacks." *Fernandez v. New York City Dep't of Corr.,* No. 08-cv-4294, 2010 WL 1222017, at \*4 (S.D.N.Y. Mar. 29, 2010) (internal quotation marks and citation omitted).

Here, Brown has not pled facts to establish that Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen acted with the state of mind necessary to establish deliberate indifference. None of these individuals was present at the time of the attack, and thus none of them could have actually intervened to stop it. Further, none of these defendants was on notice that an attack was imminent because there had been no prior altercations involving Brown, and Brown had not complained to any prison officials that he was in danger.

At worst, Warden Suprenant and CO Tietjen improperly placed Brown and D.T. together in the general prison population. Brown himself describes this conduct as mere negligence. *See* Compl. ¶ 194 ("The defendants *negligently* placed the plaintiff in GMDC....") (emphasis added); *id.* ¶ 199 ("The defendants *negligently* placed the plaintiff in GMDC....") (emphasis added). Because "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence," *Darnell,* 849 F.3d at 36, Brown's deliberate indifference claims against Warden Suprenant and CO Tietjen are dismissed.

Brown's allegations regarding Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden

Beltz, and Captain Skepple primarily relate to post-attack investigations and reports. Brown says that Assistant Deputy Warden Beltz and Captain Skepple prepared false reports, and that Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz "signed off" on false reports. Brown also claims that Assistant Deputy Warden Skepple failed to conduct a proper investigation. Even if these allegations are true, they do not support a claim for deliberate indifference because they occurred *after* the attack, and thus in no way imply that these defendants knew of and disregarded an excessive risk to Brown's safety leading up to the incident. Finally, Brown's allegations that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple acted with deliberate indifference to his safety by allowing the Bloods to control common areas at GMDC is insufficient to state a claim under § 1983 because, as discussed above, Brown has pled no specific facts to support the theory. *See Iqbal,* 556 U.S. at 678 (holding that a complaint fails if it "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citation omitted). Accordingly, Brown's deliberate indifference claims against Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple are dismissed.

**\*12** To summarize, Brown brought a deliberate indifference claim against Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and CO Tietjen. *See* Compl. ¶¶ 204-07. The claim is dismissed as to Commissioner Ponte for lack of personal involvement. For the reasons described above, the claim is also dismissed as to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen. Brown's deliberate indifference claim, then, only remains as to CO James and CO Grinkley.

### 3. Other Claims Under § 1983 Against the Individual Defendants

As described in the procedural history, Brown asserts a variety of other claims against the Individual Defendants pursuant to § 1983. Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden

O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire (i.e., all defendants except for CO James and CO Grinkley) move to dismiss these claims. Their only argument, though, is lack of personal involvement. Because the court has found that neither Commissioner Ponte nor CO Freire was personally involved in any violation of Brown's constitutional rights, all of Brown's § 1983 claims against Commissioner Ponte and CO Freire are dismissed. But to the extent the complaint asserts other claims under § 1983—i.e., claims not for deliberate indifference—against Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Tietjen, those claims remain.

### C. *Monell* Claim Against the City

Brown alleges that the City has failed to properly train, supervise, or discipline its correction officers. Brown also contends that the City has a policy or custom of encouraging false reports and allowing the Bloods and other gangs to operate DOC facilities. According to Brown, the City's policy/custom and inadequate training program resulted in a deprivation of his constitutional rights, and he seeks to hold the City liable pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978). The City moves to dismiss the claim.

In *Monell,* the Supreme Court held that a municipality may not be held liable under § 1983 for its employees' conduct solely on the basis of *respondeat superior. Id.* at 694. Instead, to state a claim for relief against a local government under § 1983, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy or custom. *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 122 (2d Cir. 1991). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 563 U.S. 51, 61 (2011). Additionally, in limited circumstances, a municipality's failure to train its employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *Id.*

"Ultimately, the burden is on the plaintiff to 'demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury.' " *Whitfield v. City of Newburgh,* No. 08-cv-8516, 2015 WL 9275695, at *28 (S.D.N.Y. Dec. 17, 2015) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)). The plaintiff must also establish a causal connection, or an "affirmative link," between the municipal policy and the deprivation of his constitutional rights. *Tuttle,* 471 U.S. at 823.

 **\*13** Brown offers two avenues for relief under *Monell.* First, Brown says that the City has failed to properly train and supervise its correction officers. Second, Brown contends that the City has an unofficial custom of engaging gangs to operate DOC jails and using false reports to cover up incidents involving inmates. The City counters that Brown has failed to state a plausible *Monell* claim under either of these theories. Alternatively, the City argues that even if Brown has sufficiently alleged the existence of a municipal policy, he has not plausibly alleged that a particular violation of his constitutional rights was directly caused by such a policy.

### 1. Failure to Properly Train, Supervise, or Discipline

To state a claim against a municipality for its failure to properly train, supervise, or discipline its employees, a plaintiff must show that the local government acted with "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick,* 563 U.S. at 61 (quoting *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). The "deliberate indifference" test "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). "The operative inquiry is whether the municipality was on *notice* that 'a particular omission in their training program causes city employees to violate citizens constitutional rights.' " *Williams v. City of New York,* 121 F. Supp. 3d 354, 373-74 (S.D.N.Y. 2015) (quoting *Connick*, 563 U.S. at 61).

Here, Brown has not offered any specific factual allegations regarding the City's training, supervision, or discipline programs for DOC personnel. In fact, there is only one reference to the City's training program in the complaint, and it simply alleges in conclusory terms that the City's training is inadequate. *See* Compl. ¶ 217.

Since a plaintiff cannot "unlock the doors of discovery" with "nothing more than [his] unsupported supposition," *5 Borough Pawn, LLC v. City of New York,* 640 F. Supp. 2d 268, 299 (S.D.N.Y. 2009), the court dismisses Brown's *Monell* claim to the extent it is based on the City's alleged failure to properly train its employees.

### 2. Unconstitutional Policy or Custom

Brown also alleges that the City, acting through the DOC, unofficially delegates duties to gangs at Rikers, fails to protect inmates from attacks by other inmates, and encourages false reports to cover up incidents. A municipal "policy" is generally defined as a regulation that has been officially promulgated through a formal act by the municipality's governing body. *Monell,* 436 U.S. at 690. A municipal "custom," on the other hand, is not formally approved but "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown,* 520 U.S. at 404. "*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007).

Here, Brown concedes that he "does not have any evidence at this time" to suggest that the DOC had an official or formal policy of turning over control of DOC facilities to the Bloods. Pl.'s Br. 11. Brown argues, however, that the City's "tolerance" of the Bloods and their activities at DOC jails is so well settled that City policymaking officials can be said to have either actual or constructive knowledge of it. In essence, Brown contends that the City has a custom of allowing gangs to control certain aspects of DOC facilities.

 **\*14** To sustain a claim for municipal liability under § 1983 based on the existence of a custom, a plaintiff must do more than simply state that a municipal custom exists. *Santos v. New York City,* 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012). "Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Id.* A single instance of unconstitutional conduct is generally insufficient to infer that a municipality has an unlawful policy or custom. *Tuttle,* 471 U.S. at 823-24.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1390678

However, courts in this Circuit have held that a plaintiff may state a plausible *Monell* claim by citing cases or newspapers articles containing allegations of related repeated misconduct. *See, e.g., Gonzalez v. New York City,* No. 16-cv-00254, 2016 WL 7188147, at *8 (S.D.N.Y. Dec. 2, 2016) (collecting cases).

Brown alleges numerous times that the DOC allows—even invites the Bloods to control DOC facilities such as GMDC. *See, e.g.,* Compl. ¶¶ 27-28, 32-38, 44-45. Standing alone, these allegations are conclusory and are insufficient to support a plausible *Monell* claim based on Brown's single incident. But Brown also claims that the Bloods perpetrated a similar attack on another inmate a few days before he was attacked, Compl. ¶ 193, and he cites an assortment of cases and articles reporting on corruption and gang-related violence at Rikers. Granted, many of these reports offer no support for Brown's allegation that the City has an unofficial custom of allowing gang activity to occur at GMDC. Certain ones, however, bear enough factual similarity to the incident that is the subject of this lawsuit to allow Brown's *Monell* claim to survive the City's motion to dismiss.

For example, Brown cites a *New York, Times* article about the killing of a teenage inmate at Rikers by other inmates in 2008. Compl. ¶¶ 229-33. In that case, the teen's attackers had allegedly been enlisted by correction officers to act as enforcers to help maintain control over the jail. The scheme, nicknamed "the Program," also gave certain inmates special privileges such as deciding who was allowed to use chairs in common rooms.

Brown also cites a 2007 *Village Voice* article reporting on violence at Rikers. *Id.* ¶¶ 240-41. That article, which quotes deposition testimony by a former correction officer, describes how certain inmates were deputized as enforcers by correction officers to control other inmates. The article also discussed an alleged practice known as "write with us," in which DOC personnel conspired to make false reports on incidents involving inmates.

These articles, which contain allegations that are strikingly similar to the factual allegations here, plausibly support Brown's contention that the DOC has not adequately responded to a pattern of misconduct. At this stage in the litigation, the court finds that Brown has adequately alleged the existence of a municipal policy or custom.

### 3. Causal Connection

To state a claim for municipal liability under § 1983, a plaintiff must not only establish the existence of a municipal policy or custom, but also show a causal connection, or "affirmative link," between the policy and the deprivation of his constitutional rights. *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir. 1985). The City argues that, even if Brown has sufficiently alleged the existence of a municipal policy, he has not plausibly alleged that his constitutional rights were violated as a result of that policy.

If the City has a custom of enlisting gang members to help control other inmates, it is plausible that the attack on Brown—and the correction officers' lack of response—was directly connected to this policy. Accordingly, the City's motion to dismiss Brown's claim for municipal liability based on an unofficial custom or practice is denied.

## IV. State Law Claims

**\*15** In addition to his federal claims, Brown brings various state law claims against Defendants. The court addresses these claims below.

### A. Claims Under the New York State Constitution

Brown asserts that Defendants violated his rights under the New York State Constitution. There is, however, no private right of action under the New York State Constitution for claims that can be brought under § 1983. *Davis v. City of New York,* No. 15-cv-08575, 2016 WL 4532012, at *10 (S.D.N.Y. Aug. 29, 2016). Here, § 1983 provides a remedy for all of the claims Brown brings under the New York State Constitution against the Individual Defendants. Brown's state constitutional claims against the Individual Defendants are therefore dismissed. *See Allen v. Antal,* 665 Fed.Appx. 9, 13-14 (2d Cir. 2016) (affirming a district court's dismissal of claims brought under the New York State Constitution where alternative remedies were available).

But § 1983 does not provide an alternative remedy for Brown's state constitutional claims against the City

because § 1983 does not recognize *respondeat superior* liability. See *Campbell v. City of New York,* No. 09-cv-3306, 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011). Thus, to the extent Brown asserts claims under the New York State Constitution against the City, those claims survive.

### B. Claim Against the City for
### Negligent Hiring and Retention

Brown also brings a claim against the City for negligent hiring and retention. The City seeks dismissal of this claim, and Brown voluntarily withdraws it with prejudice. This claim is therefore dismissed with prejudice.

### C. Remaining State Law Claims

Brown further alleges that Defendants are liable for various torts under New York State law. The City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire move to dismiss these claims.

The City, Assistant Deputy Warden Beltz, Captain Skepple, and CO Freire offer no argument in support of their motion to dismiss these state law claims. Their motion is thus denied.

Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen (i.e., the six individuals added in the amended complaint) argue that Brown's state law claims against them are time barred. Brown's state law tort claims against the City and its employees are subject to a one-year and ninety-day statute of limitations. *See* N.Y. Gen. Mun. § 50-i(l)(c); *Jones v. City of New York,* No. 13-cv-929, 2016 WL 1322443, at *5 (S.D.N.Y. Mar. 31, 2016). Brown does not dispute the length of the limitations period or its application to these claims but he contends that, despite the limitations period, his state law claims are nonetheless timely.

In support of his argument that the state law claims against Commissioner Ponte are timely, Brown points to Federal Rule of Civil Procedure 25(d), which provides

that when a public officer who is a party in an official capacity ceases to hold office while a lawsuit against him is pending, the officer's successor is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d); *Gusler v. City of Long Beach,* No. 10-cv-2077, 2015 WL 3796328, at *1 (E.D.N.Y. June 18, 2015). Brown's original complaint listed Commissioner Schriro as a defendant. Ponte replaced Schriro as DOC Commissioner in April 2014. Under Rule 25(d), Ponte was automatically substituted—in his official capacity—as a party in this litigation at that time. But as discussed above, Brown's claims against the Individual Defendants in their official capacities are duplicative of his claims against the City. To the extent Brown asserts claims against Commissioner Ponte in his individual capacity, Rule 25(d) is irrelevant. Thus, Brown's state law claims against Commissioner Ponte in his individual capacity are untimely.

**\*16** With respect to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen, Brown argues that his state law claims against them are timely due to the "relation back" doctrine. Both the Federal Rules of Civil Procedure and New York State law allow, in certain circumstances, an amended pleading to relate back to the date of the original pleading for purposes of the statute of limitations. "Federal courts choosing between federal and state relation back doctrines should pick the more forgiving principle of relating back." *Fisher v. Cty. of Nassau,* No. 10-cv-0677, 2011 WL 4899920, at *4 (E.D.N.Y. Oct. 13, 2011) (internal quotation marks and citations omitted). Here, the federal relation back doctrine allows Brown to proceed with his state law claims against Deputy Warden Laboriel. However, neither the federal relation back doctrine nor the New York relation back doctrine saves Brown's untimely state law claims against Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen.

The federal relation back doctrine is governed by Rule 15(c)(1) of the Federal Rules of Civil Procedure. An amended complaint that adds a party to the litigation after the statute of limitations has run relates back to the original complaint if (1) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set forth in the original complaint, and (2) within the time for serving the original complaint, the new party both (i) received such notice of the action that it will not be prejudiced in defending on the merits, and (ii) knew

2017 WL 1390678

or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity. Fed. R. Civ. P. 15(c)(1)(C); *Fisher,* 2011 WL 4899920, at *4; *Abdell v. City of New York,* 759 F. Supp. 2d 450, 454 (S.D.N.Y. 2010).

It is clear that the new claims against Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen arise out of the same occurrence set forth in the original complaint, namely the attack on Brown at GMDC. Only Deputy Warden Laboriel, though, received timely notice of the action.

Rule 15 requires that the party to be added receive notice of the action within the time period provided by Rule 4(m), which—at the time this lawsuit began in 2013—was 120 days after the filing of the complaint. [11] *See* Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 15(c)(1)(C). Notice for purposes of Rule 15 can be either actual or constructive. *Girau v. Eurpower, Inc.,* 317 F.R.D. 414, 421 (S.D.N.Y. 2016). "Under the constructive notice doctrine, the court can impute knowledge of a lawsuit to a new defendant government official through his attorney, when the attorney also represented the officials originally sued, so long as there is some showing that the attorney[s] knew that the additional defendants would be added to the existing suit." *Muhammad v. Pico,* No. 02-cv-1052, 2003 WL 21792158, at *20 (S.D.N.Y. Aug. 5, 2003) (internal quotation marks and citations omitted). "The relevant inquiry for determining whether such constructive notice should be based on 'sharing of counsel' is whether counsel 'knew or should have known' within the limitations period that the additional defendants would be added." *Samuels v. Dalsheim,* No. 81-cv-7050, 1995 WL 1081308, at *14 (S.D.N.Y. Aug. 22, 1995) (quoting *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir. 1989)).

In the caption of his original complaint, Brown listed "Deputy Warden John Doe [Shield# 561]" as a defendant. *See* ECF No. 1. In his amended complaint, Brown replaced this John Doe defendant with "Acting Warden Felipe Laboriel [Shield # 561]." [12] *See* ECF No. 52. Because Brown specifically identified Laboriel by his shield number in the original complaint, counsel knew or should have known within the limitations period that Laboriel would be added as a defendant. Further, this knowledge can be imputed to Laboriel within 120 days of when the original complaint was filed on September 20, 2013 because defense counsel appeared in this matter on

January 7, 2014. *See* ECF Nos. 1, 3. Accordingly, Brown's state law claims against Deputy Warden Laboriel relate back under Rule 15.

**\*17** Rule 15, however, is of no help to Brown with respect to Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. These defendants were not identified in any manner in the original complaint's caption. Moreover, the original complaint contained no factual allegations regarding these defendants' alleged conduct. Thus, there is no indication that counsel knew or should have known that Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen would be named as defendants in an amended complaint.

New York's relation back doctrine also fails to save Brown's untimely state law claims against Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. The relation back doctrine under New York law allows claims against a new defendant to relate back to timely filed claims previously asserted against a co-defendant when (1) the new claims arose out of the same conduct, transaction, or occurrence as the original allegations; (2) the new defendant is "united in interest" with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new defendant knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well. *Buran v. Coupal,* 661 N.E.2d 978, 981 (N.Y. 1995), *see also* N.Y. C.P.L.R. § 203; *Strada v. City of New York,* No. 11-cv-5735, 2014 WL 3490306, at *6 (E.D.N.Y. July 11, 2014). "This test was patterned largely after the Federal relation back rule ... and, at least with respect to its third prong, it uses the same standard as Federal Rule 15." *Fisher,* 2011 WL 4899920, at *5 (internal quotation marks and citations omitted). As discussed above, there is no indication here that Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen knew or should have known that they would be added as defendants. Thus, New York's relation back doctrine is unavailing as well.

Nor can Brown simply substitute Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen for the "John Doe" and "Jane Doe" defendants listed in the original complaint. Section 1024 of the New

2017 WL 1390678

York Civil Practice Law and Rules allows a plaintiff to replace a John Doe defendant with a named party after the statute of limitations has run if (1) the plaintiff exercised "due diligence, prior to the running of the statute of limitations, to identify the defendant by name," and (2) the plaintiff described "the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." See Hogan v. Fischer, 738 F.3d 509, 518-19 (2d Cir. 2013). Here, regardless of whether Brown exercised due diligence, he cannot rely on § 1024 because he did not provide any identifying information whatsoever about any of the John Doe defendants listed in the original complaint.

In sum, Brown's state law claims are dismissed as to Commissioner Ponte, Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. These claims remain, however, as to the City, Deputy Warden Laboriel, Assistant Deputy Warden Beltz, Captain Skepple, and CO Freire.

### V. Brown's Motion for Reconsideration

Brown was able to file his amended complaint in this action because the court granted him leave to do so on November 13, 2015. ECF No. 49. Brown now asks the court to reconsider that November 13, 2015 decision because, when he filed his amended complaint, he mistakenly deleted former DOC Commissioner Schriro as a defendant. ECF No. 73. Brown's motion for reconsideration is denied.

**\*18** Brown's motion for reconsideration is governed by Local Rule 6.3. Under Local Rule 6.3, a motion for reconsideration must be served within fourteen days after the court's determination of the original motion. Here, the underlying decision was entered on November 13, 2015. Brown's request for reconsideration, however, was not filed until April 21, 2016. Thus, the motion is untimely, and it can be denied on that basis alone. See Garcia v. BAE Cleaners Inc., No. 10-cv-7804, 2012 WL 98511, at *1 (S.D.N.Y. Jan. 11, 2012).

But even if the motion were timely made, it would still be denied. "[R]econsideration will generally be denied unless

the moving party can point to controlling decisions or data that the court overlooked matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). Here, Brown does not point to any controlling decisions or data that *the court* overlooked; he only says that *he* erred while drafting his amended complaint. The motion for reconsideration is, therefore, denied. If Brown wishes to amend his complaint a second time, he may file a motion seeking leave to do so pursuant to Federal Rule of Civil Procedure 15(a).

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss certain claims in the amended complaint is granted in part and denied in part. All of Brown's claims against the Individual Defendants in their official capacities are dismissed. All of Brown's § 1983 claims against Commissioner Ponte and CO Freire are dismissed for lack of personal involvement. Brown's § 1983 claims for deliberate indifference only are also dismissed as to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen. Brown's claims under the New York State Constitution against the Individual Defendants are dismissed. Brown's claim against the City for negligent hiring and retention is dismissed. Brown's state law tort claims against Commissioner Ponte, Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen are dismissed. All other claims in the amended complaint remain.

Brown's motion for reconsideration is denied.

This opinion resolves the items listed at docket numbers 63 and 73.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 1390678

---

Footnotes

1    The court will refer to all defendants, collectively, as "Defendants," and the individuals, collectively, as the "Individual Defendants."

2017 WL 1390678

2    All references to the complaint refer to the amended complaint filed on November 17, 2015 (ECF No. 52).

3    For purposes of this motion to dismiss, the court accepts Brown's factual allegations as true and draws all reasonable inferences in his favor. *See Gonzalez v. Hasty,* 651 F.3d 318, 321 (2d Cir. 2011).

4    It is unclear why Brown did not also complain to Captain Rudolph that CO Grinkley saw the attack but did not intervene.

5    Brown lists Laboriel as "Acting Warden" in the case caption. Defendants, however, refer to Laboriel as a "Deputy Warden." The court assumes Defendants' description of Laboriel's DOC rank is correct, and thus the court will use "Deputy Warden" throughout this opinion.

6    As mentioned above, Brown alleges that Captain Skepple did not actually conduct an investigation.

7    Brown refers to this defendant as "Tretjen," and the case caption includes that spelling. Defendants, however, refer to this individual as "Tietjen." The court assumes Defendants' spelling is correct, and will thus use "Tietjen" throughout this opinion.

8    Brown attempted to file his amended complaint on November 16, 2015, but due to a filing error, it was not properly docketed until November 17, 2015.

9    The Second Circuit has previously held that the personal involvement of a supervisory defendant can be shown in five ways: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).

    The Supreme Court's 2009 decision in *Iqbal,* though, may have nullified all or part of *Colon's* holding. *See Hollins v. City of New York,* No. 10-cv-1650, 2014 WL 836950, at *13 (S.D.N.Y. Mar. 3, 2014) ("The district courts of the Second Circuit disagree about what remains of *Colon* after *Iqbal."*). *Iqbal* addressed supervisory liability claims, and held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. "Accordingly, some courts in this Circuit have found that *Iqbal* abrogated all of the *Colon* categories except for the first and either all or part of the third." *Doe v. New York,* 97 F. Supp. 3d 5, 11 (E.D.N.Y. 2015).

    This court need not make a ruling on whether all of the *Colon* categories remain after *Iqbal* because, as will be discussed below, Brown has pled facts sufficient to establish that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple directly participated in an alleged constitutional violation.

10    "In other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively." *Darnell,* 849 F.3d at 35.

11    Rule 4(m) has since been amended to reduce the presumptive time for serving a defendant from 120 days to 90 days. *See* Fed. R. Civ. P. 4(m) advisory committee's note to 2015 amendment. The court will apply the 120-day period here since that rule was in effect at the time service was originally made.

12    Since Laboriel does not dispute whether this is his actual shield number, the court assumes it is correct.

---

End of Document          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1234930
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kevin WALKER, Plaintiff,
v.
Dora B. SCHRIRO, et al., Defendants.

No. 11 Civ. 9299(JPO).
|
March 26, 2013.

*MEMORANDUM AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** This civil rights case, brought by Plaintiff Kevin Walker against a number of prison officials, arises from a course of events that pivot around Plaintiff's efforts to obtain medically authorized supportive footwear while incarcerated. The Second Amended Complaint, filed *pro se* and therefore interpreted to allege the strongest claims it suggests, alleges due process, equal protection, First Amendment retaliation, access to courts, Eighth Amendment, and products liability violations. Defendants have moved to dismiss all claims. For the reasons that follow, this motion is granted in part and denied in part.

**I. Background**

The facts stated in this background section are drawn from allegations made in Plaintiff's Second Amended Complaint. For purposes of this motion, these allegations are presumed to be true. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). [1]

On August 10, 2011, Plaintiff was placed in the New York City Department of Correction V.C.B.C. (also known as "the Boat"). While being processed into the facility, Plaintiff was informed by Defendant Daly that a prison order prevents inmates from wearing any personal footwear. Plaintiff objected to Daly and explained that he has a medical condition that necessitates special footwear. Specifically, Plaintiff requires custom sneakers with extra support, cushioned soles, ankle support, and special arch support. In contrast, D.O.C. standard-issue sneakers lack

these features. Daly responded by telling Plaintiff to sign up for sick call.

On August 15, 2011, Plaintiff saw a doctor and explained this situation. The doctor examined Plaintiff, determined that Plaintiff has flat feet and weighs over 350 pounds, and stated that if Plaintiff did not wear suitable sneakers he would experience pain and swelling in his feet and back. Plaintiff returned to sick call several times due to extreme pain from his deficient footwear and was given Tylenol, even though he explained to the doctor that this medicine was inadequate. The doctor indicated that Plaintiff would soon receive different pain medication.

On August 29, 2011, Plaintiff was moved to G.R.V.C. (known as "the Beacon"). He signed up for sick call and planned on seeing a foot and back specialist on September 6, 2011, but this never happened (for reasons unspecified in the Complaint) and Plaintiff remained in "extreme pain." The doctor continued to prescribe only Tylenol, even after indicating that Plaintiff would receive more effective medication.

On September 13, 2011, Plaintiff spoke with Dr. Pravin Nanjan, who indicated that the medicine had not arrived because the order had been placed incorrectly. Ranjan prescribed Plaintiff stronger medication, provided permits for a double mattress to alleviate Plaintiff's severe back pain, and provided a permit for Plaintiff to wear his supportive sneakers. Around this time, Plaintiff spoke with Defendant Washington, explained his situation and his receipt of a permit, and was informed by Washington that Plaintiff's wife could bring custom sneakers to the prison for Plaintiff. Also around this time, Plaintiff learned from his wife that she had sent a pair of permissible sneakers and they had been returned—even though Plaintiff had never been notified of this package. When Plaintiff asked Defendant Hart about this package, "in hopes that defendant would understand because she too is a big person," she "became very abusive and stated 'maybe your fatass need to loose [sic] weight and your feet would not bother you!' "

**\*2** On September 17, 2011, Plaintiff's wife brought Plaintiff's custom sneakers. Defendant Lespinasse prohibited Plaintiff from keeping the sneakers, adding that Washington had told her not to allow the sneakers. She "laughed" when Plaintiff presented her with his medical permit.

Several days later, Plaintiff explained his situation to Defendants Lemon and Fraizer. Lemon stated that he would look into it, but that he had told the doctors to stop giving out permits for sneakers. A week later, Lemon confirmed to Plaintiff that he told the doctors to stop issuing medical permits for prisoners and added that he "runs G.R.V.C., not the warden, not the doctors, me! Deputy of security!" Lemon and Frazier then discussed their desire to set a precedent that would prevent all inmates from obtaining medically prescribed footwear. Lemon added that Plaintiff could get his sneakers by offering information on what was happening in the jail, an offer that Plaintiff refused by telling Lemon "that he was losing his fucking mind!"

On September 19, 2011, Plaintiff asked Defendants Williams and Best for help with his footwear situation. Williams called someone and then told Plaintiff that he had "pissed someone off" and "there was nothing he could do to help." When Plaintiff spoke to Best, she replied that "nobody in this building (GRVC) get their personal footwear regardless of a medical or not, it's the building rules, if it's a problem we ship your ass out to another jail, its just that simple."

After these events, Plaintiff's unit was subjected to a routine search. Harris arrived at his cell, explained that Plaintiff had "pissed somebody off," and, without any process known to Plaintiff, gave him a "green Id ICR card; ICR is the acronym for Inmate Contraband Receiver." Harris cursed at Plaintiff and promised that Plaintiff would never get his custom footwear. Receipt of an ICR card entails a number of onerous disciplinary consequences, including more extensive searches of an inmate's cell, prohibitions on work outside one's housing unit, and more thorough searches during visits by family.

Several days later, Plaintiff explained his medical and ICR situation to Defendant Garcia. Garcia replied that nobody gets to wear special footwear and that corrections officers "do what we want." Garcia reiterated that Plaintiff had "pissed someone off" and referred to prior litigation involving Plaintiff before Judge William H. Pauley of this District.

In the middle of October 2011, Defendant Anku and other officers searched Plaintiff's housing unit. The inmates were told to get down on their knees. Plaintiff told

Anku that Plaintiff's medical condition would cause severe pain if he remained in that position; Anku replied by cursing at Plaintiff and emphasizing that he did not care about Plaintiff's medical condition. This caused Plaintiff "extreme pain" for 30–45 minutes.

On October 17, 2011, Plaintiff was called to appear concerning his grievances against Lemon arising from denial of medically appropriate footwear notwithstanding a medical permit. Defendant Moultre told Plaintiff that his request for a hearing had been denied and that the grievance had been rejected. Moultre stated "I don't give a fuck about no medical." As they argued, Defendants Smith and Hines arrived. Plaintiff explained his footwear situation and medical permit. Smith replied that "we are setting standards throughout Rikers Island that in the Beacon (GRVC) nobody gets to wear their personal sneakers, regardless of a medical." Smith added that he would speak to Lemon about Plaintiff's concerns. Plaintiff returned to his cell and wrote to Defendant Agro about his problems.

 **\*3** Ten to twenty minutes later, Lemon came by and told Plaintiff that his subordinates would be dealing with the situation. Thirty minutes later, Plaintiff was "packed up and removed from the housing unit to a waiting bus to C–95." Plaintiff objected to non-defendant Captain Carter that he could not go to C–95; Carter replied that he had his orders. Upon arrival at C–95, Plaintiff explained to non-defendant C.O. Jacobs that he wasn't supposed to be on Rikers Island, "especially this building per O. S.I.U. (security)." Jacobs sent for security. Ten minutes later, Defendant Williams "came to the bullpens ... and stated 'I know who the fuck you are, you got a lot of balls even coming in this building'!" At Williams' order, Plaintiff was confined to the intake bullpens for two days without food, shower, linen, running water, or a bathroom. Plaintiff believes this conduct was in retaliation for a civil rights lawsuit filed by Plaintiff in 2008 against Williams and several other guards. The next morning, Plaintiff's wife called security and spoke with Defendant Letizia, "who told her, 'don't worry we will take care of him and laughed.' " Plaintiff and his wife interpreted this as a threat.

On October 19, 2011, Plaintiff was moved to M.D.C., where the corrections personnel similarly refused to honor his medical permit. At M.D.C., Plaintiff was told to see a foot specialist, but this appointment was cancelled because

Plaintiff could not fit into any of the orange jumpsuits prerequisite to trips outside the prison facility. Plaintiff grieved this situation several times, but has not yet been fitted for a jumpsuit. Many of his medical appointments and physical therapy sessions have been cancelled as a result.

Plaintiff has seen two podiatrists, one at West Facility and one at M.D.C., both of whom agreed that he should wear supportive sneakers. At this point, non-defendant Deputy of Security Colon stated that Plaintiff could wear custom sneakers only if they are "PUMA" brand. Plaintiff's wife set out in search of suitable Puma brand sneakers and sent them to Plaintiff, but Plaintiff was denied access to the sneakers for 30–45 days while Colon inspected them. In total, Plaintiff suffered 7–8 months of "extreme pain in [his] foot and ankles," and his lower back, with only Tylenol to alleviate this condition.

On March 28, 2012, Plaintiff was returned to the Boat. Upon his arrival, Daly—who was not at the time a named defendant in this action—learned of Plaintiff's lawsuit and threatened Plaintiff, adding that he had "something" for Plaintiff upstairs. Plaintiff immediately spoke to Defendant Morris and explained his fear of Daly's threat. Morris replied "don't worry about it, just go to your housing area." Even though his classification did not merit such treatment, Plaintiff was sent to a high classification housing unit.

The next morning, Plaintiff called the Inspector General office and reported Daly's threat. He also called the Board of Corrections and filed a complaint. At 2 p.m., Defendant Bacote arrived at Plaintiff's housing unit to discuss the matter. At Becote's request, Plaintiff showed Becote the initial complaint in this case and noted where it mentioned Daly. Becote told Plaintiff and another inmate who had witnessed this whole course of events to remain by the officer station. An hour later, Becote arrived with a team of officers clad in riot gear. Plaintiff was handcuffed and taken to the intake bullpens, where he remained for five hours.

 *4 Non-defendant Captain Calise took statements from Plaintiff and the other inmate, and Plaintiff was then led by Morris to the medical clinic. Upon leaving the clinic, Morris, Bacote, Daly, and two other officers "tried to take [P]laintiff in a secluded area by the elevators and [P]laintiff to walk in the area with all five (5) officers, which (3)

are defendants." Morris then ordered Plaintiff to "play the wall" while Daly applied tight handcuffs. Plaintiff was returned to a high classification house, threatened by Bacote and Daly, and released from the handcuffs.

On April 2, 2012, Plaintiff was called to the security office and given a ticket by Bacote, who told Plaintiff to "shut the fuck up." The next day, Bacote walked by Plaintiff in a threatening manner. On April 5, 2012, Bacote and two other officers taunted and threatened Plaintiff in the housing unit. The Warden of V.C.B.C. did not respond to Plaintiff's request that she intervene in this course of events. Plaintiff received a ticket for disciplinary charges fabricated by Bacote. At the hearing on this ticket, Bacote successfully urged the hearing officer to give Plaintiff the maximum penalty of forty days. Plaintiff believes that throughout this period, Bacote, Morris, and Daly were retaliating against plaintiff. In August 2012—several months after these events—Bacote continued to retaliate against Plaintiff by stealing his legal papers, breaking Plaintiff's personal glasses, arranging for repeated searches of Plaintiff's cell, threatening Plaintiff, and interfering with Plaintiff's personal mail.

Plaintiff reports that he remains in extreme pain due to improper footwear, that he has been rushed to Bellevue Hospital on one occasion because of swelling in his ankles, and that he is still taking Tylenol with codeine twice per day. Plaintiff has sued Defendant Barker, the supplier of standard inmate footwear to the New York City Department of Correction, for "failure to notify the public that the product that he is selling has not only a defect in the design but that it would cause serious injuries to those that wear it for an extended period of time ... and that it is not suggested that these sneakers be [worn] for a specific period of time." Plaintiff adds that Barker has failed to warn the public that his sneakers are not suitable for extended wear or for use by people who weigh a certain amount and have certain foot problems.

## II. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus,* 433 F.3d 248, 250 (2d Cir.2006) (quotations omitted). That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citation omitted).

**\*5** "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest." Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (citations omitted). The pleadings filed by pro se litigants thus merit "special solicitude." *Ruotolo,* 28 F.3d at 8.

### III. Discussion

In the Complaint, Plaintiff identifies five causes of action: (1) violations of Plaintiff's due process and equal protection rights by Agro, Lemon, Fraizer, Garcia, Harris, and Schriro when Plaintiff was placed on ICR status without appropriate procedure; (2) retaliation against Plaintiff by Bacote, Morris, Daly, Garcia, Lemon, Harris, and Williams for filing a civil complaint and numerous grievances, retaliation against Plaintiff by Williams for Plaintiff's prior civil complaint before Judge Pauley, and retaliation against Plaintiff by Bacote for the filing of this civil action; (3) violations of Plaintiff's Eighth Amendment rights by Williams, who kept Plaintiff locked in the intake area for two days, and by Bacote, who forced Plaintiff to sleep in the intake area on a number of occasions while moving Plaintiff out of the building; (4) violations of Plaintiff's Eighth Amendment rights by Schriro, Agro, Lemon, Fraizer, Williams, Best, Smith, Garcia, Washington, Lespinasse, Hart, Hines, Aknu, and Moultrie through deliberate indifference to Plaintiff's need for medical treatment, and by Barker through deliberate indifference to the public's medical need in warning of design defects in his products; and (5) a products liability claim against Barker for design flaws and failure to warn. The Court generally agrees with Plaintiff that the facts alleged in the Complaint are best interpreted as alleging this set of claims. However, in recognition of the special solicitude afforded to pro se litigants, the Court clarifies

the doctrinal basis and appropriate defendants for some of Plaintiff's claims.

### A. Due Process and Equal Protection

Plaintiff alleges that he was assigned a "Green ID, ICR card" while at G.R.V.C. without proper procedure or an opportunity to contest that designation. He adds that the defendants associated with the claim—Agro, Lemon, Fraizer, Garcia, Harris, and Schriro—acted in specific disregard of standard disciplinary procedures. He argues that these defendants thereby violated his due process and equal protection rights. Neither claim succeeds.

To establish a due process claim with respect to a prison disciplinary proceeding, "a plaintiff must establish (1) possession of a liberty interest and (2) deprivation by defendants of that interest as a result of insufficient process." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009). "Prison discipline [does] implicate[ ] a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). However, "[t]he Supreme Court has stated ... that prisoners do not have a liberty interest under the Federal Constitution in 'prisoner classifications and eligibility for rehabilitative programs in the federal system.' " *Green v. Armstrong,* 189 F.3d 460, 460 (2d Cir.1999) (quoting *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976)). As Judge Castel has explained:

> **\*6** In assessing whether a prison facility has afforded its inmates adequate procedural due process, courts acknowledge that prison administrators have wide discretion to adopt and execute policies and procedures that are in the best interest of the institution. Regarding classification procedures, prison officials have "full discretion" to control conditions of confinement, which include prisoner classification, and prisoners have no legitimate statutory or constitutional entitlement sufficient to invoke due process in connection with such conditions. Consequently,

prisoners have no liberty interest that protects them from security classification or mis-classification.

*Walker v. City of New York,* No. 11 Civ. 9611, 2012 WL 3037308, at *2 (S.D.N.Y. July 25, 2012) (quotation marks and citations omitted); *see also Taylor v. New York Dept. of Corr.,* No. 10 Civ. 3819, 2012 WL 2469856, at *3 (S.D.N.Y. June 27, 2012). Because Plaintiff has failed to identify a liberty interest protected by the Due Process Clause, his claim cannot succeed.

Plaintiff's equal protection claim also fails. The Second Circuit has explained that:

> To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender. Such intentional discrimination can be demonstrated in several ways. First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender. In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect.

*Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d Cir.1999) (citations omitted). Here, Plaintiff does not allege that he was mistreated or treated differently than his colleagues on the basis of a protected classification. He does not identify any law or policy as the source of the alleged violation, nor does he adequately allege discriminatory enforcement of any law or policy. Thus, Plaintiff cannot prevail as a matter of law on any equal protection claim.

**B. Retaliation and Access to Courts**

Plaintiff alleges three distinct claims styled as "retaliation": the first claim focuses on actions by Bacote, Morris, Daly, Garcia, Lemon, Harris, and Williams against Plaintiff motivated by Plaintiff's filing of a

civil complaint and numerous grievances; the second claim concerns actions taken by Williams and Letizia as punishment for Plaintiff's prior civil case before Judge Pauley; and the third claim focuses on actions taken by Bacote in response to Plaintiff's decision to file this civil action.[2] The Court interprets Plaintiff's Complaint to raise claims under the First Amendment for retaliation and under the constitutional right of access to courts.

**1. First Amendment Retaliation**

**\*7** "[O]therwise constitutional acts may be actionable if taken in retaliation for the exercise of First Amendment rights." *Soto v. Iacavino,* No. 01 Civ. 5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003). To survive dismissal, "a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

It is well established that "a prisoner's filing of both lawsuits and administrative grievances is constitutionally protected ." *Collins v. Goord,* 438 F.Supp.2d 399, 419 (S.D.N.Y.2006) (citations omitted). In other words, "[s]ince access to the courts is an established constitutional right," *Smith v. City of New York,* No. 03 Civ. 7576, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (citing *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)), speech undertaken for the purpose of accessing courts—extending from civil litigation to the administrative grievances ordinarily prerequisite to civil litigation under the Prison Litigation Reform Act—is "protected" for purposes of First Amendment retaliation analysis.

The adverse action inquiry is "objective" and is "tailored to the different circumstances in which retaliation claims arise." *Dawes,* 239 F.3d at 493 (citation omitted). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493 (citations omitted). "Otherwise, the retaliatory act is simply *de*

Case 9:17-cv-00564-TJM-DEP Document 33 Filed 01/09/18 Page 51 of 75
Walker v. Schriro, Not Reported in F.Supp.2d (2013)
2013 WL 1234930

minimis and therefore outside the ambit of constitutional protection." Id. (citing Davidson v. Chestnut, 193 F.3d 144, 150 (2d Cir.1999) (per curiam)); see also id. ("Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." (citation omitted)). Thus, "[u]nder some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered ... [but] vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim." Bumpus v. Canfield, 495 F.Supp.2d 316, 326 (W.D.N.Y.2007).

Courts also recognize a doctrine of retaliatory transfer. As Judge Swain has explained:

> Prisoners normally have no constitutional right to remain in any particular state prison facility, absent a state statute or policy conditioning transfers on proof of specific acts of misconduct. Prison officials thus have broad discretion in making transfer determinations. They may not, however, transfer [prisoners] solely in retaliation for the exercise of constitutional rights. Where, as here, an adverse action (such as a transfer) is challenged as retaliatory in violation of the First and Fourteenth Amendments, the plaintiff has the burden in the first instance of demonstrating that the underlying conduct that precipitated the adverse action was constitutionally protected and that said conduct was a substantial or motivating factor in the defendant's subsequent adverse conduct. If the plaintiff meets that burden, the defendants have the opportunity to demonstrate by a preponderance of the evidence that they would have reached the same decision even in the absence of the protected conduct.

**\*8** Salahuddin v. Perez, No. 99 Civ. 10431, 2006 WL 266574, at \*5 (S.D.N.Y. Feb.2, 2006) (quotation marks and internal citations omitted).

The third and final requirement of a retaliation claim is a causal connection between the protected speech and adverse action. Dawes, 239 F.3d at 492. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part in the employer's adverse employment action.' " Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir.2000) (quoting Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 780 (2d Cir.1991)). A combination of direct and circumstantial evidence can support such an inference. Smith, 2005 WL 1026551, \*4. Even at the motion to dismiss stage, "the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must [allege facts] from which retaliation may plausibly be inferred." Crenshaw v. Hartman, 681 F.Supp.2d 412, 416 (W.D.N.Y.2010) (quotation marks and citations omitted). In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, courts may consider "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citation omitted).

"[P]rison officials have broad administrative and discretionary authority over the institutions they manage." Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994) (citation omitted). Accordingly, courts approach First Amendment retaliation claims brought by inmates "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dawes, 239 F.3d at 491.

Here, Plaintiff alleges several different retaliation claims. The Court addresses each in turn, granting in part and denying in part Defendants' motion to dismiss.

First, Plaintiff alleges that Letizia retaliated against him for his prior civil suit before Judge Pauley. Specifically,

he alleges that Letizia mocked Plaintiff's wife with the promise that "we will take care of [Plaintiff]." Plaintiff adds that "I know this comment [referred] to the treatment plaintiff was receiving in retaliation for the suit in 2008, in which defendant Williams was a defendant with [several] of his colleagues also." This claim fails even at the motion to dismiss stage because Plaintiff has inadequately pleaded a connection between the protected activity (his civil suit) and the adverse action (threatening Plaintiff while on the phone with Plaintiff's wife). This critical element is merely asserted, but none of the facts contained in the Complaint adequately support it. *See Crenshaw,* 681 F.Supp.2d at 416. Further, even if the claim did not fail on this ground, the Court would still dismiss it due to the requirement of an adverse action that rises above the threshold of a vague verbal threat. *See Bumpus,* 495 F.Supp.2d at 326 ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim.").

**\*9** Second, Plaintiff alleges that Garcia retaliated against him for his prior civil suit before Judge Pauley. The protected activity here is Plaintiff's prior civil suit. The adverse action is denial of supportive footwear notwithstanding a medical permit. As the Court explains below, this constitutes an independent constitutional violation—but that does not preclude it from doing double—duty as the adverse action prerequisite to a finding of First Amendment retaliation. Denial of medical care that could address "extreme pain" surely qualifies as an action "that would deter a similarly situated individual of ordinary fitness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493. The causal connection is based on Plaintiff's recollection that Garcia "stated that he was notified by an officer in the 3 building (GMDC) and 5 building (AMKC) that you were back in the system ... and that you [were] involved in something back in 2006, (a settled suit with Honorable William H. Pauley[ ] ), and for us to put you on ICR status. Defendant Garcia stated that plaintiff pissed someone off, so, I can't help you." Plaintiff has adequately alleged the factual predicate of a causal connection between the protected activity and the adverse action. This claim therefore survives Defendants' motion to dismiss.

Third, Plaintiff alleges that Lemon engineered a retaliatory transfer. The protected activity for this claim is Plaintiff's filing of a grievance against Lemon for denial of medical care. The adverse action is the transfer of Plaintiff at Lemon's instigation to C–95—a facility that Plaintiff immediately recognized as a dangerous location, as evidenced by his objections to Carter that "I could not go to C–95." Plaintiff explains that C–95 was "the same facility that defendant Lemon threaten[ed] to send plaintiff if he don't leave it alone (obtaining his supportive footwear) even though defendant Lemon knew that a few officers tried to have physical injury done to plaintiff." The causal connection is based on this explicit threat by Lemon, coupled with the fact that Plaintiff filed a grievance against Lemon (thereby not "leav[ing] it alone") and the fact that Lemon "told plaintiff that his underlings will be dealing with me." Applying the standard that Judge Swain articulated in *Salahuddin,* which includes the proviso that prison officials may not transfer prisoners "solely in retaliation for the exercise of constitutional rights," 2006 WL 266574, at \*5 (citations omitted), the Court concludes that Plaintiff's claim of retaliatory transfer survives this motion to dismiss.

Fourth, Plaintiff alleges that Williams locked him in an intake area without food, water, showers, linens, running water, or a bathroom as retaliation for Plaintiff's 2008 civil case against Williams. The protected activity is Plaintiff's prior civil case. The adverse action is Williams' decision to confine Plaintiff to an intake area without basic necessities for two days. The causal connection is based on Williams' statement that "I know who the fuck you are, you got a lot of balls coming to this building!" This claim survives Defendants' motion to dismiss.

**\*10** Finally, Plaintiff alleges that Becote, Morris, and Daly threatened him in several ways on and after March 28, 2012, and that Bacote gave Plaintiff a ticket without any other justification that resulted in Plaintiff being punished for 40 days. The protected activity is Plaintiff's decision to litigate this case. The adverse actions consist of verbal and physical threats and a handcuffing by Becote, Morris, and Daly, as well as the forty days of punishment that resulted from Becote's trumped-up charges. The causal connection is based on the facts that Daly learned of this case and told Plaintiff that Daly had "something" for Plaintiff upstairs, that Becote reviewed the initial complaint in this case after Plaintiff complained of Daly's threat, and that Daly and Becote (joined by Morris) commenced their allegedly adverse actions almost immediately afterwards. A retaliation claim based on the threats and handcuffing described by Plaintiff cannot succeed because these actions do not rise to the level of

severity prerequisite to a finding of adverse action. Thus, the retaliation claim against Daly, Morris, and Becote based on their threats and handcuffing must be dismissed. However, forty days of punishment for a charge fabricated to punish an inmate for filing a civil lawsuit does qualify as an adverse action under retaliation doctrine. [3] Given that Plaintiff also described facts that support a finding of causal connection, Defendants' motion to dismiss the retaliation claim against Becote arising from the ticketing incident is denied.

In sum, Plaintiff's retaliation claims against Garcia, Lemon, Williams, and Becote survive this motion to dismiss. All other retaliation claims are dismissed.

### 2. Access to Courts

"It is well established that all persons enjoy a constitutional right of access to the courts, although the source of this right has been variously located in the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments." *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) (collecting cases). "The right of access to courts extends beyond mere physical access to a courtroom and a judge." *Id.* "Prisoners must have a 'reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Smith,* 2005 WL 1026551, at *6 (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Thus, the active interference of prison officials in the preparation, filing, or exchange of legal documents may constitute denial of access to the courts. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

"In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." *Monsky,* 127 F.3d at 247 (quotation marks and citations omitted). "Interference with legal mail implicates a prison inmate's rights to access to the courts ... [t]o state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d

Cir.2003) (quotation marks and citations omitted); *see also id.* ("In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment.") (citations omitted)). Accordingly, "[i]n balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (collecting cases).

**\*11** "To state a valid § 1983 claim that he has been denied reasonable access to the courts, [an inmate] must show that the alleged deprivation actually interfered with his access to the courts or prejudiced an existing action." *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995); *see also Davis,* 320 F.3d at 352 ("[Plaintiff] fails to state a constitutional claim for violating his right to send and receive legal mail because he alleges neither the establishment of an ongoing practice by prison officials of interfering with his mail nor any harm suffered by him from the tampering."). "A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen,* 877 F.Supp. at 871. "In other words the plaintiff must show that a non-frivolous legal claim had been frustrated or was being impeded due to the actions of prison officials." *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citations omitted); *see also Smith,* 2005 WL 1026551, at *6; *Bartley v. Artuz,* No. 95 Civ. 10161, 1999 WL 942425, at *9 (S.D.N.Y. Oct.19, 1999).

Plaintiff alleges at multiple points that certain defendants interfered with his mail, including his legal mail, and took action against him in retaliation for his grievances and civil lawsuits (including this suit). [4] Most of Plaintiff's legal claims arising from this course of events are covered by First Amendment retaliation doctrine. Regardless, because Plaintiff has not alleged facts that reveal a substantial delay or interruption in his ability to communicate with the Court, and has not alleged facts that could support a finding that he has been prejudiced or impeded in his legal actions, Defendants' motion to dismiss must be granted as to any access to court claim suggested by the Complaint. *See Cancel,* 2001 WL 303713, at *4.

## C. Eighth Amendment

The Eighth Amendment to the U.S. Constitution provides that "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. That rule, applicable to the states through the Fourteenth Amendment, *see Estelle v. Gamble,* 429 U.S. 97, 101–02, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), is violated by unnecessary and wanton inflictions of pain and suffering, *see Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

Plaintiff alleges Eighth Amendment violations under two distinct theories: inadequate medical treatment and unconstitutional conditions of confinement.[5] In 1976, the Supreme Court explained that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment ... whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05 (quotation marks and internal citations omitted). The Court has since clarified that "we see no significant distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement .... Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the deliberate indifference standard articulated in *Estelle."* *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quotation marks and citations omitted).

**\*12** To state an Eighth Amendment claim, a prisoner must allege both (1) that he suffered a sufficiently, objectively serious deprivation and (2) that officials who caused the harm acted or failed to act with a sufficiently culpable state of mind, *i.e.,* with deliberate indifference to inmate health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The objective prong of this analysis requires an assessment of the allegedly cruel and unusual conditions. "[T]he Constitution does not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). However, prisoners may not be deprived of "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Helling,* 509 U.S. at 35). "Ultimately, to establish the objective element of an Eight Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Id.* (citations omitted); *see also Carr v. Canty,* No. 10 Civ. 3829, 2012 WL 3578742, at *3 (S.D.N.Y. Aug.16, 2012) ("[T]o establish the deprivation of a basic human need such as reasonable safety, an inmate must show actual or imminent harm." (quotation marks and citations omitted)).

"To establish the second element, deliberate indifference, a plaintiff must show something more than mere negligence ...." *Id.* (internal quotation marks and citation omitted). An official cannot be found liable on a conditions of confinement theory "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. The Second Circuit has noted that "[t]his deliberate indifference element is equivalent to the familiar standard of recklessness as used in criminal law." *Phelps v. Kapnolas,* 308 F.3d at 186 (quotation marks omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842.

Plaintiff's conditions of confinement claims against Williams and Bacote for confining him in intake areas do not succeed. Plaintiff's claim against Williams is based on the fact that Plaintiff was confined to an intake bullpen for two days and denied access to food, shower, linens, running water, and a bathroom. Plaintiff's claim against Bacote is based on the fact that, on the 5–7 occasions that Plaintiff was moved out of V.C.B.C. at Bacote's command, Plaintiff was forced to sleep in an intake area with "a constant air-condition system" that blew "extreme cold

air" onto Plaintiff, who lacked blankets, sheets, running water, and a toilet.

 **\*13** Addressed individually, none of these conditions suffices to state an Eighth Amendment violation. It is well established that deprivation of food, *see Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983), denial of toilet paper and toiletries, *see Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003), exposure to the bitter cold, *see Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001), exposure to the cold without bed linens, *see Maguire v. Coughlin,* 901 F.Supp. 101, 105 (N.D.N.Y.1995), and confinement in a cell without a toilet, *see LaReau v. MacDougall,* 473 F.2d 974, 977 (2d Cir.1972), can result in an Eighth Amendment violation when severe enough or sustained over a long enough period of time. Moreover,

> *[s]ome* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.

*Wilson,* 501 U.S. at 304 (citations omitted). In this case, however, the Court cannot conclude that the deprivations that Plaintiff experienced rise to the level of cruel and unusual punishment. This determination hinges largely on the fact that none of Plaintiff's confinements in the intake areas lasted more than two days. Given that none of these deprivations rose to an acute and conscience-shocking level, either alone or in combination, the relative brevity of Plaintiff's mistreatment precludes a finding that Plaintiff can satisfy the requirement of an objectively serious deprivation.

The Court reaches a different conclusion, however, with respect to Plaintiff's claim based on denial of medical care. At this early stage in the case, drawing all inferences in Plaintiff's favor, the Court concludes that Plaintiff has sufficiently alleged a serious medical need.

It is well established that not every claim made by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment; neither negligence nor medical malpractice is sufficient. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). To the contrary, a plaintiff must show conduct that is "repugnant to the conscience" or "incompatible with the evolving

standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102, 105 (citations omitted). [6]

Defendants cite a number of cases that have rejected Eighth Amendment claims based on denial of footwear. Most of these cases are off-point or address the issue only with stray lines of *obiter dictum.* While the Court agrees that the legal principles articulated by these cases would defeat a conditions of confinement claim in this case based on shoddy footwear, it parts ways from Defendants on the significance of these cases for Plaintiff's denial of medical care claim. [7] Although these claims are analyzed under the same doctrinal framework, the presence of a medical treatment issue calls upon the Court to assess with particularity the nature and quality of the medical deprivation that Plaintiff endured. As the Second Circuit has explained,

 **\*14** if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citations omitted). While this standard most certainly includes "condition[s] of urgency that may produce death, degeneration, or extreme pain," *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted), it has also been interpreted to include "less serious denials [of medical attention] which cause or perpetuate pain." *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Thus, courts "will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain." *Id.* Accordingly, when presented with denial of medical treatment claims, courts do not "require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one." *See id.* (disagreeing with district court determination that chronic pain somewhere between 'annoying' and 'extreme' could not suffice to support

a denial of treatment violation under the Eighth Amendment).

Here, Plaintiff states that he experienced months of "extreme pain," including intense pain in his feet, severely swollen ankles, and chronic bouts of lower back pain, as the direct result of Defendants' allegedly malicious refusal to allow him access to supportive footwear. These symptoms, he reports, resulted in a visit to the hospital to examine his swollen ankles and difficulties engaging in certain prerequisites to prison life, such as "playing the wall" and kneeling on the ground during a search. Significantly, this situation persisted despite several recommendations from prison physicians that Plaintiff be allowed to wear supportive footwear, despite official permits from these physicians, and despite the fact that Plaintiff was prescribed painkillers to deal with the pain that resulted from non-treatment. Plaintiff is thus differently situated than the plaintiffs in other cases that lacked medical advice and medical prescriptions. [8]

While "[i]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," *Chance,* 143 F.3d at 702–03 (citations omitted), the Court concludes that this claim must survive Defendants' motion to dismiss. Plaintiff has described a form of near-chronic suffering that, by his own account, far exceeds the threshold of merely annoying and rises to the level of extreme pain. *Brock,* 315 F.3d at 163. Notably, physicians found this condition "worthy of comment" and treatment—namely, prescription painkillers and medical permits—and Plaintiff has explained that this condition "significantly affects [his] daily activities." *See Salahuddin,* 467 F.3d at 280. While this case is in some respects a close one, the Court cannot conclude as a matter of law that Plaintiff's injuries fall below the relevant threshold of objective severity for purposes of an Eighth Amendment denial of medical treatment claim. The settled fact that "the Constitution does not mandate comfortable prisons," *Rhodes,* 452 U.S. at 349, simply does not mean that the Eighth Amendment abides the wanton infliction of months of "extreme" pain through the allegedly arbitrary denial of medically authorized footwear by prison guards. Recalling that "[m]obility is fundamental to our continued health," the Court concludes that "discovery could shed light on whether Plaintiff's medical need was of such seriousness and

urgency that the failure to address it ... amounted to a violation of Plaintiff's constitutional rights." *Giambalvo v. Sommer,* No. 10 Civ. 6774, 2012 WL 4471532, at *5 (S.D.N.Y. Sept.19, 2012). [9]

**\*15** Because Defendants have not moved to dismiss these claims on any ground other than Plaintiff's supposed failure to demonstrate a sufficiently serious deprivation, the Court does not examine whether Plaintiff satisfies the other requirements of a denial of medical treatment claim (including the requirement of a culpable mental state on Defendants' part).

In the Complaint, Plaintiff identifies Schriro, Agro, Lemon, Fraizer, Williams, Best, Smith, Garcia, Washington, Lespinasse, Hart, Hines, Anku, and Moultrie as the defendants associated with the deliberate indifference claim. Because the Complaint was filed by a *pro se* litigant, it must be interpreted to raise the strongest claims it suggests against the set of named defendants. The Court has independently examined the Complaint and concludes that Plaintiff's Eighth Amendment claim is alleged against Hart, Lespinasse, Washington, Lemon, Fraizer, Best, Williams, Harris, Garcia, Moultrie, Smith, and Hines. For the reason set forth *infra,* Plaintiff's claims against Schriro and Agro are dismissed for failure adequately to allege their supervisory liability. Further, Plaintiff's allegations against Aknu involve only conditions of confinement; to wit, being required to kneel uncomfortably for 30–45 minutes during a search. Because the Complaint does not allege that Aknu participated in the denial of Plaintiff's request for medical treatment, the Eighth Amendment claim against him must be dismissed.

### D. Claims Against Defendants Schriro and Agro

"It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." *McCoy v. Goord,* 255 F.Supp.2d 233, 258 (S.D.N.Y.2003) (quotation marks and citations omitted). Under § 1983, supervisory liability "depends on a showing of some personal responsibility, and cannot rest on *respondeat superior." Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citing *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989)). "[P]roof of 'linkage in the prison chain of command' is

insufficient." *Id.* (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). "Absent some personal involvement by [an official] in the allegedly unlawful conduct of his subordinates," he cannot be liable under section 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987); *see also Hernandez,* 341 F.3d at 145 (specifying some of the forms of involvement that would support supervisory liability). A defendant's status as warden or commissioner of a prison, standing alone, is thus insufficient to support a finding of supervisory liability. *See Collins,* 438 F.Supp.2d at 420. Further, merely "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* No. 01 Civ. 5178, 2007 WL 162476, at *10 (S.D.N.Y. Jan.19, 2007). "Broad, conclusory allegations that a high-ranking defendant was informed of an incident are also insufficient." *Gonzalez v. Sarreck,* No. 08 Civ. 3661, 2011 WL 5051341, at *14 (S.D.N.Y. Oct.24, 2011) (citation omitted).

**\*16** Applying these rules, the Court concludes that Plaintiff has not alleged facts that could support a finding of supervisory liability against Agro and Schriro. All claims against these defendants are therefore dismissed.

### E. Claims Against Barker

Plaintiff alleges that Barker violated the Eighth Amendment by virtue of deliberate indifference to the public's medical needs and that Barker should be held liable under the tort law doctrine of products liability for defective design and failure to warn. These claims do not succeed. As a provider of shoes to the prison, Barker could not plausibly be described as one of the officials acting under color of law "who caused the harm" or did so with the requisite state of mind—namely, deliberate indifference. *See Farmer,* 511 U.S. at 834. This defeats any Eighth Amendment claim against him. Plaintiff has not alleged and this Court cannot imagine any other claim

under § 1983 against Barker. Thus, there is no federal claim in this case against Barker.

Absent such a federal claim, this Court could only consider a state law products liability claim against Baker as a matter of supplemental jurisdiction. Given the early stage of this litigation and the markedly distinct nature of the state law claims as compared to Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the varied products liability claims alleged in the Complaint. *See Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 102–03 (2d Cir.1998) (noting that "when all federal claims are eliminated in the early stages of the litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice").

All claims against Barker are therefore dismissed.

### IV. Summary of Remaining Claims

All claims in this case are dismissed except for First Amendment retaliation claims against Garcia, Lemon, Williams, and Becote, and Eighth Amendment denial of medical treatment claims against Hart, Lespinasse, Washington, Lemon, Fraizer, Best, Williams, Harris, Garcia, Moultre, Smith, and Hines.

### V. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. The Clerk of Court is directed to close the motion at Dkt. No. 32.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1234930

---

Footnotes

1    Plaintiff filed his original complaint on December 16, 2011. He filed an amended complaint on June 6, 2012. Defendants filed a motion to dismiss the amended complaint on August 30, 2012. On November 20, 2012, the Court informed Plaintiff that he had until December 7, 2012 to file opposition papers. The Court added that Plaintiff "may also file on that date his proposed second amended complaint, to which defendants may respond in their reply brief." In their reply brief, Defendants have asked the Court to reject Plaintiff's proposed second amended complaint. Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave" to amend the complaint "when justice so requires." The principal reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Here, there is no evidence of undue delay, bad faith, prejudice, or repeated failure to cure deficiencies. The futility of amendment is a question best addressed by actually deciding the pending motion to dismiss. Recognizing that the Court indicated that Plaintiff could file a proposed second amended complaint, and that the pleadings filed by *pro se* litigants merit "special solicitude," *Ruotolo v. I.R.S.,* 28 F.3d 6, 8 (2d Cir.1994), the Court therefore accepts Plaintiff's Second Amended Complaint ("the Complaint") as the operative pleading in the case.

2    Plaintiff's prior case before Judge Pauley is denoted 1:08–cv–00284–WHP on ECF.

3    Defendants argue that Plaintiff should be required specifically to allege that he did not engage in the behavior charged by the ticket. In the Second Amended Complaint, however, Plaintiff plainly states that "Up until that point plaintiff have not had one single problem that would warrant a misbehavior report, nor have plaintiff ever refused to lock-in." He adds that "both charges [were] fabricated by defendant Bacote." These facts, taken as true for purposes of this motion, negate Defendants' argument.

4    Plaintiff's opposition to the motion to dismiss the First Amended Complaint contains additional facts of this sort, some of which are addressed by Defendants in their filings. Those allegations are not considered in this opinion, which addresses only the now-operative Second Amended Complaint and Defendants' motion to dismiss.

5    The Complaint also suggests an instance of tight handcuffing by Daly while Morris ordered Plaintiff to "play the wall" after Plaintiff's visit to the medical clinic. To the extent that Plaintiff alleges an Eighth Amendment excessive force claim based on this incident, that claim does not succeed on these facts. As this Court has noted:

> [S]ome degree of injury is ordinarily required to state a claim of excessive use of force in violation of the Eighth Amendment. A plaintiff need not prove significant injury to make out an excessive force claim, but a *de minimis* use of force will rarely suffice to state a constitutional claim. *De minimis* force, even if clearly unpleasant to endure, does not violate the Eighth Amendment where the use of force is not of a sort repugnant to the conscience of mankind.

> *Taylor v. New York Dept. of Corr.,* No. 10 Civ. 3819, 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012); *see also id.* at *3–5 (discussing Eighth Amendment excessive force doctrine). Here, Plaintiff does not allege any serious injury, nor does he allege that he protested that the handcuffs were too tight or that the officers acted abusively. *Cf. Sachs v. Cantwell,* No. 10 Civ. 1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012) (discussing the legal standard for excessive force claims under the Fourth Amendment for claims based on tight handcuffing).

6    Moreover, inmates are not entitled to the medical treatment of their choice. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ( "[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." (citation omitted)); *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986).

7    Nearly all of the cases cited by Defendants either address this point in brief dicta or discuss only a conditions of confinement claim where the plaintiff lacked a medical condition, medically advised footwear, or prescription medication. In *Edwards v. Quinones,* Judge Pauley held that a plaintiff could not satisfy the deliberate indifference element—and then added in a single sentence of dicta that the plaintiff, who had not alleged such facts as medical need, prescribed painkillers, or extreme pain, "[bore] the hallmarks of a recreational litigant." No. 10 Civ. 314 1, 2010 WL 4669110, at * 1, *3 (S.D.N.Y. Nov.17, 2010). *Walker v. Clemson,* presented by Defendants as their principal case, similarly misses the mark. No. 11 Civ. 9623, 2012 WL 2335865 (S.D.N.Y. June 20, 2012) *report and recommendation adopted,* No. 11 Civ. 9623, 2012 WL 3714449 (S.D.N.Y. Aug.28, 2012). In *Walker,* the plaintiff was denied use of personal sneakers even after a doctor recommended that he be provided with supportive footwear to remedy a foot spur; this injury, coupled with the prison-issued sneakers, caused the plaintiff "to suffer pain, chronic fungus, [and] a painful gait which in turn warranted the use of a cane to correct" and resulted in a possible need for surgery. *Id.* at * 1. Magistrate Judge Cott recommended denial of a conditions of confinement claim based on deprivation of basic human needs, noting that "[w]hile the prison-issued footwear may not have been as supportive as [the plaintiff's] personal sneakers, the Constitution does not require that prisons provide high-quality footwear." *Id* . at *4. However, when Judge Cott turned to the plaintiff's separate claim of inadequate medical care, he concluded that an absence of information about "how much time passed from [ ] the date Walker was seen by the facility doctor, to the date his personal sneakers were returned to him" prevented any "determination from the pleadings as to the particular risk of harm faced by Walker due to the alleged deprivation." *Id.* at *6. Judge Cott nonetheless recommended denial of the plaintiff's claim due to failure to satisfy the deliberate indifference requirement. *Id.* Several of Defendants' other citations fare little better because Defendants rely on cases that deal with ordinary conditions of confinement claims, not denial of medical care claims. *See, e.g., Martin v. City of New York,* No. 11 Civ. 600, 2012 WL 1392648, at *9 (S.D.N.Y. Apr. 20, 2012) (finding no Eighth Amendment violation where inmate slipped

2013 WL 1234930

and fell on a wet shower floor while wearing poorly constructed shoes); *Williams v. Dep't of Corr.,* No. 11 Civ. 1515, 2011 WL 3962596, at *4 (S.D.N.Y. Sept.7, 2011) (denying conditions of confinement claim where poorly constructed shoes caused slip and falls, and pain in inmate's calves and feet).

8    Further, unlike cases where courts addressed somewhat analogous facts with the precision made possible by fully developed factual records, this Court can rely only on the pleadings. *Cf. Cole v. Scully,* No. 93 Civ.2066, 1995 WL 231250, at *3 (S.D.N.Y. Apr.18, 1995)

9    Defendants argue that this claim must be dismissed on the basis of a single Inmate Grievance Form (IGF) from October 12, 2011, which Defendants argue is incorporated into the Complaint by reference. Even assuming that this IGF is, in fact, incorporated by reference, it would not constitute a basis to dismiss the Complaint. This form states that, as a resolution of Plaintiff's grievance, "the [Inmate Grievance Resolution Committee] was informed that if your medical note is current, you are advised to bring your medical note to the clothes box and you will be issued supportive footwear." The IGF indicates that Plaintiff refused to sign. Nothing about this document plainly contradicts Plaintiff's own account of events. It is entirely possible that the Committee took that permissive position in response to his grievance, but that Defendants nonetheless maliciously and willfully disregarded that instruction from the Committee. The fact that Plaintiff refused to sign the form says little on its own; it certainly does not contradict Plaintiff's allegations that Defendants denied him access to his supportive footwear notwithstanding a medical permit, nor does it prove that Plaintiff actually received supportive footwear.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.



Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln
Work-Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe # 1,
Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.
No. Civ.A. 95CV1641RSPDS.

Sept. 22, 1997.

Kenneth Brown, State Court Institute-Greene,
Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman
Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M.
Dvorin, Assistant Attorney General, Carl N. Lundberg,
Chief Legal Counsel, South Carolina Department of
Probation, Columbia, SC, for defendants Bishop, Magee,
Barton, McMahan, and Stanford, Carl N. Lundberg, of
Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Daniel
Scanlon, Jr., duly filed on April 17, 1997. Following ten
days from the service thereof, the Clerk has sent me the
entire file, including any and all objections filed by the
parties herein.

Plaintiff Kenneth Brown commenced this Section

1983 civil rights action on November 17, 1995. On
February 12, 1996, Magistrate Judge Scanlon ordered
Brown to submit an amended complaint alleging the
specific acts committed by the individuals named as
defendants which Brown claimed violated his
constitutional rights. Brown filed an amended complaint
on March 21, 1996. In his amended complaint, Brown
alleged that defendants violated his rights under the Eighth
and Fourteenth Amendments by failing to process properly
his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact he
had never violated the conditions of his parole. For a more
complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams
made a motion to dismiss for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No.
14, at 2. On August 19, 1996, defendants Bishop, Magee,
Barton, and McMahan made a motion to dismiss the
complaint against them or, in the alternative, for summary
judgment. Dkt. No. 20. On October 17, 1996, defendants
Herman, Stewart, and Stanford made a motion to dismiss
for failure to state a claim. Dkt. No 34. On April 17, 1996,
Magistrate Judge Scanlon recommended that all
defendants' motions to dismiss be granted and that the
complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave
to file a second amended complaint and a copy of his
proposed amended complaint. Dkt. No. 53. I turn first to
the last motion filed, Brown's motion for leave to amend
his complaint a second time.

Brown seeks to file a second amended complaint
"setting forth in detail the personal involvement of each
defendant and how their acts of commission and omission
served to deprive plaintiff of Constitutionally secured
rights." Dkt. No. 53. The district court has discretion
whether to grant leave to amend. *Ruffolo v. Oppenheimer*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

& Co., 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss-the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

*2 Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to

allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a de novo determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for pro se pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. See Camardo v. General Motors Hourly-Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); Chambrier v. Leonardo, 1991 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[FN1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

> FN1. I note, however, that the report-recommendation would survive even *de novo* review.

### CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

### ORDER and REPORT-RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

### BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1-2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5-7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8-10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11-14; Exs. C-J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15-17; Exs. F-I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. See LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing Ortiz v. Cornette, 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their]] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill*, 824 F.2d at 196.

*7 Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.
E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

### CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby
ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

N.D.N.Y.,1997.

Brown v. Peters
Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



LEXSEE 1995 U.S.DIST. LEXIS 7136

**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURCE, HIRMAN INSURNCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants.** [1]

1  Names in the caption are spelled to reflect plaintiffs complaint.

**Civil Action No. 94-CV-1594**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 7136*

**May 22, 1995, Decided**
**May 23, 1995, FILED**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P. 4(k)*. Defendants were not subject to federal interpleader jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service***
***Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents***
***Governments > Federal Government > Employees & Officials***
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2)*. Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1)*.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview***
***Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail***
***Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations***
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1), 4(e)(1)*.

***Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview***
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308, 311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

***Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail***
***Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview***
***Governments > Local Governments > Claims By & Against***
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2)*. Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Civil Procedure > Parties > Interpleaders > General Overview***
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General***

*Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*

[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*

[HN8] See *28 U.S.C.S. § 1391(a)*.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*

[HN9] See *28 U.S.C.S. § 1391(1)*.

*Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers*
*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Venue > Multiparty Litigation*

[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a)*.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Governments > Legislation > Statutes of Limitations > General Overview*

[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*

[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

*Civil Rights Law > General Overview*

[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*

[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*

[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Appointments*
*Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals*

[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

**COUNSEL:** [*1] HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ., MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P., Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

***MEMORANDUM-DECISION AND ORDER***

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint

on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (sic) [2] ("J.C. Penney"), British Airways, Kowate (sic) Airline ("Kuwait"), MSi Insurnce (sic) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (sic) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, [*6] it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March [*7] 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

> 2    Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

> 3    Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8]    The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson [*9] and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to

Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

> 4    The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.
>
> 5    The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11] Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

**ANALYSIS**

**The Defaults**

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P.*

*4(e)(1).* [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1)* and *4(e)(1).* [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See N.Y. Civ. Prac. L. & R. §§ 308, 311* (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

**II. The Jurisdictional Arguments**

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

**A. Personal Jurisdiction**

Maki, the state defendants, Olmsted County,

Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*. Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19*. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k). See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a)*. The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a)*. Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

**B. Subject Matter Jurisdiction**

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1)*. Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The

state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17] was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983)*. These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332*. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18] address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a). Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

> 6   We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. §*

*1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332. Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989), cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332.*

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

## C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

[HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a). Section 1391(b)* provides that federal question actions, except as otherwise provided by law, may be brought only in

[HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United

States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

> 7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25]

of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).* [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363.*

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27] amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989)).* We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).*

> 8    Former Supreme Court Justice Harry A. Blackmun.
>
> 9    We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. § 1915(d)*, holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8.* The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993), aff'd 41 F.3d 1500 (2d Cir. 1994); cf. Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540.*

## IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991).* Moreover, her litigiousness has not yet reached the point

at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695.*

## CONCLUSION

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875 (3d Cir.) cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE