# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

AKANNI AMBERSLIE,

                Plaintiff,            Civil Action No.
                                       9:17-CV-0564 (TJM/DEP)

     v.

PRISONER TRANSPORT SERVICE
OF AMERICA, LLC,[1]

                Defendant.

─────────────────────────────

APPEARANCES:                   OF COUNSEL:

FOR PLAINTIFF:

AKANNI AMBERSLIE, *Pro Se*
17-B-2005
Livingston Correctional Facility
P.O. Box 91
Sonyea, NY 14556

FOR DEFENDANT:

GOLDBERG SEGALLA LLP       JONATHAN M. BERNSTEIN, ESQ.
8 Southwoods Boulevard
Suite 300
Albany, NY 12211-2526

─────────────────────

[1]    Defendant's motion papers reflect that the proper name of defendant is "Prisoner Transportation Services, LLC," rather than "Prisoner Transport Service of America, LLC," the name under which it was sued. Dkt. No. 39-3 at 2. The clerk of the court will respectfully be directed to modify the court's records to reflect this change.

GOLDBERG SEGALLA LLP                    SHANNON T. O'CONNOR, ESQ.
5786 Widewaters Parkway
Syracuse, NY 13214-1840

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## ORDER, REPORT, AND RECOMMENDATION

This is a civil rights action brought by *pro se* plaintiff Akanni Amberslie, an inmate currently confined in a New York State prison facility, pursuant to 42 U.S.C. § 1983, against defendant Prisoner Transportation Services, LLC ("PTS"), a corporation organized under Tennessee law, and with its principal place of business near Nashville, Tennessee. In his amended complaint, plaintiff alleges that defendant was engaged to transport him in custody from Fayetteville, Georgia to Broome County, New York as a pretrial detainee, and that during the course of the transport, he was exposed to inhumane conditions rising to a level of constitutional significance.

Currently pending before the court is a motion brought by defendant seeking dismissal of the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6), without leave to replead. In the motion, defendant argues that (1) plaintiff's complaint fails to set forth facts sufficient to demonstrate the existence of a plausible due process claim; (2) plaintiff's amended complaint fails to allege facts to support that his

2

constitutional rights were violated pursuant to an official policy or custom under the criteria set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); and (3) venue is improper in the Northern District of New York. Alternatively, defendant seeks a transfer of the action to the Middle District of Tennessee, where defendant is headquartered, pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, I recommend that defendant's motion to dismiss be granted, and plaintiff's complaint be dismissed.

I.    BACKGROUND[2]

On March 14, 2017, plaintiff was transferred into the custody of defendant PTS to be transported from Georgia to New York.[3] Dkt. No. 35 at 3. In the ensuing days that he was in defendant's custody, plaintiff was

---

[2]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

I have also considered plaintiff's opposition to the pending motion to the extent that it is consistent with, and elaborates upon, the factual allegations contained in the amended complaint. *See Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 170 n.1 (2d Cir. 1998) ("[W]e deem [the plaintiff]'s complaint to include the facts contained in his memorandum of law filed in response to [the defendant]'s 1996 motion to dismiss.").

[3]    Defendant's transport of plaintiff from Georgia to New York was conducted pursuant to the Interstate Transportation of Dangerous Criminals Act of 2000, or "Jeanna's Act", Pub. L. 106-560, S.18998 (Dec. 21, 2000), codified at 34 U.S.C. § 60601 *et seq*., and the regulations promulgated under that Act and found at 28 C.F.R. Pt. 97.

confined to a cramped prisoner transport van, where he was unable to move or stretch for forty or fifty hours at a time. Dkt. No. 45 at 7. Plaintiff alleges that he was not provided with his medication in a timely fashion, that he was not given three meals per day, and that he was deprived of the use of the bathroom for up to seven hours at a time, resulting in his having to use a water bottle to relieve himself. *Id.* at 4-7; *see also* Dkt. No. 35.

Plaintiff alleges that he suffered these conditions as a result of defendant's "policies" and the lack of training of its personnel. Dkt. No. 35. In further support of his claim, plaintiff details the treatment of other individuals he claims were transported by defendant and subjected to either unsafe or inhumane treatment as a result of defendant's policies and lack of training. Dkt. No. 35 at 2-3. As a result of the conditions of his interstate transport, plaintiff alleges that he suffers from a variety of ailments, including anxiety, stress, headaches, night terrors, bladder issues, depression, and pain in his knees. Dkt. No. 45 at 1.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on May 23, 2017. Dkt. No. 1. His original complaint named defendant PTS, the State of New York, and Broome County as defendants. *Id.* at 1-2. Following the grant of plaintiff's

application for leave to proceed *in forma pauperis* and the court's review of his complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A, Senior District Judge Thomas J. McAvoy issued a decision and order on June 8, 2017, in which he (1) dismissed all claims against the State of New York, with prejudice; (2) dismissed plaintiff's claims against the Broome County, without prejudice; (3) dismissed plaintiff's Fourteenth Amendment equal protection claim against defendant PTS, without prejudice; and (4) ordered that only plaintiff's Fourteenth Amendment cruel and unusual punishment claim against defendant PTS survived the court's *sua sponte* review. *See generally* Dkt. No. 4.

In lieu of answering plaintiff's complaint, defendant moved on August 31, 2017 seeking dismissal of his remaining claims for failure to state a cognizable claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See generally* Dkt. No. 23. Defendant also moved to dismiss on the ground that venue was improper pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure and argued, in the alternative, that the action should be transferred to the United States District Court for the Middle District of Tennessee. *See generally id.* As a result of that motion, and following my issuance of a report and recommendation, Judge

McAvoy issued a decision and order on February 22, 2018 dismissing plaintiff's complaint, but granting him leave to replead. Dkt. Nos. 33, 38.

Plaintiff availed himself of the opportunity to replead and filed an amended complaint on February 1, 2018. Dkt. No. 35. On March 6, 2018, defendant again moved for dismissal of plaintiff's amended complaint pursuant to Rule 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing in the alternative that the action should be transferred to the United States District Court for the Middle District of Tennessee, and on May 31, 2018, submitted additional materials in support of its motion. Dkt. Nos. 39, 46. Plaintiff filed papers in opposition to the motion on May 25, 2018. Dkt. No. 45. Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Motion to Dismiss for Improper Venue[4]

---

[4]    As a magistrate judge, although I lack the authority, absent consent of the parties, to order dismissal of an action, a venue transfer is regarded as a non-dispositive matter, which falls within the scope of my non-consensual jurisdiction under 28 U.S.C. § 636(b)(1)(A). Because defendant's motion to transfer venue is raised in conjunction with its motion to dismiss, however, I have chosen to format my response to that motion as a recommendation to Judge McAvoy.

In its motion, defendant asserts that venue is improperly laid in the Northern District of New York, and that it is therefore entitled to dismissal of the amended complaint pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. Dkt. No. 39-10 at 18-22. As an alternative to dismissal, defendant requests that the matter be transferred to the Middle District of Tennessee. *See generally id.* Plaintiff opposes the motion to dismiss, as well as defendant's alternative argument to transfer. *See generally* Dkt. No. 45.

    1.    <u>Legal Standard Governing Motions to Dismiss for Improper Venue - Generally</u>

To survive a motion to dismiss for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, it is the plaintiff's burden to plead that venue is proper in the district in which the case has been brought. *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 447 (E.D.N.Y. 2013). Where, as here, the parties have not yet engaged in discovery, the plaintiff must only make a *prima facie* showing of venue being proper, with all the pleadings and affidavits being construed in plaintiff's favor. *Starr v. Michael Stars, Inc.*, No. 12-CV-860, 2013 WL 12291517, at *2 (N.D.N.Y. Mar. 21, 2013) (Mordue, J.).[5] Thus, in analyzing defendant's claim of improper

---

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

venue, the court must view all facts in the light most favorable to the plaintiff. *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 384 (2d Cir. 2007). The court "may consider evidentiary matters outside the pleadings 'by affidavit or otherwise[.]' " *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010) (quoting *Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986)). The question of whether to dismiss on the basis of improper venue is entrusted to the sound discretion of the district court. *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993).

To determine whether venue in this district is "improper," and if a plaintiff's complaint is therefore subject to dismissal under Rule 12(b)(3), the court is guided by 28 U.S.C. § 1391(b), which is applicable to claims filed pursuant to section 1983. *See, e.g.*, *Phillips v. PTS of Am., LLC*, No. 16-CV-0466, 2017 WL 9325623, at *2 (E.D. Ky. Sept. 12, 2017) ("There is no special venue statute for § 1983 civil rights actions."). Pursuant to section 1391(b), a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the

8

subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b)(1)-(3).[6] As can be seen, "[i]n cases where the plaintiff brings a civil action in a district other than the one where any defendant lives, venue will be proper 'if a substantial part of the events or omissions giving rise to the claim occurred' in that judicial district." *E. Mishan & Sons, Inc. v. Smart and Eazy Corp.*, No. 18-CV-3217, 2018 WL 6528496, at \*7 (S.D.N.Y. Dec. 12, 2018) (quoting 28 U.S.C. § 1391(b)(2)) (finding plaintiff's choice of venue proper in the Southern District of New York where defendants, two California corporations, advertised, shipped, and marketed products to New York residents).

"In the event a court in which an action is pending finds that venue is improper, a court 'shall dismiss, or if it be in the interest of justice, transfer [the] case to any district or division in which it could have been brought.' "

---

[6]     Subsection (3) of the venue statute is inapplicable unless application of subsections (1) or (2) do not yield a judicial district in which the action may be brought. *See, e.g.*, *Grasso v. Bakko*, 570 F. Supp. 2d 392, 397 (N.D.N.Y. 2008) (Hurd, J.) ("Section (3) is inapplicable because there are other districts in which this action could have been brought.").

*Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP*, No. 17-CV-0034, 2017 WL 7411022, at *7 (N.D.N.Y. Mar. 23, 2017) (Peebles, M.J) (quoting 28 U.S.C. § 1406(a)); *see Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 465-67 (1962).

### 2.    Venue Pursuant to 28 U.S.C. § 1391(b)(1)

A civil action may be brought in "a judicial district in which any defendant resides[.]" 28 U.S.C. § 1391(b)(1). For purposes of the present motion, defendant argues that plaintiff cannot rely on residence to establish venue in the Northern District of New York. Dkt. No. 39-10 at 19. In particular, defendant asserts that because it is incorporated in the State of Tennessee and is headquartered in Whites Creek, Tennessee, a neighborhood of Nashville, it "resides" in the Middle District of Tennessee for purposes of section 1391(b)(1). *Id.*; *see also* Dkt. No. 39-3.

Defendant's argument, however, ignores the contours of 28 U.S.C. § 1391(c)(2), which provides that for purposes of determining proper venue, a business entity "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question[.]" As a result, the venue question turns not on the location of incorporation or principal place of business, but on whether the district court can properly assert personal

jurisdiction over the corporate defendant. *See, e.g.*, *Gonsalves-Carvalhal v. Aurora Bank*, *FSB*, No. 12-CV-2790, 2014 WL 201502, at *4 (E.D.N.Y. Jan. 16, 2014).

Personal jurisdiction is determined by "a two-step inquiry." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013)). First, the court "look[s] to the law of the forum state" to determine whether there is personal jurisdiction. *Id.*; *see Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2015). If there is personal jurisdiction under state law, the court still must consider whether the exercise of personal jurisdiction over the out-of-state defendant "comports with due process protections established under the United States Constitution." *Licci*, 732 F.3d at 169; *see Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).

Here, although defendant indicates that it does not have any offices or employees in the State of New York, *see* Dkt. No. 39-2 at 5, because it has ignored the contours of 28 U.S.C. § 1391(c)(2), it has not provided any additional information from which the court could meaningfully analyze whether it is subject to the personal jurisdiction of the court for purposes of venue. I note, however, that defendant has not moved to dismiss the complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the

Federal Rules of Civil Procedure. Moreover, it does appear that defendant "transacts . . . business" inasmuch as it provides comprehensive prisoner transportation services for law enforcement agencies across the State of New York. *See* N.Y. C.P.L.R. § 302(a)(1).

At this stage, when construing all pleadings and affidavits in plaintiff's favor, as the court must, particularly in the absence of additional information from defendant, I am inclined to conclude that venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(1). Accordingly, although I recommend that defendant's motion on this basis be denied, I will proceed to subsection (2) of the venue statute.

3.    Venue Pursuant to 28 U.S.C. § 1391(b)(2)

A challenge to venue pursuant to section 1391(b)(2) is informed by a two-part inquiry. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005). "First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims." *Id.* Second, a court must determine whether a "substantial part of the events of omissions giving rise" to plaintiff's claim occurred in this district. *Id.*; 28 U.S.C. § 1391(b)(2).

In 2005, the Second Circuit joined several other circuits in clarifying that the phrase "a substantial part" does not mean "the substantial part,"

and, accordingly, venue may properly lie in more than one district pursuant to section 1391(b)(2). *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356-57 (2d Cir. 2005). The court cautioned, however, that the venue statute must be strictly construed, and the term "significant" implies that "for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Id.* at 357 (emphasis in original); *see also Daniel,* 428 F.3d at 432.

"Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). When the material acts or omissions bear a "close nexus to the claims," they are properly considered "significant" under the statute. *Daniel*, 428 F.3d at 433. For events to be considered "substantial," however, "does not require a majority of the events to take place here, nor that the challenged forum be the best forum for the lawsuit to be venued." *Hayes v. Transcor Am., LLC*, No. 08-CV-0293, 2009 WL 1795309, at *2 (E.D. Pa. June 23, 2009) (quoting *Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan Coasters, Inc.*, No. 05-CV-2052, 2005 WL 2660351, at *3 (E.D. Pa. Oct. 18, 2005)). In other words, "significant

events or omissions material to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Glasbrenner*, 417 F.3d at 357; *see Fen Wang v. Tavernier*, 621 F. App'x. 83, 84 (2d Cir. 2015).

Addressing the first part of the inquiry pertaining to the nature of plaintiff's claims, and drawing all reasonable inferences in his favor, I note that plaintiff alleges the following in his amended complaint: (1) defendant violated plaintiff's Fourteenth Amendment rights during his transfer from Georgia to New York in which he was "depriv[ed] of food, bathroom, unreasonable safety and medical attention"; and (2) defendant violated his Fourteenth Amendment rights through unconstitutional policies and inadequate training. *See generally* Dkt. No. 35. In effect, the acts or omissions giving rise to plaintiff's claims stem from defendant's allegedly unconstitutional policies and inadequate training, resulting in plaintiff's "deprivation of food," denial of bathroom breaks, "unreasonable safety," and defendant's failure to provide necessary medication. *Id.*; *see also* Dkt. No. 45.

Defendant contests venue in this district, arguing that "a substantial part" of the events did not occur in New York, and thus venue in this district is improper. See Dkt. No. 39-10 at 20-22. Although plaintiff does

not specifically plead each state through which he was transported, viewing the facts in the light most favorable to plaintiff, it appears likely that the alleged acts or omissions giving rise to plaintiff's claims occurred throughout the duration of his transfer, which spanned through multiple districts from Georgia to New York. *See* Dkt. No. 35 at 3 (stating that plaintiff was subjected to the alleged harm "during his transport . . . from Georgia to Broome County"). According to the affidavit of defendant's president and general counsel, Joel W. Brasfield, plaintiff's transport traversed through the following states: Georgia on March 14 and 15, 2017; North Carolina, South Carolina, Virginia, and Maryland on March 16, 2017; Pennsylvania, New York, and New Jersey on March 17, 2017; New Jersey on March 18, 2017; and New Jersey and Pennsylvania on March 19, 2017. Dkt. No. 39-2 at 7-10. Plaintiff, for the second time, entered the state of New York in the early morning hours of March 20, 2017, reaching Buffalo, New York at approximately 12:30 a.m. Dkt. No. 39-2 at 10. The transport then continued through Syracuse, Oriskany, and Rome before dropping plaintiff off at his final destination in Binghamton, New York at approximately 9:00 p.m. Dkt. No. 39-2 at 10.

Despite the fact that the quantity of the acts or omissions alleged to have occurred in this district is relatively small considering the duration of

his interstate transport, those acts or omissions alleged to have been committed by defendant are not insignificant. " 'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Daniel*, 428 F.3d at 432-33; *see also Katz v. Mogus*, 538 F. Supp. 2d 538, 543 (E.D.N.Y. 2007) (finding venue proper where less than one-fifth of the conduct giving rise to plaintiff's claimed damages occurred within the district).

The court is guided by similar cases involving claims against companies in the primary business of transporting prisoners. In those cases, several courts have found that although the time spent in the forum state was minimal, the defendant-transport companies' acts or omissions in the forum state still bore a "close nexus" to the plaintiffs' claims such that venue was proper. *See, e.g., Hayes*, 2009 WL 1795309, at *1 (quoting *Leone v. Cataldo*, 574 F. Supp. 2d 471, 484 (E.D. Pa. 2008)); *see also Daniel*, 428 F.3d at 433 ("When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed "significant" and, thus, substantial.").

For example, in *Hayes v. Transcor America, LLC*, plaintiff was transported by the defendant over six days, beginning in North Carolina and ending in Philadelphia, Pennsylvania. *Hayes,* 2009 WL 1795309, at *1. The plaintiff alleged that during the course of the transport and in accordance with its unconstitutional policies, the defendant refused to provide the plaintiff with his medications and denied his requests to use bathroom facilities, resulting in the plaintiff defecating on himself. *Id.* Applying the "substantial part" test of section 1391(b)(2), the district court found that venue was proper in the Eastern District of Pennsylvania. *Id.* at *2-4. Reasoning that the "within-[d]istrict acts or omissions" bore a close nexus to plaintiff's claims and were "qualitatively central to [p]laintiff's claims and comprised[d] part of the historical predicate" for the action, the court found venue proper in the Eastern District of Pennsylvania. *Id.* at *3 (quoting *Estate of Moore v. Dixon*, 460 F. Supp. 2d 931, 936 (E.D.Wis. 2006)) (internal quotation marks omitted); *see also Hastings v. Inmate Servs. Corp.*, No. 2:17-CV-145, 2017 WL 5138272, at *5 (M.D. Fla. Nov. 6, 2017) (finding venue proper pursuant to section 1391(b)(2) in the Middle District of Florida on plaintiff's section 1983 claims alleging inadequate medical care during plaintiff's fifteen-day trip from California to Florida because plaintiff alleged the misconduct continued while in defendant's

custody in the state of Florida and plaintiff claimed he was treated for his injuries in Florida); *Schilling v. Transcor Am., LLC*, No. 08-CV-0941, 2009 WL 3334889, at *4 (N.D. Cal. Oct. 14, 2009) (finding venue proper pursuant to section 1391(b)(2) because "it [was] undisputed that at least some portion of [the prisoner's] route was in the Northern District.").

Drawing all reasonable inferences in plaintiff's favor, I find that a substantial portion of the events or omissions giving rise to plaintiff's claims occurred in this district, and that venue is therefore proper in the Northern District of New York pursuant to 29 U.S.C. § 1391(b)(2). Accordingly, I recommend that defendant's motion on this basis also be denied.

### B. Motion to Transfer Venue

In the alternative, defendant has requested that the court, in the exercise of its discretion, transfer the case to the Middle District of Tennessee, where PTS is headquartered, pursuant to 28 U.S.C. 1404(a). Dkt. No. 39-10 at 24-29. That section provides, in relevant part, as follows:

> for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

28 U.S.C. § 1404(a); *see Gottlieb v. U.S. Sec. & Exch. Comm'n*, 723 F.

App'x 17, 19 (2d Cir. 2018) (summary order)). "The purpose of section 1404(a) is to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Flaherty v. All Hampton Limousine, Inc.*, 01 Civ 9939, 2002 WL 1891212, at *1 (S.D.N.Y. Aug. 16, 2002) (internal quotation marks omitted) (quoting *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 94 (S.D.N.Y. 1995)); *see also Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). The decision of whether to grant a requested transfer under section 1404(a) is addressed to the sound discretion of the court. *Nelson A. Taylor Co., Inc. v. Tech. Dynamics Grp. Inc.*, No. 95-CV-0431, 1997 WL 176325 (N.D.N.Y. Apr. 7, 1997) (Pooler, J.) (citing *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993)).

In this circuit, the decision of whether to grant a requested transfer under section 1404 is informed by several relevant factors, including

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties.

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006) (alteration in original) (quoting *Albert Fadem Trust v. Duke Energy*

*Corp.*, 214 F. Supp. 2d 341, 343 (S.D.N.Y. 2002)); *see also N.Y. Marine &*

*Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010);

*Wagner v. N.Y. Marriot Marquis*, 502 F. Supp. 2d 312, 314 (N.D.N.Y.

2007) (Mordue, J.).

A party seeking to transfer under section 1404(a) bears the " 'burden

of making out a strong case for a transfer.' " *Filmline Prods., Inc. v. United*

*Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989) (quoting *Ford Motor Co. v.*

*Ryan*, 182 F.2d 329, 330 (2d Cir. 1950). Although the Second Circuit has

> never explicitly approved a district court's use of the
> 'clear and convincing evidence' standard in ruling on
> a motion to transfer venue . . . [i]t is . . . appropriate
> that the district courts in [this] Circuit have
> consistently applied the clear and convincing
> evidence standard in determining whether to
> exercise discretion to grant a transfer motion.

*N.Y. Marine*, 599 F.3d at 113-14. Thus, the court should not "disturb a

plaintiff's choice of forum 'unless [the d]efendants make a clear and

convincing showing that the balance of convenience favors [their] choice.'"

*View 360 Sols., LLP v. Google, Inc.*, 12-CV-1352, 2013 WL 998379, at *1

(N.D.N.Y. Mar. 13, 2013) (Dancks, M.J.), *report and recommendation*

*adopted by* 2013 WL 12130430 (N.D.N.Y. Aug. 13, 2013) (Suddaby, C.J.).

Here, because this case could have been brought in the proposed

transferee district, the determination of whether the action should be

transferred to the Middle District of Tennessee will turn on the balance of the convenience and interest of justice factors. While plaintiff's choice of forum is afforded considerable weight, "[c]onvenience of both party and non-party 'witnesses is probably the single-most important factor in the analysis of whether transfer should be granted.' " *In re Bennett Funding Grp., Inc.*, 259 B.R. 243, 249 (N.D.N.Y. 2001) (Kahn, J.) (quoting *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 657 (S.D.N.Y. 1998)). An evaluation of this factor typically involves weighing the materiality of testimony witnesses may provide, the number of witnesses, and where those witnesses are located. *See View 360*, 2013 WL 12130430, at *5. To that end, the Second Circuit has stated that when a party seeks to rely on the "convenience of witnesses" factor, the party "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978), *abrogated on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579, 586 (2d Cir. 1990). This requirement exists so that the court may appropriately assess the inconvenience of a particular forum. *See Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 396 (S.D.N.Y. 2006).

Here, through the affidavit of Mr. Brasfield, defendant PTS states that it expects to call James Carder, an individual whom they identify as the "Officer in Charge" and one of the drivers participating in plaintiff's transport, as a witness. Dkt. No. 39-2 at 5. Defendant acknowledges, however, that Mr. Carder does not reside in Tennessee, but is based in Florida. *Id.* Although the Middle District of Tennessee is somewhat closer to Mr. Carder's residence, either district would be equally inconvenient for that witness.

Defendant also states that "the number of witnesses relevant to this action is unknown, but witnesses with knowledge of extradition transports such as this one . . . are located in Tennessee." *Id.* at 6. Plaintiff, on the other hand, has identified numerous witnesses who he believes will testify on his behalf regarding the conditions of his transportation, including one of the two drivers of the transport. *See* Dkt. No. 45 at 7-9. Plaintiff claims his witnesses are located in the northeast, including in Syracuse, New York, Pennsylvania, and New Jersey, although he does provide the specific location of each witness listed. *See* Dkt. No 45 at 7-9. While the "convenience of witness" factor would normally weigh in favor of defendant in light of plaintiff's allegations regarding the unconstitutional policies of defendant, considering plaintiff's identification of specific witnesses that he

22

intends to call at trial, I do not find that this factor weighs heavily in favor of one party over the other such that it should disturb plaintiff's choice of venue.

With respect to the third convenience and interest of justice factor, including the location of documents, defendant recognizes that "[a]lthough documents in this case may be available electronically, . . . it will be easier to access in the Middle District of Tennessee since all of the original documents are housed at Defendants home office located in Whites Creek, Tennessee." Dkt. No. 39-10 at 26-27. Although the documents are physically located in Tennessee and this factor would weigh in favor of transfer, "the [c]ourt does not view it as particularly significant given that we live in a technological age, where electronic production has become the norm in litigation." *Zaltz*, 952 F. Supp. 2d at 462. In addition, this factor is not entitled to great weight because defendant has not indicated that transporting the original documents from Tennessee would be particularly burdensome. *See, e.g.*, *Larew v. Larew*, 11-CV-5771, 2012 WL 87616, at *5 (S.D.N.Y. Jan. 10, 2012); *see also Weintraub v. Advanced Corr. Healthcare, Inc.*, 161 F. Supp. 3d 1272, 1283 (N.D. Ga. 2015) ("Since the predominance of electronic discovery in the modern era, most courts have

recognized that the physical location of relevant documents is no longer a significant factor in the transfer inquiry").

Turning next to the fourth factor and considering the convenience of the parties, it is true that defendant will suffer some inconvenience if the case remains in the Northern District of New York. The reality, however, is that the plaintiff is currently incarcerated in a facility located within the Western District of New York, and therefore will suffer considerable hardship if the case were to be transferred to the Middle District of Tennessee. " '[W]here transfer would merely shift the inconvenience from one party to the other,' the court should leave plaintiff's choice of venue undisturbed." *Wagner*, 502 F. Supp 2d at 316 (quoting *Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp.*, 976 F. Supp. 174, 182 (W.D.N.Y. 1997)). Accordingly, this factor favors the action remaining in the Northern District of New York and against transferring the action to the Middle District of Tennessee.

When examining the locus of operative facts, "courts look to the 'site of the events from which the claim arises.' " *Oubre v. Clinical Supplies Mgmt., Inc.*, No. 05-CV-2062, 2005 WL 3077654, at *4 (S.D.N.Y. Nov. 17, 2005) (quoting *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 134 (S.D.N.Y. 1994)). While the alleged harm suffered by

plaintiff may ultimately have flowed from defendant's policies, which were likely drafted and originated in Tennessee, where PTS is headquartered, the relevant events themselves are alleged to have occurred as a continuum over the course of plaintiff's journey from Georgia to New York. This factor is thus neutral, at best.

As for the availability of process to compel the attendance of unwilling witnesses, this court has the authority to compel the attendance of a non-party witness within one hundred miles of where the individual resides, is employed, or regularly conducts business. Fed. R. Civ. P. 45(c)(1)(A). For party witnesses, the court may compel a witness's compliance within the state where the person resides, is employed, or regularly transacts business. Fed. R. Civ. P. 45(c)(1)(B). Defendant has indicated that the witnesses it intends to call either reside in Florida or Tennessee, and thus the court is not convinced it may compel those witnesses, if they were unwilling, to attend a trial in the Northern District of New York. *See* Dkt. 39-2 at 4-5 (identifying defendant's potential witnesses). Plaintiff has stated that he believes one potential witness lives in Syracuse, whereas another potential witness may reside in New Jersey. *See* Dkt. No 45 at 7-9. For the remainder of the witnesses listed by plaintiff, no residence was provided. *See* Dkt. No 45 at 9 (listing the names

of thirteen witnesses). Considering that the location of plaintiff's witnesses is likely speculative, the court is not convinced it has the authority to compel the attendance of any witnesses listed by plaintiff. Thus, this factor weighs in favor of defendant's requested transfer where the majority its witnesses may be compelled to attend in the Middle District of Tennessee.

Finally, with respect to the relative means of the parties, I find that this factor weighs heavily in favor of plaintiff. "Where a disparity exists between the means of the parties, such as in the case of an individual suing a large corporation, the court may consider the relative means of the parties in determining where a case should proceed." *800-Flowers, Inc.*, 860 F. Supp. at 135. In response to defendant's motion to transfer, plaintiff asserts that he is proceeding *pro se* and has limited resources. Dkt. No. 45 at 8. Plaintiff further notes that travel to Tennessee is hindered by his incarceration. *Id.* Where a party argues against transfer based on inadequate means, he must offer documentation to demonstrate that transfer would be unduly burdensome on his or her finances. *See Zaltz,* 952 F. Supp. 2d at 463-64 (citing cases); *see also Weintraub*, 161 F. Supp. 3d at 1284 (concluding that because the defendant was "a large and established company" and plaintiff was "retired and of modest means," this factor weighed against transfer). As plaintiff is proceeding *in*

*forma pauperis* in this matter, documentation is before the court regarding plaintiff's financial status. *See generally* Dkt. No. 2. In light of the apparent disparity in the financial means of the parties, the court finds that this factor weighs heavily in favor of keeping the case in this district.

Finally, defendant argues that in the interest of justice and trial efficiency, this matter should be transferred. While courts often consider this factor in making a transfer determination, *see, e.g., 800-Flowers,* 860 F. Supp. at 135 (discussing application of the "interest of justice" factor), defendant has not offered any meaningful points for consideration beyond the factors already discussed herein. *See* Dkt. No. 39-10 at 29. Thus, I find no compelling reason as to why the matter should be transferred to the Middle District of Tennessee.

On consideration of the relevant factors, I find that notions of convenience and fairness weigh in favor of upholding plaintiff's choice of venue in this district. While defendant has demonstrated that it would suffer some inconvenience should the matter remain here, other factors weigh heavily in plaintiff's favor, namely plaintiff's choice of forum, plaintiff's residence, and the relative means of the parties. Accordingly, I recommend that defendant's motion to transfer be denied.

C.    <u>Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6)</u>

1. <u>Legal Standard</u>

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper*, 378 U.S. at 546; *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005)

(Kahn, J.). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y.

2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

## 2. Plaintiff's Due Process Claim

Section 1983 "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)). It " 'is not itself a source of substantive rights[,] . . . but merely provides 'a method for vindicating federal rights elsewhere conferred[.]' " *Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In order to state a claim pursuant to section 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.' " *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *accord, Byng v. Delta Recovery Servs. LLC*, 568 F. App'x 65, 65-66 (2d Cir. 2014).

State action is an essential element of any claim that is brought pursuant to section 1983. *Gentile v. Republic Tobacco Co.*, No. 95-CV-1500, 1995 WL 743719, at *2 (N.D.N.Y. Dec. 6, 1995) (Pooler, J.) (citing *Velaire v. City of Schenectady*, 862 F. Supp. 774, 776 (N.D.N.Y. 1994)

(McAvoy, J.)). A private entity becomes a state actor when there is " 'such a close nexus between the [s]tate and the challenged action' that the state is '*responsible* for the specific conduct." *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (alteration and emphasis in original) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 111 (2d Cir. 2003)). Courts employ three main tests to determine whether private actions are attributable to the states:

> (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state ("the public function test").

*Id.* at 207 (quoting *Sybalski v. Indep. Grp. Home Living Program Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)).

Notably, numerous district courts have permitted a plaintiff to proceed with section 1983 claims against private corporations engaged in offering prison transport services. *See, e.g., McCorvey v. Prison Transp. Servs. of Am.*, LLC, No. CV 16-16993, 2017 WL 2270024, at *3 n.5 (Apr. 25, 2017), *report and recommendation adopted by* 2017 WL 2256778 (E.D. La. May 23, 2017); *Lewis v. Extradition Transp. of Am.*, No. 13-CV-

0138, 2014 WL 494573, at *4 & n.2 (D. Mont. Feb. 5, 2014); *Nave v. Trans-Cor of Am.*, No. 06-CV-1065, 2007 WL 2156670, at *4 (D.S.C. July 26, 2007). Here, all parties acknowledge that defendant is a private entity. Dkt. 35 at 1; Dkt. 39-2 at 4. At this juncture, however, defendant does not dispute that it is a state actor for purposes of a claim brought pursuant to section 1983. *See* Dkt. 39-10 at 14.

Defendant does argue that plaintiff's allegations, even if accepted as true, do not rise to a level of constitutional significance nor do the facts as pled support a finding that any PTS employee acted with the requisite state of mind necessary to establish a due process violation. Dkt. No. 39-10 at 12-13. As a state pretrial detainee, plaintiff's claims are subject to analysis under the due process clause of the Fourteenth Amendment, which governs claims of unconstitutional conditions of confinement of non-sentenced prisoners. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *Brown v. City of New York*, No. 13-CV-06912, 2017 WL 1390678, at *10 (S.D.N.Y. Apr. 17, 2017). To establish such a claim under the Fourteenth Amendment, a pretrial detainee must demonstrate that the defendant responsible for the allegedly unconstitutional conditions of confinement acted with deliberate indifference to the plaintiff's circumstances. *Darnell*, 849 F.3d at 29; *Brown,* 2017 WL 1390678, at *10. This, in turn, entails a

two-prong inquiry, including both "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong'—perhaps better classified as a '*mens rea* prong' or 'mental element prong'—showing that the [defendant] acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29.

To satisfy the objective prong at the pleading stage, plaintiff must allege facts that plausibly demonstrate, either alone or in combination, that he faced conditions posing an unreasonable risk of serious damage to his health. *Darnell*, 849 F.3d at 29. There is no bright-line "test" to determine whether the deprivation is sufficiently serious; rather, the objective prong is " 'evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)); *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Applying this standard, I note that the Second Circuit has held a prisoner may not be deprived of basic human needs, including, for example, food, shelter, medical care, and reasonable safety. *Darnell*, 849 F.3d at 29 (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). Under *Darnell*, the second prong is ultimately informed through an objective lens as

> the pretrial detainee must prove that the defendant-
> official acted intentionally to impose the alleged

condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively.

*Id.* at 35.

Plaintiff alleges that defendant subjected him to "the deprivation of food, bathroom, unreasonable safety and medical attention," and was provided "a fast food sandwich for days when a prisoner is provided 3 meals a day." Dkt. No. 35 at 3 (internal quotation marks omitted). In his opposition to defendant's motion, plaintiff elaborates that "everytime [sic] myself or anyone on the van requested permission to use the bathroom[,] [O]fficer Carder would say that he had to call a local precinct or jail to see if they would allow us to stop at their jail and allow us to use the bathroom." Dkt. No. 45 at 7. Plaintiff further states that although he cannot recall every bathroom break during the course of the transport, he remembers "several occasions where [he and fellow prisoners] weren't allowed to use the bathroom for several hours," and he used "water bottles for a urinal for most of this trip." *Id.* Regarding food, plaintiff recounted one occasion where he was fed by hospital staff from Oneida Hospital as opposed to being provided food by PTS drivers. *Id.* at 3. In his response,

plaintiff does not elaborate any further regarding his alleged "deprivation of food," nor does he elaborate upon his allegation of "unreasonable safety." *See generally* Dkt. No. 45; Dkt. No. 35 at 3.

With respect to the allegation that he was deprived of medical attention, plaintiff provides additional facts in his opposition, alleging that "[b]etween the time of March 14th- March 19 2016 [he] was denied [his] blood pressure medication when [he] was having serious problems due to hypertension"; "[t]he PTS officers were told by the nurse at fayetteville county jail that it was extremely important that [he] was given [his] medication every morning at 8:00 a.m. consistently"; "[he] was only given [his] medication in Georgia and Maryland"; [he] only received [his] medication in Maryland while using the restroom at a police station on the 16th at 11:00 p.m. [He] didn't receive medication until leaving Kearney NJ in the morning 3 days after"; "[t]he mishandling of [his] medication could have resulted in [his] having a stroke or a heart attack while on the highway traveling through a number of different states." Dkt. No. 45 at 4-5.

Plaintiff's broad allegations regarding the deprivation of food, bathroom breaks, and unreasonable safety, over a relatively brief, finite period, which have been accepted as true as they must at this procedural stage, fail to rise to a level sufficient to sustain claim for a due process

violation under the Fourteenth Amendment. *See e.g.*, *Walker v. Schriro*, 2013 WL 1234930, at *12-*13 (S.D.N.Y. Mar. 26, 2013) (finding that a two-day confinement without access to "access to food, shower, linens, running water, and a bathroom" did not amount to a constitutional deprivation); *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 269 (N.D.N.Y. 2008) (McCurn, J.) (finding that an overnight deprivation of food and water did not amount to a constitutional deprivation). Although plaintiff's amended complaint appears to allege that defendant had knowledge of the alleged prohibited conduct through its application of unconstitutional policies, as discussed herein, the harm alleged by plaintiff does not rise to a level of constitutional significance. Thus, the court need not analyze the second, *mens rea* prong of the test for plaintiff's allegations regarding the deprivation of food and bathroom breaks and unreasonable safety.[7]

Plaintiff's allegations claiming deprivation of medical care require closer examination, as plaintiff elaborates to a greater extent regarding defendant's alleged failure to provide plaintiff his medication. Although not

---

[7] I note that plaintiff's amended complaint states documents are attached to his pleading "in substantiation of this objective prong." *See* Dkt. No. 35. However, no such documents are attached to his amended complaint.

specifically set forth, the court liberally construes plaintiff's amended complaint, in conjunction with his opposition to defendant's motion to dismiss, to assert a claim for deliberate indifference to his medical needs. To plead a cognizable medical deprivation claim under the Fourteenth Amendment, plaintiff's allegations must still meet the two-prong analysis discussed above—that is, plaintiff must establish that the deprivation was "sufficiently serious" and that defendant was aware of plaintiff's medical needs and "consciously disregarded a substantial risk of serious harm" to plaintiff's health. *See, e.g.*, *Dzwonczyk*, 710 F. Supp. 2d at 268 (internal citations omitted). At this juncture, I am unable—given the paucity of factual allegations in his amended complaint—to determine whether plaintiff's medical condition constitutes a "sufficiently serious" condition. *See Araujo v. City of New York*, No. 08-CV-3715, 2010 WL 1049583, at *7 (E.D.N.Y. Mar. 19, 2010) (stating that "[a]lthough the Second Circuit has articulated factors that are relevant to whether a medical condition is 'sufficiently serious,' . . . the [c]ourt cannot make a conclusive determination on that issue in this case at the motion to dismiss stage, based upon the allegations in the complaint" where plaintiff alleged he needed various medications for his diabetes, high blood pressure, and post-traumatic stress disorder).

However, even assuming that plaintiff has satisfied the first prong of the analysis, plaintiff has not sufficiently pled facts reflecting that defendant acted with reckless indifference to plaintiff's medical condition. Despite plaintiff's allegation that a nurse from the Fayetteville County Jail informed defendant of plaintiff's need to take blood pressure medication, plaintiff has not alleged he informed defendant that he had a life-threatening medical condition, made requests to defendant for his medications, or requested immediate medical care at any of the stops during the transport. *See* Dkt. Nos. 35, 45. At best, plaintiff's allegations tend to show little more than an inadvertent failure to provide him with adequate medical care over a brief period, and thus fail to rise to a level of constitutional magnitude. *See, e.g., Araujo*, 2010 WL 1049583, at *7 (finding only inadvertent failure to provide medical care where plaintiff failed to request immediate emergency care while in custody and failed to inform an official that he had a "serious medical condition that caused extreme pain, was life-threatening or fast-degenerating"). Moreover, despite the fact that plaintiff was to take his medication daily, plaintiff admits that his need for his medication did not go completely ignored by defendant. *See* [Dkt. No. 45 at 4](noting that he received his medication in Georgia, Maryland, and New Jersey); *see also Dzwonczyk*, 710 F. Supp.

2d at 269 (finding that "because [the p]laintiff's alleged injury is not sufficiently serious, and because he alleges that his medical concerns were addressed by at least one person, he fails to state a claim against [the d]efendants for deliberate indifference to a medical need.").

Accordingly, since plaintiff has failed to allege facts to support a cognizable due process claim under the Fourteenth Amendment, I recommend a finding that his remaining claim is subject to dismissal.

### 2. Plaintiff's Supervisory Claims Under *Monell*

As an alternative basis for seeking dismissal under Rule 12(b)(6), defendant argues that plaintiff's allegations fail to satisfy the criteria set forth under *Monell*.

Even assuming plaintiff could meet his burden to demonstrate a plausible due process claim, this would not carry the day for plaintiff. Similar to holding a municipality liable for a constitutional tort, when attempting to hold a private entity accountable, plaintiff must allege that actions of defendant's employees were taken pursuant to some official policy or custom of defendant that caused the constitutional violation to occur. *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408 (2d Cir. 1990); *see, e.g.*, *Karn v. PTS of Am., LLC*, No. 16-CV-3261, 2017 WL 4162251, at *5 (D. Md. Sept. 19, 2017) (noting that the plaintiff could "proceed only

against the PTS employees in their personal capacities, or seek to establish that the employees were acting pursuant to an official policy or custom of PTS."); *Bess v. City of New York*, No. 11-CV-7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("Despite the fact that it is a private entity, [the private defendant] enjoys the benefit of the *Monell* requirements for the same reason it may be named as a defendant in a [section] 1983 suit."). In the absence of such a showing, a private entity, such as defendant, cannot be held liable for the constitutional torts of its employees because there is no *respondeat superior* liability under section 1983, whether the defendant is a municipality or a private entity acting for the state. *See Rojas*, 924 F.2d at 40; *Whalen v. Allers*, 302 F. Supp. 2d 194, 202-03 (S.D.N.Y. 2003).

An entity may be held accountable for a constitutional violation that has occurred pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers . . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell.*, 436 U.S. at 690-91. Such liability can be established in various ways, including through "proof of an officially adopted rule or widespread, informal custom[] [demonstrating] 'a deliberate government

policy of failing to train or supervise its officers.' " *Bruker v. City of N.Y.* 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (quoting *Anthony v. City of N.Y.*, 339 F.3d 129, 140 (2d Cir. 2003)). A plaintiff may also show that the allegedly unconstitutional action was "taken or caused by an official whose actions represent official policy," *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000), or when municipal officers have acquiesced in or condoned a known policy, custom, or practice that violates federal law. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.").

A state actor's failure to act "satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices [is] so likely to result in a deprivation of federal rights[] that the municipality . . . can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). Assuming a plaintiff can prove that a state action has acquiesced to a pattern of conduct that may result in a violation of federal

law, "for liability to attach[,] . . . the identified deficiency . . . must be closely related to the ultimate injury." *City of Canton*, 489 U.S. 391; *accord, Amnesty Am.*, 361 F.3d at 130 ("*City of Canton* requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that . . . it actually caused the constitutional deprivation." (internal quotation marks omitted)).

Plaintiff's complaint fails to allege facts that would plausibly establish *Monell* liability on the part of defendant PTS. *See generally* Dkt. No. 35. The Supreme Court's decision in *Twombly* and *Iqbal* both require that *Monell*-like liability claims provide a "factual description of such a policy, not just bald allegations that such a thing existed." *Bess*, 2013 WL 1164919, at *2 (citing *Davis v. City of New York*, 07-CV-1395, 2008 WL 2511734 (S.D.N.Y. June 19, 2008)); *see also Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 454 (S.D.N.Y. 2012) (requiring more than simply conclusory allegations that an employee did not receive proper training and unexplained implications that additional training would have resulted in better conditions).

Here, plaintiff alleges that defendant employs multiple policies that result in the endangerment of passengers' lives during transport. Dkt. No. 35 at 2. These purported "policies" on behalf of defendant include a policy to "operate vans without bathrooms," lack of adequate bathroom breaks, and a lack of seatbelts in the prisoner transport vans. *Id.* (internal quotation mark omitted). Plaintiff alleges that with respect to the lack of seatbelt policy, it has resulted in over ten "crashes involving injuries and even death . . . because prisoners are shackled, but without [seatbelts and] unable to brace themselves." *Id.* However, plaintiff simply alleges that because certain conditions existed, they result from unidentified policies, as opposed to providing a factual description of the alleged policies. Likewise, plaintiff has also failed to plead sufficient facts to show that such customs constitute a deprivation of federal rights such that defendant may be found deliberately indifferent to plaintiff's needs.

Moreover, plaintiff contends that although defendant provides training to its employees, that training is wholly inadequate. Dkt. No. 35 at 1-2. Plaintiff contends that defendant's employees do not receive training in "medical and mental health education," which would plaintiff alleges would "prevent[ the] deprivation of life, [and] minimize[] the risk of injuries" suffered by prisoners during transport. *Id.* at 2. Yet, plaintiff has not

43

pleaded any facts with respect to how this alleged failure to train resulted in a deprivation of plaintiff's rights.

Plaintiff also points to specific instances where passengers were allegedly injured during the course of their transportation by defendant, including a 2009 crash that resulted in the death of an unidentified passenger due to lack of seatbelt; the 2014 death of William Weintraub due to lack of medical attention; the 2014 death of Denise Isaacs due to lack of medical attention; and the 2016 death of William Culpepper due to lack of medical attention. Dkt. No. 35 at 3. These isolated instances devoid of any further context, while perhaps indicating negligence on the part of individual drivers, do not amount to a pattern of misconduct. *Reynolds*, 506 F.3d at 192 ("Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*."). There are no allegations as to when the training occurred, what training was provided to the driver on plaintiff's transport, or most notably, any connection to the ultimate injury alleged in this case.

Accordingly, as an alternative basis for dismissal of plaintiff's remaining claim, I recommend a finding that plaintiff's amended complaint fails to allege facts that would demonstrate a plausible basis to find *Monell*-type liability on the part of defendant PTS.

D.    Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y.1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord,*

*Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this instance, the deficiencies identified in this report are substantive in nature and extend beyond the mere sufficiency of plaintiff's complaint. Moreover, plaintiff has already been afforded one opportunity to amend his complaint and failed to cure the deficiencies there were identified by the court. *See* Dkt. Nos. 33, 38. Because I find that any amendment that might be offered by plaintiff would be futile, I recommend against granting him leave to further amend his complaint.

IV.    ORDER, SUMMARY, AND RECOMMENDATION

While plaintiff's experience during his transport from Georgia to New York may have been unpleasant and uncomfortable, he has failed to plausibly allege that defendant's policies resulted in a deprivation of a constitutional magnitude. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion to dismiss (Dkt. No. 39) be GRANTED in part to the extent outlined in this report and recommendation, and that plaintiff's amended complaint (Dkt. No. 35) be DISMISSED, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed

46

with the clerk of the court within FOURTEEN days of service of this report.[8] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993). It is further hereby

ORDERED that the clerk of the court is respectfully directed to modify the court's records to change defendant Prisoner Transport Service of America, LLC name on the docket to "Prisoner Transportation Services of America, LLC"; and it is further hereby

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     March 4, 2019
           Syracuse, New York

---

[8]     If you are proceeding *pro se* and are served with this order, report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment

Distinguished by Fogelman v. Donato, E.D.N.Y., June 16, 2015

2010 WL 1049583
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

NOT FOR PUBLICATION
United States District Court,
E.D. New York.

William ARAUJO, Plaintiff,

v.

The CITY OF NEW YORK, the New York City
Police Department, The New York City Department
of Corrections, Detective Tammie Ordonez and
Detective "john Doe" (said name being fictitious, as
his true name is presently unknown), individually
and in their official capacities, Defendants.

No. 08-CV-3715 (KAM)(JMA).
|
March 19, 2010.

**Attorneys and Law Firms**

Arnold Jay Levine, Arnold J. Levine, Esq., New York, NY, for Plaintiff.

Elizabeth M. Daitz, Max Oliver McCann, New York City Law Department, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

MATSUMOTO, District Judge.

**\*1** Plaintiff William Araujo commenced this action on September 12, 2008 against the City of New York (the "City"), the New York City Police Department (the "NYPD"), the New York City Department of Corrections (the "DOC") (collectively, the "Municipal Defendants"), and NYPD Detectives Tammie Ordonez and "John Doe" (collectively, the "Individual Defendants").[1] Plaintiff claims that (1) the Individual Defendants deprived him of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution, in violation of 42 U.S.C. § 1983 ("Section 1983"); and

(2) the constitutional violations occurred as a result of a custom, policy, usage, or rule maintained by the Municipal Defendants. (*See generally,* Doc. No. 1, Complaint ("Compl.") ¶¶ 1, 7-13.) Plaintiff also alleges violations of 42 U.S.C. §§ 1981 and 1988.[2] (*Id.* ¶¶ 1-2.) Plaintiff claims that the Individual Defendants are liable in their individual and official capacities. (*Id.* ¶ 10.)

[1]  This case was initially assigned to the Honorable Charles P. Sifton and subsequently reassigned to the undersigned on November 24, 2009.

[2]  Although the Complaint cites 42 U.S.C. §§ 1981 and 1988 in the sections titled "Preliminary Statement" (Compl.¶ 1) and "Jurisdiction" (*id.* ¶¶ 2-3), neither the Complaint nor plaintiff's opposition to defendant's instant motion make further mention of, or allege any claim for relief under, either section. Section 1981 was "meant, by its broad terms, to proscribe discrimination in making or enforcement of contracts against, or in favor of, any race." *Gratz v. Bollinger,* 539 U.S. 244, 276 n. 23, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (citation and internal quotation marks omitted). Section 1981 is inapplicable to this action because plaintiff does not allege that he was discriminated against based on his race or that any contract is involved in this suit. Moreover, Section 1988 does not confer a substantive right; rather, it permits the recovery of attorney's fees by prevailing parties in civil rights actions. *Guadagni v. New York City Transit Auth.,* No. 08-CV-3163 (CPS), 2009 WL 1910953, at \*10 (E.D.N.Y. June 30, 2009). Accordingly, to the extent plaintiff alleges claims under Sections 1981 and 1988, those claims are dismissed as to all defendants. defendants' motion and has filed opposition papers addressing arguments relating to all defendants.

Presently before this court is the Municipal Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Although defendants' Notice of Motion indicates that only the Municipal Defendants seek judgment on the pleadings, defendants' memorandum of law in support of the motion seeks dismissal of plaintiff's Complaint in its entirety, including as against the Individual Defendants. (*See* Doc. No. 20, Defendants' Memorandum of Law ("Defs.Mem.") at 5-11, 13.) Plaintiff's counsel received notice of defendant' motion and has filed opposition papers addressing arguments relating to all defendants. (*See* Doc. No. 22 Plaintiff's Memorandum of Law ("Pl.Mem.").) The court considers the motion as one made by all defendants and,

for the reasons set forth herein, the motion is granted in part and denied in part.

### BACKGROUND

The following facts are drawn from plaintiff's Complaint and are taken as true for purposes of this motion. Plaintiff is a resident of Queens County in the State of New York. (Compl.¶ 6.) Defendant City of New York is a municipality of the State of New York. (*Id.* ¶ 7.) Defendants NYPD and DOC are municipal agencies of defendant City. (*Id.* ¶¶ 8-9.) Defendants Tammie Ordonez and "John Doe" are detectives employed by defendant NYPD. (*Id.* ¶ 10.)

On October 5, 2006, at approximately 12:00 p.m., plaintiff was arrested at his home by defendant detectives Ordonez and Doe. (*Id* . ¶ 14.) Plaintiff alleges that the arrest was made without a warrant, based on a complaint by a seven-year-old girl, J.D.,[3] made two days earlier, that plaintiff had sexually abused her on several occasions approximately three and one-half to four and one-half years earlier. (*Id.* ¶ 15.) According to the Complaint, "[a]mong the allegations made by the complainant [J.D.] against Plaintiff was the claim that Plaintiff on some occasions" masturbated and ejaculated. (*See* Compl. ¶ 17.) Plaintiff alleges that J.D.'s father is a retired NYPD officer. (*Id.* ¶ 16.)

[3]     Plaintiff's Complaint refers to the alleged infant complainant by her full name, in contravention of the Federal Rules of Civil Procedure and an Administrative Order of this court requiring parties to refer to minors in court filings by their initials. *See* Fed.R.Civ.P. 5.2 (adopted in compliance with E-Government Act of 2002, Pub L. 107347, 116 Stat. 2899 § 205(c)(3) (2002)) (directing the Supreme Court to prescribe rules to protect privacy and security concerns relating to electronic filing of documents); E.D.N.Y. Administrative Order 2004-09, available at http:// www.nyed.uscourts.gov /pub/docs/ adminorder04-09.pdf [last visited March 19, 2010]. Plaintiff shall immediately contact the Clerk's Office and arrange for the substitution of the present Complaint with one that refers to the complainant only by her initials.

**\*2**  After plaintiff was arrested, he was transported to the Queens Special Victims Unit of the NYPD, where he was

questioned for approximately two hours. (*Id.* ¶¶ 18, 24.) Plaintiff alleges that prior to being questioned, he asked the Individual Defendants whether he needed an attorney and was told that he did not. (*Id.* ¶ 22.) Plaintiff also asserts that he was not read his *Miranda* rights before his custodial interrogation. (*Id.* ¶ 23.) During the questioning, plaintiff informed the Individual Defendants that he had been "impotent for more than ten years, including during the time he allegedly sexually abused the complainant, and was unable during the time of the alleged abuse to have an erection or to ejaculate." (*Id.* ¶ 25.) According to plaintiff, Detective Ordonez telephoned plaintiff's wife and inquired whether plaintiff was then currently, and was at the time of the alleged incidents, impotent. (*Id.* ¶ 27.) Plaintiff's wife confirmed that plaintiff was impotent and had been so during the relevant time period. (*Id.*) Notwithstanding the statements by plaintiff's wife, plaintiff was handcuffed and placed in a cell in the precinct. (*Id.* ¶ 28.)

Plaintiff then informed the Individual Defendants that he needed various medications for his diabetes, high blood pressure, and post traumatic stress disorder. (*Id.* ¶ 29.) Plaintiff alleges that the Individual Defendants returned to plaintiff's home and retrieved his medications. (*Id.* ¶ 30.)

Plaintiff was then transported from the Special Victim's Unit to the 112th police precinct and fingerprinted, and subsequently taken to Queens Central Booking, where he remained for "several hours" before being arraigned on a felony complaint. (*Id.* ¶¶ 31-33 .) The court set bail at $25,000 and issued an Order of Protection requiring plaintiff to stay away from the complainant. (*Id.* ¶ 33-34.)

At approximately 1:00 a.m. the following morning, October 7, 2006, plaintiff was released from a DOC facility in the Bronx upon the payment of bail. (*Id.* ¶¶ 35-36.) Plaintiff alleges that "[d]espite his numerous requests of members of [the] NYPD and DOC," he was not permitted "to take his required medications while in the custody of NYPD or DOC," resulting in high blood sugar and worsening and aggravation of diabetes, blood pressure, and post traumatic stress disorder." (*Id.* ¶ 37.)

Plaintiff alleges that as a result of the criminal charges, he was obligated to appear in Queens Criminal Court on approximately seven occasions, check in weekly with a bail bondsman, was prevented by the Order of Protection from attending his church and shopping at certain stores which he previously had frequented, and was required to

spend $7,700 to retain counsel to represent him in the criminal case. (*Id.* ¶¶ 39-42.) Plaintiff contends that he did not commit the alleged criminal acts, and has suffered embarrassment, humiliation and reputational harm. (*Id.* ¶ 43, 48.) On September 10, 2007, the criminal charges against plaintiff were dismissed and sealed on motion of the prosecutor. (*Id.* ¶ 46.)

## DISCUSSION

### A. Standard of Review

**\*3** In deciding a Rule 12(c) motion for judgment on the pleadings, courts apply the same standard as that applicable to a motion to dismiss for failure to state a claim under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the non-moving party. *See LaFaro v. New York Cardiothoracic Group, PLLC,* 570 F.3d 471, 475-76 (2d Cir.2009). Accordingly, courts must determine whether the complaint has pled "enough facts to state a claim to relief that is plausible on its face." *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556). "Threadbare recitals of the elements of the cause of action" do not suffice; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 1949-50.

### B. Claims Arising under Section 1983

The plaintiff brings this action pursuant to 42 U.S.C. § 1983 for the alleged deprivation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution. In relevant part, Section 1983 provides that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor,* 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks and citation omitted). To establish liability under Section 1983, a plaintiff must demonstrate that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted).

Liberally construing the Complaint, plaintiff alleges that defendants, while acting the color of state law, violated his constitutional rights by subjecting him to an unreasonable seizure, in violation of the Fourth Amendment; unlawful interrogation, in violation of the Fifth Amendment; cruel and unusual punishment, in violation of the Eight Amendment; and that a municipal policy or custom caused a deprivation of plaintiff's constitutional rights. (*See* Compl. ¶¶ 66-69.) Defendants contend that each allegation fails to state a claim. (Defs. Mem. at 4.)

### C. Alleged Constitutional Violations by the Individual Defendants

**\*4** Plaintiff purports to raise claims under Section 1983, but fails to specify, as required to state a valid Section 1983 cause of action, which substantive constitutional rights defendant allegedly violated. In this regard, plaintiff's complaint does not appear to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests[,]" as required by Fed.R.Civ.P. 8(a). *See Jackson v. Onondaga County,* 549 F.Supp.2d 204, 212 (N.D.N.Y.2008) (quoting *Dura Pharm., Inc. v. Broudo,*

544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)); Fed.R.Civ.P. 8(a)(2) (requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief ....").

Moreover, it appears that plaintiff has incorrectly sued NYPD Detectives Tammie Ordonez and "John Doe" in their "individual and official capacities." (*See* Compl. ¶ 10.) It is, however, well settled that a "state official sued in his official capacity is not a person within the meaning of Section 1983, and, consequently, is not subject to liability for depriving a person of constitutional rights." *Perez v. City of New York,* No. 07-CV-10319, 2009 U.S. Dist. LEXIS 50066, 2009 WL 4901732 at \*11 (S.D.N.Y. June 8, 2009) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

Notwithstanding, the court liberally construes plaintiff's Complaint to allege three separate acts potentially giving rise to constitutional violations by the Individual Defendants: (1) false arrest; (2) unlawful interrogation; and (3) indifference to plaintiff's medical needs.[4] In briefing this motion, plaintiff argues only that judgment on the pleadings is not warranted with respect to the false arrest claim, and appears to abandon the remaining claims. (*See generally,* Pl. Mem.) Notwithstanding, each claim is addressed below.

[4]    The court liberally construes plaintiff's Complaint because he would be permitted to replead. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead") (citations omitted).

### 1. False Arrest Claim

Plaintiff was arrested and endured detention and interrogation on a charge which was ultimately dismissed. The issue before the court, however, is not whether plaintiff is innocent of the crime charged-which he is presumed to be-but rather, whether there was probable cause for plaintiff's arrest.

The elements of a false arrest claim are that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (citation omitted); *see also Hygh*

*v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992) ("The elements of a claim of false arrest under § 1983 are 'substantially the same' as the elements of a false arrest claim under New York law.") (citing *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991)). Only the last element is in dispute.

"There can be no federal civil rights claim for false arrest where the arresting officer had probable cause" to arrest. *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (*citing Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* at 119 (citations and internal quotation marks omitted). "To find that probable cause for an arrest existed, it is not necessary to show evidence beyond a reasonable doubt, ... [n]or do police officers need to demonstrate that it is more probable than not [that] an offense has been committed to make a *prima facie* showing of criminal activity. Instead, the standard of probable cause requires only the probability of criminal activity." *Miloslavsky v. AES Eng'g Soc., Inc.,* 808 F.Supp. 351, 354 (S.D.N.Y.1992) (citations and internal quotation marks omitted). "Whether or not there was probable cause to arrest depends on the information available at the time of the arrest, judged against the totality of the circumstances ...." *Morgan v. Nassau County,* No. 03-CV-5109 (SLT), 2009 U . S. Dist. LEXIS 79180, 2009 WL 2882823 at \*12-13 (E.D.N.Y. Sept. 2, 2009) (citations and internal quotation marks omitted).

**\*5** "Even where probable cause is not found to exist, a police officer sued for false arrest is immune from suit under the doctrine of qualified immunity where 'arguable probable cause' exists." *Rodriguez v. New York City Transit Auth.,* No. 06-CV-13762 (RJS), 2009 U.S. Dist. LEXIS 106464, 2009 WL 3817298 at \*19 (S.D.N.Y. Nov. 10, 2009) (citing *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004)). "While arguable probable cause should not be understood to mean almost probable cause, it exists where officers of reasonable competence could disagree on the legality of the defendant's actions." *Id.* (citing *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007); *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995)) (internal quotation marks omitted). "The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively

reasonable for the officer to conclude that probable cause existed." *Jenkins,* 478 F.3d at 87 (citations omitted).

"[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (citations and internal quotation marks omitted). Absent specific facts suggestive of prevarication or unreliability, "[t]he veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." *Miloslavsky,* 808 F.Supp. at 355 (citing *Adams v. Williams,* 407 U.S. 143, 146-47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

Here, plaintiff contends that probable cause for his arrest was lacking because a reasonable officer would not have credited the unsubstantiated complaint of a seven-year-old child, reporting events that allegedly occurred when she was between two and one-half and three and one-half years of age. (*See* Pl. Mem. at 6; *see also* Compl. ¶ 15.) Further, plaintiff contends that (1) there is no evidence that the alleged victim's claims were corroborated in any way; (2) the claims were not made under oath; and (3) there is no evidence that the child informant appreciated the difference between truth and falsehood. (*See* Pl. Mem. at 6-7.)

Based on a review of the Complaint, the court concludes that plaintiff has pled sufficient facts to state a false arrest claim against the Individual Defendants that is plausible on its face. The court does not conclude that an arrest is unreasonable as a matter of law based on a statement of a seven-year-old child about events that reportedly occurred when the child was between two and one-half and three and one-half years of age. Plaintiff, however, has pled sufficient facts to cross "the line between possibility and plausibility" concerning whether the circumstances should have raised doubts as to complainant's reliability or veracity. *See Iqbal,* 129 S.Ct. at 1949; *see also Twombly,* 550 U.S. at 557. Discovery may plausibly reveal that the Individual Defendants lacked a reasonable basis for believing either (1) that a crime had been committed, or (2) that plaintiff was the perpetrator. [5]

[5]    At oral argument, plaintiff's counsel stated that plaintiff might seek discovery concerning, among other things, whether the complainant was shown

a photo array, or whether plaintiff's name was first mentioned by the complainant or by the Individual Defendants. (*See* Transcript of Oral Argument on Oct. 8, 2009 ("Tr.") at 4-7.)

**\*6** Defendants cite to a number of distinguishable cases which dismissed false arrest claims where law enforcement officers were presented with different accounts from the complainant and arrestee. (*See* Defs. Mem. at 7-9.) Defendants' reliance on *Cabble v. City of New York,* No. 04-CV-9413 (LTS), 2009 U.S. Dist. LEXIS 26478, 2009 WL 890098 (S.D.N.Y. Mar. 30, 2009), is misplaced. There, the court, *inter alia,* dismissed without prejudice to replead, plaintiff's false arrest claim, finding that plaintiff alleged no facts to suggest that the police had any reason to doubt the complaints of two adult women that had been sexually assaulted by the plaintiff. *See Id.,* at *15-16. Similarly, in *Silver v. Kuehbeck,* 05-6316-cv, 217 Fed. Appx. 18 (2d Cir. Feb.8, 2007), the Second Circuit affirmed the dismissal of a false arrest claim based on a finding that the defendant officer "clearly" had probable cause to arrest the plaintiff for aggravated harassment where the complaint alleged that plaintiff's "agitation had grown to anger" and he attempted to contact the complainant and left telephone messages "about her evident lack of consideration and disrespect[.]" *Id.* Further, in *Obilo v. City Univ. of New York,* No. 01-CV-5118 (DGT), 2003 U.S. Dist. LEXIS 2886, 2003 WL 715749 at *26 (E.D.N.Y. Feb. 28, 2003), the plaintiff was arrested for sexual assault reported by a female college student whom plaintiff alleged was his girlfriend. The court granted the arresting officer's motion to dismiss a false arrest claim where the pleadings indicated that the arresting officer relied on an exhaustive investigation by college campus security officers and had interviewed the complainant "one day after she filed her police complaint." *Id.* at *24. In *Jouthe v. City of New York,* No. 05-CV-1374 (NGG), 2009 U.S. Dist. LEXIS 18163, 2009 WL 701110 (E.D.N.Y. Mar. 10, 2009), the court granted the arresting officer summary judgment dismissing the plaintiff's false arrest claim after the parties had conducted discovery.

Further, based upon the Complaint, the Individual Defendants have not established the existence of "arguable probable cause" for purposes of qualified immunity. Plaintiff has plausibly alleged that under the circumstances, it would not have been reasonable for an officer to have believed he or she was justified in arresting plaintiff. Accordingly, defendants have not established

that "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances." *See Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citation and internal quotation marks omitted). Thus, the court declines to dismiss plaintiff's false arrest claim against the Individual Defendants.

### 2. Unlawful Interrogation Claim

Plaintiff claims that he suffered constitutional injury by being interrogated without having a lawyer present, and without having been first read his *Miranda* rights, in violation of the Fifth Amendment. (*See* Compl. ¶¶ 23-24, 61, 68.) "The Supreme Court concluded [in *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) ] that an officer could not be subjected to civil liability for an alleged violation of the privilege against compelled self-incrimination where the coerced statement is not thereafter used against the person who gave the statement." *Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2007). "[A] run-of-the-mill *Miranda* violation, ... can taint the evidence but is not independently actionable as a civil rights claim." *Jocks v. Tavernier,* 316 F.3d 128, 138 (2d Cir.2003).

*7 In *Higazy,* government officials used allegedly coerced statements by plaintiff Higazy as the basis for filing a criminal complaint and opposing bail. 505 F.3d at 167. The government later withdrew its complaint, and Higazy was released. *Id.* Higazy subsequently filed a federal civil rights action against officials. *Id.* at 168. The Second Circuit held that although Higazy's coerced statements were never used against him at a criminal trial, the government's use of his statements against him at the preliminary bail hearing provided a sufficient basis for alleging a violation of his Fifth Amendment rights. *Id.* at 170.

Here, plaintiff does not allege that the statements he made to the Individual Defendants were used against him in the criminal prosecution, in violation of the Fifth Amendment. Indeed, plaintiff asserts that he was arrested in spite of his statements that he could not have sexually assaulted the complainant in the manner described by the complainant. Accordingly, plaintiff's allegation that he was interrogated in violation of *Miranda,* and without being afforded counsel, fails to state a Section 1983 claim.

### 3. Medical Indifference Claim

Plaintiff claims that he was not permitted by the Individual Defendants to take necessary medications while he was in the custody of NYPD or DOC, "resulting in high blood sugar and worsening and aggravation of diabetes, blood pressure, and post traumatic stress disorder." (Compl. ¶ 37.) Although not specifically pled, the court liberally construes the Complaint to allege a claim of inadequate medical care or treatment and deliberate indifference in violation of the Due Process Clause of the Fourteenth Amendment. [6]

[6]     A pretrial detainee's claims of inadequate medical treatment and deliberate indifference to serious medical needs are analyzed under the Fourteenth Amendment's Due Process Clause as opposed to the Cruel and Unusual Punishment Clause of the Eighth Amendment, but the tests are the same under the Eighth and Fourteenth Amendments. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (citing *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Dzwonczyk v. Syracuse City Police Dep't,* No. 08-CV557 (NPM), 2008 U.S. Dist. LEXIS 103315, at *37-38, 2008 WL 5459147 (N.D.N.Y. Dec. 22, 2008).

To establish a claim for deliberate indifference to a medical need, a plaintiff must allege facts demonstrating both an objective and a subjective element: (1) objectively, a deprivation must be "sufficiently serious," *i.e.,* "a deprivation that presents a condition of urgency, one that may produce death, degeneration, or extreme pain[;]" and (2) subjectively, the defendant officials must act with a reckless indifference, "that is, defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm." *See Dzwonczyk,* 2008 U.S. Dist. LEXIS 103315, at 38-39 (internal quotation marks and citations omitted); *see also Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

With respect to the first element-that plaintiff was detained under conditions posing a substantial risk of serious harm-plaintiff alleges that the Individual Defendants failed to provide him with prescribed medications from the time of his arrest, at approximately 12:00 p.m. on October 5, 2006, until his release, at approximately 1:00 a.m. on October 7, 2006, or approximately 37 hours. (*See* Compl. ¶¶ 14, 36-37.) Defendants contend that plaintiff has failed to "plead that he suffers from an objectively serious medical

condition sufficient to state a claim for deliberate [medical] indifference." (Defs. Mem. at 12.) Although the Second Circuit has articulated factors that are relevant to whether a medical condition is "sufficiently serious," such as whether a reasonable doctor or patient would find it important and whether it causes chronic and substantial pain, *see, e.g., Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), "the Court cannot make a conclusive determination on that issue in this case at the motion to dismiss stage, based upon the allegations in the complaint." *See Thomas v. Tisch,* No. 08-CV-400 (JFB), 2009 WL 701009, at *7 (E.D.N.Y. Mar.11, 2009). Thus, liberally construing plaintiff's Complaint, the court declines to dismiss plaintiff's medical indifference claim on defendant's contention that plaintiff has not alleged that he suffers from an objectively serious medical condition. *See id.* at *7-8 (holding that complaint stated a claim where plaintiff alleged, *inter alia,* that a twenty-hour delay in receiving medication for diabetes and epilepsy resulted in mental anguish, pain and suffering and ridicule from other inmates and officers).

**\*8** Even assuming that plaintiff has satisfied the first element that he suffered substantial harm from the Individual Defendants' failure to treat a serious medical condition, plaintiff has not plausibly alleged that the defendants acted with reckless or deliberate indifference toward plaintiff's medical condition. Plaintiff alleges that he did not alert officers that he suffered from any medical condition until approximately two hours after his arrest. (*See* Compl. ¶¶ 24, 29.) After being informed of plaintiff's condition, the Individual Defendants returned to plaintiff's home and retrieved his medications. (Compl.¶ 30.) While in custody, plaintiff was transferred numerous times: he was moved from the Special Victim's Unit to the 112th Precinct to be fingerprinted, then to Queens Central Booking to await arraignment, then to Queens Criminal Court to be arraigned, and ultimately to a DOC facility in the Bronx from which he was released. (*See* Compl. ¶¶ 18, 31, 35.) Plaintiff does not allege that he requested immediate emergency care at any of these locations, or that he informed an official at any of the locations that he had a serious medical condition that caused extreme pain, was life-threatening or fast-degenerating. Thus, plaintiff's Complaint does not allege anything more than an inadvertent failure to provide adequate medical care. *See Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("inadvertent failure to provide

adequate medical care" does not constitute "deliberate indifference"); *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). Accordingly, plaintiff's medical indifference claim is dismissed.

### D. Alleged Constitutional Violations by the Municipal Defendants

As an initial matter, although plaintiff purports to name the NYPD and DOC as defendants, both are non-suable agencies of defendant City. *See Wray v. City of New York,* 340 F.Supp.2d 291, 303 (E.D.N.Y.2004) ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law.") (*quoting* NYC Charter § 396) (judgment vacated on other grounds); *see also Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007) (noting that "[t]he district court correctly noted that the NYPD is a non-suable agency of the City.") (citing *Wray,* 340 F.Supp.2d at 303); *Adams v. Galletta,* 966 F.Supp. 210, 212 (S.D.N.Y.1997) ( "where a plaintiff has named the Department of Corrections as a defendant he has sued a non-suable entity"). Accordingly, all claims are dismissed against the NYPD and the DOC. *See Maier v. New York City Police Dep't,* No. 08-CV-5104 (ILG), 2009 U.S. Dist. LEXIS 78821, at *6, 2009 WL 2915211 (Sept. 1, 2009) (dismissing all claims against the NYPD and DOC as non-suable entities).

Plaintiff alleges that the Municipal Defendants are liable for constitutional violations under Section 1983. To impose liability under Section 1983 on a municipality for the acts of its employees, a plaintiff must "plead and prove ... (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) denial of a constitutional right." *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (citation omitted); *see Monell v. Department of Soc. Servs. of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). [7]

[7]     Plaintiff's memorandum of law in opposition to defendants' motion does not mention municipal liability or cite any theory under which the Municipal Defendants would be liable. The Complaint, however, alleges municipal liability arising out of the Municipal Defendants' "customs, policies, usages, practices, procedures and rule[s]," suggesting an

intent to invoke liability under the theory of *Monell.* (Compl.¶ 64.)

**\*9** "Following *Monell* and its progeny, a municipality cannot be held liable under § 1983 under a theory of *respondeat superior." Abreu v. City of New York,* 657 F.Supp.2d 357, 360 (E.D.N.Y.2009) (citations omitted). "Rather, there must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.' " *Id.* (quoting *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "[A] plaintiff may establish this required causal link by showing that a defendant was deliberately indifferent to the training, supervision, or discipline of its employees." *Id.* (citing *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 127-130 (2d Cir.2004)); *see also Jenkins,* 478 F.3d at 94 ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.") (citing *Harris,* 489 U .S. at 388).

In the context of a motion to dismiss, "[t]o allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." *Missel v. County of Monroe,* No. 09-0235-cv, 2009 U.S.App. LEXIS 24120, at \*4, 2009 WL 3617787 (2d Cir. Nov. 4, 2009) (citing *Vives v. City of New York,* 524 F.3d 346, 350 (2d Cir.2008)); *see also Iqbal,* 129 S.Ct. at 1951; *Twombly,* 550 U.S. at 555. Mere "boilerplate" assertions that a municipality has such a custom or policy which resulted in a deprivation of the plaintiff's rights is insufficient to state a *Monell* claim. *See Bradley,* 2009 U.S. Dist. LEXIS 51532, at \*8-9 (citations omitted).

Here, plaintiff's Complaint contains only a conclusory allegation that the Municipal Defendants had *"de facto* policies, practices, customs, and usages of failing

to properly train, screen, supervise, or discipline employees ... [which] were a direct and proximate cause of the unconstitutional conduct alleged." (Compl ¶ 58.) "In this regard, [plaintiff's] complaint succinctly states one of the core legal concepts animating *Monell* liability. But it does absolutely nothing else." *See Abreu,* 657 F.Supp.2d at 360-61. Plaintiff alleges no facts to indicate any deliberate choice by municipal policymakers to engage in unconstitutional conduct. Moreover, plaintiff's allegation that the Municipal Defendants acted pursuant to *"de facto* policies, practices, customs, and usages" (Compl.¶ 58), without any facts suggesting the existence of the same, are plainly insufficient to state a Section 1983 claim against the Municipal Defendants. *See Abreu,* 657 F.Supp.2d at 360-61; *Bradley,* 2009 U.S. Dist. LEXIS 51532, at \*8-9 (dismissing municipal liability claim where the "[c]omplaint's conclusory, boilerplate language-that the City 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[ed] to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees"-[was] insufficient to raise an inference of the existence of a custom or policy). Accordingly, plaintiff's Section 1983 claim against the Municipal Defendants is dismissed.

### *CONCLUSION*

**\*10** For the foregoing reasons, defendants' motion for judgment on the pleadings is denied with respect to plaintiff's claim for false arrest against the Individual Defendants, and granted in all other respects. The parties are respectfully referred to Magistrate Judge Azrack, to whom this case is assigned for pretrial supervision.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1049583

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1164919
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Curtis BESS, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendant.

No. 11 Civ. 7604(TPG).
|
March 19, 2013.

## OPINION

THOMAS P. GRIESA, District Judge.

**\*1** Curtis Bess, *pro se,* brings this action under 42 U.S.C. § 1983 alleging that defendants, the City of New York and Corizon Health Services, failed to provide him adequate medical care during his detention at Otis Bantum Correctional Center on Rikers Island. Bess originally sued the New York City Department of Corrections and Prison Health Services but the court subsequently substituted the City of New York as a party for NYCDOC, and Prison Health Services has subsequently changed its name to Corizon Health Services.

Defendants move to dismiss the complaint. The motion is granted.

### The Complaint

Bess alleges that, on an undisclosed date, he was taken into custody by the police, presumably the New York Police Department, and placed in the backseat of a police vehicle. The police vehicle he was riding in, however, was involved in an accident with a taxi cab and, therefore, he was transferred to another vehicle which took him to the police station. Bess alleges that, throughout this process, he made several requests for medical attention, all of which were ignored.

Eventually, for reasons Bess does not explain, he became an inmate at Otis Bantum Correctional Center under the care of NYCDOC. Bess alleges that, while in prison, he

continued to seek medical care. But he alleges that he was repeatedly denied care and at one point was told "that's not our problem. You should've fixed the problem when you [were] in police custody." It appears that Bess was seen by a doctor at least once as evidenced by the "request for a second opinion" form attached to his complaint and his statement on that form that the treatment he received up to that point had not been medically appropriate.

Bess alleges that, due to the automobile accident and lack of subsequent medical care, he suffers from severe back and neck pain as well as nausea, headaches, and sleeplessness. He seeks damages of $3,000,000.

### Discussion

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, (2009). In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal conclusions. *Iqbal, 556 U.S. at 678–79.* A court must also draw all reasonable inferences in the plaintiffs favor, and it may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. *ATSI Commc'ns, Inc. v. Shaar Fund. Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). A complaint filed by a *pro se* plaintiff is to be construed liberally and, therefore, interpreted to raise the strongest arguments that it suggests. *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

**\*2** It is well established that a municipality may not be sued under 42 U.S.C. § 1983 for acts of its employees unless a plaintiff can show that these actions were caused by an official policy or custom of the municipality. *Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658 (1978). And, in keeping with the pleading requirements imposed by *Twombly* and *Iqbal,* a plaintiff must give a factual description of such a policy, not just bald allegations that such a thing existed. *See Davis v. City of New York,* 07 Civ. 1395, 2008 WL 2511734 (S.D.N.Y. June 19, 2008).

Here, plaintiff brings claims against a municipality, the City of New York, and a private entity performing a municipal function, Corizon. Despite the fact that it is a private entity, Corizon enjoys the benefit of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983 suit. In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality. *See Buckner v. Toro,* 116 F.3d 450, 452 (11th Cir.1997); *Conner v. Donnelly,* 42 F.3d 220, 224 (4th Cir.1994); *Iskander v. Vill. of Forest Park,* 690 F.2d 126, 128 (7th Cir.1982); *Mercado v. City of New York,* 8 Civ. 2855, 2011 WL 6057839 at *7 n. 10 (S.D.N.Y. Dec. 5, 2011).

Thus, to bring a § 1983 action against either the City of New York or Corizon, Bess must plausibly allege that the constitutional violations he alleges were caused by official policies or customs of those entities. But he has not done so. Bess's only allegation that speaks to defendants' liability for the actions of their employees is that "NYCDOC is directly responsible for my well-being and healthcare while in their custody. They employ the services of [Corizon] and all of its staff." But this contains no allegation at all that these employees were acting pursuant to anything like an official policy. Therefore, the allegations in Bess's complaint are not adequate to support an action against the City of New York or Corizon under § 1983.

### Conclusion

Defendants' motion to dismiss is granted and the complaint is therefore dismissed.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1164919

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

2017 WL 1390678
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shone BROWN, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

13-cv-06912
|
Signed 04/17/2017

**Attorneys and Law Firms**

Ugochukwu Uzoh, UGO Uzoh, P.C., Brooklyn, NY, for
Plaintiff.

Ashley Rebecca Garman, New York City Law
Department, New York, NY, for Defendants.

## OPINION

THOMAS P. GRIESA, United States District Judge:

 **\*1** Plaintiff Shone Brown brings this action pursuant to
42 U.S.C. § 1983 against the City of New York (the "City")
and eleven individuals employed by the New York City
Department of Correction (the "DOC").[1] Brown alleges
that Defendants violated his constitutional rights while
he was a pretrial detainee at Rikers Island. Brown also
brings claims against Defendants under New York State
law. Defendants move to partially dismiss the complaint[2]
pursuant to Federal Rule of Civil Procedure 12(b)(6). For
the reasons stated below, Defendants' motion is granted
in part and denied in part.

[1]    The court will refer to all defendants, collectively, as
       "Defendants," and the individuals, collectively, as the
       "Individual Defendants."

[2]    All references to the complaint refer to the amended
       complaint filed on November 17, 2015 (ECF No. 52).

## BACKGROUND

**I. The Complaint**[3]

[3]    For purposes of this motion to dismiss, the court
       accepts Brown's factual allegations as true and draws
       all reasonable inferences in his favor. *See Gonzalez v.
       Hasty*, 651 F.3d 318, 321 (2d Cir. 2011).

Brown was arrested in April 2012 following a domestic
dispute with his ex-wife. Compl. ¶ 22. After his
arraignment, Brown was held as a pretrial detainee at
the Otis Bantum Correctional Center, a DOC facility on
Rikers Island. *Id.* ¶ 23-24. On July 7, 2012, the DOC
moved Brown to a different facility on Rikers Island: the
George Motchan Detention Center ("GMDC"). *Id.* ¶ 24.

### A. Attack on Brown in GMDC's Dayroom

At approximately 4:30 PM on July 15, 2012, Brown
entered a dayroom at GMDC and sat down in a chair. *Id.*
¶¶ 46-47. After Brown sat down, four inmates who were
members of the Bloods gang approached him and told him
to get up because "the chair belonged to Bloods." *Id.* ¶ 48.
Brown did not get up and instead asked why he could not
sit in the chair. *Id.* ¶ 49. The four inmates then attacked
him. *Id.* The attack lasted for about twenty minutes and
rendered Brown unconscious. *Id.* ¶¶ 50-51.

Correction Officer ("CO") Regina James and CO
Kenyonda Grinkley witnessed the attack but did not
intervene. *Id.* ¶¶ 52, 54. They "merely stood idly by
and watched." *Id.* ¶ 54. After Brown had been severely
wounded, CO James and CO Grinkley called for aid.
*Id.* Brown's attackers then left the area. *Id.* ¶ 57. Before
assistance arrived, Brown regained consciousness and
asked CO James why she did not protect him. *Id.* ¶ 55.

A group of additional DOC personnel, known as a "probe
team," responded to the dayroom. *Id.* ¶ 56. The probe
team was led by Captain Ronald Rudolph. *Id.* ¶ 16. Brown
told Captain Rudolph that he had been attacked by four
members of the Bloods. *Id.* ¶ 58. Brown also told Captain
Rudolph that he wanted to press charges against the four
Bloods members, but Brown did not know their names
because he had just been transferred to GMDC. *Id.* ¶
60-61. Brown asked Captain Rudolph and CO James to
help him identify the four inmates who attacked him. *Id.* ¶
61. Brown also complained to Captain Rudolph that CO
James saw the attack but did not intervene.[4] *Id.* ¶ 59.

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

4    It is unclear why Brown did not also complain to Captain Rudolph that CO Grinkley saw the attack but did not intervene.

**\*2** DOC personnel took Brown to GMDC's medical clinic. The doctor who saw Brown at the clinic noted that Brown had visible injuries to his back, lips, jaw, and ankle. *Id.* ¶ 72. At approximately 6:15 PM, Brown was transported from GMDC to Elmhurst Hospital Center, and later to Bellevue Hospital, for additional treatment. *Id.* ¶¶ 73, 132-33. Brown was diagnosed with a broken jaw and a fractured ankle. *Id.* ¶¶ 50, 134. Doctors performed surgery on Brown and implanted a plate, wires, and screws into his ankle. *Id.* ¶¶ 142-143. Brown was confined to a wheelchair for several months. *Id.* ¶ 144.

Captain Edwin Skepple was a supervisor on duty at the time of the incident. *Id.* ¶¶ 15, 105. Assistant Deputy Warden Raymond Beltz was the commanding officer on duty. *Id.* ¶¶ 14, 105. Assistant Deputy Warden Beltz tasked Captain Skepple with investigating the incident. *Id.* ¶ 105. Brown contends, however, that Captain Skepple did not conduct an investigation. *Id.* ¶ 106.

### B. Post-Attack Events and Incident Reports

After the incident, CO James prepared and signed a handwritten report, dated July 15, 2012, detailing what she had observed. *Id.* ¶ 62. In the report, CO James wrote that she saw Brown and another inmate, "D.T.," engaged in a fist fight. *Id.* CO James said she ordered Brown and D.T. to stop fighting but they ignored her commands. *Id.* ¶ 63. According to the report, CO James then warned Brown and D.T. that she would use pepper spray if they continued fighting. *Id.* ¶ 64. CO James wrote that the fight then ended, and both inmates were escorted out of the area without further incident. *Id.* ¶¶ 64, 67. CO James also noted in her report that CO Grinkley witnessed the fight. *Id.* ¶ 65. Brown claims that CO James lied in this report to cover up the attack and to retaliate against him for his complaint about her to Captain Rudolph. *Id.* ¶ 62.

A similar report about the incident, also dated July 15, 2012, bears CO Grinkley's signature. *Id.* ¶ 69-70. Brown says this report, despite purporting to be authored by CO Grinkley, was really prepared by CO James as well. *Id.* ¶ 69.

On July 20, 2012, CO Jose Freire met with Brown to discuss the incident. *Id.* ¶ 166. At this meeting, Brown prepared a handwritten complaint stating that he was attacked by four members of the Bloods while CO James stood by and watched. *Id.* ¶ 79. Brown also wrote that he wanted to press charges against CO James and the gang members. *Id.* CO Freire told Brown that he would show Brown a photo array of GMDC inmates to help Brown identify his attackers. *Id.* ¶ 166. CO Freire also said he would investigate Brown's complaint and assist Brown in pressing charges against CO James and the gang members. *Id.* ¶ 167.

Brown speculates that, after this exchange, CO Freire met with CO James, CO Grinkley, and Captain Skepple (the supervisor) to discuss the situation. *Id.* ¶ 168. Brown claims that, during this discussion, CO James, CO Grinkley, and Captain Skepple told CO Freire that they were working with other DOC personnel to cover up the truth about the incident. *Id.* ¶ 169. Specifically, Brown contends that CO James, CO Grinkley, and Captain Skepple informed CO Freire that Captain Rudolph (the probe team leader), Assistant Deputy Warden Beltz (the commanding officer), Deputy Warden Daniel O'Connell, and Deputy Warden Felipe Laboriel [5] were all part of the conspiracy to cover up the incident. *Id.* According to Brown, once CO Freire learned that these seven DOC personnel were working together to hide the truth, CO Freire agreed to join the effort to conceal the actual facts of the incident. *Id.* ¶ 170. Thus, after the discussion, CO Freire refused to meet with Brown again, did not provide Brown with the promised photo array, and did not assist Brown in pressing charges against CO James and the four gang members. *Id.* ¶ 171.

5    Brown lists Laboriel as "Acting Warden" in the case caption. Defendants, however, refer to Laboriel as a "Deputy Warden." The court assumes Defendants' description of Laboriel's DOC rank is correct, and thus the court will use "Deputy Warden" throughout this opinion.

**\*3** On July 23, 2012, Captain Rudolph filed a report about the incident. *Id.* ¶ 77. Captain Rudolph wrote that he responded to the dayroom with the probe team on July 15, and Brown told him at the scene that he was involved in a fight with one other inmate. *Id.* ¶ 78. Brown contends that Captain Rudolph submitted this false report as part of his collusion with CO James, CO Grinkley, Captain Skepple, and other DOC personnel. *Id.* ¶¶ 77, 79.

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

On July 30, 2012, Captain Skepple submitted a report detailing the findings of his investigation.[6] *Id.* ¶ 107. In his report, Captain Skepple wrote that he attempted to question Brown on July 15 at GMDC's medical clinic but Brown refused to provide a statement or any information as to how he got hurt. *Id.* ¶ 108. Captain Skepple also noted that he told Brown that fighting was not tolerated in DOC facilities, and that Brown would be "infracted" for violating DOC rules. *Id.* ¶ 109. Captain Skepple wrote that he tried to give Brown a formal notice of the infraction during the morning of July 20, 2012—i.e., just before CO Freire went to meet with Brown—but Brown refused to sign and take a copy. *Id.* ¶¶ 110-11. Captain Skepple concluded in his report that no other inmates besides Brown and D.T. were involved in the altercation. *Id.* ¶¶ 113, 118. Captain Skepple speculated that Brown lied in his statement to CO Freire on July 20 because Brown had just been given notice of the infraction and wanted to make himself look like a victim to avoid discipline. *Id.* ¶¶ 115-17. Moreover, Captain Skepple praised CO James for her quick response to the situation. *Id.* ¶ 120. Brown claims that he never spoke to Captain Skepple and that this report, like the others, is inaccurate. *Id.* ¶¶ 107, 110.

[6]     As mentioned above, Brown alleges that Captain Skepple did not actually conduct an investigation.

Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz reviewed all of the reports, agreed with their findings, and "signed off" on them. *Id.* ¶ 150. Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz also praised their staff for responding quickly to the incident, exonerated CO James of any wrongdoing, and summarily dismissed Brown's complaint against CO James and the gang members. *Id.* ¶ 151. As the commanding officer, Assistant Deputy Warden Beltz submitted a final report about the incident. *Id.* ¶ 152. Beltz wrote that Brown and D.T. were "horse playing" when the situation escalated and turned into a fist fight. *Id.* ¶ 154. Brown contends that Beltz's report contains numerous lies and was fabricated to cover up the incident.

Brown supports his allegation that Defendants' fist-fight theory is implausible by highlighting D.T.'s physical traits and medical records. D.T. is 5 feet, 7 inches tall and weighs 140 pounds. *Id.* ¶ 140. Brown, on the other hand, is 5 feet, 9 inches tall and weighs 180 pounds. *Id.* ¶ 139. Like

Brown, D.T. was seen by a doctor at GMDC's clinic after the incident. *Id.* ¶ 135. But unlike Brown, D.T. did not sustain any visible injuries and did not need treatment. *Id.* ¶¶ 135-36. Brown says it is impossible that D.T., who weighs less than Brown, inflicted such severe injuries on Brown without sustaining any injuries of his own. *Id.* ¶ 146.

On September 18, 2012, Brown met with Captain Rudolph to complete an application for protective custody. *Id.* ¶ 81. Brown wrote that he was attacked by four members of the Bloods gang, and that he was worried the Bloods would target him again. *Id.* ¶ 84. Captain Rudolph signed Brown's application as a witness. *Id.* ¶ 85. Captain Rudolph wrote in his own separate form, though, that Brown was involved in an altercation with just one other inmate who is a known member of the Bloods. *Id.* ¶¶ 86-87.

**\*4** The DOC did not hold a hearing to adjudicate the merits of the misbehavior report filed against Brown. *Id.* ¶¶ 157, 159, 163. The infraction remained in Brown's official inmate file. *Id.* ¶¶ 161-62. Defendants relied on the misbehavior report to maintain Brown's custody level at a classification that deprived him of several benefits available to inmates with a lower custody level classification. *Id.* ¶ 164.

### C. Screening for Gang Membership

Brown claims that D.T. did not belong in GMDC's general population. Brown says CO Tietjen,[7] who processed D.T.'s inmate classification, failed to screen D.T. for gang membership. *Id.* ¶ 187. Further, Brown alleges that Warden Brian Suprenant, the individual responsible for approving D.T.'s initial placement, also improperly reviewed D.T.'s criminal history and missed D.T.'s gang membership. *Id.* ¶¶ 188-89. According to Brown, had CO Tietjen and Warden Suprenant properly evaluated D.T., then D.T. would have been placed in a special housing area away from the general population. *Id.* ¶¶ 190-92.

[7]     Brown refers to this defendant as "Tretjen," and the case caption includes that spelling. Defendants, however, refer to this individual as "Tietjen." The court assumes Defendants' spelling is correct, and will thus use "Tietjen" throughout this opinion.

**Brown v. City of New York, Not Reported in Fed. Supp. (2017)**

2017 WL 1390678

#### D. Allegations of Violence and Corruption at GMDC

Brown further alleges that GMDC is known for inmate assaults. Brown says that DOC Commissioner Joseph Ponte and other DOC officials are aware of gang-related violence at GMDC but do not take corrective action. *Id.* ¶¶ 35-44, 197-98. Moreover, Brown claims that correction officers regularly recruit inmates who are gang members to help control the general prison population. *Id.* ¶¶ 27-28, 45. Brown contends that correction officers give these gang members exclusive use of common areas, including dayrooms and chairs, and allow gang members to attack other inmates who attempt to use these areas. *Id.* ¶ 32-34. According to Brown, a few days before he was attacked, another inmate at GMDC was attacked by the Bloods in a similar manner. *Id.* ¶ 193.

#### II. Procedural History

Brown brought this lawsuit on September 30, 2013. Defendants answered the original complaint and, on April 16, 2015, moved for partial judgment on the pleadings pursuant to [Federal Rule of Civil Procedure 12(c)](). Brown responded on June 2, 2015 by moving for leave to amend his complaint. The court granted Brown's motion for leave to file an amended complaint on November 13, 2015. ECF No. 49. In light of that decision, the court denied Defendants' motion for partial judgment on the pleadings.

Brown filed his amended complaint on November 17, 2015 and listed the following parties as defendants: the City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO James, CO Grinkley, CO Tietjen, and CO Freire. Each of the Individual Defendants is named in his or her official capacity and individual capacity. Six of these defendants—Ponte, Suprenant, Laboriel, O'Connell, Rudolph, and Tietjen were not listed in the original complaint. On the other hand, some defendants listed in the original complaint were not named in the amended complaint, including former DOC Commissioner Dora Schriro and numerous "John Doe" and "Jane Doe" defendants.

In his amended complaint, Brown brings various claims against Defendants through eight causes of action. The first four causes of action arise under [42 U.S.C. § 1983]() and allege as follows:

**\*5** (1) Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and CO Tietjen engaged in conduct that "amounted to deliberate indifference to a serious threat to the health or safety, cruel and inhuman treatment, cruel and unusual punishment and denial of due process rights." *Id.* ¶¶ 204-07.

(2) Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and Captain Rudolph engaged in conduct that "amounted to first amendment retaliation and denial of due process rights." *Id.* ¶¶ 208-11.

(3) Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, Captain Rudolph, and CO Freire engaged in conduct that "amounted to conspiracy, denial of equal protection of the laws and denial of due process rights." *Id.* ¶¶ 212-15.

(4) The City is liable for having an unconstitutional municipal policy or custom, and for failing to properly train, supervise, or discipline its correction officers. *Id.* ¶¶ 216-45.

The remaining four causes of action arise under state law and make the following allegations:

(5) All defendants violated Brown's rights under various provisions of the New York State Constitution. *Id.* ¶¶ 246-50.

(6) All defendants are liable for "other New York torts," including "negligence, assault and battery, and breach of special duty or relationship." *Id.* ¶¶ 251-53.

(7) Unspecified defendants are liable for intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* ¶¶ 254-57.

(8) The City negligently hired and retained DOC employees. *Id.* ¶¶ 258-62.

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

On March 16, 2016, all defendants except for CO James and CO Grinkley moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b) (6). Specifically, the City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire seek dismissal of all Brown's claims against them.

### DISCUSSION

#### I. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

#### II. Claims Against the Individual Defendants in their Official Capacities

The court notes that Brown has sued the Individual Defendants in both their official and individual capacities. Compl. ¶¶ 10-20. Brown's claims against the Individual Defendants in their official capacities are duplicative of his claims against the City because "a suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." *McMillian v. Monroe Cty.,* 520 U.S. 781, 785 n.2 (1997) (internal quotation marks and citations omitted). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *see also Davis v. Stratton,* 360 Fed.Appx. 182, 183 (2d Cir. 2010) ("[I]n a suit against a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit." (internal quotation marks and citation omitted)). "Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant."

*Phillips v. Cty. of Orange,* 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012). Thus, Brown's claims against the Individual Defendants in their official capacities are dismissed.

#### III. Section 1983 Claims

**\*6** As outlined above, Brown asserts four causes of action against Defendants pursuant to 42 U.S.C. § 1983. "Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Id.* (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)). The City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire (i.e., all defendants except for CO James and CO Grinkley) move to dismiss Brown's § 1983 claims.

#### A. Timeliness

As a preliminary matter, the six individuals added as defendants in the amended complaint—Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen contend that all of Brown's claims against them are time-barred. The statute of limitations for claims brought pursuant to § 1983 is determined by state law. *Owens v. Okure,* 488 U.S. 235, 249-51 (1989). In New York State, the statute of limitations for personal injury actions under § 1983 is three years. *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir. 2009). The incident that is the subject of this lawsuit occurred on July 15, 2012. Brown filed his original complaint on September 30, 2013—well within the limitations period. But the original complaint did not name Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen as defendants. On June 2, 2015, Brown moved to amend his complaint to add these six individuals. The court granted Brown's motion to amend on November 13, 2015, and Brown promptly filed his amended complaint on November 17, 2015. [8] Commissioner Ponte, Warden Suprenant, Deputy

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen argue that Brown's [§ 1983](#) claims against them are time-barred because the amended complaint was filed more than three years after the date of the incident.

8     Brown attempted to file his amended complaint on November 16, 2015, but due to a filing error, it was not properly docketed until November 17, 2015.

"When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *[Nw. Nat'l Ins. Co. v. Alberts,](#)* 769 F. Supp. 498, 510 (S.D.N.Y. 1991). Here, Brown filed his motion to amend on June 2, 2015, which was within the three-year limitations period that began to run on July 15, 2012. The fact that the amended complaint was not actually filed until November 17, 2015 is irrelevant. Brown's [§ 1983](#) claims against the six new defendants in the amended complaint are, therefore, timely.

Having determined that all of the [§ 1983](#) claims in Brown's amended complaint are timely, the court turns to their merits. The court first considers Brown's claims against the Individual Defendants, followed by his claims against the City.

### B. Claims Against the Individual Defendants

#### 1. Personal Involvement

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§ 1983.](#)" *[Wright v. Smith,](#)* 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citation omitted). Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire argue that Brown cannot state claims against them under [§ 1983](#) because they were not personally involved in any violation of his constitutional rights. The court will address the personal involvement of each of these defendants in turn. Before examining the specific allegations about each defendant, though, the court notes that Brown alleges generally that

Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Freire were "were working in cahoots ... to cover up the actual facts of the incident." Compl. ¶¶ 169. This broad assertion does not establish their personal involvement.

**\*7** "To state a legal truism, just because a litigant posits the existence of a conspiracy does not make it plausible." *[McIntosh v. United States,](#)* No. 14-cv-7889, 2016 WL 1274585, at \*15 (S.D.N.Y. Mar. 31, 2016). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *[Sommer v. Dixon,](#)* 709 F.2d 173, 175 (2d Cir. 1983). Thus, Brown's assertion that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Freire were part of a conspiracy is insufficient to state a claim under [§ 1983](#) because it is conclusory, vague, and unsupported by specific factual allegations.

Having disposed of Brown's vague allegations about a conspiracy, the court turns to his specific allegations about each of the Individual Defendants seeking dismissal.

#### a. Commissioner Ponte

Ponte became DOC Commissioner in April 2014— i.e., nearly two years after the incident. Accordingly, Commissioner Ponte could not conceivably have had any personal involvement in the constitutional violations Brown claims to have suffered in July 2012. Brown's [§ 1983](#) claims against Commissioner Ponte are therefore dismissed.

#### b. Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple

Brown contends that he has "adequately pleaded supervisory liability" against Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple. Pl.'s Br. 23. Brown cannot, however, state [§ 1983](#) claims against these defendants merely because they were supervisors at GMDC. *See [Hernandez v. Keane,](#)* 341 F.3d 137, 144-45 (2d Cir. 2003) (noting that a supervisory official cannot be held

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

liable under § 1983 simply because he had a position of authority). Instead, to establish their liability, Brown must show that they were personally involved in the allegedly unlawful conduct. *See id.* Proof of "linkage in the prison chain of command" is insufficient. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985).[9]

[9] The Second Circuit has previously held that the personal involvement of a supervisory defendant can be shown in five ways: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995). The Supreme Court's 2009 decision in *Iqbal,* though, may have nullified all or part of *Colon's* holding. *See Hollins v. City of New York,* No. 10-cv-1650, 2014 WL 836950, at *13 (S.D.N.Y. Mar. 3, 2014) ("The district courts of the Second Circuit disagree about what remains of *Colon* after *Iqbal."*). *Iqbal* addressed supervisory liability claims, and held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. "Accordingly, some courts in this Circuit have found that *Iqbal* abrogated all of the *Colon* categories except for the first and either all or part of the third." *Doe v. New York,* 97 F. Supp. 3d 5, 11 (E.D.N.Y. 2015). This court need not make a ruling on whether all of the *Colon* categories remain after *Iqbal* because, as will be discussed below, Brown has pled facts sufficient to establish that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple directly participated in an alleged constitutional violation.

**\*8** Brown alleges that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple (1) allowed the Bloods to control aspects of GMDC, (2) authored or "signed off" on false reports, and (3) failed to hold a hearing to adjudicate the misbehavior reports. Compl. ¶¶ 32, 75, 150, 157.

Brown's first allegation about these defendants—that they created or acquiesced in an unconstitutional policy by allowing the Bloods to control GMDC's common areas —is insufficient to establish personal involvement. "[T]o hold supervisors liable for creating a custom or policy fostering a constitutional violation, courts in this Circuit have required that plaintiffs plead more than conclusory allegations of the existence of the custom or policy." *Lindsey v. Butler,* 43 F. Supp. 3d 317, 330 (S.D.N.Y. 2014); *see also Burgis v. Dep't of Sanitation City of New York,* No. 13-cv-1011, 2014 WL 1303447, at *6 (S.D.N.Y. Mar. 31, 2014) ("[I]ncluding boilerplate language alleging the existence of a policy, without factual allegations to support it, is not enough at the pleading stage."). "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013).

Brown contends that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple gave gang members special privileges and responsibilities at GMDC. But Brown has not pled any specific facts that, if accepted as true, would establish that these defendants created this policy or allowed it to continue under their watch. For example, Brown does not allege that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple instructed specific correction officers to behave this way, nor does Brown claim that Laboriel, O'Connell, Beltz, and Skepple learned of and ignored specific instances of correction officers condoning attacks by the Bloods. The complaint's conclusory statements that these defendants' created an unconstitutional policy are thus insufficient to demonstrate their personal involvement in this case.

Brown's allegation that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple failed to arrange a disciplinary hearing is also insufficient to establish their personal involvement. Although a prisoner has "a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report," *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997), the complaint here does not contain any specific description of the liberty interest that Brown allegedly lost. In fact, all Brown says is that he was deprived of "several benefits available to

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

an inmate with lower custody level classification." *See* Compl. ¶ 164. This vague assertion does not establish a constitutional violation. Moreover, there is no indication that these defendants were even responsible for scheduling disciplinary hearings at GMDC. Thus, Brown's claim that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple failed to arrange a disciplinary hearing is insufficient to establish their personal involvement in a constitutional violation.

Brown's allegations about the false reports, though, are sufficient to establish the personal involvement of Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple. Brown contends that Assistant Deputy Warden Beltz and Captain Skepple authored false reports, and that Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz "signed off" on false reports prepared by others. Compl. ¶¶ 75, 150. Defendants cite the Second Circuit's decision in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir. 1986) for the proposition that "the creation of an inaccurate report alone" does not constitute a constitutional violation. Defs. Br. 15. Here, however, Brown alleges not only that the incident reports were inaccurate, but also that the Individual Defendants who authored and reviewed them did so to retaliate against him for his complaint about CO James. Although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," the creation of a false report can infringe on an inmate's constitutional rights when it is used to retaliate against him for exercising a constitutional right. *Boddie,* 105 F.3d at 862. Since the complaint here plausibly suggests that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple had a retaliatory motive, the court cannot dismiss Brown's § 1983 claims against them for lack of personal involvement. *Cf. Heyliger v. Gebler,* No. 06-cv-6220L, 2010 WL 7746201, at *2 (W.D.N.Y. July 30, 2010) (dismissing a § 1983 claim against a correction officer that was premised on the officer filing a false report because there was "no suggestion in the complaint that [the defendant] acted out of any retaliatory motive").

**\*9** To summarize, at this stage in the litigation, Brown's allegation that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple had a retaliatory motive in drafting

and approving false reports is sufficient to establish their personal involvement in a constitutional violation. Brown's other allegations about these defendants, though, are insufficient to show personal involvement.

### c. Captain Rudolph

Brown alleges that Captain Rudolph was personally involved in violating his constitutional rights in two ways. First, Brown contends that Captain Rudolph filed a false report to cover up the attack and to retaliate against him. Compl. ¶¶ 75, 95. Second, Brown alleges that Captain Rudolph lied on the protective custody application. *Id.* ¶¶ 86-87.

As discussed above, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie,* 105 F.3d at 862. "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Id.* Here, Brown claims that Rudolph lied in the incident report and on the protective custody application to retaliate against him for complaining about CO James. At this point in the litigation, these allegations are sufficient to establish Captain Rudolph's personal involvement in a violation of Brown's constitutional rights.

### d. CO Freire

Brown contends that CO Freire violated his constitutional rights by failing to investigate the incident. Brown alleges that CO Freire originally promised to provide him with a photo array to help identify the attackers and press charges against them, but decided not to after speaking with other DOC personnel and agreeing "to work in cahoots" with them. There is, however, no constitutional right to an investigation by government officials. *See Hayes v. Cty. of Sullivan,* 853 F. Supp. 2d 400, 433 (S.D.N.Y. 2012); *Carrasquillo v. City of New York,* 324 F. Supp. 2d 428, 438 (S.D.N.Y. 2004). "Furthermore, a victim of allegedly criminal conduct is not entitled to a criminal investigation or the prosecution of the alleged perpetrator of the crime." *Johnson v. Ruiz,* No. 3:11-cv-542, 2012 WL 90159, at *4 (D. Conn. Jan. 10, 2012). Accordingly, Brown cannot establish CO Freire's personal involvement in any violation of his constitutional

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

rights by alleging that CO Freire failed to properly investigate Brown's complaint.

Brown makes a related argument that, because CO Freire did not uncover the identities of the Bloods members, Brown has been deprived of his opportunity to sue them, which he says is a violation of his constitutional rights. To support his claim, Brown cites the Supreme Court's decision in *Bounds v. Smith,* 430 U.S. 817 (1977), and the Second Circuit's decision in *Ayers v. Ryan,* 152 F.3d 77 (2d Cir. 1998). These cases, though, do not support Brown's claims.

In *Bounds,* the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828. Brown does not allege that he was hindered from accessing legal materials or lawyers, so *Bounds* is irrelevant.

In *Ayers,* the Second Circuit held that a prison official violated an inmate's due process rights by not following through on a promise to assist the inmate in preparing his defense for a disciplinary hearing. 152 F.3d at 80-81. *Ayers* is distinguishable because Brown does not allege that CO Freire promised to help with a disciplinary hearing, but rather that CO Freire promised to act as Brown's personal investigator for a potential civil lawsuit or criminal action. Even assuming CO Freire made this promise, it would be insufficient to make him personally involved in any violation of Brown's constitutional rights.

**\*10** Brown, therefore, has not pled facts sufficient to establish CO Freire's personal involvement in any violation of his constitutional rights. The § 1983 claims against CO Freire are dismissed.

### e. Warden Suprenant and CO Tietjen

Brown says that Warden Suprenant and CO Tietjen caused D.T. to be improperly placed in the general prison population, which jeopardized Brown's health and safety. This allegation plausibly suggests that Warden Suprenant and CO Tietjen were personally involved in a violation of Brown's rights under the Fourteenth Amendment. Whether their conduct actually amounted to

a constitutional violation is discussed below. The court cannot, however, dismiss the complaint against them for lack of personal involvement.

### f. Summary

Having determined that Brown has alleged facts sufficient to support the personal involvement of Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Tietjen, the court will now address the substance of Brown's § 1983 claims against them.

### 2. Deliberate Indifference

In his first cause of action pursuant to § 1983, Brown alleges, among other things, that Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen engaged in conduct that amounted to deliberate indifference to his health or safety. Brown's deliberate indifference claims arise under the Due Process Clause of the Fourteenth Amendment because he was a pretrial detainee at the time of the incident. *See Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017). While a convicted prisoner's claim of deliberate indifference arises under the Eighth Amendment's prohibition on cruel and unusual punishment, this proscription does not apply to a pretrial detainee because a pretrial detainee is not being punished. *Id.* A pretrial detainee's rights under the Fourteenth Amendment, though, "are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.' " *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983)).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell,* 849 F.3d at 29. The claim consists of two prongs. The first is the "objective prong," which requires the pretrial detainee to show "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." *Id.* The second is the "subjective prong," under which the pretrial detainee must prove "that the officer acted with at least deliberate indifference to the challenged

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

conditions." *Id.* The Second Circuit has suggested that the subjective prong is "perhaps better classified as a '*mens rea* prong' or 'mental element prong.' " *Id.*

To establish an objective deprivation under the first prong, a plaintiff must show that he was detained under conditions posing an unreasonable risk of serious damage to his health, including his "physical and mental soundness." *Id.* at 30 (citations omitted). The parties here dispute whether Brown was subject to an unreasonable risk of serious harm. Defendants argue that such a risk can only be demonstrated where there is evidence of a previous altercation between an inmate and his attacker, coupled with a request by the inmate to be separated from the attacker. Brown counters that evidence of a specific risk is not required. The court need not decide this issue because, as explained below, Brown has not sufficiently alleged that Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen acted with deliberate indifference as contemplated by the subjective prong.

**\*11** To show deliberate indifference under the subjective prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." [10] *Id.* at 35. Therefore, the pretrial detainee must prove that the prison official acted with "a *mens rea* greater than mere negligence," *id.* at 36, because "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process," *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2472 (2015). "Absent clear notice of a risk of harm to the prisoner, [c]ourts routinely deny deliberate indifference claims based upon surprise attacks." *Fernandez v. New York City Dep't of Corr.,* No. 08-cv-4294, 2010 WL 1222017, at \*4 (S.D.N.Y. Mar. 29, 2010) (internal quotation marks and citation omitted).

[10]   "In other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively." *Darnell,* 849 F.3d at 35.

Here, Brown has not pled facts to establish that Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain

Skepple, and CO Tietjen acted with the state of mind necessary to establish deliberate indifference. None of these individuals was present at the time of the attack, and thus none of them could have actually intervened to stop it. Further, none of these defendants was on notice that an attack was imminent because there had been no prior altercations involving Brown, and Brown had not complained to any prison officials that he was in danger.

At worst, Warden Suprenant and CO Tietjen improperly placed Brown and D.T. together in the general prison population. Brown himself describes this conduct as mere negligence. *See* Compl. ¶ 194 ("The defendants *negligently* placed the plaintiff in GMDC....") (emphasis added); *id.* ¶ 199 ("The defendants *negligently* placed the plaintiff in GMDC....") (emphasis added). Because "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence," *Darnell,* 849 F.3d at 36, Brown's deliberate indifference claims against Warden Suprenant and CO Tietjen are dismissed.

Brown's allegations regarding Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple primarily relate to post-attack investigations and reports. Brown says that Assistant Deputy Warden Beltz and Captain Skepple prepared false reports, and that Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz "signed off" on false reports. Brown also claims that Assistant Deputy Warden Skepple failed to conduct a proper investigation. Even if these allegations are true, they do not support a claim for deliberate indifference because they occurred *after* the attack, and thus in no way imply that these defendants knew of and disregarded an excessive risk to Brown's safety leading up to the incident. Finally, Brown's allegations that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple acted with deliberate indifference to his safety by allowing the Bloods to control common areas at GMDC is insufficient to state a claim under § 1983 because, as discussed above, Brown has pled no specific facts to support the theory. *See Iqbal,* 556 U.S. at 678 (holding that a complaint fails if it "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citation omitted). Accordingly, Brown's deliberate indifference claims against Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple are dismissed.

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

**\*12** To summarize, Brown brought a deliberate indifference claim against Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and CO Tietjen. *See* Compl. ¶¶ 204-07. The claim is dismissed as to Commissioner Ponte for lack of personal involvement. For the reasons described above, the claim is also dismissed as to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen. Brown's deliberate indifference claim, then, only remains as to CO James and CO Grinkley.

### 3. Other Claims Under § 1983
### Against the Individual Defendants

As described in the procedural history, Brown asserts a variety of other claims against the Individual Defendants pursuant to § 1983. Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire (i.e., all defendants except for CO James and CO Grinkley) move to dismiss these claims. Their only argument, though, is lack of personal involvement. Because the court has found that neither Commissioner Ponte nor CO Freire was personally involved in any violation of Brown's constitutional rights, all of Brown's § 1983 claims against Commissioner Ponte and CO Freire are dismissed. But to the extent the complaint asserts other claims under § 1983—i.e., claims not for deliberate indifference—against Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Tietjen, those claims remain.

### C. *Monell* Claim Against the City

Brown alleges that the City has failed to properly train, supervise, or discipline its correction officers. Brown also contends that the City has a policy or custom of encouraging false reports and allowing the Bloods and other gangs to operate DOC facilities. According to Brown, the City's policy/custom and inadequate training program resulted in a deprivation of his constitutional rights, and he seeks to hold the City liable pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978). The City moves to dismiss the claim.

In *Monell,* the Supreme Court held that a municipality may not be held liable under § 1983 for its employees' conduct solely on the basis of *respondeat superior. Id.* at 694. Instead, to state a claim for relief against a local government under § 1983, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy or custom. *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 122 (2d Cir. 1991). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 563 U.S. 51, 61 (2011). Additionally, in limited circumstances, a municipality's failure to train its employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *Id.*

"Ultimately, the burden is on the plaintiff to 'demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury.' " *Whitfield v. City of Newburgh,* No. 08-cv-8516, 2015 WL 9275695, at \*28 (S.D.N.Y. Dec. 17, 2015) (quoting *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir. 2008)). The plaintiff must also establish a causal connection, or an "affirmative link," between the municipal policy and the deprivation of his constitutional rights. *Tuttle,* 471 U.S. at 823.

**\*13** Brown offers two avenues for relief under *Monell.* First, Brown says that the City has failed to properly train and supervise its correction officers. Second, Brown contends that the City has an unofficial custom of engaging gangs to operate DOC jails and using false reports to cover up incidents involving inmates. The City counters that Brown has failed to state a plausible *Monell* claim under either of these theories. Alternatively, the City argues that even if Brown has sufficiently alleged the existence of a municipal policy, he has not plausibly alleged that a particular violation of his constitutional rights was directly caused by such a policy.

### 1. Failure to Properly Train, Supervise, or Discipline

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

To state a claim against a municipality for its failure to properly train, supervise, or discipline its employees, a plaintiff must show that the local government acted with "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick,* 563 U.S. at 61 (quoting *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). The "deliberate indifference" test "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). "The operative inquiry is whether the municipality was on *notice* that 'a particular omission in their training program causes city employees to violate citizens constitutional rights.' " *Williams v. City of New York,* 121 F. Supp.3d 354, 373-74 (S.D.N.Y. 2015) (quoting *Connick*, 563 U.S. at 61).

Here, Brown has not offered any specific factual allegations regarding the City's training, supervision, or discipline programs for DOC personnel. In fact, there is only one reference to the City's training program in the complaint, and it simply alleges in conclusory terms that the City's training is inadequate. *See* Compl. ¶ 217. Since a plaintiff cannot "unlock the doors of discovery" with "nothing more than [his] unsupported supposition," *5 Borough Pawn, LLC v. City of New York,* 640 F. Supp. 2d 268, 299 (S.D.N.Y. 2009), the court dismisses Brown's *Monell* claim to the extent it is based on the City's alleged failure to properly train its employees.

### 2. Unconstitutional Policy or Custom

Brown also alleges that the City, acting through the DOC, unofficially delegates duties to gangs at Rikers, fails to protect inmates from attacks by other inmates, and encourages false reports to cover up incidents. A municipal "policy" is generally defined as a regulation that has been officially promulgated through a formal act by the municipality's governing body. *Monell,* 436 U.S. at 690. A municipal "custom," on the other hand, is not formally approved but "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown,* 520 U.S. at 404. "*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly

authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007).

Here, Brown concedes that he "does not have any evidence at this time" to suggest that the DOC had an official or formal policy of turning over control of DOC facilities to the Bloods. Pl.'s Br. 11. Brown argues, however, that the City's "tolerance" of the Bloods and their activities at DOC jails is so well settled that City policymaking officials can be said to have either actual or constructive knowledge of it. In essence, Brown contends that the City has a custom of allowing gangs to control certain aspects of DOC facilities.

**\*14** To sustain a claim for municipal liability under § 1983 based on the existence of a custom, a plaintiff must do more than simply state that a municipal custom exists. *Santos v. New York City,* 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012). "Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Id.* A single instance of unconstitutional conduct is generally insufficient to infer that a municipality has an unlawful policy or custom. *Tuttle,* 471 U.S. at 823-24. However, courts in this Circuit have held that a plaintiff may state a plausible *Monell* claim by citing cases or newspapers articles containing allegations of similar repeated misconduct. *See, e.g., Gonzalez v. New York City,* No. 16-cv-00254, 2016 WL 7188147, at *8 (S.D.N.Y. Dec. 2, 2016) (collecting cases).

Brown alleges numerous times that the DOC allows— even invites the Bloods to control DOC facilities such as GMDC. *See, e.g.,* Compl. ¶¶ 27-28, 32-38, 44-45. Standing alone, these allegations are conclusory and are insufficient to support a plausible *Monell* claim based on Brown's single incident. But Brown also claims that the Bloods perpetrated a similar attack on another inmate a few days before he was attacked, Compl. ¶ 193, and he cites an assortment of cases and articles reporting on corruption and gang-related violence at Rikers. Granted, many of these reports offer no support for Brown's allegation that the City has an unofficial custom of allowing gang activity to occur at GMDC. Certain ones, however, bear enough factual similarity to the incident that is the subject of this lawsuit to allow Brown's *Monell* claim to survive the City's motion to dismiss.

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

For example, Brown cites a *New York, Times* article about the killing of a teenage inmate at Rikers by other inmates in 2008. Compl. ¶¶ 229-33. In that case, the teen's attackers had allegedly been enlisted by correction officers to act as enforcers to help maintain control over the jail. The scheme, nicknamed "the Program," also gave certain inmates special privileges such as deciding who was allowed to use chairs in common rooms.

Brown also cites a 2007 *Village Voice* article reporting on violence at Rikers. *Id.* ¶¶ 240-41. That article, which quotes deposition testimony by a former correction officer, describes how certain inmates were deputized as enforcers by correction officers to control other inmates. The article also discussed an alleged practice known as "write with us," in which DOC personnel conspired to make false reports on incidents involving inmates.

These articles, which contain allegations that are strikingly similar to the factual allegations here, plausibly support Brown's contention that the DOC has not adequately responded to a pattern of misconduct. At this stage in the litigation, the court finds that Brown has adequately alleged the existence of a municipal policy or custom.

### 3. Causal Connection

To state a claim for municipal liability under [§ 1983](), a plaintiff must not only establish the existence of a municipal policy or custom, but also show a causal connection, or "affirmative link," between the policy and the deprivation of his constitutional rights. *[Vippolis v. Village of Haverstraw,]() 768 F.2d 40, 44 (2d Cir. 1985)*. The City argues that, even if Brown has sufficiently alleged the existence of a municipal policy, he has not plausibly alleged that his constitutional rights were violated as a result of that policy.

If the City has a custom of enlisting gang members to help control other inmates, it is plausible that the attack on Brown—and the correction officers' lack of response—was directly connected to this policy. Accordingly, the City's motion to dismiss Brown's claim for municipal liability based on an unofficial custom or practice is denied.

## IV. State Law Claims

**\*15** In addition to his federal claims, Brown brings various state law claims against Defendants. The court addresses these claims below.

### A. Claims Under the New York State Constitution

Brown asserts that Defendants violated his rights under the New York State Constitution. There is, however, no private right of action under the New York State Constitution for claims that can be brought under [§ 1983](). *[Davis v. City of New York,]()* No. 15-cv-08575, [2016 WL 4532203, at \*10 (S.D.N.Y. Aug. 29, 2016)](). Here, [§ 1983]() provides a remedy for all of the claims Brown brings under the New York State Constitution against the Individual Defendants. Brown's state constitutional claims against the Individual Defendants are therefore dismissed. *See [Allen v. Antal,]() 665 Fed.Appx. 9, 13-14 (2d Cir. 2016)* (affirming a district court's dismissal of claims brought under the New York State Constitution where alternative remedies were available).

But [§ 1983]() does not provide an alternative remedy for Brown's state constitutional claims against the City because [§ 1983]() does not recognize *respondeat superior* liability. See *[Campbell v. City of New York,]()* No. 09-cv-3306, [2011 WL 6329456, at \*5 (E.D.N.Y. Dec. 15, 2011)](). Thus, to the extent Brown asserts claims under the New York State Constitution against the City, those claims survive.

### B. Claim Against the City for Negligent Hiring and Retention

Brown also brings a claim against the City for negligent hiring and retention. The City seeks dismissal of this claim, and Brown voluntarily withdraws it with prejudice. This claim is therefore dismissed with prejudice.

### C. Remaining State Law Claims

Brown further alleges that Defendants are liable for various torts under New York State law. The City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire move to dismiss these claims.

The City, Assistant Deputy Warden Beltz, Captain Skepple, and CO Freire offer no argument in support of their motion to dismiss these state law claims. Their motion is thus denied.

Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen (i.e., the six individuals added in the amended complaint) argue that Brown's state law claims against them are time barred. Brown's state law tort claims against the City and its employees are subject to a one-year and ninety-day statute of limitations. *See* N.Y. Gen. Mun. § 50-i(l)(c); *Jones v. City of New York,* No. 13-cv-929, 2016 WL 1322443, at *5 (S.D.N.Y. Mar. 31, 2016). Brown does not dispute the length of the limitations period or its application to these claims but he contends that, despite the limitations period, his state law claims are nonetheless timely.

In support of his argument that the state law claims against Commissioner Ponte are timely, Brown points to Federal Rule of Civil Procedure 25(d), which provides that when a public officer who is a party in an official capacity ceases to hold office while a lawsuit against him is pending, the officer's successor is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d); *Gusler v. City of Long Beach,* No. 10-cv-2077, 2015 WL 3796328, at *1 (E.D.N.Y. June 18, 2015). Brown's original complaint listed Commissioner Schriro as a defendant. Ponte replaced Schriro as DOC Commissioner in April 2014. Under Rule 25(d), Ponte was automatically substituted—in his official capacity—as a party in this litigation at that time. But as discussed above, Brown's claims against the Individual Defendants in their official capacities are duplicative of his claims against the City. To the extent Brown asserts claims against Commissioner Ponte in his individual capacity, Rule 25(d) is irrelevant. Thus, Brown's state law claims against Commissioner Ponte in his individual capacity are untimely.

**\*16** With respect to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen, Brown argues that his state law claims against them are timely due to the "relation back" doctrine. Both the Federal Rules of Civil Procedure and

New York State law allow, in certain circumstances, an amended pleading to relate back to the date of the original pleading for purposes of the statute of limitations. "Federal courts choosing between federal and state relation back doctrines should pick the more forgiving principle of relating back." *Fisher v. Cty. of Nassau,* No. 10-cv-0677, 2011 WL 4899920, at *4 (E.D.N.Y. Oct. 13, 2011) (internal quotation marks and citations omitted). Here, the federal relation back doctrine allows Brown to proceed with his state law claims against Deputy Warden Laboriel. However, neither the federal relation back doctrine nor the New York relation back doctrine saves Brown's untimely state law claims against Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen.

The federal relation back doctrine is governed by Rule 15(c)(1) of the Federal Rules of Civil Procedure. An amended complaint that adds a party to the litigation after the statute of limitations has run relates back to the original complaint if (1) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set forth in the original complaint, and (2) within the time for serving the original complaint, the new party both (i) received such notice of the action that it will not be prejudiced in defending on the merits, and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity. Fed. R. Civ. P. 15(c)(1)(C); *Fisher,* 2011 WL 4899920, at *4; *Abdell v. City of New York,* 759 F. Supp. 2d 450, 454 (S.D.N.Y. 2010).

It is clear that the new claims against Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen arise out of the same occurrence set forth in the original complaint, namely the attack on Brown at GMDC. Only Deputy Warden Laboriel, though, received timely notice of the action.

Rule 15 requires that the party to be added receive notice of the action within the time period provided by Rule 4(m), which—at the time this lawsuit began in 2013—was 120 days after the filing of the complaint. [11] *See* Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 15(c)(1)(C). Notice for purposes of Rule 15 can be either actual or constructive. *Girau v. Eurpower, Inc.,* 317 F.R.D. 414, 421 (S.D.N.Y. 2016). "Under the constructive notice doctrine, the court can impute knowledge of a lawsuit to a new defendant government official through his attorney, when

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

the attorney also represented the officials originally sued, so long as there is some showing that the attorney[s] knew that the additional defendants would be added to the existing suit." *Muhammad v. Pico,* No. 02-cv-1052, 2003 WL 21792158, at *20 (S.D.N.Y. Aug. 5, 2003) (internal quotation marks and citations omitted). "The relevant inquiry for determining whether such constructive notice should be based on 'sharing of counsel' is whether counsel 'knew or should have known' within the limitations period that the additional defendants would be added." *Samuels v. Dalsheim,* No. 81-cv-7050, 1995 WL 1081308, at *14 (S.D.N.Y. Aug. 22, 1995) (quoting *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir. 1989)).

11  Rule 4(m) has since been amended to reduce the presumptive time for serving a defendant from 120 days to 90 days. *See* Fed. R. Civ. P. 4(m) advisory committee's note to 2015 amendment. The court will apply the 120-day period here since that rule was in effect at the time service was originally made.

In the caption of his original complaint, Brown listed "Deputy Warden John Doe [Shield# 561]" as a defendant. *See* ECF No. 1. In his amended complaint, Brown replaced this John Doe defendant with "Acting Warden Felipe Laboriel [Shield # 561]." [12] *See* ECF No. 52. Because Brown specifically identified Laboriel by his shield number in the original complaint, counsel knew or should have known within the limitations period that Laboriel would be added as a defendant. Further, this knowledge can be imputed to Laboriel within 120 days of when the original complaint was filed on September 20, 2013 because defense counsel appeared in this matter on January 7, 2014. *See* ECF Nos. 1, 3. Accordingly, Brown's state law claims against Deputy Warden Laboriel relate back under Rule 15.

12  Since Laboriel does not dispute whether this is his actual shield number, the court assumes it is correct.

**\*17** Rule 15, however, is of no help to Brown with respect to Warden Supranant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. These defendants were not identified in any manner in the original complaint's caption. Moreover, the original complaint contained no factual allegations regarding these defendants' alleged conduct. Thus, there is no indication that counsel knew or should have known that Warden Supranant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen would be named as defendants in an amended complaint.

New York's relation back doctrine also fails to save Brown's untimely state law claims against Warden Supranant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. The relation back doctrine under New York law allows claims against a new defendant to relate back to timely filed claims previously asserted against a co-defendant when (1) the new claims arose out of the same conduct, transaction, or occurrence as the original allegations; (2) the new defendant is "united in interest" with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new defendant knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well. *Buran v. Coupal,* 661 N.E.2d 978, 981 (N.Y. 1995), *see also* N.Y. C.P.L.R. § 203; *Strada v. City of New York,* No. 11-cv-5735, 2014 WL 3490306, at *6 (E.D.N.Y. July 11, 2014). "This test was patterned largely after the Federal relation back rule ... and, at least with respect to its third prong, it uses the same standard as Federal Rule 15." *Fisher,* 2011 WL 4899920, at *5 (internal quotation marks and citations omitted). As discussed above, there is no indication here that Warden Supranant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen knew or should have known that they would be added as defendants. Thus, New York's relation back doctrine is unavailing as well.

Nor can Brown simply substitute Warden Supranant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen for the "John Doe" and "Jane Doe" defendants listed in the original complaint. Section 1024 of the New York Civil Practice Law and Rules allows a plaintiff to replace a John Doe defendant with a named party after the statute of limitations has run if (1) the plaintiff exercised "due diligence, prior to the running of the statute of limitations, to identify the defendant by name," and (2) the plaintiff described "the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." *See Hogan v. Fischer,* 738 F.3d 509, 518-19 (2d Cir. 2013). Here, regardless of whether Brown exercised due diligence, he cannot rely on § 1024 because he did not provide any identifying information whatsoever about any of the John Doe defendants listed in the original complaint.

Brown v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1390678

In sum, Brown's state law claims are dismissed as to Commissioner Ponte, Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. These claims remain, however, as to the City, Deputy Warden Laboriel, Assistant Deputy Warden Beltz, Captain Skepple, and CO Freire.


**V. Brown's Motion for Reconsideration**

Brown was able to file his amended complaint in this action because the court granted him leave to do so on November 13, 2015. ECF No. 49. Brown now asks the court to reconsider that November 13, 2015 decision because, when he filed his amended complaint, he mistakenly deleted former DOC Commissioner Schriro as a defendant. ECF No. 73. Brown's motion for reconsideration is denied.

**\*18** Brown's motion for reconsideration is governed by Local Rule 6.3. Under Local Rule 6.3, a motion for reconsideration must be served within fourteen days after the court's determination of the original motion. Here, the underlying decision was entered on November 13, 2015. Brown's request for reconsideration, however, was not filed until April 21, 2016. Thus, the motion is untimely, and it can be denied on that basis alone. *See Garcia v. BAE Cleaners Inc.,* No. 10-cv-7804, 2012 WL 98511, at \*1 (S.D.N.Y. Jan. 11, 2012).

But even if the motion were timely made, it would still be denied. "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995). Here, Brown does not point to any controlling decisions or data that *the court* overlooked; he only says that *he* erred while drafting his

amended complaint. The motion for reconsideration is, therefore, denied. If Brown wishes to amend his complaint a second time, he may file a motion seeking leave to do so pursuant to Federal Rule of Civil Procedure 15(a).


## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss certain claims in the amended complaint is granted in part and denied in part. All of Brown's claims against the Individual Defendants in their official capacities are dismissed. All of Brown's § 1983 claims against Commissioner Ponte and CO Freire are dismissed for lack of personal involvement. Brown's § 1983 claims for deliberate indifference only are also dismissed as to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen. Brown's claims under the New York State Constitution against the Individual Defendants are dismissed. Brown's claim against the City for negligent hiring and retention is dismissed. Brown's state law tort claims against Commissioner Ponte, Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen are dismissed. All other claims in the amended complaint remain.

Brown's motion for reconsideration is denied.

This opinion resolves the items listed at docket numbers 63 and 73.


SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1390678

---

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John
Doe # 1, Parole Agent, Watertown Correctional
Facility; John Doe # 2, Parole Agent, Lincoln
Work Release Center; Susan Bishop, Director of
Interstate Compact, South Carolina; Cecil Magee,
Parole Officer, South Carolina; Frank Barton,
Parole Officer, South Carolina; John McMahan,
Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

### Attorneys and Law Firms

Kenneth Brown, State Court Institute–Greene,
Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General,
The Capitol Albany, NY, for defendants Peters, Herman
Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M.
Dvorin, Assistant Attorney General, Carl N. Lundberg,
Chief Legal Counsel, South Carolina Department of
Probation, Columbia, SC, for defendants Bishop, Magee,
Barton, McMahan, and Stanford, Carl N. Lundberg, of
Counsel.

### DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon,
Jr., duly filed on April 17, 1997. Following ten days from
the service thereof, the Clerk has sent me the entire file,
including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983
civil rights action on November 17, 1995. On February
12, 1996, Magistrate Judge Scanlon ordered Brown to
submit an amended complaint alleging the specific acts
committed by the individuals named as defendants which
Brown claimed violated his constitutional rights. Brown
filed an amended complaint on March 21, 1996. In
his amended complaint, Brown alleged that defendants
violated his rights under the Eighth and Fourteenth
Amendments by failing to process properly his interstate
compact paperwork, resulting in Brown being imprisoned
pursuant to a parole hold when in fact he had never
violated the conditions of his parole. For a more complete
statement of Brown's claims, see his amended complaint.
Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant
to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2.
On August 19, 1996, defendants Bishop, Magee, Barton,
and McMahan made a motion to dismiss the complaint
against them or, in the alternative, for summary judgment.
Dkt. No. 20. On October 17, 1996, defendants Herman,
Stewart, and Stanford made a motion to dismiss for failure
to state a claim. Dkt. No 34. On April 17, 1996, Magistrate
Judge Scanlon recommended that all defendants' motions
to dismiss be granted and that the complaint be dismissed.
Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate
judge's report-recommendation, having been granted
additional time in which to do so. Dkt. No. 52. In addition,
Brown filed on June 9, 1997, a motion for leave to file a
second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last
motion filed, Brown's motion for leave to amend his
complaint a second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt.
No. 53. The district court has discretion whether to grant
leave to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d
129, 131 (2d Cir.1993). In exercising that discretion, the
court should freely grant leave to amend when justice so
requires. Fed.R.Civ.P. 15(a). However, the court need not
grant leave to amend where it appears that amendment

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment

would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.)* (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997)* (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

[1]    I note, however, that the report-recommendation would survive even *de novo* review.

### CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

### ORDER and REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary

judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

### BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff is given a preliminary hearing at Riker's

Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were

negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford. Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.
In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.
Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2511734
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gregory DAVIS, Plaintiff,
v.
CITY OF NEW YORK, New York City Police
Department, Police Officer George Lopez
Police Officer "John Doe", Defendants.

No. 07 Civ. 1395(RPP).
|
June 19, 2008.

**Attorneys and Law Firms**

Mark Lubelsky & Associates, Attn: Mark L. Lubelsky, New York, NY, for Plaintiff.

Office of the Corporation Counsel, New York City Law Dep't, Attn: Sabrina Melissa Tann, New York, NY, for Defendants.

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., District Judge.

**\*1** Plaintiff Gregory Davis filed a complaint against Defendants City of New York, New York City Police Department ("NYPD"), Police Officer George Lopez and Police Officer "John Doe" alleging a cause of action under 42 U.S.C. § 1983. Defendants City of New York and NYPD move to dismiss the complaint in its entirety pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the following reasons, Defendants' motion for summary judgment (Doc. No. 12) is granted.

BACKGROUND

On February 26, 2007, Plaintiff initiated this action by filing the complaint with the Court. (Defs.' Rule 56.1 Stmt. ¶ 4; Pl.'s Rule 56.1 Stmt. ¶ 4.) The complaint alleges that on or about March 16, 2004, Police Officers George Lopez and "John Doe" used excessive force while arresting Plaintiff near the intersection of Broadway and 136th Street for minor drug possession, caused him physical injury, and subsequently denied him medical treatment

in violation of Plaintiff's constitutional rights. (Compl. ¶¶ 15-34; Defs.' Rule 56.1 Stmt. ¶ 2; Pl.'s Rule 56.1 Stmt. ¶ 2.) The complaint also alleges that the City of New York failed to properly train and supervise its officers, resulting in the deprivation of Plaintiff s constitutional rights. (Compl. ¶¶ 65-66; Defs.' Rule 56.1 Stmt. ¶ 3; Pl.'s Rule 56.1 Stmt. ¶ 3.)

By letter dated April 25, 2007 and copied to Plaintiff's counsel, Sabrina Tann, Esq., counsel for Defendant City of New York, requested an adjournment of the initial pretrial conference scheduled for the following day on the grounds that "none of the named defendants in this action have been served with a copy of the summons and complaint." (Tann Decl., Ex. C; Defs.' Rule 56.1 Stmt. ¶ 6.) On May 10, 2007, Plaintiff served Corporation Counsel of the City of New York, located at 100 Church Street, New York, New York 10007, with two copies of the summons and complaint. (Tann Decl. ¶ 7; Defs.' Rule 56.1 Stmt. ¶ 7; Pl.'s Rule 56.1 Stmt. ¶ 7.) Each of the two summons, dated February 26, 2007, were addressed to "Police Officer George Lopez," "Police Officer John Doe," "City of New York," and "The New York City Police Department" at "100 Church Street, Fourth Floor, New York, New York 10026." [1] (Tann Decl., Ex. D; *id.* ¶ 8; Defs.' Rule 56.1 Stmt ¶ 8; Pl.'s Rule 56.1 Stmt. f 8.) Plaintiff never filed any affidavits of service of the summons and complaint with the Court. (Tann Decl. ¶ 11; Defs.' Rule 56.1 Stmt. ¶ 10; Pl.'s Rule 56.1 Stmt. ¶ 10.)

[1]     Plaintiff acknowledges that the zip code was written as "10026" in error and that the correct zip code is 10007. (Tann Decl. at 2 n. 1.)

On June 12, 2007, Defendants City of New York and NYPD filed their answer to the complaint. (Tann Decl. ¶ 12; Defs.' Rule 56.1 Stmt. ¶ 11; Pl.'s Rule 56.1 Stmt. ¶ 11.) In their answer, Defendants City of New York and NYPD stated "[u]pon information and belief, the individual identified in the caption of the complaint as George Lopez, has not been served with a copy of the Summons and Complaint or requested representation from the office of Corporation Counsel." (Tann Decl., Ex. E; Defs.' Rule 56.1 Stmt. ¶ 12; Pl.'s Rule 56.1 Stmt. ¶ 12.)

**\*2** On September 11, 2007, at an initial conference with both counsel present before the Court, Defendants' counsel stated that service of process had not been effected on the named defendant George Lopez. (Tann Decl. ¶ 13; Defs.' Rule 56.1 Stmt. ¶ 13.) At that conference, the Court

set a briefing schedule for Defendants' proposed motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(c). (Tann Decl. ¶ 15; Defs.' Rule 56.1 Stmt. ¶ 15; Pl.s' Rule 56.1 Stmt. ¶ 15.) By letter dated September 26, 2007, Defendants withdrew their request to submit the motion to dismiss, and by order dated September 26, 2007, the Court directed the parties to complete discovery by January 1, 2008 and submit a proposed Pre-Trial order by January 18, 2008. (Tann Decl., Ex. F; Defs.' Rule 56.1 Stmt. ¶¶ 16-17; Pl's Rule 56.1 Stmt. ¶¶ 16-17.)

Following the Court's September 27, 2007 Order, Plaintiff failed to seek leave from the Court for a further period in which to serve Defendant George Lopez with process. (Tann Decl. ¶ 18; Defs.' Rule 56.1 Stmt. ¶ 18.) Ms. Tann, counsel for Defendants City of New York and NYPD, has not contacted Mr. Lopez with respect to the claims asserted against him in the complaint, nor has Mr. Lopez contacted the office of Corporation Counsel to request legal representation in this matter. (Tann Decl. ¶ 19; Defs.' Rule 56.1 Stmt. ¶ 19.) Upon information and belief of Defendants, to date, George Lopez has had no notice of this action. (Tann Decl. ¶ 20; Defs.' Rule 56.1 Stmt. ¶ 20.)

On November 19, 2007, Plaintiff served the City of New York with a first demand for production of documents and first set of interrogatories. (Pl.s' Affirmation, Ex. C.) On December 12, 2007, Plaintiff's counsel sought a two-month stay of discovery on the grounds that counsel, despite ardent efforts, was unable to contact Plaintiff to assist him with the prosecution of this matter. (Tann Decl., Ex. G; Defs.' Rule 56.1 Stmt. ¶ 23; Pl's Rule 56.1 Stmt. ¶ 23.) By letter dated December 18, 2007, Defendants opposed Plaintiff's application for a stay and sought leave to file a motion pursuant to Federal Rule of Civil Procedure 56. (Tann Decl., Ex. H; Defs.' Rule 56.1 Stmt. ¶ 24; Pl.'s Rule 56.1 Stmt. ¶ 24.) By order dated December 20, 2007, the Court granted Plaintiff's application in part and stayed discovery until February 12, 2008. (Pl.s' Affirmation, Ex. B; Pl's Rule 56.1 Stmt. ¶ 25.)

Defendants City of New York and NYPD filed the instant motion for summary judgment on January 18, 2008. At the time the motion was filed, Plaintiff had not sought to depose any witnesses in this matter or identified "Police Officer John Doe." (Tann Decl. ¶¶ 21, 22; Defs.' Rule 56.1 Stmt. ¶ 21, 22; Pl.s' Rule 56.1 Stmt. ¶ 21, 22.) Nor had Defendants responded to Plaintiffs' document demands and interrogatories. (Pl.s' Rule 56.1 Stmt. ¶ 21 .)

Defendants City of New York and NYPD move for summary judgment on the grounds that the NYPD is not a suable entity and that the complaint fails to state a claim against the City of New York for failure to properly train and supervise the defendant officers. Defendants also argue that the claims against Officers Lopez and "John Doe" should be dismissed pursuant to Federal Rule of Civil Procedure 4(m) because Plaintiff failed properly to serve Officer Lopez within 120 days of filing this action despite having notice that his service was defective and also failed to apply for an order extending the 120-day period.

## DISCUSSION

### I. Summary Judgment Standard

**\*3** A court may grant summary judgment only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Braham v. Clancy,* 425 F.3d 177, 181 (2d Cir.2005). Summary judgment is inappropriate if, after resolving all ambiguities and drawing all inferences against the moving party, there remains a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

### II. Plaintiff's Claim against Police Officers George Lopez and "John Doe"

Defendants move for summary judgment in favor of the individual police officers against whom Plaintiff alleges § 1983 violations on the grounds that they were never served with the summons and complaint. Defendants argue that the claim against the defendant officers should be dismissed with prejudice because Plaintiff cannot show good cause for his failure to timely serve, the statute of limitations ran on Plaintiff's claim on March 16, 2007, and Officer Lopez would be prejudiced by an extension for service at this time.

### A. Whether service was effected on the defendant officers

Federal Rule of Civil Procedure 4(e)(1) provides that service of process is effected on an individual in one of three ways: (1) pursuant to the law of the state in which the district court is located, or in which the service is effected; (2) by delivering a copy of the summons and complaint to the individual personally, or by leaving copies at the individual's "dwelling house or usual place of abode with some person of suitable age and discretion then residing therein"; or (3) by delivering a copy of the summons and complaint to an agent authorized by law to receive service of process. Under New York law, service can be made by delivering the summons "to a person of suitable age and discretion at the actual place of business ... and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business." N.Y. C.P.L.R. 308 (McKinney 2007). Under this section, " 'actual place of business' shall include any location that the defendant, through regular solicitation or advertisement, has held out as its place of business." *Id.*

Plaintiff argues that he complied with New York law by serving Police Officers George Lopez and "John Doe" at the office of Corporation Counsel. Under C.P.L.R. § 311, Corporation Counsel is an authorized agent permitted to accept service on behalf of the City of New York. N.Y. C.P.L.R. § 311. Plaintiff contends because the police officers are employees of the City of New York, service on the City is proper. Section 311 of the C.P.L.R., however, pertains to "personal service upon a corporation or governmental subdivision" and does not authorize the City of New York to accept service on behalf of individuals. See *id.* Nor is the office of Corporation Counsel the "actual place of business" for Officer Lopez or the unnamed officer "John Doe," under C.P.L.R. § 308. The police precinct to which they report and where they conduct their business is their actual place of business. Moreover, Plaintiff made no effort to serve the officers personally or at their actual residences. Under these circumstances, service on the City of New York constitutes improper service on the defendant police officers. *See Moultry v. City of Poughkeepsie,* 154 F.Supp.2d 809, 811 (S.D.N.Y.2001) (holding that service on the police officers who allegedly violated plaintiff's civil rights was not proper where the summons and complaint were served on an official in a city office never frequented

by the officers, and no effort was made to serve them personally or leave papers at their residences).

### B. Whether an extension for service should be granted

**\*4** Under Rule 4(m) of the Federal Rules of Civil Procedure, a plaintiff must properly serve the defendants within 120 days of filing of the complaint. Fed.R.Civ.P. 4(m). If a plaintiff fails to timely serve, the district court must either "dismiss the action without prejudice as to that defendant or direct that service is effected within a specified time." *Id.* The district court is required to grant an appropriate extension of time to effect service if the plaintiff shows good cause for failure to serve and has discretion to grant such an extension even in the absence of good cause. *Id.; Zapata v. City of New York,* 502 F.3d 192, 197 (2d Cir.2007) (holding that under Rule 4(m) "district courts have discretion to grant extensions even in the absence of good cause" but are not required to do so). The policy behind Rule 4(m) and the statute of limitations is to promote the "diligent prosecution of civil cases." *Nat'l Union Fire Ins. Co. v. Sun,* No. 93 Civ. 7170, 1994 U.S. Dist. LEXIS 11934, at \*7 (S.D.N.Y. Aug. 18, 1994); *accord* **Gordon v. Hunt,** 116 F.R.D. 313, 320 (S.D.N.Y.1987) (noting that the policy behind Rule 4(m) and the statute of limitations is "to encourage prompt movement of civil actions in the federal courts").

In this case, Plaintiff cannot show good cause for failure to serve the defendant police officers within the 120-day period. Plaintiff and Plaintiff's counsel were put on notice on June 8, 2007, when Defendants filed their answer, and again on September 11, 2007, at the initial pretrial conference before the Court, that the defendant police officers had not been served. (Tann Decl. ¶¶ 12, 13.) Despite this notice, Plaintiff took no steps to serve Officer Lopez, request an extension of the 120-day period (Tann Decl. ¶ 18), or request assistance in locating the officers. An attorney's inadvertence, neglect, or ignorance of the rules does not constitute good cause for untimely service. *McKibben v. Credit Lyonnais,* No. 98 Civ. 3358, 1999 U.S. Dist. 12310, at \*9 (S.D.N.Y. Aug. 9, 1999) (citing *Klein v. Williams,* 144 F.R.D. 16, 19-20 (E.D.N.Y.1992)). Under the circumstances in this case, Plaintiff fails to establish good cause for untimely service. *See Bogle-Assegai v. Connecticut,* 470 F.3d 498, 508 (2d Cir.2006) (holding that the plaintiff failed to establish good cause where she knew that defendants thought service was improper and made no effort to remedy this defect or ask the court to extend her time to effect service).

Nor is this a case where an extension should be granted in the Court's discretion despite the absence of good cause. In considering whether or not to grant an extension absent a showing of good cause, the Court must weigh the impact a dismissal or extension would have on the parties. *Zapata,* 502 F.3d at 197. Dismissing the complaint without prejudice in this case would have serious consequences for Plaintiff because the statute of limitations would bar him from re-filing. On the other hand, these consequences are attributable in large part to Plaintiff and his counsel's neglect and failure to prosecute. Plaintiff's counsel filed the complaint on February 16, 2007, only three weeks shy of the expiration of the three-year statute of limitations on his § 1983 claims. Even after being notified that the defendant officers had not been served, Plaintiff's counsel failed to make any further attempts to effect service or seek an extension of the 120-day period. Importantly, Plaintiff's counsel did not inform the Court that he had lost contact with Plaintiff until his December 12, 2007 letter requesting a stay of discovery, which the Court had ordered completed by January 1, 2008. In his letter, Plaintiff's counsel stated that he had "recently attempted to contact Mr. Davis on numerous occasions in order to respond to defendant's [discovery] demands" but had been unable to reach him by either phone or mail. (PL's Affirmation, Ex. B.) Although the Court granted counsel's request for a 60-day stay of discovery to "provide plaintiff the needed time to effectuate contact" (*id.*), counsel has not informed the Court that any contact has been restored. Furthermore, more than four years have passed since the alleged incident took place. Officer Lopez never received notice of this litigation, as he was never served and no depositions were ever taken to make him aware of the case against him. Were Plaintiff granted leave to effect service at this point, Officer Lopez would suffer considerable prejudice in defending against the case, as the facts would have certainly faded from memory. Under these circumstances, the Court declines to exercise its discretion to grant an extension for service under *Zapata.*

### III. Plaintiff's Claim against the City of New York

**\*5** Plaintiff alleges that the City of New York failed to properly train and supervise the police officers who deprived Plaintiff of his constitutional rights. (Compl.¶¶ 65-66.) Defendants seek to dismiss Plaintiff's claim against the City of New York on the grounds that the complaint fails adequately to state a claim for municipal liability and

that, even if the claim is adequately plead, Plaintiff fails to proffer any evidentiary support for the claim.

A municipality may not be held liable under 42 U.S.C. § 1983 for the conduct of its employees based on a theory of respondeat superior. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability attaches only if the plaintiff can show that a municipal policy or custom caused the deprivation of his constitutional rights. *Id.* at 690-91. Where a plaintiff alleges municipal liability based on a failure to train and supervise, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and therefore amounts to an actionable city "policy or custom." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court held that district courts may not apply a "heightened pleading standard" beyond what is generally required by Federal Rule of Civil Procedure 8(a) to Section 1983 complaints alleging municipal liability. *Id.* at 164. *Leatherman* appears to reject the pleading standard applied by the Second Circuit in *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993), which held that the allegation of a single incident involving only actors below the policymaking level does not suffice to state a claim of municipal liability under Section 1983. *See Simpkins v. Bellevue Hosp.,* 832 F.Supp. 69, 73 n. 3 (S.D.N.Y.1993); *see also Cooper v. Metro. Transp. Auth.,* 2006 U.S. Dist. LEXIS 47970, at \*9-10 (S.D.N.Y. July 13, 2006). Since *Leatherman.* courts in this district have denied motions to dismiss complaints alleging that an individual officer's conduct conformed to official policy or custom or that an individual officer was empowered to make policy decisions on behalf of the municipality. *See, e.g., Cooper,* 2006 U.S. Dist. LEXIS 47970, at \*9-10 (holding that "[u]nder the *Leatherman* rule ... Plaintiff's bare allegations that Harrington was a "policy maker" and that both Harrington and Paul were empowered to make policy decisions on behalf of Metro-North/MTA are sufficient" to withstand a motion to dismiss); *Lucas v. New York City,* 1995 U.S. Dist. LEXIS 17017, at \*7, 1995 WL 675477 (S.D.N.Y. Nov. 14, 1995) (denying the motion to dismiss plaintiff's § 1983 claim under *Leatherman* to the extent plaintiff alleges

he was arrested pursuant to the long established policy of racially selective law enforcement attributable to the City). Plaintiff, represented by counsel in this case, fails adequately to plead a claim of municipal liability against the City of New York. Even the usual pleading standard of Rule 8(a) still requires more than conclusory allegations. *Bell Atlantic v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (stating that Rule 8(a) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (stating that on a motion to dismiss, a district court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Plaintiff makes only the conclusory allegation that the City of New York "failed to properly train the person(s) who deprived [Plaintiff] of his civil rights" and "failed to properly supervise the person(s) who deprived [Plaintiff] of his civil rights ."

**\*6** Such conclusory allegations that a municipality failed to train and supervise its employees is insufficient to state a *Monell* claim. See *McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 705 (S.D.N.Y.1999) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation."); *Oparaji v. City of New York,* 1997 U.S. Dist. LEXIS 23686, \*10, 1997 WL 139610 (E.D.N.Y. Mar. 21, 1997) (dismissing a *Monell* claim for failure to state a claim where plaintiff alleged only that the City had a policy, practice or custom of failing to adequately screen, hire and train police officers which resulted in the violation of his constitutional rights).

Plaintiff argues that summary judgment is inappropriate at this stage because no discovery has taken place. The Court granted Plaintiff's request for a stay of discovery from December 20, 2007 to February 12, 2008, and prior to the stay, Defendants had not responded to Plaintiff's document demands and interrogatories served on November 19, 2007.

Generally, before summary judgment may be granted, the nonmoving party "must have had the opportunity to discover information that is essential to his opposition to the motion ... [and] only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veteran Affairs,* 201 F.3d 94, 97

(2d Cir.2000) (internal quotations omitted). If, however, the allegations of a plaintiff's Section 1983 claim are insufficient as a matter of law or could not be aided by discovery, a district court may grant summary judgment even without discovery. *M.B. v. Reish,* 119 F.3d 230, 232 (2d Cir.1997) (concluding that the district court's denial of discovery was within its discretion because plaintiff's claims were insufficient as a matter of law and plaintiff failed to present a credible basis to suggest discovery would produce favorable evidence). In rejecting the heightened pleading standard for Section 1983 claims in *Leatherman,* the Supreme Court noted that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman,* 507 U.S. at 168-169.

In this case, Plaintiff has not made any showing that further discovery is likely to lead to evidence supporting Plaintiff's claim against the City of New York. Moreover, because Plaintiff's complaint fails to state a claim of municipal liability upon which relief may be granted, Plaintiff's claim against the City of New York is insufficient as matter of law. On these grounds, Defendant City of New York's motion for summary judgment is granted.

**IV. Plaintiff's Claim against NYPD**

It is well settled that NYPD, as an agency of the City of New York, lacks independent legal existence and is therefore not a suable entity. *Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007); *see also* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."). In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff concedes that NYPD is a non-suable entity and discontinues his claim against NYPD. Accordingly, the claim against NYPD is dismissed.

**CONCLUSION**

**\*7 For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 12) is granted. The claims against Defendant Police Officers George Lopez and "John Doe" are dismissed for non-service, the claims against Defendant City of New York for failure to state a claim**

and insufficiency as a matter of law, and the claims against NYPD because it is not a suable entity.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2511734

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6528496
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

E. MISHAN & SONS, INC., Plaintiff,

v.

SMART AND EAZY CORP., and
Masterpan, Inc., Defendants.

18 Civ. 3217 (PAE)
|
Signed 12/12/2018

**Attorneys and Law Firms**

Brian Joseph Doyle, John Zaccaria, Alan Federbush,
Notaro, Michalos & Zaccaria P.C., Orangeburg, NY, for
Plaintiff.

Christopher Robert Kinkade, Fox Rothschild LLP,
Lawrenceville, NJ, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, United States District Judge

**\*1** Plaintiff E. Mishan & Sons ("Emson") brings this
action against defendants Smart and Eazy Corp. ("S&E"),
and Masterpan, Inc. ("Masterpan"). Emson alleges unfair
competition due to false advertising in violation of 15
U.S.C. § 1125(a) of the Trademark Act of 1946 ("Lanham
Act").

Masterpan and S&E now move for dismissal, based on
lack of personal jurisdiction under Federal Rule of Civil
Procedure 12(b)(2), failure to state a claim under Rule
12(b)(6), and improper venue under Rule 12(b)(3). In the
alternative, defendants move for transfer of venue to the
Central District of California pursuant to 28 U.S.C. §§
1404(a), 1406(a), and 1631.

For the reasons that follow, the Court denies defendants'
motions, with one exception: The Court grants the motion
to dismiss Emson's claims against S&E for failure to state
a claim.

**I. Background**

**A. Facts** [1]

[1] This account is drawn from the Complaint. Dkt. 1
("Compl"). For the purpose of resolving the motion
to dismiss, all factual allegations in the Complaint
are presumed true. *See Koch v. Christie's Int'l PLC*,
699 F.3d 141, 145 (2d Cir. 2012). For the purposes
of resolving the motions under Rules 12(b)(1) and
12(b)(3), the Court also considered the following
factual submissions: the declarations of Christopher
Kikade, Dkt. 17 ("Kikade Decl."), Leo Lee, Dkt. 15-4
("Lee Decl."), Raejndra Nagrani, Dkt. 18 ("Nagrani
Decl."), Brian Doyle, Dkt. 25-5 ("Doyle Decl."), and
the exhibits thereto. The Court cites here the parties'
memoranda of law as follows: Dkt. 16 ("D. Mem.");
Dkt. 25 ("P. Mem."); and Dkt. 26 ("D. Rep.").

**1. Emson**

Emson is a New York corporation with its principal place
of business in New York. Compl. ¶ 7. Emson markets
and sells consumer products throughout the United States
both to wholesalers and directly to customers via print
media, the Internet, and television advertising. *Id.* ¶ 11.

Since at least 2015, Emson has marketed and sold
"Gotham Steel," a line of nonstick cookware and
bakeware that includes pots and pans. *Id.* ¶ 12. "The
Gotham Steel pots and pans are made of aluminum and
have a copper-colored, non-stick ceramic and titanium
coating." *Id.* ¶ 13.

Emson advertises and sells the Gotham Steel pots and
pans through direct response ("DRTV") commercials
broadcast on various cable network channels. *Id.* ¶ 14.
Emson "has spent over ten million dollars on advertising
Gotham Steel cookware on television." *Id.* ¶ 15. Emson
also "sells the Gotham Steel pots and pans throughout
the United States, including New York and this district,
directly to consumers through Internet websites and to
nationwide retailers ... for resale to consumers." *Id.* ¶ 16.

The "retail packaging and label inserts for the Gotham
Steel pots and pans include" an "As Seen On TV" logo.
*Id.* ¶ 18. Emson also displays this logo both "on its
Internet websites" and "in printed advertisements and
promotional materials." *Id.* ¶ 19. Gotham Steel claims that
it "has sold hundreds of thousands of Gotham steel pots

and pans labelled and/or packaged in retail boxes printed with the 'As Seen on TV logo.' " *Id.* ¶ 20.

### 2. S&E's and Masterpan's Marketing of Their "Original" Copper Pan

**\*2** Defendants S&E and Masterpan are each California corporations with a principal place of business in California. *Id.* ¶¶ 8–9.

Emson alleges that, in or about 2016, "long after Emson introduced the Gotham Steel pots and pans," defendants began marketing and selling a product bearing the trademark "The Original Copper Pan" (the "OCP"). *Id.* ¶¶ 24, 69. According to Emson, Dreambiz Ltd. of Hong Kong owns the trademark "The Original Copper Pan," Registration No. 5390167. *Id.*, Ex. D. Emson alleges that Dreambiz Ltd. "has shipped non-stick cookware on several occasions to, and only to, defendant S&E." *Id.* ¶ 35.

Emson claims that defendants sell the OCP "directly to consumers, including consumers in [the Southern District of New York], via the Internet and, as well, to retailers for resale to consumers, in competition with Emson's Gotham Steel Cookware." *Id.* ¶ 25. Specifically, Emson alleges, defendants own and operate the website, www.theoriginalcopperpan.com, through which they market and sell the OCP. *Id.* ¶ 33. Defendants also allegedly sell and market OCP cookware on Groupon.com. *Id.* ¶ 43.

Emson alleges that, by branding its product as the "original" copper pan, defendants "are attempting to deceive the public by falsely and deceptively conveying to consumers that its cookware is the first of its kind and that Emson's (and other's) products are not the originals but are instead mere imitations of Defendants' cookware." *Id.* ¶ 28. Emson alleges that defendants' allegedly "false and deceptive use of the descriptor 'original' is part of a pattern and practice of false advertising on its part." *Id.*

Emson further alleges that defendants falsely advertise certain versions of the OCP as being made of, and not merely coated with, copper. *Id.* ¶ 48. According to Emson, defendants hold out the OCP line of cookware as "copper-infused," "made of ultra-tough copper," and featuring "copper construction." *Id.* ¶¶ 29, 41–42. Although each

pan has a copper-colored cooking surface, Emson alleges that it ran tests on samples of the 12-inch OCP, which the OCP website describes as "nonstick ceramic plus copper" and having a "durable, copper-infused nonstick ceramic cooking surface." *Id.* ¶ 38. According to Emson, the "test results indicate that the cores of each of the tested Original Copper Pans had undetectable levels of copper" and that the inner coating on the samples also lacked the presence of copper. *Id.* ¶ 46.

Finally, Emson claims that although defendants, like Emson, "use an 'As Seen On TV logo in their advertising,' " *id.* ¶ 30, "[d]efendants have not advertised any of [the OCP] cookware on television or any television advertising for [d]efendants' cookware has been miniscule." *Id.* ¶ 50. Accordingly, Emson alleges, "the use of the 'As seen on TV slogan by [d]efendants is a material misrepresentation.' " *Id.* ¶ 52.

Emson contends that the false claims in defendants' advertising—the claim to have been the "original" copper pan, the claim that the OCP is made of copper, and the claim that defendants' products have been "seen on TV"—have "divert[ed] sales from Emson, trade[d] off the goodwill built up by Emson's extensive television advertising campaign to create public recognition of its products, and deceive[d] the buying public." *Id.* ¶ 55. [2]

[2]    Emson's Complaint largely treats the two defendants collectively. In litigating the motions to dismiss, the parties cast differently the relationship between them. Defendants acknowledge that Masterpan sells products to the OCP website for resale to consumers. *See* D. Mem. at 6. Emson contends that because the defendants share a principal place of business, S&E is accountable for Masterpan's advertising. *See* P. Mem. at 7. Defendants counter that "S&E is an independent, third party package delivery company that provides shipping services to individuals and businesses" and that it merely "provides mailing addresses for some customers, including Masterpan." D. Mem. at 2.

### B. Procedural History
**\*3** On April 12, 2018, Emson filed its Complaint. Dkt. 1. It brings four claims under the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) & (B): for falsely advertising that defendants' copper pan is the "original" of its kind, Compl. ¶¶ 66–76; for falsely advertising that defendants' pan is "copper," "copper-infused,"

of "copper-construction," and "made of ultra-tough Copper," *id.* ¶¶ 77–85; for falsely advertising that plaintiffs' product have been "seen on TV," *id.* ¶¶ 86–94; as well as claims for unfair competition, false designation of origin, false description of fact, and misrepresentation of fact, also based on the defendants' advertising claim that their products are "as seen on TV," *id.* ¶¶ 95–103.

On June 4, 2018, Masterpan and S&E filed a joint motion to dismiss on the grounds identified above, Dkt. 15, a supporting memorandum of law, Dkt. 16, and factual materials, Dkts. 17–18. On July 16, 2018, Emson filed a brief in opposition, Dkt. 25. On July 23, 2018, defendants filed a reply. Dkt. 26.

## II. Overview

Defendants move to dismiss on multiple grounds. The Court first considers defendants' argument that the Court lacks personal jurisdiction. The Court then considers the other asserted grounds for dismissal: improper venue and failure to state a claim. Because Emson's claims against Masterpan survive these motions, the Court last considers the motion to transfer these surviving claims to the Central District of California.

## III. Motion to Dismiss for Lack of Personal Jurisdiction

### A. Applicable Legal Standards

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). What a plaintiff must show "to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.' " *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) ). In the posture here, where a case is prior to discovery, a plaintiff may defeat such a jurisdiction testing motion "by pleading in good faith[ ] legally sufficient allegations of jurisdiction. At such a preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.*; *see also In re Terrorist Attacks*, 714 F.3d at 673 ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists." (citation omitted) ).

A plaintiff may make this showing through its " 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.' " *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) ). The Court "construe[s] the pleadings and affidavits in the light most favorable to [the] plaintiff[ ], resolving all doubts in [the plaintiff's] favor." *Dorchester, 722 F.3d at 85* (quoting *S. New Eng. Tel*, 624 F.3d at 138); *accord A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." (citation omitted) ). The Court, however, will neither "draw argumentative inferences in the plaintiff's favor" nor "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted).

**\*4** "In a federal question case, where the defendant resides outside the forum state, federal courts apply the forum state's personal jurisdiction rules if the applicable federal statute does not provide for national service of process." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) (citation omitted). The Lanham Act does not provide for national service of process. Accordingly, New York's long-arm statute, New York Civil Practice Law and Rules ("CPLR") § 302(a), governs the instant action. *See id.*; *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000).

Under CPLR § 302(a)(1), two conditions must be met for a court to exercise personal jurisdiction over a non-domiciliary defendant. First, the defendant must "transact[ ] [ ] business within the state or contract[ ] anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1) (2006). Second, the cause of action must arise from the "act[s] which are the basis of jurisdiction." *Id.* The Second Circuit has held that this second condition requires a showing that the contacts with the state had a "substantial relationship" to the cause of action. *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).

Section 302(a)(1) is a "single act" statute; therefore, the defendant need not have engaged in more than one transaction in, or directed to, New York for New York courts to invoke jurisdiction. *See Deutsche Bank Sec., Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 70 (2006). Such jurisdiction exists even if "the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988) (citations omitted); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999) (finding jurisdiction based on a single transaction where defendant was not physically present in state). A court may also find jurisdiction based on the totality of the defendant's conduct. *See, e.g., CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.") (citations omitted).

Section 302(a)(2) provides an alternative basis for personal jurisdiction over a defendant who "in person or through an agent ... commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act." As with Section 302(a)(1), "there is no minimum threshold of activity required so long as the cause of action arises out of the allegedly infringing activity in New York." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 567 (S.D.N.Y. 2000). Even "[o]ffering one copy of an infringing work for sale in New York ... constitutes commission of a tortious act within the state sufficient to imbue [the] Court with personal jurisdiction over the infringers." *Id.* (quoting *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F. Supp. 62, 64 (S.D.N.Y. 1993) ).

**B. Discussion**

Emson argues that the Court has specific jurisdiction over defendants under New York's long-arm statute, C.P.L.R. §§ 302(a)(1), based on defendants' having caused sales in New York of the products at issue. P. Mem. at 9–15. For purposes of analyzing the competing arguments as to this question, the Court treats Masterpan and S&E collectively (and refers to them together as "Masterpan"), recognizing, as developed in the discussion of the motions under Rule 12(b)(6), that Emson's allegations linking

Masterpan to the sale of the OCP are substantially more fulsome.

**\*5** Masterpan does not dispute Emson's assertion that Masterpan's products are sold within New York. In contesting personal jurisdiction, Masterpan counters that *it* "has never sold any accused products to consumers or businesses within New York." D. Mem. at 8. Rather, Masterpan represents, it sells its products "to third party OCP website [sic], which is a generally-available website and not domiciled in New York or directed at New York consumers." *Id.* at 8. Masterpan emphasizes that it does not "advertise[ ] in New York[ ] or receive[ ] funds from any individual business in New York," and that it is not "licensed or registered to do business in New York and do[es] not pay New York taxes." *Id.* Masterpan further disputes that it "own[s] or controls marketing statements on the third-party websites from which Plaintiff purchased the accused products." *Id.*, at 1.

The Court holds that Emson has made both showings required under CPLR § 302(a)(1) to demonstrate personal jurisdiction over Masterpan in New York.

**1. Masterpan Transacts Business in New York**

Under the long-arm statute, Emson must first establish that Masterpan "transacts [ ] business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. § 302(a). Emson has made this showing in two ways.

First, Emson purchased three products from the OCP website, which, Emson alleges, Masterpan controls. Because New York's long-arm statute is a single-act statute, *Deutsche Bank Sec., Inc.*, 7 N.Y.3d at 70, these three sales and deliveries constitute more than sufficient business contact with New York to satisfy the threshold requirement that the defendant conduct business within the state. This showing would suffice, in fact, even if the OCP website used by Masterpan to facilitate its sales were outside of Masterpan's ownership and control. *See EnviroCare Techs., LLC v. Simanovsky*, No. 11 Civ. 3458 (JS) (ETB), 2012 U.S. Dist. LEXIS 78088, at *13, 2012 WL 2001443 (E.D.N.Y. June 4, 2012) ("[E]ven though Defendants did not personally manage the websites through which they sold their products, their internet-

based activities established regular business with foreign jurisdictions, including New York.").

That Masterpan does not operate a brick and mortar store in New York is also not determinative. What matters is that Masterpan, via the OCP website and/or Groupon.com, marketed its products to residents of New York and sold those products, through at least one of those websites, to people within that state, appreciating that the products would be sent to New York residents. By advertising its product on interactive websites through which users make purchases, Masterpan purposefully availed itself of the privilege of conducting business in New York. *See, e.g., Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 567 (S.D.N.Y. 2000) (denying motion to dismiss for lack of personal jurisdiction based on finding that operating an interactive website that is accessible in New York constitutes transacting business under Section 302(a)(1) ).

Second, Emson plausibly alleges that Masterpan has shipped products into the state. Even if the Court accepts as true Masterpan's assertions that it has not *sold* products in New York, Emson's allegation that Masterpan has *shipped* infringing products to New York is sufficient to show that Masterpan conducts business in New York. *See Pearson Education, Inc. v. Shi*, 525 F. Supp. 2d 551 (S.D.N.Y. 2007). In *Pearson*, the district court found personal jurisdiction with respect to plaintiffs' Lanham Act claims where the defendant sold infringing works through third-party websites *and shipped* those products into the forum where plaintiff filed the lawsuit. *Id.* at 554. Similarly here, Emson alleges that Masterpan does ship products to New York. Masterpan notably does not dispute—indeed, it appears to confirm—this point. In his declaration, Masterpan chief financial officer Rajendra Nagrani attests that "Masterpan ships its products through an independently-owned, third party freight shipping company, Smart & Eazy." Nagrani Decl. at 2. Similarly, the exhibits attached to Emson's Complaint drawn from the Groupon.com website suggest that seller Masterpan handles the pricing and shipping of its products purchased through that website. *See* Compl. Exs. I–K ("The merchant is solely responsible to purchasers for the fulfillment, *delivery*, care, quality, and *pricing* information of the advertised goods and services." (emphasis added) ).

**\*6** Both Groupon.com and the OCP website list Masterpan's principal place of business, in California, as the return address for products purchased on those websites. This fact does not defeat Emson's showing of personal jurisdiction, as it is inconsistent with neither Masterpan's role in causing these websites to sell its products to New Yorkers nor Masterpan's role in sending its products to New York buyers. And while Emson, pre-discovery, does not yet have access to Masterpan's contractual agreement with the OCP website and Groupon.com, it is fair to infer that Masterpan derives some financial or business benefit from the sale to customers of its products through these sites, including the sale of the three products to Emson in New York. Masterpan does not proffer otherwise. Accordingly, the Court holds, the shipment of the allegedly infringing cookware into New York "constituted *the* transacting of business." *John Wiley & Sons, Inc. v. Treeakarabenjakul*, No. 09 Civ. 2108 (CM), 2009 WL 1766003, at *4 (S.D.N.Y. June 18, 2009) (citing *Pearson Educ.*, 525 F. Supp. at 558) (emphasis in original).

### 2. The Cause of Action Arises From Business Masterpan Transacted in New York

Emson must also show that its claims here arise from the "act[s] which are the basis of jurisdiction." C.P.L.R. § 302(a). Emson easily clears this bar. Its claim is that Masterpan has engaged in false advertising as to Masterpan's pots, including by falsely terming them "original," by falsely hyping their copper content, and by falsely claiming that its products had been "seen on TV." Those claims broadly implicate Masterpan's sales, including those to New York consumers. And Emson adequately pleads that three units of Masterpan cookware were sold to New York residents and shipped to New York. This showing is sufficient to demonstrate that Emson's claims arise from the conduct that gives rise to personal jurisdiction.

### 3. The Exercise of Jurisdiction is Consistent with Due Process

Having held that New York's long-arm statute authorizes the exercise of jurisdiction over Masterpan, the Court finally must satisfy itself that this exercise is consistent with due process. To do so, the Court applies a minimum-

contacts test and a reasonableness inquiry. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).

To determine whether a defendant has sufficient minimum contacts with the New York venue, the Court considers whether the defendant " 'purposefully availed itself' of the privilege of doing business in the forum state and could 'reasonably anticipate being haled into court there.' " *Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 557 (S.D.N.Y. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985) ). Here, Masterpan's contacts with New York—causing its cookware to be marketed to, and then shipped to, New York residents—readily qualify as purposeful availment so as to satisfy the minimum contacts test.

Although a plaintiff's showing of "minimum contacts" will generally satisfy due process, the defendant can present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (quoting *Burger King*, 471 U.S. at 477). The reasonableness inquiry "hinges on whether the assertion of jurisdiction comports with 'traditional notions of fair play and substantial justice.' " *Chatwal Hotels & Resorts LLC v. Bollywood Co.*, 90 F. Supp. 3d 97, 107 (quoting *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) ). The Court weighs five factors when determining reasonableness:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiffs interest in obtaining convenient and effective relief; (4) the interstate judicial[ ] system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering social substantive policies.

**\*7** *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999) (internal quotations and citations omitted).

These factors make the exercise of jurisdiction entirely reasonable. Masterpan allegedly sold and shipped products to New York. Having chosen to do so, Masterpan could reasonably have expected to be subject to suit in New York in connection with such sales and deliveries to New York buyers. Masterpan has not made any showing of countervailing considerations, such as a burden that trying this case in New York might pose to it or a unique interest that California has in this controversy. And the New York long-arm statute does not by nature tempt due process limits; on the contrary, "[t]he New York long-arm statute does not extend in all respects to the constitutional limits." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60–61 (2d Cir. 2012). Accordingly, the Court holds that both the minimum contacts and reasonableness requirements of due process have been met.

The Court therefore finds the exercise of personal jurisdiction here proper.

### IV. Motion to Dismiss for Improper Venue

#### A. Applicable Legal Standards
The plaintiff also "bears the burden of demonstrating that [its] chosen venue is proper." *Vann v. Fischer*, No. 11 Civ. 1958 (JPO), 2012 WL 2384428, at \*4 (S.D.N.Y. June 21, 2012). In ruling on a motion to dismiss pursuant to Rule 12(b)(3), the Court accepts as true all factual allegations in the non-moving party's pleadings, including the complaint and supporting affidavits, and draws all reasonable inferences in that party's favor. *See Blakely v. Lew*, No. 13 Civ. 2140 (JMF), 2013 WL 6847102, at \*1 (S.D.N.Y. Dec. 30, 2013). If the Court chooses not to hold an evidentiary hearing and, instead, relies only "on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of [venue]." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (alteration in original).

#### B. Discussion
In cases where the plaintiff brings a civil action in a district other than the one where any defendant lives, venue will be proper if "a substantial part of the events or omissions giving rise to the claim occurred" in that judicial district. 28 U.S.C. § 1391(b)(2).

Emson makes the requisite *prima facie* showing of venue here. The events giving rise to Emson's claim are the advertisement of products that are marketed by defendants to New York residents and the shipping of products to venues including New York. Emson's Complaint sufficiently alleges both that these products were marketed to individuals in New York through the interactive OCP website and through Groupon.com, and that they thereafter were shipped by Masterpan and delivered to Emson's address in New York. There is a sufficiently substantial nexus between Emson's claims and this forum to make venue here proper under § 1391(b)(2).

## V. Motion to Dismiss for Failure to State a Claim

### A. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B. Discussion

**\*8** As noted, Emson brings false advertising claims under 15 U.S.C. §§ 1125(a)(1)(A)–(B). The analysis as to whether these state claims differ by defendant.

### 1. Masterpan

The Complaint states a claim under the Lanham Act against Masterpan. The Act makes liable:

[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]

15 U.S.C. § 1125(a)(1).

Here, the Complaint plausibly alleges that Masterpan falsely describes its products in several respects. First, it claims that Masterpan falsely describes its pots as being made of copper construction (e.g., "having a durable, copper-infused nonstick ceramic cooking surface") when in fact they are not. ¶¶ 38, 44. Emson's basis for asserting falsehood are tests that it ran to determine the composition of the OCP, which did not detect any level of copper in the "cores of each of the tested [OCPs]." *Id.* ¶ 46. This allegation of a central factual falsehood as to the composition of Masterpan's product is clearly sufficient to state a claim under the Lanham Act. In addition, Emson plausibly alleges two other falsehoods: that (1) Masterpan's "branding of its products as The Original Copper Pan" is deceptive in that it suggests it "is the first of its kind," when in fact other copper pots and pans preceded it on the market, *Id.* ¶ 27; and (2) Masterpan misrepresents its products as having been "As Seen on TV," *Id.* ¶ 53, when in fact they—unlike Emson's competing products—were not. [3]

[3]   To be sure, Emson contradictorily alleges that Masterpan does not market the OCP on television or that it does so minimally. *See* Compl. ¶ 50. Discovery will determine whether in fact the OCP has never been marketed on television, or whether it has been, in which case Masterpan may have available a defense, at least as to this claim, of literal truthfulness.

Masterpan's attempts to distance itself from the statements on the OCP website and Groupon.com do not

gain traction on a motion to dismiss. It is conceivable that Masterpan had no agency over or awareness of the statements made to market its product in these fora, and Masterpan will be at liberty to attempt to develop such theories in discovery. But on a motion to dismiss, the Court cannot so assume. Viewing the facts in the light most favorable to the plaintiff, it is plausible that Masterpan controls or is party to the marketing statements regarding its products that appear on both websites. The OCP website bears the name of the product that Masterpan manufactures and sells. Even if, as defendants note, the domain is not registered to Masterpan, D. Mem. at 7, it is plausible that Masterpan has had a say in the words used to market its products as sold through that website. Masterpan's control over the advertising on Groupon.com is even more plausible. The Groupon.com webpage explicitly states that the product is "[s]old by Master[p]an" and that "the merchant is solely responsible to purchasers for the fulfillment, delivery, care, *quality*, and pricing information of the advertised goods and services." Compl. Exs. I, K (emphasis added). These allegations easily make plausible the claim that Masterpan is responsible for the advertisements made in connection with the OCP on the OCP website and Groupon.com.

### 2. S&E

**\*9** Emson's Complaint, however, does not adequately plead Lanham Act claims against S&E.

The Complaint persistently lumps both Masterpan and S&E together as "defendants." *See, e.g.*, Compl. ¶ 25 ("On information and belief, Defendants sell The Original Copper Pan cookware products directly to consumers, including consumers in this district, via the Internet and, as well, to retailers for resale to consumers...."). It recites sufficient basis on which to conclude that Masterpan markets and sells the OCP. For example, it alleges, with documentary support, that the Groupon.com website explicitly states that the OCP is "[s]old by Master[p]an." *Id.*, Ex. I. The Complaint also attaches documentary evidence that Masterpan shares directors with Dreambiz, Ltd., which owns the trademark "The Original Copper Pan." *See id.* Exs. B–C.

The Complaint, however, does not contain any such specific pleadings as to S&E. The only connection Emson

articulates between S&E and the allegedly misleading statements is that S&E shares an address with Masterpan. *See* Compl. ¶ 8–9. That is not a sufficient basis on which to tie S&E to the actionable conduct alleged here. And the Complaint's allegations that S&E falsely described or advertised any relevant product are conclusory. Pleadings, however, "must contain something more than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action," *Twombly*, 550 U.S. at 555. Accordingly, the Court grants the motion to dismiss the claims against S&E.

## VI. Motion to Transfer Venue

The Court, finally, considers Masterpan's motion to transfer venue to the Central District of California, the site of its principal place of business.

### A. Applicable Legal Standards

A district court has broad discretion when deciding a motion to transfer venue. *N. Y. Mar. & Gen. Ins. Co. v. Lafarge N.A., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010). However, the party seeking transfer "carries the 'burden of making out a strong case for transfer.' " *Id.* at 114 (quoting *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989) ). To prevail, the moving party must make a "clear and convincing" showing that transfer is proper. *See id.* at 113–14; *see also Hershman v. UnumProvident Corp.*, 658 F. Supp. 2d 598, 600 (S.D.N.Y. 2009); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 725 F. Supp. 1314, 1321 (S.D.N.Y. 1989) ("The moving party must make a clear-cut showing that transfer is in the best interests of the litigation.").

When evaluating a motion to transfer, the Court's principal consideration is the "convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Courts undertake a two-step inquiry to decide motions to transfer venue under § 1404(a). *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 743 (S.D.N.Y. 2013).

At the first step, the Court must determine " 'whether the action could have been brought in the transferee district.' " *Id.* (quoting *Robertson v. Cartinhour*, No. 10 Civ. 8442 (LTS) (HBP), 2011 WL 5175597, at *3 (S.D.N.Y. Oct. 28, 2011) ). If so, the Court then must determine " 'whether transfer would be an appropriate exercise of the Court's discretion.' " *Everlast*, 928 F. Supp. 2d at 743 (quoting

*Robertson*, 2011 WL 5175597, at \*3). This second step entails weighing the following factors: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *Lafarge*, 599 F.3d at 112 (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006) ). The moving party must show by clear and convincing evidence that these seven factors favor the new venue. Otherwise, the action must be maintained in this District. *See id.*

**B. Discussion**

**\*10** The Court considers first whether Emson could have brought this action in the Central District of California. Venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b) (1). Because Masterpan resides in California, venue is proper there. *See* Compl. ¶ 19; 28 U.S.C. § 1391(c).

The Court next applies the multi-factor balancing test. The Court finds that one factor favors a transfer of venue (the locus of operative fact) and another favors denying transfer (the plaintiff's choice of forum). The remaining factors, however, are neutral or nearly so.

*Locus of operative facts*: This factor is a primary one in determining a § 1404(a) motion to transfer. *Smart v. Goord*, 21 F. Supp. 2d 309, 316 (S.D.N.Y. 1998) (citation omitted). It "substantially favors transfer from this district when a party 'has not shown that any of the operative facts arose in the Southern District of New York.' " *SBAV LP v. Porter Bancorp, Inc.*, No. 13 Civ. 372 (PAE), 2013 WL 3467030, at \*4 (S.D.N.Y. July 10, 2013) (quoting *Dr. Boy GmbH v. Nationwide Ins.*, No. 96 Civ. 3217 (AGS), 1996 WL 350699, at \*2 (S.D.N.Y. June 25, 1996) ). "[W]here there is no material connection between this district and the operative facts[,] the interests of justice require the transfer of the action." *Cohn v. Metro. Life Ins., Co.*, No. 07 Civ. 0928 (HB), 2007 WL 1573874, at \*3 (S.D.N.Y. May 31, 2007) (citation omitted). "To determine the locus of operative facts, a court must look to the site of the events from which the claim arises." *AVEMCO Ins. Co. v. GSV Holding Corp.*, No. 96 Civ. 8323 (LAP), 1997 WL 566149, at \*6 (S.D.N.Y. Sept. 11, 1997) (citation omitted). In assessing this factor, the Court focuses on "the degree of

relationship between the forum and the cause of action." *CYI, Inc. v. Ja–Ru, Inc.*, 913 F. Supp. 2d 16, 21 (S.D.N.Y. 2012).

Here, important facts giving rise to Emson's claims occurred in California. That is because Emson claims false advertising by Masterpan. The inquiries as to Masterpan's causal role in making the allegedly false representations, the basis on which these representations were made, and the development of the company's marketing plan, as relevant, are likely to turn on events occurring in or around Masterpan's principal place of business.

But the pertinent evidence will not uniformly come from there. Some of the proof used to test the validity of Masterpan's claims will derive from elsewhere. Masterpan's claim that its product was the "original" of its kind will largely be proven, or disproven, based on plaintiffs' ability to muster evidence as to prior incarnations of this cookware including, presumably, Emson's own. Masterpan's claim that its product is copper-based will presumably turn on expert analyses like the one Emson claims to have conducted. There is no reason to assume that such extrinsic-to-Masterpan proof is uniquely situated, if at all, in California. And the truthfulness of Masterpan's claim that its product has been "seen on TV" will presumably turn on analyses drawn from its business records but also from those of the television networks or station on which Masterpan may claim to have aired its advertisements. Separately, to the extent that Masterpan may carry through on the suggestion in its briefs that it does not manufacture the product at issue, its proof would presumably turn on evidence from the actual manufacturer. Masterpan, however, has not represented who that entity is or where it is situated, but presumably, in light of its motion to transfer venue, would have done so had that entity been California-based.

**\*11** There will also be some proof derived from this District. Emson alleges, and represents that it will show, that New York consumers were among those who bought the OCR Of necessity, some such proof will be presented at trial. However, such proof will presumably be limited in scope. Emson has not alleged facts indicating that sales by Masterpan to New York consumers are unique. [4]

[4]    One or both parties presumably may also seek
        testimony and documents from Dreambiz, Ltd., the

Hong Kong-based company that owns the trademark "The Original Copper Pan." Compl. ¶ 34.

Accordingly, the Court finds that the locus of operative facts, on balance, weighs in favor of transferring venue to the Central District of California.

*Plaintiff's choice of forum*: This factor, like the locus of operative facts, is given considerable weight. *See SBAV LP v. Porter Bancorp, Inc.*, No. 13 Civ. 372 (PAE), 2013 WL 3467030, at *11 (S.D.N.Y. July 10, 2013) ("A plaintiff's choice of forum is accorded considerable weight in the § 1404(a) balancing test."). And there are no offsetting facts. Plaintiffs have grounded their decision to sue here on, as alleged, Masterpan's having marketed and caused multiple sales of its product to occur in this District. This factor thus strongly favors denial of the motion to transfer. *See, e.g., Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 690, 698 (S.D.N.Y. 2009) (finding that plaintiffs' choice of forum merited substantial deference where "three out of six of them maintain their principal place of business [there], and because defendant conducts business [there]"); *Hershman v. UnumProvident Corp.*, 658 F. Supp. 2d 598, 601 (S.D.N.Y. 2009) (finding that "plaintiff's choice of forum weighs against a transfer" where defendant has offered "no evidence that plaintiff chose the Southern District to give him an improper advantage or put defendants at a tactical disadvantage").

*Other factors*: On close consideration, the Court's judgment is that all other factors are neutral or close to it. Indeed, neither party fulsomely litigated this motion— each side's submissions as to various factors were sparse.

In many cases, the convenience of witnesses is a key factor. Neither party, however, has provided a list of witnesses to demonstrate the greater suitability of one forum over the other. *See, e.g., Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp. 2d 474, 479 (S.D.N.Y. 2006) ("Having failed to identify particular unwilling witnesses who might be more available in California than in New York, the Defendants have failed to establish that this factor weighs in their favor."); *Kiss My Face Corp. v. Bunting*, No. 02 Civ. 2645 (RCC), 2003 WL 22244587, AT *2 (S.D.N.Y. Sept. 30, 2003) (finding that convenience of witnesses weighed against transfer because movant "failed to supply the Court with any list, detailed or otherwise," of witnesses inconvenienced by the current forum); *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, 6 F. Supp. 2d 203, 208–09 (S.D.N.Y. 1998) ("Vague generalizations and failure to clearly specify the key witnesses to be called, along with a statement concerning the nature of their testimony, are an insufficient basis upon which to grant a change of venue under § 1404(a)."). And the nature of the claims here, which appears largely to turn largely on the truth or falsity of Masterpan's marketed claims about its product, is such that this case is inherently less likely than many to require a lengthy autopsy of corporate decision-making and a consequent long line of corporate witnesses.

**\*12** Nor has either party argued, let alone shown, that the location of relevant documents presents a material convenience issue. And, in an era of electronic maintenance and transmission of discovery, this factor is widely and rightly regarded as of diminished importance. *See ESPN, Inc. v. Quicksilver, Inc.*, 581 F. Supp. 542, 548 (S.D.N.Y. 2008) ("In an era of electronic documents, easy copying and overnight shipping, this factor assumes much less importance than it did formerly." (citing *Angelov v. Wilshire Bancorp*, No. 06 Civ. 4223 (CM), 2007 WL 237513, at *4 (S.D.N.Y. Aug. 14, 2007) ) ).

Nor has either party identified unique issues as to its convenience or as to why an imbalance in the parties' financial or other means make a transfer (or the lack thereof) in the interests of justice. *Cf. Am. Steamship Owners Mut. Protection and Idem. Ass'n, Inc. v. Lafarge N.A., Inc.*, 474 F. Supp. 2d 474, 485 (S.D.N.Y. 2007) (finding that the relative means favors plaintiff's choice of forum where plaintiff's "revenue and size are dwarfed" by defendant); *Herbert Ltd. Partnership v. Electronic Arts, Inc.*, 325 F. Supp. 2d 282, 290 (S.D.N.Y. 2003) (finding that relative means favors plaintiff's choice of forum where defendant's "annual revenue appears to have exceeded [plaintiff's] annual revenue by a factor of more than one thousand in 2003"). [5]

5      Under the case law, the convenience of counsel is not germane to a motion to transfer. *See, e.g., Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 374 (S.D.N.Y. 2006) ("[T]he convenience of counsel is not an appropriate factor to consider on a motion to transfer.") (quoting *Invivo Research, Inc. v. Magnetic Resonance Equip. Corp.*, 119 F. Supp. 2d 433, 438 (S.D.N.Y. 2000) ); *Cento Grp., SPA. v. OroAmerica, Inc.*, 822 F. Supp. 1058, 1061 (S.D.N.Y. 1993) ("The convenience of counsel is of relatively little consequence...."). In any event, Emson is represented by New York area counsel

and Masterpan is represented by New York (and California) counsel.

On balance, therefore, one important factor (locus of events) favors transfer and another important factor (the plaintiff's choice of forum) favors the current venue. The Court therefore cannot, and does not, find that the balance of factors clearly favors transfer or that transfer, in any real sense, is necessary here to further "the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); *see, e.g., Ramirez v. SupportBuddy Inc.*, 2018 WL 2089362 (S.D.N.Y. May 4, 2018) (denying motion to transfer case to Eastern District of California, even though all defendants resided in California, because, *inter alia*, "plaintiff resides in New York and accessed defendants' website from New York" and "defendants do not provide any reasons for why it would be inconvenient for them to litigate in New York"); *Karam v. N. Y. Power Auth.*, No. 16 Civ. 6286 (VB), 2017 WL 1424568, at *2 (S.D.N.Y. 2017) (finding that plaintiff's choice of forum should not be disturbed where all other factors were neutral and locus of operative facts was split between multiple fora); *Hershman*, 658 F. Supp. 2d at 603 (denying motion to transfer venue where locus of operative facts favored transfer, plaintiff's choice weighed against transfer, and all other factors

were neutral). Accordingly, the Court denies defendants' motion to transfer venue.

## CONCLUSION

For the foregoing reasons, the Court denies all of defendants' motions to dismiss, with the exception of the motion to dismiss the claims against defendant S&E for failure to state a claim. The Court further denies defendants' motion to transfer venue to the Central District of California. The Clerk of Court is respectfully requested to terminate the motions pending at Dkt. 15.

**\*13** Discovery will now commence. By Monday, December 17, 2018, the parties are to submit a proposed case management plan, consistent with the Court's individual rules, that provides for the close of fact discovery by the end of April 2019.

SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 6528496

---

Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan..., Not Reported in...

2005 WL 2660351

2005 WL 2660351
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Azriel C. FELLNER, In his capacity as
Personal Representative of the Estate
of Tamar Etana Fellner, Plaintiff,
v.
PHILADELPHIA TOBOGGAN COASTERS, INC.
and Koch Development Corporation, Defendants.

No. Civ.A.05-2052.
|
Oct. 18, 2005.

**Attorneys and Law Firms**

Keith W. Vonderahe, Patrick A. Shoulders, Ziemer, Stayman, Weitzel & Shoulders, LLP, Evansville, IN, Robert A. Nicholas, Tracy G. Weiss, Krista Ayn Schmid, Reed Smith LLP, Philadelphia, PA, for Plaintiff.

Carol Ann Murphy, Matthew J. Zamites, Margolis, Edelstein & Scherlis, Heather M. Eichenbaum, Spector Gadon & Rosen PC, Philadelphia, PA, Stephen J. Tasch, Thomas M. Sheehan, Sheehan & Lower PC, Cary, IL, for Defendants.

MEMORANDUM AND ORDER

SCHILLER, J.

**\*1** This case arises out of the tragic death of Tamar Etana Fellner resulting from a roller coaster accident at an Indiana amusement park. Defendant Koch Development Corporation ("Koch") owns and operates the amusement park, and Defendant Philadelphia Toboggan Coasters, Inc. ("PTC") designed and manufactured the roller coaster cars. Plaintiff Rabbi Azriel C. Fellner ("Plaintiff"), as the Personal Representative of Ms. Fellner's Estate, brings negligence and strict product liability claims against Defendants. Presently before the Court are Defendants' motions to dismiss. For the reasons that follow, Defendants' motions are granted in part and denied in part, and this case is transferred to the Southern District of Indiana.

## I. BACKGROUND

On April 29, 2005, Plaintiff brought this wrongful death and survival action against Defendants. (Compl.¶¶ 50-51, 53-55.) Plaintiff alleges that Ms. Fellner was killed on May 31, 2003, when she was ejected from a wooden roller coaster ride that was negligently designed, manufactured, and operated by Defendants. (Compl.¶¶ 14, 16-18, 22-24.) The roller coaster, named the Raven, is located at Holiday World, an amusement park in Santa Claus, Indiana. (*Id.* ¶¶ 6-7, 11-12.) Koch owns and operates both Holiday World and the Raven roller coaster. (*Id.* ¶¶ 11-12.) PTC, a corporation with its principal place of business in Hatfield, Pennsylvania, designed and manufactured the roller coaster cars for the Raven. (*Id.* ¶¶ 5, 13.) Plaintiff asserts negligence, strict liability, and breach of implied warranty claims against Defendants, and seeks compensatory as well as punitive damages. (*Id.* ¶¶ 15-56.)

Plaintiff alleges jurisdiction under 28 U.S.C. § 1332 based on complete diversity of the parties. (*Id.* ¶ 8.) Plaintiff, as Personal Representative of Ms. Fellner's Estate, is a citizen of New York; PTC is a citizen of Pennsylvania; and Koch is a citizen of Indiana. (*Id.* ¶¶ 1, 3, 4.) Defendants seek to dismiss this action based on improper venue, or in the alternative, seek to transfer the case to the Southern District of Indiana. [1] (Mot. to Dismiss of Def. Koch ¶¶ 34-45; Mot. to Dismiss of Def. PTC ¶¶ 10-20.) Additionally, Defendant Koch seeks to dismiss the strict liability and breach of implied warranty claims for failure to state a claim, and Defendants jointly move to strike Plaintiff's request for punitive damages and costs of suit. (Mot. to Dismiss of Def. Koch ¶¶ 46-61; Mot. to Dismiss of Def. PTC ¶¶ 21-26.)

[1]  In its initial motion, Defendant Koch also sought dismissal based on lack of personal jurisdiction. (Mot. to Dismiss of Def. Koch ¶¶ 13-33.) Defendant Koch has since withdrawn this objection. (Pl.'s Resp. in Opp'n to Def. PTC's Mot. to Dismiss Ex. C; R. at 21 (Oral Arg. Sept. 15, 2005).) Therefore, Koch's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) is denied as moot.

## II. STANDARD OF REVIEW

In considering a motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), the court must generally accept as true the allegations in the complaint, although the parties may submit affidavits in

**Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan..., Not Reported in...**

2005 WL 2660351

support of their positions. *See Heft v. AAI Corp.,* 355 F.Supp.2d 757, 762 (M.D.Pa.2005) (*citing Myers v. Am. Dental Ass'n,* 695 F.2d 716, 724 (3d Cir.1982). The court may examine facts outside the complaint to determine proper venue, but must draw all reasonable inferences and resolve all factual conflicts in the plaintiff's favor. *See id.; Quarles v. Gen. Inv. & Dev. Co.,* 260 F.Supp.2d 1, 8 (D.D.C.2003). The Third Circuit has determined that "the movant (the defendant) bears the burden of demonstrating that venue is improper." *Simon v. Ward,* 80 F.Supp.2d 464, 467 (E.D.Pa.2000) (*citing Myers,* 695 F.2d at 724). The defendant also bears the burden of establishing that a venue transfer is warranted. *Id.* at 470. Furthermore, "in ruling on defendant's [transfer] motion the plaintiff's choice of venue should not be lightly disturbed." *Id.* (quoting *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995)) (internal citations omitted).

### III. DISCUSSION

A. Proper Venue in This District

**\*2** Pursuant to 28 U.S.C. § 1406, a court faced with "a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. 1406(a) (2005). Venue is proper in a diversity case only in "(1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated...." *See* 28 U.S.C. § 1391(a). For venue purposes, a defendant corporation "shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c).

Although the parties focus solely on the propriety of venue under § 1391(a)(2), the Court first considers whether venue is proper in this District under § 1391(a)(1). As a corporation, Koch is deemed to reside in any judicial district in which it is subject to personal jurisdiction. *See* 28 U.S.C. § 1391(c). Because Koch has represented to this Court that it does not contest the Court's personal jurisdiction over it in this matter, the Court need not belabor this point. (R. at 21.) The Court finds that Koch is subject to personal jurisdiction in this District, and may be considered a resident of this District for the purpose of assessing proper venue. Pursuant to § 1391(a)(1), with

PTC and Koch both residing in Pennsylvania, venue is proper in this District. *See* 28 U.S.C. § 1391(a)(1); *see, e.g., George Young Co. v. Bury Bros., Inc.,* Civ. A. No. 03-3353, 2004 WL 1173129, at \*7 (E.D.Pa. Apr. 2, 2004); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1128 (W.D.Pa.1997).

Furthermore, the Court finds that venue is also proper under § 1391(a)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. *See* 28 U.S.C. § 1391(a)(2). Generally, venue must be proper as to each specific claim, except in "cases in which the claims are parts of the same cause of action." *Phila. Musical Soc'y, Local 77 v. Am. Fed'n of Musicians of the U.S. and Can.,* 812 F.Supp. 509, 517 (E.D.Pa.1992); *see also Lomanno v. Black,* 285 F.Supp.2d 637, 641 (E.D.Pa.2003). When the plaintiff seeks relief based upon separate legal theories for a single wrong, the claims constitute one cause of action. *See Christian Dalloz S.A. v. Holden,* Civ. A. No. 90-0835, 1990 WL 121342, at \*2 (E.D.Pa. Aug.20, 1990) ("Claims can only be characterized as separate causes of action if they do not simply allege a single wrong with two separate grounds for relief.") (*citing Beattie v. United States,* 756 F.2d 91, 100 (D.D.C.1985); *see also Klauder and Nunno Enters., Inc. v. Hereford Assocs., Inc.,* 723 F.Supp. 336, 341 (E.D.Pa.1989) (describing the issue as "whether the relief sought is 'to put an end to an essentially single wrong, however differently characterized ...' ") (*quoting Hurn v. Oursler,* 289 U.S. 238, 246, 53 S.Ct. 586, 77 L.Ed. 1148 (1933)). Here, Plaintiff asserts multiple claims against Koch and PTC, but only seeks relief arising out of a single injury. Thus, venue need not be proper as to each claim individually, but only as to the action as a whole.

**\*3** The Third Circuit has noted that while the events or omissions giving rise to the plaintiff's claims must be substantial to make venue proper, "the statute no longer requires a court to select the 'best' forum." *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994) (noting that pre-1990 version of 1391(a)(2) laid venue in district "in which the claim arose," suggesting only one proper district for venue). "Events or omissions that might only have some tangential connection with the dispute in litigation are not enough. Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Id.* Yet the statute "does not require a majority of the events take place here, nor that

Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan..., Not Reported in...

2005 WL 2660351

the challenged forum be the best forum for the lawsuit to be venued." *Park Inn Int'l, L.L.C. v. Mody Enters., Inc.,* 105 F.Supp.2d 370, 376 (D.N.J.2000).

According to Plaintiff, the alleged defective design and manufacture of the roller coaster cars, which occurred in this District, constitute a substantial part of the events or omissions giving rise to this claim. (Pl.'s Resp. in Opp'n to Def. Koch's Mot. to Dismiss at 6.) The Court agrees that such activities represent a substantial part of the product liability claims Plaintiff asserts. *See, e.g., Elam v. Ryder Auto Operations,* Civ. A. No. 94-151A, 1994 WL 705290, at *8 (W.D.N.Y. Nov.1, 1994)* (venue proper where design and manufacture of product occurred). Moreover, as the statute does not require that a majority of the events giving rise to the claims occurred in this District, nor that this District is the best forum for laying venue, venue is proper in this District. *See Cottman,* 36 F.3d at 294; *Park Inn Int'l,* 105 F.Supp.2d at 376. Thus, under either provision of § 1391(a), venue is proper in this District, and Defendants' motions to dismiss for improper venue are denied.

B. Transfer of Venue to the Southern District of Indiana

Pursuant to 28 U.S.C. 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). An action may be transferred to another district even if venue is proper where initially brought, provided venue is also proper in the transferee district. *See Simon v. Ward,* 80 F.Supp.2d 464, 470 (E.D.Pa.2000). Here, venue would be proper in the Southern District of Indiana pursuant to § 1391(a)(2), because a substantial part of the events or omissions giving rise to Plaintiff's negligence claims occurred at Koch's amusement park in Indiana, the site of the accident. (Compl.¶¶ 6, 11-12, 22-26.); *see also* § 1391(a)(2).

The venue transfer analysis adopted by the Third Circuit incorporates and elaborates upon the three factors-convenience of parties, convenience of witnesses, and interests of justice-explicitly mentioned in § 1404(a). *See Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). The Third Circuit has outlined various private and public interests that are also relevant to the transfer inquiry. *See id.* Private interests include: (1) plaintiff's forum preference; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) convenience of the parties

as indicated by their relative physical and financial condition; (5) convenience of the witnesses, but only to the extent that witnesses may be unavailable to testify in one forum; and (6) location of books and records, limited to the extent they cannot be produced at alternative forum. *See id.* Public interests include: (1) enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) relative administrative difficulty related to court congestion; (4) local interest in deciding local controversies; (5) public policies of both forums; and (6) familiarity of trial judge with applicable state law in diversity case. *See id.* at 879-80.

**\*4** Defendant must show the desirability of transferring venue, and must present evidence upon which the court may rely in justifying transfer. *See Plum Tree, Inc. v. Stockment,* 488 F.2d 754, 756-57 (3d Cir.1973). Appropriate supporting evidence includes documents, affidavits, or statements concerning the availability of material witnesses, relative ease of access to evidence, and business or personal hardships that might result for the moving parties.[2] *See id.* at 757 n. 2. In this case, the *Jumara* factors weigh strongly in favor of transfer, and Defendants' supplemental submissions support the Court's decision to transfer.

[2]  The Third Circuit described appropriate evidence in support of a transfer motion as follows:
> Examples of such documents would be a list of the names and addresses of witnesses whom the moving party plans to call and affidavits showing the materiality of the matter to which these witnesses will testify, statements by the moving parties of the business difficulties or personal hardships that might result from their having to defend against the suit in the district court where it was originally brought, affidavits concerning the relative ease of access to sources of documentary evidence, and other materials where appropriate.

> *Plum Tree,* 488 F.2d at 757 n. 2.

*1. Plaintiff's Choice of Forum*

Generally, "plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request," and while "[t]he decision to transfer is in the court's discretion, [ ] a transfer is not to be liberally granted." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970); *see also Park Inn Int'l,* 105 F.Supp.2d

**Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan..., Not Reported in...**

2005 WL 2660351

[at 377](#) ("[U]nless the balance is strongly tipped in favor of the defendant, the plaintiff's choice of forum should not be disturbed.") (*quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)*). However, when plaintiff brings suit in a district other than his home state, his venue choice is entitled to less deference. *See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)* ("[P]laintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum ...."); *see also Horace Mann Ins. Co. v. Nationwide Mutual Ins. Co.,* Civ. A. No. 04-5978, 2005 U.S. Dist. LEXIS 4199, *7 (E.D.Pa. Mar.17, 2005) (noting that courts grant less deference to plaintiff's choice of forum when plaintiff does not reside in chosen forum). Here, Plaintiff's choice is entitled to less deference because Pennsylvania is not Plaintiff's home forum: Decedent Tamar Fellner resided in New York, and her Estate is domiciled in New York. [3] (Compl.¶¶ 3, 4.) Accordingly, although Plaintiff's choice of forum weighs against transfer, less significance is accorded to this preference than if Plaintiff's home forum were Pennsylvania.

[3] The Court notes that Plaintiff's personal residence in New Jersey is not relevant to this transfer analysis, as Plaintiff brings this suit as the Personal Representative of Ms. Fellner's Estate.

### 2. Defendants' Forum Preference

Defendants' forum preference weighs in favor of transfer, as both Koch and PTC desire to litigate this case in Indiana. (Mot. to Dismiss of Def. Koch ¶¶ 38-45; Mot. to Dismiss of Def. PTC ¶¶ 17-20.) The issue of where this claim arose weighs slightly in favor of transfer as well. Despite the fact that the design and manufacture of the roller coaster cars in Pennsylvania support a finding of proper venue in this District, *see supra* Part III.A, the accident itself occurred in Indiana, where the primary witnesses of Ms. Fellner's fatal ride are located. (Compl. ¶¶ 6, 11-12, 14; Mot. to Dismiss of Def. Koch ¶¶ 39-41; Mot. to Dismiss of Def. PTC ¶¶ 5-6.)

### 3. Convenience of the Parties

The convenience of the parties, as indicated by their relative physical and financial condition, and the location of books and records, to the extent they cannot be produced at an alternative forum, are neutral here. Records and documents may be produced in either

forum, and the inconvenience and expense of traveling to an alternate forum for discovery and trial exists for all parties. ®. at 10-13 (noting personal hardship upon Plaintiff if required to travel to Indiana and business hardship on Defendant Koch if required to travel to Pennsylvania); Supplemental Docs. in Supp. of Mot. to Dismiss of Def. Koch [hereinafter "Suppl. Docs. of Def. Koch"] Ex. 5 (noting hardship and expense to family-run Koch Corporation because Holiday World would likely be shut down during trial due to high number of employees traveling to testify).)

### 4. Public Interests

**\*5** The public interests in this case are neutral as well and thus do not significantly impact the transfer analysis. Plaintiff and Defendants both validly claim that each forum has a strong policy interest in the outcome of the case; Indiana as the site of the accident has an interest based in promoting and monitoring safety in amusement parks within its state, and Pennsylvania as the site of the manufacture of potentially defective products has an interest in monitoring the design, manufacture, and sale of such products. (Mot. to Dismiss of Def. Koch ¶ 42; Br. in Supp. of Def. PTC's Mot. to Dismiss at 15; Pl.'s Resp. in Opp'n to Mot. to Dismiss of Def. Koch at 6-8.)

### 5. Convenience of Witnesses

The factor which most strongly supports transfer in this case is the convenience of witnesses, to the extent they would be unavailable to testify at Plaintiff's chosen forum. This District has noted that "[t]he convenience of witnesses weighs heavily in making a decision regarding a motion to transfer venue," and "[t]o show inconvenience to witnesses, the moving party needs to provide the type of documents set forth in *Plum Tree." Gonzalez v. Elec. Control Sys., Inc.,* Civ. A. No. 93-3107, 1993 WL 372217, at *4 (E.D.Pa. Sept.17, 1993); *see also Clay v. Overseas Carriers Corp.,* 61 F.R.D. 325, 331 (E.D.Pa.1973) (noting that while "the required specificity of proof necessary to support a transfer motion" will vary based on the circumstances of each case, some established facts must support movant's conclusory allegations).

In support of their motions, Defendants have submitted appropriate supplemental documentation in the form of affidavits and written and recorded statements, indicating the materiality of testimony by witnesses who would be unavailable if this case proceeded to trial in this District.

**Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan..., Not Reported in...**

2005 WL 2660351

(Suppl. Docs. of Def. Koch; Supplemental Docs. in Supp. of Mot. to Dismiss of Def. PTC [hereinafter "Suppl. Docs. of Def. PTC"] ); *see also Plum Tree,* 488 F.2d at 757 n. 2. Defendants present at least twelve non-party witnesses who can provide material testimony regarding Ms. Fellner's accident, including:

(1) Two guests in the parking lot of the amusement park and one summer Koch employee within the park who viewed a woman matching Ms. Fellner's description on the fatal ride prior to her death;

(2) Three guests who were seated directly in front of Ms. Fellner on the fatal ride, one of whom gave medical care to Ms. Fellner after her fall;

(3) A former Koch employee responsible for roller coaster maintenance;

(4) A summer Koch employee who checked Ms. Fellner's coaster seat restraints on the ride Ms. Fellner took immediately prior to the fatal ride;

(5) A former Koch employee who checked Ms. Fellner's coaster seat restraints on the fatal ride;

(6) A summer Koch employee who viewed Ms. Fellner's coaster car and seat restraints upon the ride's return to the station after Ms. Fellner's fall;

**\*6** (7) An amusement ride inspector from the Division of Fire and Building Safety of the State of Indiana, who inspected Ms. Fellner's roller coaster car after the accident and prepared a report of his findings; and

(8) The former Marshall of the Santa Claus Police Department, who performed an inspection after the accident, including observations of the roller coaster.

(Suppl. Docs. of Def. Koch Exs. 3A, 3B, 3C, 4D, 4G, 4H, 4K, 4M, 4N; Suppl. Docs. of Def. PTC Exs. A & C.) Seven of these witnesses completed affidavits indicating that they would not voluntarily appear in this District to testify in this case. (Suppl. Docs. of Def. Koch Exs. 4D, 4G, 4H, 4K, 4M, 4N; Suppl. Docs. of Def. PTC Ex. C.) Counsel for Defendants were unable to obtain similar affidavits from the other five witnesses, but included prior written and/or recorded statements from these witnesses. (Suppl. Docs. of Def. Koch Exs. 3, 3A, 3B, 3C; Suppl. Docs. of Def. PTC Exs. 1 & A.) Indeed, two of these primary witnesses indicated to Counsel for PTC via telephone that they did not intend to voluntarily give any further statement

regarding the incident they observed. (Suppl. Docs. of Def. Koch Ex. 6.)

With the exception of one witness in Illinois and one in Kentucky, [4] all of these witnesses reside in Indiana (Suppl. Docs. of Def. Koch Exs. 3A, 3B, 3C, 4D, 4G, 4H, 4K, 4M, & 4N; Suppl. Docs. of Def. PTC Exs. A & C), and thus the Court could not compel their attendance in this District. *See* FED. R. CIV. P. 45(b)(2) (federal court's subpoena power over non-party witnesses only extends to persons within judicial district or within a 100-mile radius of courthouse). These witnesses would, however, be subject to the subpoena power of the district court in the Southern District of Indiana. *See id.* As important questions of liability will be addressed by the testimony of these non-party witnesses, the interests of justice require their live testimony, which can only be compelled in Indiana. *See, e.g., Ryer v. Harrisburg Kohl Bros., Inc.,* 307 F.Supp. 276, 280 (S.D.N.Y.1969) (noting the importance of the location of material witnesses, especially when live testimony is preferable to assess difficult questions of liability).

[4]   The witness who resides in Kentucky is sufficiently close to the Southern District of Indiana's courthouse in Evansville, Indiana to be subject to that court's subpoena power. (Suppl. Docs. of Def. Koch Ex. 4N); *see also* FED. R. CIV. P. 45(b)(2).

Plaintiff essentially pursues two distinct theories in this case-a product liability claim against PTC for its design and manufacture of the roller coaster cars and a negligence claim against Koch for its operation of the roller coaster. (Compl.¶¶ 15-32.) The former could be successfully litigated as easily in Indiana as in Pennsylvania, with experts and relatively few PTC principals/employees testifying regarding the design and manufacture of the roller coaster cars. (Ex. B of Reply Br. in Resp. to Pl.'s Br. in Opp'n to Def. PTC's Mot. to Dismiss (noting that PTC has eleven employees, but only two principals likely to testify, both of whom are willing to travel to Indiana); R. at 37.) On the other hand, the latter must be litigated in Indiana to ensure a fair and just outcome of the negligence claim against Koch. The material testimony of numerous non-party witnesses, as documented in Defendants' supporting submissions to the Court, will be crucial to a jury's assessment of Defendant Koch's liability for this tragic accident. In weighing the *Jumara* factors and considering the interests of justice, the Court finds that transferring this case to the Southern District of Indiana

**Fellner ex rel. Estate of Fellner v. Philadelphia Toboggan..., Not Reported in...**

2005 WL 2660351

is warranted. Thus, Defendants' motions to transfer this case are granted.

## IV. CONCLUSION

**\*7** For the reasons discussed above, Defendants' motions to dismiss are granted in part and denied in part, [5] and this action is transferred to the Southern District of Indiana. An appropriate Order follows.

[5]   Given the Court's decision to transfer this action, the Court need not rule on Defendants' motions to dismiss the strict liability and breach of implied warranty claims and to strike Plaintiff's request for punitive damages and costs of suit, as these matters now fall within the province of the transferee court to resolve.

### *ORDER*

AND NOW, this 18th day of October, 2005, upon consideration of Defendants' Motions to Dismiss, Plaintiff's responses thereto, Defendants' replies thereon, and for the foregoing reasons, it is hereby ORDERED that:

1.  Defendant Koch Development Corporation's Motion to Dismiss (Document No. 8) is GRANTED in part and DENIED in part, as follows:

a. Motion to dismiss for lack of personal jurisdiction is DENIED;

b. Motion to dismiss for improper venue is DENIED;

c. Motion to transfer venue is GRANTED.

2.  Defendant Philadelphia Toboggan Coasters, Inc.'s Motion to Dismiss (Document No. 22) is GRANTED in part and DENIED in part, as follows:

a. Motion to dismiss for improper venue is DENIED;

b. Motion to transfer venue is GRANTED.

3.  This case is TRANSFERRED to the United States District Court for the Southern District of Indiana.

4.  The Clerk of Court is directed to close this case for statistical purposes.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2660351

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1891212
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

James E. FLAHERTY, Plaintiff,

v.

ALL HAMPTON LIMOUSINE,
INC., et al., Defendants.

No. 01 Civ.9939 SAS.
|
Aug. 16, 2002.

**Synopsis**

Plaintiff sued 12 defendants, raising labor-related claims. The District Court, Scheindlin, acting sua sponte, held that case would be transferred to Eastern District of New York, for convenience of parties and witnesses.

Case transferred.

**Attorneys and Law Firms**

James E. Flaherty, Riverhead, New York, Plaintiff pro se.

Nora C. Marino, Great Neck, New York, for Defendants All Hampton Limousine, Inc., Matthew Galiadatto, Mary Neary, and Crystal Joyce.

Thomas J. Donovan, Bee, Eisman & Ready, LLP, Mineola, New York, for Defendant Rocky Point Taxi.

Joseph M. Glatstein, Williamson & Williamson, P.C., New York, New York, for Defendants Gates McDonald of New York and Barbara Swan.

James T. Reynolds, Reynolds Caronia Gianelli & Hagney, LLP, Hauppauge, New York, for Defendant Peter Colucci.

Mitchell D. Goldberg, Ochs & Goldberg, LLP, New York, New York, for Defendant John Tomitz.

Jones Hirsch Connors & Bull P.C., New York, New York, for Defendants David Morse & Associates, Inc. and Christopher Scheno.

Richard T. Radsch, New York, New York, for Defendant Reliance National Risk Specialists Inc..

*MEMORANDUM OPINION AND ORDER*

SCHEINDLIN, J.

**\*1** A review of plaintiff's Amended Complaint ("Am.Cmplt.") indicates that plaintiff resides in the Hamlet of Hampton Bays located in Long Island, New York. *See* Am. Cmplt. ¶ 19. Eight of the twelve defendants maintain offices or otherwise reside at addresses located within the Eastern District of New York (All Hampton Limousine, Inc.; Crystal Joyce; Mary Neary; Matthew Galiadatto; John Tomitz; Rocky Point Taxi Inc.; Peter Colucci; and David Morse & Associates, Inc.), two defendants maintain offices within the Northern District of New York (Gates McDonald of New York and Barbara Swan), one defendant maintains offices within the Southern District of New York and Pennsylvania (Reliance National Risk Specialists), and the residence of one individual defendant, Christopher Scheno, cannot be ascertained from the Amended Complaint. *See* Am. Cmplt. ¶¶ 9–18, 50 & Ex. Y.

Furthermore, a substantial portion of the events or omissions giving rise to plaintiff's claims occurred within the Eastern District. For example, plaintiff alleges that Rocky Point Taxi Inc. under-reported his 1999 wages to the Internal Revenue Service Center located at Riverhead, Long Island. *See id.* at ¶ 23. Plaintiff also alleges that All Hampton Limousine, Inc., conspiring with other defendants, sought to defraud him of New York State Workers Compensation benefits he was entitled to as a result of an on-the-job accident occurring in Hampton Bays, Long Island. *See id* . ¶ 24 and Ex. A.

Section 1404(a) of Title 28 of the United States Code provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The purpose of section 1404(a) "is to prevent the 'waste of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.' " *Eskofot AlS v. E.I. Du Pont De Nemours & Co.,* 872 F.Supp. 81, 94 (S.D.N.Y.1995) (quoting *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)).

Motions to transfer venue are governed by a two-part test: (1) whether the action to be transferred "might have been brought" in the transferee venue; and (2) whether the balance of convenience and justice favors transfer. *See American Alliance Ins. Co. v. Sunbeam Corp.,* No. 98 Civ. 4703, 1999 WL 38183, at *3 (S.D.N.Y. Jan.28, 1999); *Gerling American Ins. Co. v. FMC Corp.,* No. 97 Civ. 6473, 1998 WL 410898, at *2 (S.D.N.Y. July 22, 1998)* ("Motions for transfer lie within the broad discretion of the courts and are determined upon notions of convenience and fairness."). Because this action could have been brought in the Eastern District of New York, transfer depends on the balance of convenience and justice.

In making this determination, a judge has "[c]onsiderable discretion in adjudicating a motion for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Bionx Implants, Inc. v. Biomet, Inc.,* No. 99 Civ. 740, 1999 WL 342306, at *3 (S.D.N.Y. May 27, 1999)* (quoting *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992)). A non-exclusive list of factors to consider includes:

> **\*2** (1) the convenience of witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to those sources of proof; (4) the situs of the operative events in issue; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) judicial efficiency and the interests of justice.

*Ayala–Branch v. Tad Telecom, Inc.,* 197 F.Supp.2d 13, 15 (S.D.N.Y.2002). No individual factor is determinative and a court has discretion to weigh each factor to reach a fair result. *See Pharmaceutical Resources, Inc. v. Alpharma USPD Inc.,* No. 02 Civ. 1015, 2002 WL 987299, at *5 (S.D.N.Y. May 13, 2002)* (citing *Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 560 (S.D.N.Y.2000)).

Application of the above factors clearly indicates that the Eastern District of New York is the more convenient forum for this action. There is no question that this action could have been brought originally in the Eastern District of New York. Most of the witnesses reside within the Eastern District of New York. *See In re Eastern District Repetitive Stress Injury Litig.,* 850 F.Supp. 188, 194 (E.D.N.Y.1994)* (stating that the "[c]onvenience of witnesses is the most powerful factor governing the decision to transfer a given case"). Furthermore, plaintiff's claims arise from acts taken within the Eastern District, and the majority of relevant documents are located there. Similarly, the second factor favors transfer. Clearly, the Eastern District of New York is a more convenient forum for the *majority* of the parties. The fifth through seventh factors are neutral—witnesses can just as easily be compelled to appear before the Eastern or Southern District of New York, the means of the parties are not affected, and courts in the Eastern District are equally familiar with the governing law. While the eighth factor—plaintiff's choice of forum—favors retaining jurisdiction here, it is not dispositive. *See Ayala–Branch,* 197 F.Supp.2d at 15 (stating that plaintiff's choice of forum measurably diminishes "when the operative facts have few meaningful connections to the plaintiff's chosen forum"); *United States Surgical Corp. v. Imagyn Med. Techs., Inc.,* 25 F.Supp.2d 40, 46 (D.Conn.1998)* (holding that plaintiff's "choice of forum is entitled to little deference because the events giving rise to this case did not occur in Connecticut"). Plaintiff has expressed concern about his travel distance to the Long Island courthouse. *See* August 2, 2002 Letter from Flaherty to defense counsel at 3. Plaintiff fails to recognize, however, that this case might be assigned to the Brooklyn courthouse. Finally, the last factor—trial efficiency and interests of justice—strongly supports a transfer of venue given this action's nexus to Long Island.

**\*3** In sum, in the interests of justice and for the convenience of the parties and witnesses, the above captioned case is hereby transferred, pursuant to 28 U.S.C. § 1404(a), to the Eastern District of New York. Although this transfer is being made *sua sponte, see Mattel, Inc. v. Adventure Apparel,* No. 00 Civ. 4085, 2001 WL 286728, at *5 (S.D.N.Y. Mar.22, 2001)* (holding that a court can transfer venue *sua sponte* (citing *Lead Indus. Ass'n v. Occupational Safety & Health Admin.,* 610 F.2d 70, 79 n. 17 (2d Cir.1979))), I note that two defendants raised

improper venue as an affirmative defense. *See* Answer of Rocky Point Taxi Inc. ¶ 6 and Answer of Peter Collucci ¶ 6.

The Clerk of the Court is directed to transfer this file to the Eastern District of New York forthwith. All pending motions will be addressed by the transferee court.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1891212

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2019 Thomson Reuters. No claim to original U.S. Government Works. 3

Gentile v. Republic Tobacco Co., Not Reported in F.Supp. (1995)

1995 WL 743719

1995 WL 743719
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony GENTILE, Plaintiff,

v.

REPUBLIC TOBACCO COMPANY, Defendant.

No. 95-CV-1500 (RSP) (DNH).
|
Dec. 6, 1995.

**Attorneys and Law Firms**

Anthony Gentile, Binghamton, NY, pro se.

*DECISION and ORDER*

POOLER, District Judge.

*I. Background*

 **\*1** Presently before this Court is an application to proceed in forma pauperis and a civil rights complaint. Plaintiff Anthony Gentile ("Gentile") has not paid the partial filing fee required to maintain this action.

Because Gentile's complaint is without arguable basis in law, I dismiss it pursuant to 28 U.S.C. § 1915(d) and Rule 5.4(a) of the Local Rules of Practice of this District as without arguable basis in law.

In his *pro se* complaint, Gentile claims that defendant Republic Tobacco Company ("Republic") manufactures a product called TOP tobacco, and that Republic has negligently failed to put any warning labels on such product regarding possible health hazards which may be caused by the use of such product. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether

the cause of action stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y. 1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir. 1983) (*per curiam*).

I have determined that Gentile's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). I therefore turn to the second inquiry. A court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). The court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir. 1990) (*per curiam*). In addition, the court should exercise extreme caution in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir. 1983). Nonetheless, the Court has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir. 1974), and to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

Gentile brought this action under 42 U.S.C. § 1983, which permits individuals to seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* No. 91-CV-612, 1994 WL 688306, \*3, 1994 U.S.Dist. LEXIS 17698, \*8-9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). However, parties may not be held liable under this section unless it can be established that they have acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir. 1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* No. 92-Civ-4288, 1992 WL 380914, \*1, 1992 U.S.Dist. LEXIS 18864, \*2-3 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted).

 **\*2** In the present case, Gentile has named Republic as the sole defendant herein. However, Gentile has not

Gentile v. Republic Tobacco Co., Not Reported in F.Supp. (1995)

1995 WL 743719

alleged any nexus between the State of New York and the challenged actions of Republic. State action is an essential element of any § 1983 claim. *See Velaire v. City of Schenectady,* 862 F.Supp. 774, 776 (N.D.N.Y. 1994) (McAvoy, C.J.) (citation omitted).

Moreover, the Court notes that Gentile contends that Republic's failure to warn the public of possible health hazards was the result of negligence on the part of the defendant. Complaint at 2. However, it is well settled that mere negligence is not cognizable under § 1983. *See Stevens v. Pinkney,* No. 95-CV-1338, slip op. at 4 (N.D.N.Y. Oct. 25, 1995) (Scullin, J.) (citations omitted).

Because no arguable basis in law supports Gentile's complaint, I must dismiss it pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Rule 5.4(a) of the Local Rules of Practice of this District as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 743719

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 201502
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Antino GONSALVES–CARVALHAL, Plaintiff,

v.

AURORA BANK, FSB, Aurora Loan Services,
LLC, and McCurdy & Candler, LLC, Defendants.

No. 12–CV–2790 (MKB).
|
Jan. 16, 2014.

**Attorneys and Law Firms**

Antino Gonsalves-Carvalhal, Rosedale, NY, pro se.

Margaret J. Cascino, Tompkins McGuire Wachenfeld
& Barry LLP, Newark, NJ, William C. Sandelands,
Sandelands Eyet LLP, Bedminster, NJ, Dennis Jose,
Gross Polowy Orlans, LLC, Westbury, NY, Frank R.
Olson, McCurdy & Candler, LLC, Atlanta, GA, Nicole
C. Gazzo, Gross Polowy Orlans, LLC, Amherst, NY, for
Defendants.

*MEMORANDUM & ORDER*

MARGO K. BRODIE, District Judge.

**\*1** Plaintiff Antino Gonsalves–Carvalhal, proceeding
*pro se,* brings the above-captioned action against
Defendants Aurora Bank, FSB ("Aurora Bank"), Aurora
Loan Services, LLC ("Aurora Loan") (together the
"Aurora Defendants") and McCurdy & Candler, LLC,
("McCurdy & Candler"), pursuant to the Fair Debt
Collection Practices Act ("FDCPA"), the Truth in
Lending Act ("TILA"), the Real Estate Settlement
Procedures Act ("RESPA"), the Fair Credit Billing Act
("FCBA") and Georgia state law. The Aurora Defendants
moved to dismiss the Amended Complaint pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Procedure for
failure to state a claim. McCurdy & Candler moved to
dismiss the Amended Complaint pursuant to Rule 12(b)
(6) and, in the alternative, for a transfer of venue to the
Northern District of Georgia pursuant to 28 U.S.C. §
1404 and § 1406. For the reasons set forth below, the
Court grants McCurdy & Candler's motion to transfer

venue pursuant to 28 U.S.C. § 1406. In addition, the Court
finds that a transfer of the claims against the Aurora
Defendants is in the interest of justice pursuant to §
1404(a), and transfers the entire action to the Northern
District of Georgia.

**I. Background**
The facts alleged in the Amended Complaint are assumed
to be true for the purposes of this Memorandum and
Order. Plaintiff's claims arise from a mortgage agreement
between Plaintiff and Bayrock Mortgage Corporation
("Bayrock") dated June 15, 2007, to finance the purchase
of Plaintiff's retirement home ("the property") in Atlanta,
Georgia. (Docket Entry No. 22 "Am. Compl." ¶¶
12, 17, Ex. A.) As part of the mortgage agreement,
Plaintiff signed a security deed conveying a security
interest to Mortgage Electronic Registration Systems, Inc.
("MERS"), acting as the nominee for Bayrock and its
successors. [1] (Am. Compl. Ex B ("Security Deed") at 3.)
Plaintiff defaulted on the mortgage loan, (Am.Compl.¶
60), and on January 13, 2011, Plaintiff received a letter
from McCurdy & Candler informing Plaintiff that it had
been retained by MERS to "collect the debt secured by the
above-referenced property, which may involve foreclosure
proceedings," and that Plaintiff owed $138,847, (Am.
Compl. Ex. 100 at 1). On February 10, 2011, MERS
assigned the security interest in Plaintiff's home to Aurora
Loan, (Am.Compl.Ex.D), a subsidiary of Aurora Bank,
(Am.Compl.¶ 1). [2] On October 12, 2011 and April
10, 2012, McCurdy & Candler sent letters to Plaintiff
informing Plaintiff that it "represents Aurora Bank, the
creditor on the above referenced loan," and advising
Plaintiff that it had been retained to collect the debt
secured by the property. [3] (Am. Compl. Ex. 200; Docket
Entry No. 32, McCurdy & Candler Motion to Dismiss
("McCurdy Mot.") Ex. B.) The letter listed Aurora Bank
as the "Creditor" and Aurora Loan as the "Servicer" in
the address heading. (Am. Compl. Ex. 200; McCurdy Mot.
Ex. B.)

[1]    Bayrock Mortgage Corporation was dissolved by
the Georgia Secretary of State in August 2011.
(Am.Compl.Ex. C.)

[2]    Plaintiff alleges that Aurora Loan was involved with
servicing his loan as early as 2009 or 2010, prior to the
assignment of the security interest. (Am.Compl.¶¶ 22,
58.)

<sup>3</sup> McCurdy & Candler states that Aurora Loan assigned the security interest in the property to Aurora Bank on September 14, 2011, (McCurdy Mem. ¶ 3), but has not provided any supporting documentation. McCurdy & Candler attaches to its moving papers only the assignment made by MERS to Aurora Loan. (*See* McCurdy Mem. Ex. A.)

Plaintiff's Amended Complaint centers around five allegedly unlawful events: (1) his original lender, Bayrock, engaged in predatory lending, (Am.Compl.¶ 49); (2) Bayrock unlawfully named M ERS as its nominee / fiduciary in the security deed signed by Plaintiff, (*Id.* ¶¶ 37, 49(b)); (3) MERS lacked the power to assign a security interest in the property to Aurora Bank in February 2011, (*Id.* ¶¶ 49(e), 72–76); (4) Bayrock and its successor, Aurora Bank, failed to respond to a rescission notice sent by Plaintiff in November 2011, (*Id.* ¶¶ 79–88); and (5) the Aurora Defendants and McCurdy & Candler acted unlawfully with respect to the attempts to collect on the mortgage loan debt and attempts to foreclosure on the property, (*Id.* ¶¶ 90–110). Plaintiff also alleges that he is the victim of Aurora Bank's "anticipatory breach" of a Consent Order entered into between Aurora Bank and the federal Office of Thrift Supervision. (*Id.* ¶¶ 2, 45, 68; *see also* Am. Compl. Ex. 850, "Consent Order".) Plaintiff seeks equitable and injunctive relief, including declaratory judgments and an immediate cease and desist order, as well as damages under various state and federal statutes.

**\*2** The Aurora Defendants moved to dismiss for failure to state a claim, on the basis that Plaintiff's Amended Complaint is an impermissible "shotgun pleading," that Plaintiff fails to plead fraud with particularity, and that there is no basis for declaratory relief that would enjoin the pending state proceeding of the foreclosure on Plaintiff's home. (Docket Entry No. 37, "Aurora Mem." 1.) McCurdy & Candler moved to dismiss or in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404 and § 1406, arguing that the case is improperly venued and should be transferred to federal court in Georgia. (Docket Entry No. 32, Attach. 1 "McCurdy Mem.")

Plaintiff opposes Defendants' motions on the basis that another party, "RALI Series 2007—Q05 purports to own [Plaintiff's] loan," and argues that neither the mortgage nor the promissory note were legally transferred to this party, and that "Aurora is not the proper party in interest to foreclose Plaintiff's property...." (Docket Entry No. 37, Attach. 6 "Pl. Opp. Aff." ¶¶ 3–6.) Plaintiff seeks

discovery to "determine whether Plaintiff is obligated to make payments to Aurora or RA L I Series 2007—Q05," (*Id.* ¶¶ 8–9), and appends a "Property Securitization Analysis Report" prepared by Certified Forensic Loan Auditors, LLC, (Docket Entry No. 32 Attach. 7 "Pl. Opp. Aff. Ex.2000") to his opposition papers.

## II. Discussion

### a. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *Matson v. Bd. ofEduc.,* 631 F.3d 57, 63 (2d Cir.2011) (quoting *Connecticut v. Am. Elec. Power Co.,* 582 F.3d 309, 320 (2d Cir.2009)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson,* 631 F.3d at 63 (quoting *Iqbal,* 556 U.S. at 678). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). In reviewing a *pro se* complaint, the Court must be mindful that the plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Ahlers v. Rabinowitz,* 684 F.3d 53, 60 (2d Cir.2012) (quoting *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)), *cert. denied,* 568 —— U.S. ——, 133 S.Ct. 466 (2012). "While *pro se* complaints must contain sufficient factual allegations to meet the plausibility standard, we are obliged to construe a *pro se* complaint liberally to raise the strongest arguments it suggests." *Bamba v. U.S. Dep' t of* Homeland Sec., 533 F. App'x 33, ——, 2013 WL 5485916, at \* 1 (2d Cir. Oct.3, 2013) (alteration and internal quotation marks omitted) (citing *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013) and *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009)).

### b. Venue is Not Proper in the Eastern District of New York

**\*3** McCurdy & Candler seeks to transfer venue of this proceeding to the Northern District of Georgia, (Docket Entry No. 32 "McCurdy Notice of Mot."; McCurdy Mem. ¶¶ 43–51), pursuant to 28 U.S.C. § 1404 and § 1406. Once venue is challenged, "the plaintiff has the burden of establishing that it has chosen the proper venue." *Jackson v. Am. Brokers Conduit,* No. 09–CV6045, 2010 WL 2034508, at \*1 (S.D.N.Y. May 13, 2010) (citing *Bell v. Classic Auto Grp., Inc.,* No. 04–CV–0693, 2005 WL 659196, at \*4 (S.D.N.Y. Mar. 21, 2005)). However, at the motion to dismiss stage, where the Court relies only on pleadings and affidavits, "the plaintiff need only make a *prima facie* showing of [venue]." *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir.2005) (alteration in original) (citing *CutCo Indus. v. Naughton,* 806 F.2d 361, 364–65 (2d Cir.1986)). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fi n. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 84 (2d Cir.2013) (quoting *Ball v. Metallurgie Hoboken—Overpelt, S.A .,* 902 F.2d 194, 197 (2d Cir.1990)). "In analyzing whether the plaintiff has made the requisite prima facie showing that venue is proper, we view all the facts in a light most favorable to plaintiff ." *Magi XXI, Inc. v. Stato della Citta del Vaticano,* 714 F.3d 714, 720 (2d Cir.2013) (citing *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 384 (2d Cir.2007)).

Improper venue is a waivable defense. Any objection to venue must be raised in a defendant's responsive pleading or pre-answer motion, otherwise a party is deemed to have waived the obj ection. [4] *Fed.R.Civ.P.* 12(b)(3), 12(h); *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc.,* 295 F.3d 256, 261 (2d Cir.2002) (finding that a "[d]efendant [who] failed to raise any venue challenge in a pre-answer motion or responsive pleading ... is deemed to have waived any objection to venue." (citing Fed.R.Civ.P. 12(h)(1)(B) and *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369, 371 & n. 1 (2d Cir.1966)); *see also Joe Hand Promotions, Inc. v. Elmore,* No. 11–CV–3761, 2013 WL 2352855, at \* 1 n. 2 (E.D.N.Y. May 29, 2013) (noting that "it is well settled that improper venue is a waivable defense") (collecting cases).

[4]  The Aurora Defendants did not raise a venue challenge in their pre-answer motion to dismiss

(Docket Entry No. 37), and therefore waive their objection to venue. Although McCurdy & Candler argues that venue is not proper as to the Aurora Defendants, (McCurdy Mem. ¶ 46 n. 9), "venue is a personal privilege that is waivable at will," *Gross v. British Broad. Corp.,* 386 F.3d 224, 234 (2d Cir.2004) (citing *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369, 371 (2d Cir.1966)). Consequently, a party may raise objections to venue only as to itself, and not as to another party. *See Brossart v. Lynx Bus. Intelligence Consulting, Inc.,* No. 08–CV–0609, 2008 WL 2561592, at \*2 (D.Ariz. June 25, 2008) ("The defense of improper venue is generally personal, such that one defendant may not obtain dismissal or transfer because venue is improper as to a codefendant, unless that codefendant is an indispensable party." (citing *Anrig v. Ringsby United,* 603 F.2d 1319, 1324 (9th Cir.1979)); *Dean v. Anderson,* No. 01–CV2599, 2002 WL 1067454, at \* 1 (D.Kan. May 2, 2002) ("[A] defendant 'may not challenge venue on the ground that it is improper as to a codefendant.' " (citing *Pratt v. Rowland,* 769 F.Supp. 1128, 1132 (N.D.Cal.1991)); *Pratt,* 769 F.Supp. at 1132 ("Improper venue is a defense personal to the party to whom it applies. Thus one defendant may not challenge venue on the ground that it is improper as to a co-defendant." (citing *Camp v. Gress,* 250 U.S. 308, 314, 39 S.Ct. 478, 63 L.Ed. 997 (1919)).

When a defendant raises a proper objection to venue, and the plaintiff has not made a prima facie showing of venue, 28 U.S.C. § 1406 requires that the court "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); *Gonzalez v. Hasty,* 651 F.3d 318, 324 (2d Cir.2011); *see also First State Ins. v. Nat'l Cas. Co.,* No. 13–CV–0704, 2013 WL 5439143, at \* 3 (S .D.N.Y. Sept. 27, 2013) ("If the plaintiff cannot establish that chosen venue is correct, '[t]he district court ... shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.' " (quoting 28 U.S.C. § 1406)); *Azrelyant v. B. Manischewitz Co.,* No. 98–CV–2502, 2000 WL 264345, at \*3 (E.D.N.Y. Jan.13, 2000) ("Where a suit is filed in federal court in a district in which venue is improper, and a timely and sufficient objection to the defect is raised, a change of venue may be made under 28 U.S.C. § 1406(a)...."). "Courts enjoy considerable discretion in deciding whether to transfer a case [under § 1406] in the interest of justice." *White v. Rock,* No. 10–CV–5163, 2013 WL 527804, at \*5 (E.D.N.Y. Feb. 4, 2013) (quoting *Daniel*

*v. American Board of Emergency Medicine,* 428 F.3d 408, 435 (2d Cir.2005)).

 **\*4** Plaintiff alleges that "[v]enue is proper in this District under 28 USC § 1391(b)." (Am.Compl.¶ 10.) This statute provides, in pertinent part, that an action may be brought in:

> (1) a judicial district in which any Defendant resides, if all Defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any Defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

### i. Venue is not Proper Pursuant to Section 1391(b)(1)

In this case, not all Defendants "reside" in New York, the state in which the Eastern District of New York is located, as required by § 1391(b)(1), therefore venue in the Eastern District of New York is not properly based on the residence of Defendants. *See* 28 U.S.C. § 1391(b)(1) (providing that a civil action may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"). According to Plaintiff, Aurora Bank has a "principal place for doing business located at 1271 Avenue of the Americas, New York N.Y. 10019," and McCurdy & Candler's principal address is 3525 Piedmont Road, Atlanta, Georgia, with a registered agent at the same address. (Am.Compl.¶¶ 13–16.) Thus, while Plaintiff may have alleged that at least one Defendant—Aurora Bank —"resides" in New York, the state in which the Eastern District of New York is located, Plaintiff cannot establish that *all* Defendants are residents of New York state.

For purposes of determining proper venue, a business entity such as a corporation "shall be deemed to reside, if a Defendant, in any judicial district in which such Defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2); *see also 5381 Partners LLC v. Shareasale.com,*

*Inc.,* No. 12–CV–4263, 2013 WL 5328324, at \* 12 (E.D.N.Y. Sept.23, 2013) ("under Section 1391(c)(2), a defendant that is a corporation 'shall be deemed to reside ... in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question.' " (quoting § 1391(c) (2))); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP,* No. 09–CV–1340, 2013 WL 4048324, at \*2 (E.D.N.Y. Aug. 9, 2013) (noting that "the venue question [under § 1391(c)(2)] turns on whether the [district court] has personal jurisdiction over this corporate defendant." (quoting § 1391(c) (2))).

Personal jurisdiction, in turn, is determined by "a two-step inquiry." *Licci ex rel.. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 169 (2d Cir.2013), *reh'g denied,* No. 10–CV1306, 2013 W L 5700963 (2d Cir. Oct. 18, 2013) (citing *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 242 (2d Cir.2007) and *Int' l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). First, the Court "look[s] to the law of the forum state"[5] to determine whether there is personal jurisdiction. *Id.* If there is personal jurisdiction under state law, the Court still must consider whether the exercise of personal jurisdiction over the out-of-state Defendant "comports with due process protections established under the United States Constitution." *Id.*

[5] "Forum state" refers to the state in which a lawsuit is filed.

### 1. The Court Does Not Have Personal Jurisdiction.

 **\*5** Under New York state l aw, a court has jurisdiction over a non-domiciliary corporation that commits a tortious act outside New York State but causes harm to someone in the state, if that corporation "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (i i) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3); *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 164 (2d Cir.2010). Here, McCurdy & Candler is alleged to have committed a tortious act outside of New York State in its actions with respect to the property, and is a non-domiciliary entity, as "a Georgia corporation," (Am.Compl.¶ 13), whose "principal address is locate' in Atlanta, Georgia, (*Id.* ¶

14). Therefore, McCurdy & Candler is subject to personal jurisdiction in New York if it either "regularly does or solicits business" in New York, or "should reasonably expect the act to have consequences in the state." N.Y. C.P.L.R. § 302(a)(3)(i)–(i i); *see also* Levans v. Delta Airlines, Inc., No. 12–CV–00773, 2013 WL 6841984, at *5 (E.D.N.Y. Dec. 23, 2013) ("Pursuant to § 302(a)(3), a court may exercise personal jurisdiction over a non-domiciliary who ... 'commits a tortious act without the state causing injury to person or property within the state ... if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce' " (citing § 302(a)(3))); *Richtone Design Grp., LLC v. Live Art, Inc.,* No. 12–CV–7652, 2013 WL 5904975, at *5 (S.D.N.Y. Nov. 4, 2013) (same). Plaintiff has not alleged that McCurdy & Candler "regularly does or solicits business" in New York, and McCurdy & Candler states that it is a "Georgia limited liability company which only advertises itself as a provider of legal services" throughout Georgia and Tennessee. (McCurdy Mem. ¶ 47.) Plaintiff also does not allege that McCurdy & Candler should reasonably expect its actions with respect to the property to have had consequences in the state of New York. McCurdy & Candler's allegedly unlawful actions were (1) facilitating the "questionable assignment" of a security interest in the property from MERS to Aurora Loan, and entering the assignment into Georgia's land records, (Am.Compl.¶¶ 102–03), and (2) its debt collection and attempted foreclosure activities with respect to the property, (*id.* ¶¶ 90–97).

McCurdy & Candler's role in the assignment of security interest by MERS to Aurora Loan Services had no connection to the Eastern District of New York. The assignment was prepared by an individual from Aurora Loan Services located in Scottsbluff, Nebraska, stamped with MERS's Delaware corporate seal, filed and recorded in Fulton County, Georgia, and annotated with an instruction to return to McCurdy & Candler in Atlanta, Georgia. (A m. Compl. Ex. D.) Plaintiff acknowledges that the assignment was filed with the state of Georgia. (Am.Compl.¶ 103.) Nothing connected with the MERS assignment to Aurora implicates the Eastern District of New York—not the location of any of the people or the entry of the assignment into the land records itself.

Similarly, all of McCurdy & Candler's activities with respect to the debt collection and attempted foreclosure, including all of McCurdy & Candler's communications with Plaintiff, were sent to the property in Atlanta, Georgia. (*See* Am. Compl. Ex. 100 (letter dated January 13, 2011); Ex. 200 (letter dated October 12, 2011); McCurdy Mot. Ex. B (letter dated April 12, 2012)). Likewise, Plaintiff's communications with McCurdy & Candler were sent either to Nebraska or Atlanta. (*See* Am. Compl. Ex. 400 ("Revocation of Power of Attorney") at 4; Ex. 500 ("Final Notice to Remove Property from Alleged Non Judicial Foreclosure Sale") at 2–3; Ex. 725 ("Qualified Written Request") at 6.) Therefore, Plaintiff has not alleged any action by McCurdy & Candler that could have led McCurdy & Candler to "reasonably expect" that its actions would have consequences in the state of New York. Because McCurdy & Candler is not domiciled in New York, does not regularly conduct or solicit business in New York, and should not have reasonably expected its actions with respect to the property in Atlanta to have consequences in New York, personal jurisdiction cannot be established over McCurdy & Candler under N.Y. C.P.L.R. § 302(a)(3). [6]

[6]    Even if Plaintiff could establish that McCurdy & Candler is subject to personal jurisdiction in New York under New York law, the assertion of personal jurisdiction over McCurdy & Candler in the Eastern District of New York would not comport with the constitutional requirements of due process. A defendant in a civil lawsuit is entitled to "due process of law" under the Fifth and the Fourteenth Amendments of the Constitution, which means that such a defendant can only be subject to the personal jurisdiction of a court when it has "certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Licci,* 732 F.3d at 169 (quoting *Int'l Shoe,* 326 U.S. at 316). Plaintiff does not allege that McCurdy & Candler has conducted any business in New York, nor that it has *any* contacts with New York, let alone the "minimum contacts" that are required for personal jurisdiction. All of the events alleged in the Amended Complaint took place in Georgia, and McCurdy & Candler's mailing address and place of incorporation is in Georgia. Without more evidence of contacts with New York, due process prohibits the exercise of personal jurisdiction over McCurdy & Candler.

### 2. McCurdy & Candler Does Not "Reside" in New York

**\*6** Because McCurdy & Candler is not subject to the personal jurisdiction of a court in any judicial district in New York, it does not "reside" in New York for venue purposes. *See* 28 U.S.C. § 1391(c)(2) (corporations are deemed to reside, for purposes of venue, "i n any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question"); *cf. Indus. Quick Search, Inc.,* 2013 WL 4048324, at \* 4 (finding that corporate defendant was subject to personal jurisdiction in the Southern District of New York, and therefore that venue was proper in that district); *5381 Partners LLC,* 2013 WL 5328324, at \* 12 (finding that venue was proper in the Northern District of Illinois with respect to corporate defendant under § 1391(c)(2), as it was undisputed that defendant's principal place of business was in that district). As a result, Plaintiff has not satisfied the precondition to § 1391(b)(1)—that "al l defendants are residents of the State in which the district is located"—making venue improper under § 1391(b)(1).

### ii. Venue is Not Proper Pursuant to Section 1391(b)(2)

Venue in the Eastern District of New York is not proper under § 1391(b)(2), because "a substantial part of the events or omissions giving rise to the claim" did not occur in the Eastern District of New York, nor is "a substantial part of [the] property that is the subject of the action ... situated" in the Eastern District of New York. 28 U.S.C. § 1391(b)(2). To determine whether venue is proper under § 1391(b)(2), courts apply a two-part test: "First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims. Second, the court should determine whether a substantial part of those acts or omissions happened in the district where suit was filed, that is, whether 'significant events or omissions material to those claims ... have occurred in the district in question.' " *Deufrains v. Karcauskas,* No. 12–CV–2576, 2013 WL 4806955, at \*13 (E.D.N.Y. Sept.9, 2013) (citing *Daniel,* 428 F.3d at 432); *see also Delgado v. Villanueva,* No. 12–CV–3113, 2013 WL 3009649, at \*2 (S.D.N.Y. June 18, 2013) (same).

Plaintiff alleges violations of several state and federal laws in connection with the making, transfer, and management of the mortgage loan made on the property which is his retirement home in Atlanta, Georgia. (*See generally* A m. Compl.) Plaintiff does not allege that any acts or omissions relevant to his claims occurred in the Eastern District of New York; instead, Plaintiff alleges that venue is proper based in part on the fact that "the homeowner *now* lives in New York." (Am. Compl. ¶ 9 (emphasis added).) However, none of the alleged events or omissions, as pleaded by Plaintiff, took place in the Eastern District of New York. Plaintiff entered into a mortgage agreement with Bayrock to finance the purchase of the property in Atlanta, Georgia, and agreed to send his monthly payments to Alpharetta, Georgia. (Am. Compl. Ex. A at 1–2.) As part of this mortgage agreement, Plaintiff assigned a security interest in the property to MERS, acting as the nominee for Bayrock and its successors, which assignment was recorded in Fulton County, Georgia. (Security Deed at 1, 3.) M ERS assigned the security interest to Aurora Loan, which assignment took place in Fulton County, Georgia, (Am.Compl.Ex.D), and the communications from McCurdy & Candler to Plaintiff were mailed from McCurdy & Candler in Georgia to Plaintiff at the address of the property in Atlanta, Georgia. One communication from a non-party, law firm McGinnis, Tessitore, W utscher, L L P, originated in Chicago, Illinois. (A m. Compl. Ex. 600.)

**\*7** Because *no* events, let alone any "substantial" events, took place in the Eastern District of New York, venue cannot be established based on a substantial occurrence pursuant to § 1391(b)(2). [7] The fact that Plaintiff now lives in the Eastern District of New York, without more, is not a sufficient basis to establish venue pursuant to § 1391(b)(2). [8] The fact that this action arises out of a mortgage on a property located in Atlanta, Georgia, outside the Eastern District of New York, further indicates that venue is not proper in this District. *See Adams v. U.S. Bank, NA,* No. 12–CV–4640, 2013 W L 5437060, at \*5 (E.D.N.Y. Sept. 27, 2013) (dismissing challenges to foreclosure and eviction proceedings and noting "that claims regarding [dismissed plaintiffs'] property should generally be filed in the jurisdiction where the property is located and the claim arose." (citing 28 U.S.C. § 1391(b))).

---

[7]      Plaintiff's allegation that he is the victim of an "anticipatory breach" of the Consent Order between Aurora Bank and the federal government—assuming it could be a valid basis for a claim—references only Aurora Bank's place of incorporation in Delaware. (A m. Compl. ¶ 68.) The Consent Order expressly states "Nothing in this Stipulation or the Order, express or

implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Stipulation or the Order ." (Am. Compl. Ex. 850 ¶ 12.) Plaintiff also acknowledges that "[t]here is no defined right to sue granted to private individual [sic] under the Consent Order for violations or breach of agreement." (Am.Compl.¶ 11.)

8    Although Plaintiff does not allege that he was based in New York when he entered into the mortgage agreement that gives rise to his claims, he does include some communications to Defendants which originated in New York, (*see, e.g.,* Revocation of Power of Attorney at 1, Qualified Written Request at 5–6), attempting to rescind his mortgage and otherwise make legal demands on Defendants. Because these letters were sent subsequent to the events that give rise to Plaintiff's claims, they do not comprise a sufficient basis for establishing venue under § 1391(b)(2), in light of the otherwise overwhelming connections to Atlanta and Fulton County, Georgia.

**iii. Venue is Not Proper Pursuant to Section 1391(b)(3)**
Venue in the Eastern District of New York is not proper under § 1391(b)(3), because there is another district in which this action "may otherwise be brought." Section 1391(b)(3) provides that venue is proper in "any judicial district in which any Defendant is subject to the court's personal jurisdiction with respect to such action"—but only *"if there is no district in which an action may otherwise be brought* as provided in this section" (emphasis added); *see Daniel,* 428 F.3d at 434 ("the phrase 'if there is no district in which the action may otherwise be brought' indicates that venue may be based on that subsection only if venue cannot be established in another district pursuant to any other venue provision."). Here, under § 1391(b)(2), venue would be proper in the Northern District of Georgia, where a substantial part of the acts or omissions that give rise to Plaintiff's claims took place, and where the property that is the subject of the mortgage is located. Therefore, 1391(b)(3) is not applicable, because, contrary to its requirements, there is another district "in which [the] action may otherwise be brought." 28 U.S.C. § 1391(b)(3); *see also Daniel,* 428 F.3d at 435 (finding that, because plaintiffs could have brought a claim in the Western District of Michigan under § 1391(b)(2), where "a substantial part" of the alleged events giving rise to the claim took place, "they cannot rely on § 1391(b)(3) to support venue in the Western District of New York.");

*Safety Software Ltd. v. Rivo Software, Inc.,* No. 11–CV–7433, 2012 WL 1267889, at *5 (S.D.N.Y. Apr.11, 2012) (declining to apply § 1391(b)(3) where the action could be brought in another district, noting that "[b]y the plain language of the statute, however, [§ 1391(b)(3) ] applies only if there is no other district in which the action may be brought").

**iv. Transfer is Proper Under Section 1406**
In sum, because venue in the Eastern District of New York is not proper under any of the provisions of § 1391(b), and McCurdy & Candler has timely objected to venue, pursuant to 28 U.S.C. § 1406, the Court must either dismiss the claims against McCurdy & Candler or transfer them to a district where venue is proper. *See Gonzalez,* 651 F.3d at 324. In light of the fact that dismissal would require *pro se* Plaintiff to incur additional filing costs, and re-filing the Amended Complaint in the appropriate district would delay the proceeding, the Court transfers the claims against McCurdy & Candler to the Northern District of Georgia. *See Fredriksson v. Sikorsky Aircraft Corp., Inc.,* No. 07–CV–0214, 2008 WL 752469, at *4 (E.D.N.Y. Mar.19, 2008) (transferring a case pursuant to § 1406 and observing that "Congress, by the enactment of § 1406(a), recognized that 'the interest of justice' may require that the complaint not be dismissed but rather that it be transferred in order that the plaintiff not be penalized by ... 'timeconsuming and justice-defeating technicalities.' ") (quoting *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962)); *Int'l Flavors & Fragrances Inc. v. Van Eeghen Int'l B.V.,* No. 06–CV–490, 2006 WL 1876671, at * 8 (S.D.N.Y. July 6, 2006) ("Dismissal is a harsh remedy that is best avoided when another avenue is open."). [9] Although dismissal rather than transfer under is encouraged when a case is a "sure loser," *Gonzalez,* 651 F.3d at 324, or "clearly doomed," *Daniel,* 428 F.3d at 436, the Court cannot conclude that there is no merit to any of Plaintiff's claims. *See Zaltz v. JDATE,* No. 12–CV–3475, 2013 WL 3369073, at * 12 n. 8 (E.D.N.Y. July 8, 2013) (transferring under § 1404(a) "even if plaintiff's claims might be difficult to sustain, it does not appear that they are 'clearly doomed' "). In particular, in light of relevant Eleventh Circuit case law, Plaintiff may have stated a claim against McCurdy & Candler for violations of the Fair Debt Collection Practices A ct. [10]

9    The Court transfers the claims as to McCurdy & Candler, notwithstanding McCurdy & Candler's

argument that the Court lacks personal jurisdiction over it. See *Goldawr, Inc. v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) ("The language of § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not."); *see also Deufrains v. Karcauskas,* No. 12–CV–2576, 2013 WL 4806955, at * 14 (E.D.N.Y. Sept.9, 2013) ("A district court has the authority [under § 1406] to transfer a case to another district, even if the transferring court does not have personal jurisdiction over the Defendant." (citing *Goldawr,* 369 U.S. at 466, and *SongByrd, Inc. v. Estate of Grossman,* 206 F.3d 172, 179 n. 9 (2d Cir.2000)); *Brown v. City of New York,* No. 10–CV–5229, 2013 WL 3245214, at *8 (E.D.N.Y. June 26, 2013) (28 U.S.C. § 1406(a) "permits a court to transfer claims to another venue even if the transferring court lacks personal jurisdiction over the Defendants" (citing *Goldawr,* 369 U.S. at 466–67)).

10    For example, Plaintiff alleges a claim against both McCurdy & Candler and the Aurora Defendants under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.,* (Am.Compl.¶¶ 5, 91, 111.E), which McCurdy & Candler argues must be dismissed because collection on a mortgage is not debt collection for purposes of the FDCPA. (*See* McCurdy Mem. ¶ 20 (citing, *inter alia, Warren v. Countrywide Home Loans, Inc.,* 342 F. App'x 458, 460 (11 th Cir.2009); *Beadle v. Haughey,* No. 04–CV–272, 2005 W L 300060, at * 3 (D.N.H. Feb. 9, 2005).) The October 12, 2011 and April 10, 2012 letters sent by McCurdy & Candler to Plaintiff specifically state: "Notice pursuant to the Fair Debt Collection Practices Act 15 USC 1692 Initial Communications Letter," "This law firm is acting as a debt collector and attempting to collect a debt," and, "As of the date of this letter, you owe $138,847.65." (Am.Compl.Exs.100, 200.) The Eleventh Circuit has held that a letter featuring identical language sent by law firms in Georgia, attempting to collect a debt on behalf of mortgage loan holders were attempts to collect a debt under the FDCPA. See *Bourff v. Rubin Lublin, LLC,* 674 F.3d 1238, 1240–41 (11th Cir.2012) ("The FDCPA applies to the notice here in question because the notice was an attempt at debt collection. The notice stated that Rubin Lublin had been retained to 'collect the loan,' stated in bold capital letters that it was 'an attempt to collect a debt,' and advised Bourff to contact Rubin Lublin to 'find out the total current amount needed to either bring your loan current or to pay off your loan in full.' "). In addition, to the extent that Plaintiff alleges that McCurdy & Candler engaged in abusive debt collection practices by naming a false creditor in its attempt to collect a debt, such a claim is cognizable under the FDCPA. See *id.* at 1241; *Shoup v. McCurdy & Candler, LLC,* 465 F. App'x 882, 885 (11th Cir.2012) (holding that plaintiff stated a claim under the FDCPA by alleging that letter from law firm attempting to collect a debt on a mortgage loan falsely represented the name of the plaintiff's creditor). In light of the Eleventh Circuit's case law on these precise issues, and the factual similarity between the allegations in *Shoup* and Plaintiff's allegations here, the Court is not prepared to dismiss Plaintiff's Complaint as failing to state a claim or find that Plaintiff's case is a "sure loser." See *Gonzalez v. Hasty,* 651 F.3d 318, 324 (2d Cir.2011).

### c. Claims against the Aurora Defendants

**\*8**   The Court also transfers Plaintiff's claims against the Aurora Defendants pursuant to 28 U.S.C. § 1404(a) in the interest of justice and for the convenience of the parties. Because the Aurora Defendants waived their objection to venue, transfer of the claims against them under § 1406 is not proper. See *Azrelyant,* 2000 WL 264345, at * 3 ("If a party's objection to venue, however, is not timely and sufficient, or if the party has waived the right to object to venue, transfer under 1406(a) is improper and unwarranted."); *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.,* 6 F.Supp.2d 203, 207 (S.D.N.Y.1998) ("Once objections to venue are waived, any defect in venue is cured, and the benefits of a § 1406(a) transfer for lack of venue are no longer available."). However, where, as here, the conduct of the Aurora Defendants is "central to the issues raised" by Plaintiff against McCurdy & Candler, in the interest of justice and for the convenience of the parties, rather than sever the claims and hear only the claims against the Aurora Defendants, the Court transfers the entire proceeding against all Defendants to the Northern District of Georgia. See 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division or to any district or division to which all parties have consented."); *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 296 (3d Cir.1994) (stating that when one of two co-Defendants objects to improper venue and the other waives objection, if the co-Defendant who has waived the objection "is central to the issues raised by the plaintiff against those subject to transfer, ...

the proper procedure in this case [is] to transfer the case in its entirety...."); *Indymac Mortgage Holdings, Inc. v. Reyad,* 167 F.Supp.2d 222, 239 (D.Conn.2001) ("[w]hen the conduct of a co-Defendant as to whom venue is proper is central to the issues raised by the plaintiff against those subject to transfer, the grant of a severance would not ordinarily be consistent with the sound exercise of discretion." (quoting *Cottman,* 36 F.3d at 296)); *accord Montoya v. Fin. Fed. Credit, Inc.,* 872 F.Supp.2d 1251, 1283 (D.N.M.2012); *Barnes Grp., Inc. v. Midwest Motor Supply Co., Inc.,* No. 07–CV–1164, 2008 WL 509193, at *3–4 (S.D.Ohio Feb. 22, 2008); *see also Brossart v. Lynx Bus. Intelligence Consulting, Inc.,* No. 08–CV–0609, 2008 WL 2561592, at *2 (D.Ariz. June 25, 2008) ("[I]f we transfer an action against a particular defendant for improper venue, we may exercise our discretion to transfer the rest of the action to any district where it might have been brought for 'the convenience of the parties and witnesses' pursuant to 28 U.S.C. § 1404(a)." (citing 17 *Moore's Federal Practice* § 111.35[2] (3d ed.2006))); WRIGHT & MILLER, 14D FED. PRAC. & PROC. JURIS. § 3827 (3d ed. 2005) ("If venue is proper for some Defendants but improper for others, the district court has wide discretion. It may transfer the entire case to another forum that would be proper for all the Defendants as many courts have done. Alternatively, it may retain the case as to those Defendants who have been properly sued there and either transfer the severed portion of the case for those Defendants for whom venue is improper or dismiss the action as to those Defendants." (citing cases)); *cf. Paul v. Shinseki,* No. 09–CV–1591, 2010 WL 3927077, at *6 (E.D.N.Y. Sept. 29, 2010) ("Where, as here, a district court finds venue improper with respect to a given claim, it may as a matter of discretion transfer rather than dismiss the improperly venued claim where transfer is in the interest of justice.").

**\*9** The claims against the Aurora Defendants may be properly transferred pursuant to 28 U.S.C. § 1404(a). The purpose of Section 1404(a) "is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Adams,* 2013 WL 5437060, at *5 (citing *Blechman v. Ideal Health, Inc.,* 668 F.Supp.2d 399, 403 (E.D.N.Y.2009) and *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). As discussed above, this action could have been brought in the Northern District of Georgia pursuant to § 1391(b), as the "events or omissions" giving rise to Plaintiff's claims

took place in that district, and the property is located there.

Under § 1404(a), a court determines whether a transfer is warranted "for the convenience of the parties and witnesses, in the interest of justice," by analyzing various factors including: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *Id.* at *6 (citing *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.,* 599 F.3d 102, 112 (2d Cir.2010) and *Phillips v. Reed Grp., Ltd.,* No. 07–CV–3417, 2013 WL 3340293, at *5 (S.D.N.Y. July 1, 2013)). "[S]ubstantial weight is accorded a plaintiff's choice of forum." *Dornoch Ltd. ex rel. Underwriting Members ofLloyd's Syndicate 1209 v. PBM Holdings, Inc.,* 666 F.Supp.2d 366, 372 (S.D.N.Y.2009) (citation omitted). However, "when the transactions or facts giving rise to the action have no material relation or significant connection to plaintiff's chosen forum, then the plaintiff's choice is not accorded the same 'great weight' and in fact is given reduced significance." *Donde v. Romano,* No. 09–CV–04407, 2010 WL 3173321, at *7 (E.D.N.Y. Aug.10, 2010) (internal quotation marks omitted) (quoting *Romano v. Banc of Am. Insurances Servs.,* 528 F.Supp.2d 127, 130 (E.D.N.Y.2007) and *Hernandez v. Graebel Van Lines, Inc.,* 761 F.Supp. 983, 990 (E.D.N.Y.1991))).

Here, the first and the seventh factors weigh in favor of Plaintiff, who currently resides in the Eastern District of New York and who, as an individual plaintiff proceeding *pro se,* likely is of less means than the incorporated Defendants. However, all of the remaining factors weigh strongly in favor of litigating the claims against the Aurora Defendants in the Northern District of Georgia. The claims against the Aurora Defendants are essentially disputes over Plaintiff's mortgage on the property which is located in Atlanta, Georgia. Any witnesses to the signing of the mortgage and the challenged assignments are more likely to be located in the Northern District of Georgia, as are Georgia state land records and other relevant documents. *See Crutchfield v. Country Wide Home Loans,* No. 02–CV–9092, 2003 WL 102879, at *1–2 (S.D.N.Y. Jan.10, 2003) (finding that venue was more appropriate in Oklahoma district where property that was the subject of a challenged mortgage was located,

because "a critical element of the events at issue relates to the mortgage financing of the Property ... and the material witnesses and documents regarding that aspect of the underlying transaction are in Oklahoma"). More importantly, any of the witnesses who currently reside in Georgia are outside this Court's subpoena power, raising the costs and complicating the logistics of any discovery that may be needed to resolve the claims against the Aurora Defendants. *See* Fed.R.Civ.P. 45(b)(2) (providing that "a subpoena may be served at any place: (A) within the district of the issuing court; (B) outside that district but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection"); *Crutchfield,* 2003 WL 102879 at *2 ("The location of such witnesses and documents within the Court's subpoena power is an essential consideration in determining the appropriateness and convenience of plaintiff's choice of forum." (citing *AyalaBranch v. Tad Telecom, Inc.,* 197 F.Supp.2d 13, 15 (S.D.N.Y.2002) and *Summit v. U.S. Dynamics Corp.,* No. 97–CV–9224, 2000 WL 502862, at *2 (S.D.N.Y. Apr.27, 2000))); *Deufrains,* 2013 WL 4806955, at *16 ("The most compelling factors to the Court in its finding that transfer is in the interest of justice ... relate to the convenience of witnesses and the access to judicial process to compel unwilling witnesses to testify.").

**\*10** In addition to the fact that most of the witnesses likely live in Georgia and would not be subject to the Court's subpoena power, the claims against both sets of Defendants share many common facts. Severing and addressing the claims against the Aurora Defendants in the Eastern District of New York while permitting the claims against McCurdy & Candler to proceed in the Northern District of Georgia will effectively result in duplicate litigation of Plaintiff's claims, taxing judicial resources and burdening Plaintiff as well as Defendants. McCurdy & Candler is a "foreclosure specialty" law firm retained by at least one of the Aurora Defendants to foreclose on the property after Plaintiff defaulted on his mortgage. (Am. Compl. ¶¶ 13, 25; Exs. 100, 200.) Plaintiff's Amended Complaint alleges that, subsequent to the collapse of loan modification talks between Plaintiff and Aurora Loan, "Defendant McCurdy made three attempts to foreclose by non-judicial sale on behalf of Aurora Loan Services, LLC," (Am.Compl.¶¶ 22–25), and "Plaintiff's Revocation notices were sent to Aurora [Loan] and to McCurdy as a legal notification to refrain them from their continued action under their scheme to misrepresent their relationship with the

Plaintiff." (Am.Compl.¶ 36.) Plaintiff also alleges that McCurdy & Candler "knew or should have known" that "MERS is an unlawful fiduciary and nominee for Bayrock as a matter of law," and that McCurdy's "action to participate and encourage Aurora to proceed is unconscionable." (*Id.* ¶¶ 37–38.) Finally, Plaintiff notes that the third attempt at foreclosure by McCurdy & Candler occurred after Aurora Bank had signed a Consent Order with the Office of Thrift Supervision. (*Id.* ¶ 42.)

While the claims against McCurdy & Candler could be separated to focus solely on its role in attempting to foreclose on Plaintiff's property, another court could not address the claims against McCurdy & Candler without significantly duplicating the litigation before this Court involving the Aurora Defendants. *See Brossart,* 2008 WL 2561592, at *3 (transferring entire action from Arizona to California where venue was improper as to one of two defendants, and "a substantial part of the events giving rise to all of plaintiff's claims occurred in" California rather than in Arizona, because both defendants were subject to personal jurisdiction of a California court, "a majority of witnesses and evidence" were in California, and a "district judge in California will have greater familiarity with California law"). Because the conduct of the Aurora Defendants is central to the issues raised by the Plaintiff in the claims against McCurdy & Candler, which are subject to transfer, the Court finds that severance of the claims and transfer of only the claims against McCurdy & Candler is not "consistent with the sound exercise of discretion." *See Indymac,* 167 F.Supp.2d at 239.

### III. Conclusion

For the foregoing reasons, the Court grants McCurdy & Candler's motion to transfer venue as to the claims against McCurdy & Candler pursuant to 28 U.S.C. § 1406 and, in the interest of justice, transfers the claims against the Aurora Defendants pursuant to 28 U.S.C. § 1404(a). The Aurora Defendants' motion to dismiss is dismissed with leave to refile in the Northern District of Georgia. The entire action shall be transferred to the Northern District of Georgia.

**\*11** SO ORDERED:

## All Citations

Not Reported in F.Supp.3d, 2014 WL 201502

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1795309
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Lester M. HAYES

v.

TRANSCOR AMERICA, LLC, et al.

Civil Action No. 08–293.
|
June 23, 2009.

**Attorneys and Law Firms**

Emily J. Lawrence, Jason Belmont Conn, John Weber McCauley, R. Brendan Fee, Morgan, Lewis, & Bockius LLP, Philadelphia, PA, for Lester Murphy Hayes.

Leslie Miller Greenspan, Andre L. Dennis, Stradley, Ronon, Stevens, & Young LLP, Philadelphia, PA, for Transcor America, LLC, et al.

*MEMORANDUM*

PADOVA, District Judge.

**\*1** Plaintiff Lester Hayes brings this action pursuant to 42 U.S.C. § 1983 and state common law against Defendants TransCor America, LLC ("TransCor"), Karen L. Oates, Carolyn Cooper, Kevin McCord, Gary Underwood, Ernest Franklin, Don W. Bowden, Robert Koch, and Mark Spickard (the "individual Defendants"), alleging violations of his Eighth and Fourteenth Amendment rights and intentional infliction of emotional distress ("IIED"). Plaintiff's claims arise out of a six-day prisoner extradition transport from North Carolina to Pennsylvania in May 2007. Presently before the Court is Defendants' Renewed Motion to Dismiss or Transfer Venue, for which we held a hearing on June 11, 2009. For the following reasons, we deny the Motion insofar as it seeks dismissal, but grant the Motion insofar as it seeks a transfer of venue.

## I. BACKGROUND [1]

[1]  " 'In considering a motion to dismiss for improper venue under [Rule 12(b)(3)], the court must generally

accept as true the allegations in the complaint, although the parties may submit affidavits in support of their positions.' " *Chester v. Beard,* Civ. A. No. 07–4742, 2008 WL 2310946, at \*5 (E.D.Pa. June 2, 2008) (quoting *Fellner v. Phila. Toboggan Coasters, Inc.,* 2005 WL 2660351, at \*1 (E.D.Pa. Oct.18, 2005)). " 'The court may examine facts outside the complaint to determine proper venue, but must draw all reasonable inferences and resolve all factual conflicts in the plaintiff[']s favor.' " *Id.* (quoting *Fellner,* 2005 WL 2660351, at \*1).

Plaintiff is a 67–year–old man who suffers from a herniated disc, arthritis, severe spinal stenosis, high blood pressure, and an enlarged prostate. (Am.Compl.¶¶ 23–24.) Plaintiff's spinal condition makes it extremely painful for him to sit or stand for extended periods of time, and his prostate condition causes him to experience abnormally frequent urgency to urinate—as often as every 20 to 30 minutes. (*Id.* ¶¶ 25–26.) Plaintiff takes a variety of prescribed medications to treat his medical conditions. (*Id.* ¶¶ 28–29.)

In May 2007, while incarcerated in a Greensboro, North Carolina jail, Plaintiff received notice of new criminal charges filed against him in Philadelphia. (*Id.* ¶ 17.) TransCor, the largest prisoner transportation company in the country, was hired to bring Plaintiff to Philadelphia. (*Id.* ¶¶ 8, 19.) Shortly before the transport set out on its six-day journey, prison medical staff provided Defendants with a supply of Plaintiff's medications and informed Defendants of Plaintiff's medical needs. (*Id.* ¶ 31–32; *see also* Pl.'s Ex. B.) However, Defendants neither catalogued nor stored Plaintiff's medications to ensure their timely administration and or to prevent their loss. (Am.Compl.¶ 33.)

The transport departed from Greensboro on May 12, 2007, and was broken down into two, three-day legs. (*Id.* ¶ 31.) The first leg involved travel through North Carolina, South Carolina, and Tennessee, before stopping overnight in Kentucky. (*Id.* ¶ 22.) During the second leg, the transport continued through Kentucky, Virginia, Maryland, Delaware, and New Jersey, before ultimately arriving in Pennsylvania on May 18, 2007. (*Id.* ¶¶ 22, 56, 62.) All told, the transport spent scarcely an hour in Pennsylvania, leaving Mount Holly, New Jersey, at approximately 12:01 a.m. and arriving in Philadelphia at approximately 1:35 a.m. (*Id.* ¶¶ 61–62; *see also* Defs.' Exs. B, C.)

Over the course of the entire six-day transport, the individual Defendants refused to provide Plaintiff with his medications, in spite of Plaintiff's numerous complaints of back pain and other symptoms. (Am.Compl.¶¶ 35–36.) Plaintiff also made repeated requests to use bathroom facilities, which went unfulfilled because of a TransCor policy that permitted bathroom breaks only every four to five hours. (*Id.* ¶¶ 44–45.) Consequently, Plaintiff urinated and defecated in his pants, and was forced to sit in his soiled clothing for extended periods of time. (*Id.* ¶¶ 46, 49, 57.) In total, Plaintiff requested approximately 33 doses of medication, requested to use the bathroom between 20 to 25 times, urinated on himself between 24 to 28 times, and defecated on himself at least three times. (Pl.'s Resp. to Defs.' Interrog. at 6–10.) In this District, Plaintiff missed five to six doses of medication, requested to use the bathroom five to six times, urinated on himself at least once, and defecated on himself at least once.[2] (*Id.* at 6, 8, 11.)

[2]    In his interrogatory responses, Plaintiff alleges that these events occurred in Pennsylvania generally, without specifically alleging that they occurred in this District. Nevertheless, we take judicial notice that Mount Holly, New Jersey, is approximately 30 miles away from Philadelphia. Moreover, the record establishes that the transport took approximately 1.5 hours to travel between Mount Holly and Philadelphia. As we must draw all reasonable inferences in Plaintiff's favor, we find the acts that Plaintiff alleges occurred in Pennsylvania occurred in this District.

 **\*2**  Upon arriving in Philadelphia, Defendants handed Plaintiff over to the Philadelphia Police Department ("PPD"). (Am.Compl.¶¶ 62–63.) The "Prisoner Receipt" that was filled out by Defendants and delivered to PPD indicated that Plaintiff had no medications with him upon arrival. (*See* Pl.'s Ex. A.) However, a PPD officer, Officer Smith, found a container full of Plaintiff's medications attached to Plaintiff's belongings. (Am.Compl.¶ 63.) Plaintiff subsequently received medical care at the Curran–Fromhold Correctional Facility in Philadelphia. (Pl.'s Resp. to Defs.' Interrog. at 12.)

## II. DISCUSSION

Defendants ask us to dismiss this case because they contend that the Eastern District of Pennsylvania is an improper venue under 28 U.S.C. § 1391(b). Alternatively,

Defendants ask that we transfer this case to the Middle District of Tennessee pursuant to 28 U.S.C. § 1404(a).

When a defendant moves pursuant to Federal Rule of Civil Procedure 12(b)(3) to dismiss a case based on improper venue, and we determine that venue is improper, we must either dismiss the case or transfer it "to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). If, on the other hand, we determine that venue is proper in this District, we may transfer the case "to any other district or division where it might have been brought" "[f]or the convenience of parties and witnesses, [or] in the interest of justice ...." *Id.* § 1404(a). Defendants bear the burden of showing both that venue in this District is improper and that transfer to another district is justified. *See Chester,* 2008 WL 2310946, at *5 (citing *Fellner,* 2005 WL 2660351, at *1); *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). Although we find that this District is a proper venue, we conclude that transferring the case to the Middle District of Tennessee is appropriate under the circumstances.

### A. *Proper Venue*

Because this case implicates our federal question jurisdiction pursuant to 28 U.S.C. § 1331, proper venue is governed by 28 U.S.C. § 1391(b). In his Amended Complaint, Plaintiff asserts that this District is a proper venue under § 1391(b)(2) because a substantial part of the events giving rise to his claims occurred in this District. We agree.

When a defendant challenges venue under § 1391(b)(2), we undertake a two-part inquiry. First, we " 'identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims.' " *Chester,* 2008 WL 2310946, at *7 (quoting *Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408, 432 (2d Cir.2005)); *see also Cottman Transmissions Sys. v. Martino,* 36 F.3d 291, 295 (3d Cir.1994) (first identifying the acts or omissions that gave rise to the plaintiff's claims before determining whether a substantial part of those acts or omissions occurred in the district where the suit was filed).

Second, we " 'determine whether a substantial part of those events or omissions material to [those] claims ... have occurred in the district in question.' " *Chester,* 2008 WL 2310946, at *7 (quoting *Daniel,* 428 F.3d at 432). "Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a

remote district having no real relationship to the dispute." *Cottman,* 36 F.3d at 294. Consequently, " '[w]hen material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial ....' " *Leone,* 574 F.Supp.2d at 484 (quoting *Daniel,* 428 F.3d at 432; *see also Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir.2005). Conversely, "[e]vents or omissions that might only have some tangential connection with the dispute in litigation are not enough." *Cottman,* 36 F.3d at 294; *see also Leone,* 574 F.Supp.2d at 484. Because § 1391 " 'does not require a majority of the events take place here, nor that the challenged forum be the best forum for the lawsuit to be venued,' " *Fellner,* 2005 WL 2660351, at *3 (quoting *Park Inn Int'l, L.L.C. v. Mody Enters., Inc.,* 105 F.Supp.2d 370, 376 (D.N.J.2000)), " '[i]t is irrelevant that amore substantial part of the events took place in another district, as long as a substantial part of the events took place in [this] district as well.' " *Rodriguez v. Smith,* Civ. A. No. 03–3675, 2005 WL 1484591, at *3 n. 5 (E.D.Pa. June 21, 2005) (quoting *Morris v. Genmar Indus., Inc.,* Civ. A. No. 91–5212, 1993 WL 217246, at *5 (N.D.Ill. July 18, 1993)). At bottom, the substantiality inquiry is more qualitative than quantitative. *Daniel,* 428 F.3d at 432.

**\*3** Turning to the first part of the inquiry, dealing with the nature of Plaintiff's claims, we observe that Plaintiff alleges that: (1) the individual Defendants violated his Eighth and Fourteenth Amendment rights through their intentional, wanton, and deliberate indifference to his medical needs during the transport; (2) TransCor violated his Eighth and Fourteenth Amendment rights through the execution of its unconstitutional policy by the individual Defendants during the transport; and (3) all Defendants intentionally inflicted emotional distress upon him through the conduct of the individual Defendants during the transport. In essence, the acts or omissions giving rise to all of Plaintiff's claims consist of the individual Defendants' refusal to administer his medications, as well as their forcing him to both soil himself and sit in soiled clothing for extended periods of time, pursuant to TransCor's allegedly unconstitutional policy.

Turning to the second part of the inquiry, involving substantiality, we observe that several instances of the conduct giving rise to Plaintiff's claims allegedly occurred in this District. [3] Although the number of acts or omissions alleged to have occurred in this District is

relatively small, it is not insignificant. *See, e.g., Katz v. Mogus,* 538 F.Supp.2d 538, 542–43 (E.D.N.Y.2007) (finding venue proper where the conduct occurring within the district gave rise to only 20 percent of the plaintiff's damages); *McCaskey v. Continental Airlines, Inc.,* 133 F.Supp.2d 514, 525 (S.D.Tex.2001) (finding venue proper in the Southern District of Texas where the airline was allegedly negligent for failing to cut short a cross-country flight originating in Houston after the decedent suffered a heart attack shortly after take off). More importantly, the alleged within-District acts or omissions are qualitatively central to Plaintiff's claims and comprise " 'part of the historical predicate for the instant suit.' " *Estate of Moore v. Dixon,* 460 F.Supp.2d 931, 936 (E.D.Wis.2006) (quoting *Master Tech Prods., Inc. v. Smith,* 181 F.Supp.2d 910, 914 (N.D.Ill.2002)). While Plaintiff might not be able to prevail on his claims solely on the basis of the acts alleged to have occurred in this District, he likewise might not be able to prevail on his claims without them. Consequently, we find that Defendants' within-District acts or omissions are sufficiently substantial for purposes of § 1391(b)(2) because they "bear a close nexus" to Plaintiff's claims. *Leone,* 574 F.Supp.2d at 484 (quoting *Daniel,* 428 F.3d at 432). Defendants have not satisfied their burden of establishing otherwise. Venue is therefore proper in this District, and Defendants' Motion is denied insofar as it seeks dismissal based on improper venue.

[3]     At the hearing, Defendants contended that no acts or omissions relevant to Plaintiff's *Monell*-type claim occurred in this District because the policy at issue was established and enforced solely in Tennessee. However, to hold a corporation that acts under color of state law liable for its unconstitutional policy, a plaintiff must establish that the *execution* of that policy inflicted the injury alleged. *See Monell v. N.Y. City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 583–84 (3d Cir.2003) (applying *Monell* to a private corporation). Plaintiff has satisfactorily alleged that the individual Defendants executed TransCor's policy in this District.

### B. *Transferring Venue*

In the alternative, Defendants have moved pursuant to 28 U.S.C. § 1404(a) to transfer this case to the Middle District of Tennessee, where TransCor is headquartered and where five of the eight individual Defendants reside. [4] Plaintiff has not asserted that the Middle District of

Tennessee is an improper venue under 28 U.S.C. § 1391(b), but contends that we should keep the case here because Defendants have failed to establish that transfer is proper. We disagree.

4    Counsel for Defendants represented at the hearing on this Motion that the three remaining individual Defendants reside in Arkansas, Texas, and Kentucky.

**\*4** In deciding whether to transfer a case, we do not confine our review to the three factors enumerated in 28 U.S.C. § 1404(a) (convenience of parties, convenience of witnesses, and interests of justice), but consider the more general public and private interests protected by § 1404(a). *Jumara,* 55 F.3d at 879. Because the burden rests with Defendants to establish that transfer is proper, they must show that " 'the balance of convenience of the parties is strongly in [their] favor ....' " *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970) (quoting *Owatonna Mfg. Co. v. Melroe Co.,* 301 F.Supp. 1296, 1307 (D.Minn.1969)). We address the private and public factors separately below.

### 1. Private factors
The private factors we must consider include:

> [1] plaintiff's forum preference as manifested in the original choice; [2] the defendant's preference; [3] whether the claim arose elsewhere; [4] the convenience of the parties as indicated by their relative physical and financial condition; [5] the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and [6] the location of the books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*Stone St. Servs., Inc. v. Breaux,* Civ. A. No. 00–1904,2000 WL 876886, at \*3 (E.D. Pa. June 19, 2000) (quoting *Jumara,* 55 F.3d at 879). We find that the balance of these factors favors transfer to Tennessee.

Traditionally, the court does not lightly disturb the plaintiff's choice of venue because the plaintiff's choice "is a paramount consideration in any determination of a transfer request." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970). In this case, however, Plaintiff does not reside in this District, and has not resided here at any time relevant to this litigation.[5] A plaintiff's choice of forum is entitled to less deference when he does not reside in the chosen forum, and is to be considered as but one among several factors. *Perretta v. Consol. Rail. Corp.,* Civ. A. No. 98–491, 1998 WL 316088, at \*2 (E.D.Pa. June 10,1998); *see also New Image, Inc. v. Travelers Indem. Co.,* 536 F.Supp. 58, 59 (E.D.Pa.1981); *cf. Piper Aircraft v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (noting that "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum" (citing *Koster v. Am. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947))). Defendants' countervailing preference is to litigate this case in the Middle District of Tennessee. Accordingly, we find that the first two factors, the parties' respective preferences, only modestly favor keeping the case in this District.

5    When Plaintiff initiated this lawsuit, he was incarcerated in a federal correctional facility in Elkton, Ohio. (Am.Compl.¶ 7.) At the hearing, Plaintiff's Counsel represented that Plaintiff resided in Waymart, Pennsylvania, prior to his incarceration and currently resides in a halfway house outside of Scranton, Pennsylvania, both of which are in the Middle District of Pennsylvania.

However, the third and fourth factors substantially favor transfer. With respect to the third factor, we observe that the vast majority of the acts or omissions giving rise to Plaintiff's claims—including, most importantly, the creation and enforcement of TransCor's allegedly unconstitutional policy—occurred outside this District; very few occurred in this District. With respect to the fourth factor, we find that the collective burdens that would be imposed on the eight individual Defendants if the case were to remain here, where none of them resides, heavily outweighs the burden that would be imposed on the single Plaintiff if the case were transferred to Tennessee. We also note that Defendants have a constitutional right to be present at trial, which Plaintiff does not enjoy.

**\*5** Finally, the last two factors are neutral, as both Plaintiff and Defendants have failed to establish, let alone allege, that any of the witnesses they plan to call or the documentary evidence they plan to use at trial would be unavailable at trial in either this District or the Middle District of Tennessee. In sum, the private factors weigh in favor of transferring this case to the Middle District of Tennessee.

2. Public factors

The public factors we must consider include:

> [1] the enforceability of the judgment; [2] practical considerations that could make the trial easy, expeditious, or inexpensive; [3] the relative administrative difficulty in the two fora resulting from Court congestion; [4] the local interest in deciding local controversies at home; and [5] the familiarity of the trial judge with the applicable state law in diversity cases.

*Stone St.,* 2000 WL 876886, at *3 (quoting *Jumara,* 55 F.3d 879–80). As with the private factors, we find that the balance of the public factors favors transfer.

The second and fourth factors substantially favor Defendants. Most of the decision makers and records involved in Plaintiff's *Monell*-type claim against TransCor are located in the Middle District of Tennessee, as are a majority of the Defendants. The Middle District of Tennessee is therefore in the best position to oversee discovery relating to the bulk of the witnesses, parties, and important documents in this case. [6] Moreover, given that this District is not Plaintiff's home forum, the Middle District of Tennessee has a greater local interest in this controversy, insofar as it involves the alleged unlawful conduct of several of its residents, including a corporation that has its principal place of business within that District's boundaries.

[6] Plaintiff's counsel represented at the hearing that two of Plaintiff's witnesses, PPD Officer Smith and

Plaintiff's treating physician, Dr. Kaplan, currently reside in this District. Any burden imposed upon the Middle District of Tennessee in overseeing discovery with respect to these two witnesses, however, is more than outweighed by the burdens imposed on this Court in overseeing discovery with respect to at least six party witnesses in Tennessee.

The remaining factors are in equipoise. A judgment issued either by this Court or by a federal court in the Middle District of Tennessee would be equally enforceable. Moreover, to the extent that a choice-of-law question arises regarding which state's law governs Plaintiff's common law IIED claim, we note that IIED is not a "particularly complex or unsettled" area of law and that "[j]udges in this district frequently apply foreign law in diversity cases when there is no challenge to venue." *Hatfield, Inc. v. Robocom Sys. Int'l, Inc.,* Civ. A. No. 98–4004,1999 WL 46563, at *2 (E.D.Pa. Jan. 15,1999). [7] Finally, although a factor not worthy of great weight, the relative congestion of the respective courts slightly favors transfer to the extent that Defendants' evidence shows that the average Middle District of Tennessee judge has fewer new cases per year than does the average judge in this District,. *See Leading Edge Logistics, Inc. v. Central Trucking, Inc.,* Civ. A. No. 05–1299, 2005 WL 1417131, at *2 (E.D.Pa. June 16, 2005) (citations omitted).

[7] We also note that Pennsylvania's and Tennessee's respective prima facie IIED cases are virtually identical. *Compare Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 753 (Pa.1998) (requiring (1) "extreme and outrageous conduct" that (2) "intentionally or recklessly causes" (3) "severe emotional distress to another") *with Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997) (requiring that the conduct complained of must "(1) ... be intentional or reckless; (2) ... be so outrageous that it is not tolerated by civilized society; and (3) ... result in serious mental injury").

In sum, the balance of the public factors weighs strongly in favor of transferring this case to the Middle District of Tennessee.

**IV. CONCLUSION**

**\*6** For the foregoing reasons, we find that this District is a proper venue, but that transferring this case to the Middle District of Tennessee is appropriate under 28 U.S.C. § 1404(a). Consequently, Defendants' Motion is denied insofar as it seeks dismissal for improper venue,

but granted insofar as it seeks transfer of venue. An appropriate Order follows.

### ORDER

**AND NOW,** this 23rd day of June, 2009, upon consideration of Defendants' Renewed Motion to Dismiss or Transfer Venue (Docket No. 31), Plaintiff's response and Defendants' reply thereto, and the arguments of counsel at a hearing on this Motion held on June 11, 2009, **IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion for Leave to File a Reply (Docket No. 33) is **GRANTED.**

2. Defendants' Motion to Dismiss (Docket No. 31) is **DENIED** in part and **GRANTED** in part. The Motion is denied to the extent that it seeks dismissal for improper venue, but granted to the extent that it seeks a venue transfer.

3. This action is **TRANSFERRED** to the United States District Court for the Middle District of Tennessee.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1795309

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

2017 WL 4162251
Only the Westlaw citation is currently available.
United States District Court, D.
Maryland, Southern Division.

William Jeffrey KARN, Plaintiff,

v.

PTS OF AMERICA, LLC, Defendants.

Civil Action No. GJH-16-3261
|
Signed September 18, 2017
|
Filed 09/19/2017

## Attorneys and Law Firms

Jay Paul Holland, Timothy Francis Maloney, Alyse
Lauren Prawde, Joseph Greenwald and Laake PA,
Lawrence Roger Holzman, The Holzman Law Firm,
Greenbelt, MD, for Plaintiff.

Eric Matthew Rigatuso, Eccleston and Wolf PC,
Hanover, MD, for Defendants.

## MEMORANDUM OPINION

GEORGE J. HAZEL, United States District Judge

 **\*1** Plaintiff William Jeffrey Karn brings this action
against Defendants PTS of America, LLC d/b/a
Prisoner Transportation of America ("PTS") and
John Does #1-6 (collectively, "Defendants") alleging
various constitutional violations under 42 U.S.C.
§ 1983, violations of Articles 24 and 26 of the
Maryland Declaration of Rights, and state common law
claims, including negligence and intentional infliction
of emotional distress, resulting from PTS's transport
of Karn, a pre-trial detainee, from Maryland to South
Carolina in December 2015. Presently pending before the
Court is Defendant PTS's Partial Motion to Dismiss for
Failure to State a Claim. ECF No. 9.[1] A hearing on the
Motion was held on September 13, 2017. See Loc. R.
105.6 (D. Md. 2016). For the following reasons, the Partial
Motion to Dismiss shall be granted, in part, and denied,
in part. The claims of intentional infliction of emotional
distress; negligent hiring, training, and supervision; the 42
U.S.C. § 1983 claim under the Fourth Amendment; and

both claims under the Maryland Declaration of Rights
shall be dismissed. The 42 U.S.C. § 1983 claim under
the Fourteenth Amendment due process clause shall be
dismissed against PTS but shall proceed against the John
Doe defendants.

[1]     Plaintiff's Complaint asserts a total of eight causes
        of action: Count I: Negligence; Count II: Intentional
        Infliction of Emotional Distress; Count III: Negligent
        Hiring, Training, and Supervision, Count IV: False
        Imprisonment; Count V: Violation of 42 U.S.C.
        § 1983—Unlawful Arrest, Seizure, and Detention;
        Count VI: Violation of 42 U.S.C. § 1983 Mistreatment
        in Custody; Count VII: Violations of Article 24 and
        26 of the Maryland Declaration of Rights Excessive
        Force; and Count VIII: Violations of Article 24 and
        26 of the Maryland Declaration of Rights—Loss
        of Liberty. ECF No. 1 at 9-19. Defendant's Partial
        Motion to Dismiss requests dismissal of Counts II,
        III, IV, V, VI, VII, and VIII. ECF No. 9. Plaintiff
        withdraws Counts IV and VI in his Opposition. See
        ECF No. 14-1 at 1. Thus, this Memorandum Opinion
        will address only Counts II, III, V, VII, and VIII.

## I. BACKGROUND

### A. Factual Background [2]

[2]     Unless stated otherwise, the facts are taken from the
        Complaint and assumed to be true.

William Karn is an adult resident of the State of
Maryland. ECF No 1 ¶ 3. PTS is a Tennessee corporation
and private company that provides extradition and
detainee transportation services. Id. ¶ 4. PTS employs
drivers and guards to transport prisoners and detainees
between jurisdictions. Id. ¶ 5. At all times relevant to this
action, Plaintiff was a pre-trial detainee in the custody of
PTS. See id. ¶ 7.

On or about December 9, 2015, Plaintiff was arrested
in Montgomery County, Maryland for failure to timely
pay child support in Horry County, South Carolina.
ECF No. 1 ¶ 8. Plaintiff waived an extradition hearing
and was taken to a facility in Montgomery County to
await transport to South Carolina. See id. ¶¶ 9-10. On
the night of December 23, 2015, Defendants arrived to
retrieve Plaintiff from the facility. Id. ¶¶ 10-11. Defendants
handcuffed Plaintiff, strapped ankle cuffs on his legs, and
ran a chain link around his midsection. Id. ¶ 12. Plaintiff

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

alleges that the handcuffs were secured so tightly that the pressure on his wrists, nerves, tissue and bones made it difficult for him to open his hands, and that his fingers became numb. *Id.* ¶ 14. Plaintiff informed Defendants of this problem repeatedly, but Defendants ignored him. *Id.* ¶ 15. Defendants escorted Plaintiff out to a white van, and when Karn asked how long it would take to get to South Carolina, Defendants told him not to worry about it and to "just get in the fucking van." *Id.* ¶ 16.

**\*2** When Karn entered the van, there were already fourteen other prisoners inside, some of whom had been travelling for fourteen days at that point. ECF No. 1 ¶ 18. Inside the van, the prisoners were seated on eight-inch metal benches, shoulder to shoulder, with their knees pressed up against a central metal divider. *Id.* ¶¶ 27-28. The prisoners were not secured with seatbelts. *Id.* ¶ 30. Plaintiff would spend the next ten days in this van, traveling through nine different states including Maryland, Virginia, West Virginia, Ohio, Kentucky, Tennessee, Arkansas, and North Carolina, to get to South Carolina. *Id.* ¶ 19. According to Plaintiff, Defendants took a circuitous route that passed through multiple states more than once, *id.* ¶ 20, and involved several side-trips that were "completely unrelated to the transport of the prisoners," including a stop "at an out-of-the-way airport so that PTS could send one guard/driver on vacation." *Id.* ¶ 21. Over the course of the trip, the van travelled to many different jails, dropping off prisoners and picking up new ones. *Id.* ¶ 56. The PTS guards alternated eighteen-hour shifts driving, sometimes reaching "speeds up to 95 miles per hour," and other times apparently "falling asleep at the wheel." *Id.* ¶¶ 24-25.

During the trip, Plaintiff and the other prisoners would "be in the back of the van on the road for 36 hours without respite." ECF No. 1 ¶ 22. Because Defendants did not secure Plaintiff or the other prisoners with seat belts, as the van "careened and bounced its way through the route," the men were thrown around the back of the van, into each other, the metal divider, and the ceiling. *Id.* ¶ 30. According to Plaintiff, these conditions made sleeping impossible. *Id.* ¶ 31. His inability to move or stand up for long periods of time also caused him to develop "painful boils, rashes, and abrasions." *Id.* ¶ 29. Because the windows of the van were blacked out, much of the time was spent in complete darkness. *Id.* ¶ 32. The temperature was warm, and "there was little air" in the compartment. *See id.* ¶ 36.

Access to food and water varied widely, and was subject to the whim of the guards. ECF No. 1 ¶ 34. Typically, every six to eight hours, the guards would stop at a McDonalds and purchase "a small hamburger from the $1.00 menu" and a twelve-ounce bottle of water for each prisoner. *Id.* ¶ 33. This meal schedule was largely inconsistent, however, and at least once, the prisoners were allegedly not given food or water for almost twice the six hour period. *Id.* ¶ 34. Additionally, the guards made minimal effort to control the prisoners, and on more than one occasion, other prisoners stole Plaintiff's food and water, leaving him with nothing to eat or drink. *Id.* ¶ 35. Plaintiff alleges that he was dehydrated for most of the journey, because the twelve-ounce bottle of water was not sufficient. *Id.* ¶ 36.

Some of the men also fought with each other by head-butting and biting one another. ECF No. 1 ¶ 58. To quell this behavior, Defendants would "indiscriminately pepper spray the entire rear compartment" of the van, including Plaintiff, even though he had not been fighting. *Id.* ¶ 59. "Shackled and bound at the waist," Plaintiff was unable to rub his eyes or splash water to rinse his eyes of the pepper spray. *Id.* ¶¶ 40, 59. At the end of one of the thirty-six hour stretches in the van, Plaintiff alleges that he became numb in the legs, which diminished his ability to stand up and exit the van. *Id.* ¶ 41. In response, Defendants pushed Plaintiff out of the van, causing Plaintiff to fall onto his side and injure his shoulder. *Id.* ¶¶ 42-44. Plaintiff was unable to brace his fall because of the shackles and handcuffs. *Id.* ¶ 43. Plaintiff alleges that he made no complaints about this because the guards stood over him "with hands on their weapons," and he was never treated for this injury. *Id.* ¶ 44.

When it came time for the prisoners to urinate or have a bowel movement, Defendants expected the prisoners to urinate "into their empty water bottles." ECF No. 1 ¶ 45-46. However, because the men were shackled, many of them ended up urinating on the van's floor and on themselves. *Id.* ¶ 47. On multiple occasions, Plaintiff and other prisoners also defecated on themselves, because they could not contain their bowel movements any longer. *Id.* ¶¶ 48-49. One particular prisoner seated next to Plaintiff suffered from a form of irritable bowel syndrome, and had "to beg the guards to be permitted to move his bowels." *Id.* ¶ 50. Eventually, Defendants threw a plastic garbage bag in the back of the van and told the prisoner

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

to use it. *Id.* Plaintiff attempted to help the man pull his pants down and use the bag in the crowded space, but these efforts were unsuccessful, and the prisoner defecated everywhere, including on Plaintiff's "leg, arms, clothing, and the floor." *Id.* ¶ 52. Defendants would not allow Plaintiff to bathe or change clothing. *Id.* ¶ 53.

**\*3** Plaintiff alleges that the combination of urine, open feces, vomit, and other body odors in the van "was horrific." ECF No. 1 ¶ 54. The van had allegedly transported "other prisoners in the same circumstances" before Plaintiff, and Defendants did not clean it between prisoners, or for the duration of Plaintiff's journey. *Id.* ¶¶ 53-56. Throughout Plaintiff's transport, Defendants also did not allow him to use a phone to contact his family or friends. *Id.* ¶ 60. Plaintiff alleges that he still suffers from the physical pain, harm, and emotional distress of this experience, and "will require treatment into the foreseeable future." *Id.* ¶¶ 65-66. He states that he continues to "relive[ ] the pain and torment," *id.* ¶ 66, and to date, still experiences "numbness and pain in the fingers of his left hand," *id.* ¶ 39, and pain in his shoulder. *Id.* ¶¶ 44.

### B. Procedural History

Plaintiff filed the instant Complaint against PTS, and six unnamed employees, asserting eight causes of action: Count I: Negligence; Count II: Intentional Infliction of Emotional Distress ("IIED"); Count III: Negligent Hiring, Training, and Supervision; Count IV: False Imprisonment; Count V: Violation of 42 U.S.C. § 1983 – Unlawful Arrest, Seizure, and Detention; Count VI: Violation of 42 U.S.C. § 1983 – Mistreatment in Custody; Count VII: Violations of Article 24 and 26 of the Maryland Declaration of Rights Excessive Force; and Count VIII: Violations of Article 24 and 26 of the Maryland Declaration of Rights—Loss of Liberty. ECF No. 1 at 9-19. Plaintiff seeks judgment against Defendant in "an amount in excess of $75,000.00, plus interest and costs, and punitive damages, plus attorneys' fees, interest and costs." *See id.*

Defendant PTS filed an Answer to Count I, negligence, and a Partial Motion to Dismiss with respect to the remaining counts. In Plaintiff's Opposition, Plaintiff withdrew Count IV, false imprisonment, and Count VI, the Section 1983 claim for mistreatment in custody. *See*

ECF No. 14-1 at 1. Therefore, this Memorandum Opinion will address only Counts II (intentional infliction of emotional distress), III (negligent hiring, training and supervision); V (the Section 1983 claim for unlawful arrest, seizure and detention); VII (Maryland Declaration of Rights Excessive Force); and VIII (Maryland Declaration of Rights Loss of Liberty).

### II. STANDARD OF REVIEW

Defendants may "test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6)." *Prelich v. Med. Res., Inc.,* 813 F. Supp. 2d 654, 660 (D. Md. 2011) (citing *German v. Fox,* 267 Fed.Appx. 231, 233 (4th Cir. 2008)). Motions to dismiss for failure to state a claim do "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Prelich,* 813 F. Supp. 2d at 660 (citing *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999)). To overcome a Rule 12(b)(6) motion, a complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating the sufficiency of the Plaintiff's claims, the Court accepts factual allegations in the complaint as true and construes the factual allegations in the light most favorable to the Plaintiff. *See Albright v. Oliver,* 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.,* 407 F.3d 266, 268 (4th Cir. 2005). However, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009). The court should not grant a motion to dismiss for failure to state a claim for relief unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir. 2001) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50) (1989)).

### III. ANALYSIS

#### A. Intentional Infliction of Emotional Distress

**\*4** To state a common law claim for IIED, Plaintiff must allege that: "(1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) that the emotional distress was severe." *Harris v. Jones,* 281 Md. 560, 566 (1977). In Maryland, an IIED claim is "rarely viable," *Borchers v. Hyrchuk,* 126 Md. App. 10, 19 (1999), and courts have imposed "liability sparingly and ... limited the tort to situations where the 'wounds are truly severe and incapable of healing themselves.' " *Lee v. Queen Anne's Cty. Office of Sheriff,* No. CIV.A. RDB-13-672, 2014 WL 476233, at \*16 (D. Md. Feb. 5, 2014) (quoting *Solis v. Prince George's Cty.,* 153 F. Supp. 2d 793, 804 (D. Md. 2001)). Accordingly, an IIED claim is subject to a heightened pleading standard, and each element of the claim must be "pled with specificity." *Washington v. Maynard,* No. CV GLR-13-3767, 2016 WL 865359, at \*10 (D. Md. Mar. 7, 2016) (citing *Bagwell v. Peninsula Reg'l Med. Ctr.,* 665 A.2d 297, 319 (Md. Ct. Spec. App. 1995); *Foor v. Juvenile Servs. Admin.,* 552 A.2d 947, 959 (Md. Ct. Spec. App. 1989)). Defendant contends that Plaintiff has not alleged facts sufficient to satisfy the first, second and fourth elements of IIED.

To adequately plead the first element of an IIED claim, a plaintiff must allege that defendant either "desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow." *Brengle v. Greenbelt Homes, Inc.,* 804 F. Supp. 2d 447, 452 (D. Md. 2011) (quoting *Foor,* 78 Md. App. at 175).

As to the second element, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Washington,* 2016 WL 865359, at \*11 (citing *Harris,* 380 A.2d at 614). "The conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Id.* (citing *Hamilton v. Ford Motor Credit Co.,* 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986)). In assessing this element, "courts should consider multiple factors, including the context in which the conduct occurred, the personality of the plaintiff and [his] susceptibility to emotional distress, and the relationship between the defendant and plaintiff." *Brengle,* 804 F. Supp. 2d at 453. In particular, "the extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests." *Harris,* 380 A.2d at 616.

With respect to the fourth element, the plaintiff must show that he suffered "a severely disabling emotional response to the defendant's conduct, and that the distress was so severe that no reasonable man could be expected to endure it." *Solis v. Prince George's Cty.,* 153 F. Supp. 2d 793, 804 (D. Md. 2001) (quoting *Thacker v. City of Hyattsville,* 762 A.2d 172, 197 (Md. Ct. Spec. App. 2000)). To be severe, "emotional distress need not produce total emotional disablement, but it must render the plaintiff unable to function and tend to necessary matters." *Washington,* 2016 WL 865359, at \*11 (citing *Reagan v. Rider,* 70 Md. App. 503, 512 (1987)). To prevail, the plaintiff must show the "truly devastating effect of the conduct [he was] subjected to." *Kashaka v. Baltimore Cty., Maryland,* 450 F. Supp. 2d 610, 620 (D. Md. 2006) (quoting *Pemberton v. Bethlehem Steel Corp.,* 66 Md.App. 133 (Md. 1986)).

Here, Plaintiff has pleaded sufficient factual matter as to the first three elements of IIED but not the fourth. Taking the allegations in the Complaint as true, Plaintiff has alleged that PTS and its employees knowingly created and perpetuated a situation that was dehumanizing and outrageous, causing Plaintiff emotional distress. Plaintiff alleges that he was forced to sit shoulder to shoulder with fourteen other men, chained at the hands, feet, and waist, on metal benches in the back of a van for ten days. ECF No. 1 ¶¶ 18-19, 27-28, 58. Plaintiff was required to sit in the back of this van for thirty-six hour periods of time "without respite." *Id.* ¶ 22. At most, Plaintiff was provided a small hamburger and a twelve-ounce bottle of water every six to eight hours. *Id.* ¶¶ 33-35. In response to fighting among others, Plaintiff was subjected to bursts of pepper spray in a confined space, and subsequently denied medical treatment. *Id.* ¶ 59. Plaintiff also told the guards that his shackles were too tight, but these complaints were ignored, and when Plaintiff was unable to stand, the guards pushed him out of the van, injuring his shoulder. ¶¶ 15, 38-39, 41-42. The PTS guards expressly expected the prisoners to openly urinate into their empty water bottles and defecate into plastic bags. *Id.* ¶ 45-49. According to the Complaint, when Plaintiff attempted to help a sick prisoner defecate into a bag, the feces spilled all over him

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

and the floor, and the guards did not allow Plaintiff to bathe or change clothing. ¶¶ 52-53.

**\*5** Drawing all reasonable inferences in favor of Plaintiff, Defendants knew that emotional distress would result from their conduct or acted in reckless disregard of the high probability that it would occur, and the conduct went "beyond all possible bounds of decency, and ... [was] atrocious, and utterly intolerable in a civilized community." *Harris v. Jones,* 281 Md. at 567. Bolstering this conclusion is the fact that this conduct occurred while Plaintiff was in the custody and control of Defendants for ten days. *Cf. Gray v. Kern,* 124 F. Supp. 3d 600, 616 (D. Md. 2015) (noting that "where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized"). Defendants assumed a position of authority over Plaintiff, and were responsible for his health and safety during transport. The alleged abuse of this power, and the degradation of Plaintiff that ensued, was outrageous.

Nevertheless, while Plaintiff has alleged that he "relives the pain and torment to this date ... and he will require treatment into the foreseeable future," ECF No. 1 ¶ 66, and "continues to suffer humiliation and embarrassment, and severe and extreme emotional distress," *id.* ¶ 79, such allegations are insufficient to plead "a severely disabling emotional response to the defendant's conduct ... so severe that no reasonable man could be expected to endure it." *Thacker v. City of Hyattsville,* 762 A.2d 172, 197 (Md. Ct. Spec. App. 2000). Indeed, such conclusory statements of emotional distress are routinely rejected by Maryland courts for purposes of IIED claims. *See. e.g., Templeton v. First Tenn. Bank N.A.,* No. CIV.WDQ-09-3280, 2010 WL 2292493, at \*5 (D. Md. June 3, 2010), *aff'd in part, vacated in part on other grounds,* 424 Fed.Appx. 249 (4th Cir. 2011) (finding allegations that plaintiff suffered "severe mental anxiety" and "extreme emotional distress for which she incurred medical costs" were insufficient to constitute severe distress); *Griffin v. Clark,* No. RWT 11-2461, 2012 WL 4341677, at \*3 (D. Md. Sept. 20, 2012) (dismissing IIED claim and noting that "Maryland courts have found that mere embarrassment, public humiliation, feelings of inferiority, or shame do not rise to the level of severe emotional distress."); *Takacs v. Fiore,* 473 F. Supp. 2d 647, 652 (D. Md. 2007) (dismissing IIED claim where plaintiff did "not allege that she has been unable to function on a daily basis, even if her functioning is

presumably affected by her psychological and physical distress."). Here, Plaintiff has not, for example, alleged that he requires psychological treatment, that he was ever hospitalized for his mental anguish, or that he is no longer able to work or function normally. For this reason, the IIED claim must be dismissed.

## B. Negligent Hiring, Training, and Supervision

Maryland has recognized that an employer has an "obligation to the public to use due care in selecting and retaining only competent and careful employees." *Jarvis v. Securitas Sec. Servs. USA, Inc.,* No. 11-CV-00654-AW, 2012 WL 527597, at \*6 (D. Md. Feb. 16, 2012), *aff'd sub nom., Jarvis v. Contractor Securitas Sec.,* 474 Fed.Appx. 271 (4th Cir. 2012) (citing *Henley v. Prince George's Cty.,* 60 Md. App. 24 (Md. Ct. Spec. App. 1984)). To state a common law claim for negligent hiring, training, or supervision, Plaintiff must allege: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring, [training, or supervising the employee] ... as the approximate cause of plaintiff's injuries." *Jarvis,* 2012 WL 527597, at \*5 (citing *Latty v. St. Joseph's Soc. of Sacred Heart, Inc.,* 198 Md. App. 254, 272 (Md. Ct. Spec. App. 2011)); *see also Bryant v. Better Bus. Bureau,* 923 F. Supp. 720, 751 (D. Md. 1996) (noting that for a negligent training and supervision claim, the plaintiff must allege that employer knew or should have known of the employee's "conduct or general character which would have caused a prudent employer in these circumstances to have taken action.").

**\*6** "Under Maryland law, an employer's liability in this regard is not to be reckoned simply by the happening of the injurious event. Rather, there must be a showing that the employer failed to use reasonable care in making inquiries about the potential employee or in supervising or training the employee." *Gay v. United States,* 739 F. Supp. 275, 277 (D. Md. 1990) (citing *Cramer v. Housing Opportunities Commission,* 304 Md. 705, 501 A.2d 35 (1985)). Here, while Plaintiff has alleged the existence of an employment relationship between the guards or drivers and PTS, and incompetent conduct that injured Plaintiff, the Complaint is devoid of actual facts about PTS's training and supervision, or about PTS's selection

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

of any particular employee nor does Plaintiff allege prior incidents of misconduct involving these guards or drivers that would have given Defendants actual or constructive notice of their incompetence. Thus, *Keene v. Hawkins,* No. 2:13-CV-49, 2015 WL 7180695, at *1 (N.D.W. Va. Feb. 20, 2015), relied on by Plaintiff, is distinguishable. There, the plaintiff alleged five prior incidents of misconduct by the officer at issue, placing the defendant county on notice of the officer's tendency towards excessive force. *See id.* at *1, 6. By contrast, no such allegations are made here. [3]

[3]    To the extent Plaintiff contends that the opportunity to conduct discovery would lead to "attestations from prisoners previously transported by Defendant," ECF No. 14-1 at 12, Plaintiff is asking the Court to grant him the keys to discovery on this issue based upon conclusory allegations. Such an approach is clearly inconsistent with the dictates of *Iqbal,* and has been routinely rejected by courts. *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (noting that the Federal Rules of Civil Procedure do "not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *see also Young v. CitiMortgage, Inc.,* No. 5:12CV079, 2013 WL 3336750, at *12 (W.D. Va. July 2, 2013) (noting that "[t]he discovery process is not a fishing expedition, and a party is not entitled to discovery simply in hope that something will turn up.") (citing *Riddick v. United States,* No. CIV.A. 2:04CV278, 2005 WL 1667757, at *7 (E.D. Va. July 6, 2005)) (internal citations and alterations omitted).

In sum, Plaintiff's allegations are insufficient to sustain a negligent hiring, training, or supervision claim. *See Jarvis,* 2012 WL 527597, at *6 (dismissing negligent hiring claim where there were no allegations that "the security guard was unqualified or incompetent at the time Defendant hired him" or that would support "the contention that Defendant engaged in negligent hiring practices"); *Silver v. Wells Fargo Bank, N.A.,* No. CV MJG-16-382, 2017 WL 2833254, at *11 (D. Md. June 30, 2017) (dismissing negligent hiring and retention claim where complaint pointed "only to the injurious event" as evidence of negligent supervision). Therefore, the negligent hiring, training, and supervision claim is also dismissed.

## C. 42 U.S.C. § 1983—Unlawful Arrest, Seizure, and Detention

In Count V, Plaintiff brings a claim against the individual defendants and PTS pursuant to 42 U.S.C. § 1983,

claiming a violation of the Fourth and Fourteenth Amendments. ECF No. 1 at 14. Section 1983 states in pertinent part that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ... for redress." 42 U.S.C. § 1983. To state a claim under Section 1983, Plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988).

"The traditional definition of acting under color of state law requires that the defendant in a 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Jarvis,* 2012 WL 527597, at *3 (citing *Atkins,* 487 U.S. at 49). To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible ... [and] the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (citing *Lugar v. Edmondson,* 457 U.S. 922, 937 (1982)). Here, as a "private corporation involved in the custody and control of prisoners," PTS performs "a traditional state function" and therefore may be held liable under Section 1983. *See Bain v. Transcor Am., LLC,* No. 3:08-0656, 2009 WL 4348598, at *6, n.2 (M.D. Tenn. Nov. 24, 2009) (imposing Section 1983 liability on private company that transported prison inmates); *Myers v. Transcor Am., LLC,* No. 3:08-0295, 2010 WL 3619831, at *16 (M.D. Tenn. Sept. 9, 2010) (noting that "TransCor's liability under Section 1983 is akin to the liability of a municipality under Section 1983.") (compiling cases). [4]

[4]    Defendant PTS does not dispute that it is a municipality for purposes of Section 1983 liability in this case. *See* ECF No. 15 at 7.

**\*7** However, it is well-recognized that there is no doctrine of *respondeat superior* in Section 1983 actions, and thus, PTS cannot be held directly liable for the alleged unconstitutional acts of its employees. *See Chin v. City of Baltimore,* 241 F. Supp. 2d 546, 549 (D. Md. 2003) (citing *Monell v. New York Department of Social Services,* 436 U.S. 658, 694 (1978)). Rather, Plaintiff can proceed only

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

against the PTS employees in their personal capacities, or seek to establish that the employees were acting pursuant to an official policy or custom of PTS.

Plaintiff alleges a claim of "unlawful arrest, seizure, and detention" under Section 1983 in Count V, stating that "Defendants deprived Mr. Karn of his rights under the Fourth and Fourteenth Amendment ..." *See* ECF No. 1 at 14. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Bixler v. Harris,* No. CIV. WDQ-12-1650, 2013 WL 2422892, at *5 (D. Md. June 3, 2013) (citing *Brower v. Cnty. of Inyo,* 489 U.S. 593, 597 (1989)). Importantly, however, the Fourth Circuit has "rejected any concept of a continuing seizure rule," holding that "the Fourth Amendment applies to the initial decision to detain an accused, [but] not to the conditions of confinement after that decision has been made." *Robles v. Prince George's Cty., Md.,* 302 F.3d 262, 268 (4th Cir. 2002) (citing *Riley v. Dorton,* 115 F.3d 1159, 1163)). Thus, "[o]nce the single act of detaining an individual has been accomplished, the [Fourth] Amendment ceases to apply." *Id.* Claims regarding the subsequent use of excessive force and conditions of confinement are therefore governed by the Fourteenth Amendment's Due Process Clause.

Here, Plaintiff does not dispute that he was arrested pursuant to a lawful warrant for failure to pay child support. *See* ECF No. 1 ¶ 8. Plaintiff waived an extradition hearing and was therefore lawfully extradited to South Carolina. *Id.* ¶ 9. Hence, Plaintiff fails to state a claim entitling him to relief for an unlawful seizure under the Fourth Amendment. *See. e.g., Davis v. Wright,* No. 3:14CV161, 2014 WL 5361335, at *2 (W.D.N.C. Oct. 21, 2014) (dismissing Fourth Amendment claim and noting that "[s]ince Plaintiff's requests to use the bathroom began after she was arrested and was about to enter the BAT Mobile for further processing, the alleged denial of those requests must be evaluated under the Due Process Clause of the Fourteenth Amendment, not the Fourth Amendment."); *Walters v. Prince George's Cty.,* No. CIV.A. AW-08-711, 2010 WL 2858442, at *6 (D. Md. July 19, 2010) (granting summary judgment on Fourth Amendment claim under § 1983, noting that "Plaintiff complains of events that occurred after Defendants ...

took custody of her, when the Fourth Amendment had ceased to apply because the single act of detaining Plaintiff had already been completed and she was already in police custody"). Thus, to the extent Plaintiff raises a claim under the Fourth Amendment, those claims must be dismissed as to all Defendants.

While Plaintiff fails to state a claim under the Fourth Amendment—Plaintiff does, however, state a claim under the Fourteenth Amendment against John Does #1-6 in their personal capacities. [5] Claims challenging the "conditions of confinement imposed upon pretrial detainees are examined under the Due Process Clause of the Fourteenth Amendment." *Oladokun v. Maryland,* No. CIV.A. DKC-14-463, 2014 WL 7014511, at *7 (D. Md. Dec. 10, 2014). [6]

[5]    As discussed during the hearing on the Motion, because Defendant has not moved to dismiss Count I, this case would move forward into discovery regardless of the Court's rulings on the pending Motion. Thus, Plaintiff will have the opportunity, through discovery, to identify the individual drivers who are currently identified as John Doe defendants, amend the complaint to describe what each did and serve them with the Amended Complaint. For now, the Court will address whether their collective conduct could state a claim, recognizing that the Defendant will be permitted to bring a renewed Motion based on the specific conduct ascribed to individual defendants, if appropriate.

[6]    The Court notes that Count VI, labeled "42 U.S.C. § 1983 – Mistreatment in Custody," more clearly addressed the allegations the Court is relying on as its basis for not dismissing Count V. *See* ECF No. 1 at 15. For reasons explained during the hearing, however, Plaintiff has withdrawn Count VI, but the Court finds that Count V sufficiently alleges a Fourteenth Amendment claim.

**\*8** The constitutional protections guaranteed to a pretrial detainee under the Fourteenth Amendment "are co-extensive with those provided to convicted prisoners by the Eighth Amendment." *Christopher v. Warden Assistant Warden of Baltimore City Det. Ctr.,* No. CIV.A. JFM-13-1057, 2013 WL 1701464, at *1 (D. Md. Apr. 17, 2013) (citing *Bell v. Wolfish* 441 U.S. 520, 535 (1979)); *see also Patten v. Nichols,* 274 F.3d 829, 834 (4th Cir. 2001) (noting that "the Fourteenth Amendment rights of pre-trial detainees 'are at least as

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

great as the Eighth Amendment protections available to a convicted prisoner.' ") (quoting *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983)). Thus, "pretrial detainees have a clearly established right to the Eighth Amendment's restraints on 'cruel and unusual punishments' by prison officials...." *Sleeper v. City of Richmond Va.,* No. 3:12CV441-HEH, 2012 WL 3555412, at *6 (E.D. Va. Aug. 16, 2012). In determining whether conditions of confinement constitute "cruel and unusual punishment," the Court employs a two-prong test, considering first "whether the conditions of confinement objectively inflict harm that is sufficiently serious to deprive a prisoner of minimal civilized necessities." *Id.* at *6 (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)); *see also Roberts v. Taniguchi,* No. CIV.A. JKB-12-1187, 2012 WL 5252288, at *5 (D. Md. Oct. 23, 2012) (describing two-prong test). In this regard, prison officials are under a duty "to furnish humane conditions of confinement, including provision of adequate food, clothing, shelter, and medical care." *Sleeper,* 2012 WL 3555412, at *6 (citing *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). Second, the Court determines "whether prison officials subjectively acted with 'deliberate indifference' to inmate health or safety,' meaning that they actually knew of and disregarded the inhumane nature of the confinement." *Id.* (citing *Farmer,* 511 U.S. at 837). Further, Plaintiff must allege an injury that is "more than de minimis." *Robles v. Prince George's Cty. Maryland,* 302 F.3d 262, 269 (4th Cir. 2002).

The factual allegations in the Complaint demonstrate conditions in the prison van that were cruel and unusual. The rear compartment where Plaintiff was housed contained fourteen other men, many of whom openly urinated and defecated inside of the van throughout the course of the trip. While attempting to help another prisoner, Plaintiff got feces on his leg, arms and clothing and was not permitted to bathe or change clothes. Additionally, no efforts were made to clean the van of these unsanitary conditions, and thus, Plaintiff sat in a windowless, warm van, among feces and other bodily fluids, for ten continuous days. It is a "settled rule that housing inmates in a grossly overcrowded and unsanitary facility violates the inmates' rights to be free from cruel and unusual punishments." *Brown v. Mitchell,* 308 F. Supp. 2d 682, 693 (E.D. Va. 2004) (citing *Wilson v. Seiter,* 501 U.S. 294 (1991); *Strickler v. Waters.* 989 F.2d 1375 (4th Cir. 1993)); *see Dawson v. Kendrick,* 527 F. Supp. 1252, 1288 (S.D.W. Va. 1981) (finding that inadequate plumbing, failure to provide functioning lighting fixtures,

and denial of clean bedding and clothing constituted constitutional violations).

In addition, Plaintiff has alleged that he was forced to sit in darkness for much of the journey, surrounded by metal on all sides, and denied clean clothing for ten days. The drivers took 18 hour shifts, often began to fall asleep at the wheel and drove at speeds up to 95 miles per hour. Scuffles between prisoners were not addressed other than by the indiscriminate spraying of pepper spray into the back of the van. For the duration of the trip, Plaintiff was shackled at the hands, torso, and ankles. As Plaintiff has alleged, the restraints were too tight, causing him to lose sensation in his fingers. Plaintiff's cries went ignored and to date, Plaintiff still suffers numbness in his hands. When Plaintiff was unable to exit the van, the PTS guards pushed him out onto the ground, injuring Plaintiff's shoulder. Plaintiff still experiences physical pain in his shoulder. Such injuries are more than de minimis, and support a claim for a Fourteenth Amendment violation. *See Robles v. Prince George's Cty., Maryland,* 302 F.3d 262, 270 (4th Cir. 2002) (finding Fourteenth Amendment due process violation of pretrial detainee who was "tied up in a dark and deserted location in the middle of the night," and noting that "any reasonable person would have been upset by what happened here.... The resulting injury was more than de minimis"). [7]

[7]     Both sides have cited the Court to a list of cases, mostly from district court judges, supporting their respective positions on whether the conditions alleged support a Fourteenth Amendment claim. *Compare Wright v. J&S Extradition Services, LLC, et al.,* No. 3:11-0464, 2012 WL 1681812 (M.D. Tenn. May 11, 2012) (finding plaintiff did not state a claim where during transport he was shackled, not allowed to use bathroom, not allowed to bathe and his high blood pressure was not attended to), *Jensen v. Jorgenson,* No. Civ. 03-4200, 2005 WL 2412379 (D.S.D. Sept. 29, 2005) (granting motion to dismiss where plaintiff alleged being chained to other prisoners and not being allowed to use the restroom for 12 hours) *with Otero v. Catalogne,* C.A. 08-282, 2010 U.S. Dist. LEXIS 102160, 2010 WL 3883444 (W.D. Penn. Sept. 28, 2010) (allowing claim to move forward against driver of prisoner transport vehicle who was falling asleep and driving recklessly); *Avery v. Extradition Transp. Of Am.,* CV 11-00153-M-DWM-JCL, 2012 U.S. Dist. LEXIS 186588, 2012 WL 7017862 (D. Mont. Nov. 28, 2012) (granting default judgment in

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

favor of plaintiff who alleged an Eighth Amendment violation where plaintiff was shackled continuously and deprived of adequate sleeping facilities, restroom facilities, and showers for at least six days). It is difficult to extrapolate a consistent pattern from these holdings other than to note that they are fact specific and reflect a difference of opinion among judges in different jurisdictions.

**\*9** With regard to Defendants' culpable state of mind drawing all reasonable inferences in Plaintiff's favor, the guards and drivers had actual knowledge of these conditions, as they are alleged to have required the prisoners to urinate in water bottles and defecate in plastic bags. The guards and drivers are alleged to have pepper sprayed the entire rear compartment of the van, and subsequently denied medical treatment to the prisoners. Indeed, they sat in the front seat and bore witness to these events over the course of a week and a half. Thus, Plaintiff has alleged sufficient facts to state a claim for unconstitutional conditions of confinement under the Fourteenth Amendment against John Does #1-6.

With respect to Defendant PTS, however, under *Monell v. Dep't of Soc. Serv. of City of New York,* 436 U.S. 658 (1978), a § 1983 cause of action may sustain against a municipality only where execution of the government's unconstitutional policy or custom causes a plaintiff injury. *Lee,* 2014 WL 476233, at \*10; *see also Walker v. Prince George's Co., Md.,* 575 F.3d 426, 431 (4th Cir. 2009) (stating that the liability of the municipality only arises where the employees' unconstitutional actions are taken in furtherance of a municipal policy or custom); *Bain v. Transcor Am., LLC,* No. 3:08-0656, 2009 WL 4348598, at \*6-7 (M.D. Tenn. Nov. 24, 2009) (discussing *Monell* claim against private company that provided prisoner and detainee transportation services). To hold a municipality liable for an unconstitutional policy or custom, plaintiff must allege liability "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.' " *Lytle v. Doyle,* 326 F.3d 463, 471 (4th Cir. 2003) (internal citations omitted).

Because Plaintiff's Complaint is devoid of factual allegations from which the Court could reasonably infer the existence of a written policy, a policy established by custom, or a policy established by negligent training and supervision, Plaintiff has failed to state a 42 U.S.C. § 1983 claim against Defendant PTS in Count V of the Complaint. *See Miller v. Hamm,* Civ. No. CCB-10-243, 2011 WL 9185, at \*14 (D. Md. Jan. 3, 2011) (dismissing a plaintiff's § 1983 claim against defendants in their official capacity where the plaintiff "purports to identify several policies, customs, and practices engaged in by the [Defendants] that causally contributed to his constitutional violations, [but] these allegations amount to no more than conclusory statements that are not sufficient to establish a plausible claim for relief"). Indeed, Plaintiff's Complaint appears to be limited to a single experience, at a particular time, with a particular set of guards. [8] Accordingly, Count V as to PTS is dismissed.

[8]     During the Motion hearing, counsel for Plaintiff presented the Court with a list of similar allegations against PTS employees; however, those allegations were not included in the Complaint and will, therefore, not be considered for purposes of this Motion.

### D. Violations of Article 24 and 26 of the Maryland Declaration of Rights —Excessive Force and Loss of Liberty

Finally, as to Plaintiff's Articles 24 and 26 claims, "the cases are legion in which Maryland Courts have construed Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution," *Strickland v. Carroll Cty., Md.,* No. CIV.A. ELH-11-00622, 2012 WL 401075, at \*23 (D. Md. Feb. 7, 2012) (compiling cases), and Article 24 is the state analog to the Fourteenth Amendment Due Process Clause. *See Lee,* 2014 WL 476233, at \*15 (noting that Articles 24 and 26 are the state analog to the federal Fourth and Fourteenth Amendments, and they are analyzed *in pari materia).* Moreover, in evaluating claims under Article 24 and Article 26, "Supreme Court decisions with regard to those amendments are particularly persuasive." *Widgeon v. Eastern Shore Hospital Center,* 300 Md. 520, 533 (1984). But Maryland courts have recognized that relief for violations of the U.S. Constitution do not necessarily warrant relief under the Maryland Declaration of Rights. *See Manikhi v. Mass Transit Admin.,* 360 Md. 333, 361-62 (2000) (citing *DiPino v. Davis,* 354 Md. 18, 50 (1999) ("[T]he right of recovery for Federal violations arises from statute—§ 1983—whereas the redress for State violations

Karn v. PTS of America, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4162251

is through a common law action for damages."); *see also Widgeon,* 300 Md. at 537-538 ("we hold only that where an individual is deprived of his liberty or property interest in violation of Articles 24 and 26, he may enforce those rights by bringing a *common law action for damages*") (emphasis added); *Dyer v. Maryland State Board of Education,* 187 F. Supp. 3d 599, 614 n.23 (D. Md. 2016) (noting that Article 24 implicates a narrower class of defendants than § 1983).

**\*10** Liability for constitutional violations under statute (*i.e.,* § 1983) attaches to those acting "under color of law," whereas federal non-statutory constitutional claims may not be pursued against private actors. *See Correctional Services Corp. v. Malesko,* 534 U.S. 61, 71 (2001) (holding that plaintiff may not bring *Bivens* action against private prison even if prison was acting "under color of federal law"). The Fourth Circuit has also recognized the need to restrain the liability of private actors under judicially-created constitutional remedies, like *Bivens,* as compared to § 1983, which is a "congressional enactment that expressly creates liability" for those acting under color of law. *See Holly v. Scott,* 434 F.3d 287, 292 (4th Cir. 2006). As the Fourth Circuit stated, "[t]here is ample reason to be even more cautious about imputing liability to private actors under *Bivens* than under § 1983." Id.

Likewise, Maryland courts have acknowledged that plaintiff's may only pursue state constitutional claims against "public officials" or "government agents." [9] *See Estate of Jones v. NMS Health Care of Hyattsville, LLC,* 903 F. Supp. 2d 232, 239 (D. Md. 2012) ("Although a plaintiff may bring a common law cause of action under [Article 24] ... he can only do so against "public officials" or "government agents") (internal citation omitted); *see*

*also Manikhi,* 360 Md. at 363 ("Maryland Constitutional provisions have the more narrow focus of protecting citizens from certain unlawful acts committed by government officials. Indeed, *only* government agents can commit these kinds of Constitutional transgressions.") (emphasis in original and citation omitted). Therefore, because neither PTS nor John Does #1-6 are public officials or government agents, they are not subject to claims under Article 24 and Article 26 of the Maryland Declaration of Rights. [10]

[9] Plaintiff introduces general concepts of agency law to suggest that the Defendants, acting under contract with the State, are liable as government agents. *See* ECF No. 14-1 at 17 (citing *Wood v. Walton,* 855 F. Supp. 2d 494, 503 n.25 (D. Md. 2012). This analysis is not directly applicable to whether the Defendants, acting 'under color of law' for purposes of § 1983 liability are also liable under judicially-created constitutional remedies.

[10] In addition to the analysis above, the Court's dismissal of the Plaintiff's Fourth Amendment claim under Section § 1983 in Count V precludes the Article 26 claim in Count VII.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Partial Motion to Dismiss, ECF No. 9, is granted, in part, and denied, in part. A separate Order shall issue.

### All Citations

Not Reported in Fed. Supp., 2017 WL 4162251

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 87616
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Rebecca LAREW, Plaintiff,

v.

Andrew LAREW et al., Defendants.

No. 11 Civ. 5771(BSJ)(GWG).
|
Jan. 10, 2012.

*OPINION AND ORDER*

[GABRIEL W. GORENSTEIN](), United States Magistrate
Judge.

**\*1** Plaintiff Rebecca Larew ("Rebecca") has brought suit
against her former husband Andrew Larew ("Andrew");
Tony Fiorito; John Funiciello; Christine Wojcik;
Alan Doyle; Charles Sangster; John Shannon; Paula
Deckman; Central New York Associates, LLC ("CNY");
Atrium Associates, LLC ("Atrium"); 224 Harrison
Associates, LLC ("Harrison"); Armory Associates, LLC
("Armory"); 65–35 Queens Associates, LLC ("Queens");
460 North Franklin Street Associates, LLC ("Franklin");
1401 Erie Boulevard East, LLC ("Erie"); Vinegar
Hill, LLC ("Vinegar Hill"); Brittonfield Associates,
LLC ("Bnttonfield"); Soundview Real Estate Partners
("Soundview"); and Larew, Doyle & Associates, LLC
("LDA") (collectively, "the defendants") pursuant to the
Racketeer Influenced and Corrupt Organizations Act
("RICO"), [18 U.S.C. § 1961 *et seq.,*]() and state law. The
defendants have filed a motion pursuant to [28 U.S.C. §
1404(a)]() seeking to transfer the case to the United States
District Court for the Northern District of New York. For
the following reasons, defendants' motion is granted.

## I. *BACKGROUND*

### A. *Procedural History*
This action started when plaintiff filed a complaint in
the Supreme Court of the State of New York, County
of New York. *See* Summons and Complaint, filed July
18, 2011 (annexed as Ex. A to Notice of Removal, filed
Aug. 18, 2011 (Docket # 1) ("Notice of Removal"))

("Compl."). The defendants removed the case to United
States District Court for the Southern District of New
York (the "Southern District"). *See* Notice of Removal.
Shortly thereafter, the defendants filed the instant motion
seeking a transfer of the action to the United States
District Court for the Northern District of New York (the
"Northern District"). [1]

[1]     *See* Notice of Motion to Change Venue to the District
        Court for the Northern District of New York, filed
        Sept. 8, 2011 (Docket # 23); Memorandum of Law
        in Support of Defendants' Motion to Change Venue
        to the District Court for the Northern District of
        New York, filed Sept. 8, 2011 (Docket # 24) ("Def.
        Mem. of Law"); Affidavit of Anthony F. Fiorito,
        filed Sept. 8, 2011 (Docket # 25) ("Fiorito Aff.").
        Plaintiff submitted papers in opposition, *see* Affidavit
        of Rebecca Larew, filed Nov. 1, 2011 (Docket #
        49) ("Rebecca Aff."); Declaration of Richard Freeth
        in Support of Plaintiff's Opposition to the Motion
        for Change of Venue, filed Nov. 1, 2011 (Docket
        # 50) ("Freeth Decl."); Opposition to Motion to
        Change Venue to the District Court for the Northern
        District of New York, filed Nov. 1, 2011 (Docket #
        51) ("Opp.Mem."), and defendants submitted reply
        papers, *see* Reply Memorandum of Law in Further
        Support of Defendants' Motion to Transfer Venue,
        filed Nov. 14, 2011 (Docket # 59) ("Reply"); Affidavit
        of Andrew Larew, filed Nov. 14, 2011 (Docket # 60)
        ("Andrew Aff.").

### B. *Facts Relevant to Venue*

#### 1. *Allegations in the Complaint*
The complaint alleges that defendants have acted as
a criminal organization to deprive Rebecca of money
which was awarded to her in her divorce action against
Andrew in Connecticut state court. *See* Compl. ¶¶ 3, 5,
41. Specifically, Rebecca argues that Andrew and his co-
defendants conspired to hide his assets, thereby lowering
the amount he would have to pay under the court-ordered
support agreement in their divorce proceeding. *See id.* ¶¶ 1,
3, 4, 42, 48, 55. The complaint asserts the following claims:
(1) RICO; (2) fraud; (3) conversion; (4) violation of the
New York State Debtor and Creditor Law; and (5) "prima
facie tort—economic injury." *See* Compl. ¶¶ 86–118.

#### 2. *The Parties*
Rebecca is a resident of Southport, Connecticut. *Id.* ¶
7. At the time of the filing of her opposition papers on

this motion, Rebecca's sole income was a $5,500 monthly support payment, which was scheduled to end on October 20, 2011. Rebecca Aff. ¶ 3. While Rebecca states that she is a "divorced stay-at-home mother," *id.,* Andrew was awarded "sole legal and physical custody" of their children on July 1, 2011, Andrew Aff. ¶¶ 4, 5.

**\*2** Andrew is a "real estate developer with interests throughout New York State." Compl. ¶ 8. He is currently married to defendant Wojcik. *Id.* ¶ 11. Andrew and Wojcik currently reside in New York, New York, *id.* ¶¶ 8, 11, in the Southern District, although they did not live there during the time period of most of the events in the complaint, *see* Andrew Aff. ¶ 7. Defendants Fiorito and Furriciello are friends and business associates of Andrew's. Compl. ¶¶ 9, 10. Funiciello resides in Baldwinsville, New York, *id.* ¶ 10, which is located in the Northern District. Fiorito resides in Liverpool, New York, Fiorito Aff. ¶ 3, which is also located in the Northern District. Defendant Doyle is a friend and business associate of Andrew's. Compl. ¶ 12. His business address is in Providence, Rhode Island, *id.,* though he has a business based in New York County in the Southern District, *see* Freeth Decl. ¶ 4. Defendant Sangster is a business partner of Andrew's. Compl. ¶ 13. He resides in Manlius, New York, *id.,* which is in the Northern District. Defendant Shannon is an accountant for Andrew. *Id.* ¶ 14. His last known business address was in Oneida, New York, *id.,* which is also in the Northern District. Defendant Deckman is another accountant for Andrew. *Id* ¶ 15. Her principal place of business is in Syracuse, New York, *id.,* which is also in the Northern District.

Defendants CNY, Atrium, Harrison, Armory, Queens, Franklin, Erie, Vinegar Hill, and Brittonfield are New York limited liability companies. *Id.* ¶¶ 16–24. Their principal places of business are in Syracuse, New York, *id.,* in the Northern District. Defendant Soundview is a Delaware limited liability company. *Id.* ¶ 25. Its principal place of business is in Stamford, Connecticut. *Id.* Defendant LDA is a New York limited liability company. *Id.* ¶ 26. Its principal place of business is in New York, New York, *id.,* which is in the Southern District,

Defendants Atrium, Harrison, Armory, Vinegar Hill, Franklin, Erie, and Queens are single purpose entities each of which "owns a single project." Fiorito Aff. ¶ 13. They keep their books and records, including financial information and official corporate records, in Syracuse,

New York, Fiorito Aff. ¶ 6, which is in the Northern District. They are managed by a management company, Partnership Properties, which also has its principal office in Syracuse, New York, and keeps its books and records there. *Id.* ¶¶ 7–10. Defendant Vinegar Hill owns property in Oswego, New York, *id.* ¶ 13(d), which is located in the Northern District. Defendant Brittonfield owns property in Dewitt, New York, *id.* ¶ 69, which is also located in the Northern District. Defendants Atrium, Harrison, Armory, Franklin, and Erie each own property in Syracuse, New York, Fiorito Aff. ¶¶ 13(a)-(c), (e), (f), in the Northern District. Queens owns a building in Queens, New York, *id* . ¶ 13(g), which is located in the Eastern District of New York. Defendant LDA owns property in Killington, Vermont. Compl. ¶ 70.

## II. *discussion*

A. *Law Governing Motions to Transfer to Another Judicial District* Absent the consent of all parties, 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Thus, the decision whether to transfer a case from one judicial district to another absent unanimous consent requires a two-part inquiry. First, the court must determine whether the case sought to be transferred could have been brought in the proposed transferee court. Second, the court must decide whether transfer is warranted for the convenience of parties and witnesses and is in the interest of justice. *See, e.g., Whitehaus Collection v. Barclay Prods., Ltd.,* 2011 WL 4036097, at *1 (S.D.N.Y. Aug.29, 2011); *Matta v. Roswell Park Cancer Inst. Corp.,* 2011 WL 3104889, at *3 (S.D.N.Y. July 26, 2011). Here, it is undisputed that this action could have been brought in the Northern District. Therefore, only the second part of the inquiry is at issue.

**\*3** The Second Circuit has held that "courts should give deference to a plaintiff's choice of forum." *Iragorri v. United Techs. Corp .,* 274 F.3d 65, 70 (2d Cir.2001). Nonetheless, "if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Id.* at 71 (citations omitted). Whether transfer should occur is "determined upon notions of convenience and fairness on a case-by-case basis," *In re Cuyahoga*

*Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992) (citing *Stewart Org. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); *accord Orb Factory. Ltd. v. Design Sci. Toys, Ltd.,* 6 F.Supp.2d 203, 208 (S.D.N.Y.1998). The moving party must make a "clear and convincing" showing that the balance of convenience favors transfer. *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.,* 599 F.3d 102, 114 (2d Cir.2010). The Second Circuit has noted that among the factors to be considered in determining whether to grant a motion to transfer venue are the following:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*Id.* at 112 (citations omitted). Courts have also considered "(8) the forum's familiarity with the governing law, and (9) trial efficiency and the interest of justice." *Fellus v. Sterne, Agee & Leach, Inc.,* 783 F.Supp.2d 612, 618 (S.D.N.Y.2011); *accord AIG Fin. Prods. Corp. v. Pub. Util. Dist. No. 1,* 675 F.Supp.2d 354, 368 (S.D.N.Y.2009).

"There is no rigid formula for balancing these factors and no single one of them is determinative. Instead, weighing the balance is essentially an equitable task left to the Court's discretion." *Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 561 (S.D.N.Y.2000) (citations and internal quotation marks omitted). While the list of factors is not exhaustive, *see Royal & Sunalliance v. British Airways,* 167 F.Supp.2d 573, 576 (S.D.N.Y.2001), no party has suggested that any other factor should be considered.

## B. Application of the *Section 1404(a)* Factors

### 1. *Convenience of the Parties and Non–Party Witnesses*

"The convenience of parties and witnesses is considered the essential criteri [on] under the venue statute." *In re Nematron Corp. Secs. Litig.,* 30 F.Supp.2d 397, 400 (S.D.N.Y.1998) (quoting *Cento Grp., S.P.A. v. OroAmerica, Inc.,* 822 F.Supp. 1058, 1060 (S.D.N.Y.1993)) (bracketing added and internal quotation marks omitted); *accord AGCS Marine Ins. Co. v. Associated Gas & Oil Co.,* 775 F.Supp.2d 640, 647 (S.D.N.Y.2011); *Seltzer v. Omni Hotels,* 2010 WL 3910597, at *2 (S.D.N.Y. Sept.30, 2010); *Hernandez v. Graebel Van Lines,* 761 F.Supp. 983, 988 (E.D.N.Y.1991). We first address the convenience of the parties and then the convenience of non-party witnesses.

#### a. *Convenience of Parties*

**\*4** The convenience of the parties weighs heavily in favor of transfer in this case. Of the twenty parties to this case, only three, Andrew, Wojcik, and LDA, are currently located in the Southern District. Compl. ¶¶ 8, 11, 26. Notably, all three have joined in the motion to transfer venue to the Northern District. *See* Def. Mem. of Law at 3, 7. Three parties, Rebecca, Doyle, and Soundview are located in neither the Northern District nor the Southern District. *See* Compl. ¶¶ 7, 12, 25. Both Doyle and Soundview join in the motion for a change of venue. Def. Mem. of Law at 7. The remaining fourteen parties are all located in the Northern District. Compl. ¶¶ 9, 10, 13–24.

In other words, of the twenty parties in this case, only Rebecca seeks to have it remain in the Southern District. Rebecca argues the transfer is inappropriate because it would merely "shift inconvenience" from one party to another. Opp. Mem. at 4. However, Rebecca is not located in the Southern District, and therefore the inconvenience to her of moving from the Southern District to the Northern District is given less weight. *See, e.g., Deshoulieres, S.A. v. Cuthbertson Imports, Inc.,* 2006 WL 2849818, at *3 (S.D.N.Y. Oct.3, 2006) (unimportant to foreign plaintiff if it litigates in New York or Connecticut as both are equally inconvenient); *Dr. Boy, GmbH v. Nationwide Ins.,* 1996 WL 350699, at *2 (S.D.N.Y. June 25, 1996) (inconvenience of a foreign corporation with no presence in New York "is 'at best a neutral factor.' ") (quoting *Matra et Manurhin v. Int'l Armament Co.,* 628 F.Supp. 1532, 1535 (S.D.N.Y.1986)); *GE Capital Franchise Fin. Corp. v. Cosentino,* 2009 WL 1812821, at *4 (W.D.N.Y. June 25, 2009) (transfer would not shift inconvenience because plaintiff would have to travel to either venue). The Court recognizes that Rebecca lives closer to the courthouses in the Southern District than

to the courthouses in the Northern District. Nonetheless, because the vast majority of the parties are located in the Northern District, and no party residing outside the Northern District objects to the transfer, this factor strongly favors transfer,

b. *Convenience of Witnesses*

"Courts typically regard the convenience of witnesses as the most important factor in considering a § 1404(a) motion to transfer." *Herbert Ltd. P'ship v. Elec. Arts Inc.,* 325 F.Supp.2d 282, 286 (S.D.N.Y.2004); *accord AGCS Marine Ins. Co.,* 2011 WL 1325996, at *5; *Seltzer,* 2010 WL 3910597, at *2; *Clay Paky. S.p.A. v. Van–Lite, Inc.,* 2000 WL 977709, at *7 (S.D.N.Y. July 14, 2000). "In evaluating this factor, the court should 'look beyond the quantity of witnesses and assess the quality of the testimony to be offered.' " *DealTime.com, Ltd. v. McNulty,* 123 F.Supp.2d 750, 755 (S.D.N.Y.2000) (quoting *Am. Alliance Ins. Co. v. Sunbeam Corp.,* 1999 WL 38183, at *6 (S.D.N.Y. Jan.28, 1999)); *accord Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt. Co.,* 2009 WL 412126, at *15 (E.D.N.Y. Feb.17, 2009) (citations omitted). Accordingly, the movant "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Factors Etc., Inc. v. Pro Arts. Inc.,* 579 F.2d 215, 218 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *accord LeCroy Corp. v. Hallberg,* 2010 WL 3958761, at *6 (S.D.N.Y. Oct.4, 2010). This may be satisfied by "a very general indication of [the witnesses'] role in the transaction at issue, and thus, by implication, of their testimony," although it is preferable for the moving party to submit "a more elaborate statement of probable testimony." *Arrow Elecs. Inc. v. Ducommun Inc.,* 724 F.Supp. 264, 267 n. 1 (S.D.N.Y.1989); *see generally Fellner v. Cameron,* 2010 WL 681287, at *3 (W.D.N.Y. Feb.24, 2010) ("[A] party will not be held to the requirement of stating with precision each witness and document.") (citations and internal quotation marks omitted). Still, "a specific showing is required only when the movant seeks a transfer *solely* 'on account of the convenience of witnesses.' ... [If the movant] seeks a transfer 'on account of several factors, his failure to specify key witnesses and their testimony is not fatal." *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434, 455 (E.D.N.Y.1987) (emphasis in original) (quoting *Factors Etc., Inc.,* 579 F.2d at 218); *accord Beckerman v. Heiman,* 2006 WL 1663034, at *5 (S.D.N.Y. June 16, 2006).

*5 Here, defendants identify defendant Fiorito and defendant Shannon as potential witnesses, both of whom reside in the Northern District. *See* Def. Mem. of Law at 6–7. Defendants' papers state that Fiorito is the "managing member" of Atrium, Harrison, Armory, Vinegar Hill, Franklin, Erie and Queens, while Shannon is the accountant of the same entities. *See id.* Defendants also mention non-parties James Funiciello Sr. and Kristen Exner as potential witnesses. *See* Def. Mem. of Law at 7; Fiorito Aff. ¶ 12. Funiciello Sr. and Exner assist in "collecting the rents, paying the bills and preparing records and reports for [Atrium, Harrison, Armory, Vinegar Hill, Franklin, Erie and Queens.]" Fiorito Aff. ¶ 12. They both live in the Northern District. *Id.*

Rebecca has not identified any non-party witness who reside in the Southern District. She identifies as "key witnesses" all of the defendants living outside the Northern District—that is, Andrew, Wojcik, Doyle, Soundview, and LDA. *See* Opp. Mem. at 5–6; Freeth Decl. ¶¶ 2–6. But she fails to provide any specifics on these witnesses' roles in the transactions, or their general testimony. More importantly, all of them consent to the transfer of venue to the Northern District. *See* Def. Mem. of Law at 3, 7. Thus, the convenience of the witnesses identified by Rebecca should not play a part in the analysis.

Accordingly, this factor too weighs heavily in favor of transfer. *See Herbert Ltd. P'ship,* 325 F.Supp.2d at 286, 292 (ordering transfer to district where majority of party and non-party witnesses reside).

2. *Location of Documents and Ease of Access to Sources of Proof*

"In an era of electronic documents, easy copying and overnight shipping, this factor assumes much less importance than it did formerly. Furthermore, the location of documents is entitled to little weight unless [the movant] makes a detailed showing of the burden it would incur absent transfer." *Seltzer,* 2010 WL 3910597, at *4 (citations and internal quotation marks omitted); *accord K.M. v. Maclaren USA, Inc.,* 2011 WL 1900137, at *3 (S.D.N.Y. Apr.7, 2011). Here, neither party has indicated that transmitting documents or other physical evidence would be particularly burdensome. Moreover, inasmuch as the operative facts alleged in the complaint occurred in the Northern District, it is likely that the sources of proof are located within that district. Accordingly, this factor

weighs in favor of transfer. *See Seltzer,* 2010 WL 3910597, at *4.

### 3. *Location of the Operative Facts*

The location of a case's operative facts has been considered by some courts as a "primary factor in determining a § 1404(a) motion to transfer." *Mitsui Marine & Fire Ins. Co. v. Nankai Travel Int'l Co.,* 245 F.Supp.2d 523, 525– 26 (S.D.N.Y.2003) (internal quotation marks omitted); *accord Seltzer,* 2010 WL 3910597, at *4. Rebecca asserts that "the principal acts alleged in the action occurred in [the Southern District]." Opp. Mem. at 4. However, it is unclear which of the operative facts Rebecca believes occurred in the Southern District and the complaint itself provides few indications of such facts. The defendants contend that the subject matter of the dispute took place in Onondaga County, *see* Def. Mem. of Law at 3, which is located in the Northern District.

**\*6** The complaint alleges a conspiracy among the defendants to deprive Rebecca of money that was otherwise owed to her. *See* Compl. ¶¶ 27–85. In conspiracy cases, courts may look to where the transactions at issue occurred in determining the locus of operative facts. *See S.E.C. v. Lybrand,* 2000 WL 913894, at *6 (S.D.N.Y. July 6, 2000) (New York was locus of operative facts because "transactions that constituted the core of the fraudulent scheme under the SEC's theory of liability were undertaken by [defendant] in New York."); *cf. United States v. Nature's Farm Prods., Inc.,* 2004 WL 1077968, at *5 (S.D.N.Y. May 13, 2004) (New York was not locus of operative facts because core transactions took place in California and only two alleged actions took place in New York). Here, there are no allegations as to where the transactions actually took place. Of the nineteen defendants, only three, Andrew, Wojcik, and LDA, have ever been located in the Southern District, *see* Compl. ¶¶ 8, 11, 26, and Andrew and Wojcik did not live there until July 2009, Andrew Aff. ¶ 7, long after most of the events alleged in the complaint. The other defendants are all located in the Northern District or the Districts of Rhode Island, Delaware, or Connecticut. *See* Compl. ¶¶ 9–10, 12–25.

The allegations in the complaint center around Andrew hiding assets and interests by presenting false documents to the Connecticut court handling his divorce in order to lower the amount he had to pay his ex-wife. *See* Compl. ¶¶ 1–3. "When examining claims for misrepresentation on a motion to transfer venue, 'misrepresentations and

omissions are deemed to occur in the district where they were transmitted or withheld, not where they are received." ' *Branthover v. Goldenson,* 2011 WL 6179552, at *3 (S .D.N.Y. Dec. 12, 2011) (quoting *In re Nematron Corp. Secs. Litig.,* 30 F.Supp.2d at 404). Here the misrepresentations occurred in two locales: (1) the District of Connecticut, when Andrew allegedly presented false testimony and evidence during the Connecticut divorce proceedings, *see* Compl. ¶¶ 35, 36, 55; and (2) the Northern District, where tax filings and other financial documents were created allegedly to minimize Andrew's assets and income, *see id.* ¶¶ 68. 84, 85; Fiorito Aff. ¶¶ 7–9, 11, 12.

Courts have also interpreted the locus of operative facts as "the place where events and actors material to proving liability are located." *Amardeep Garments Indus., Pvt. Ltd. v. Cathay Bank,* 2011 WL 1226255, at *3 (S.D.N.Y. Mar.23, 2011). Rebecca argues in her motion papers that Andrew is "the locus of this fraud ." *See* Opp. Mem. at 3. But Andrew did not live in the Southern District until July 2009. Andrew Aff. ¶ 7. Virtually all of the allegations of the complaint concern events that took place prior to that date. *See generally* Compl. ¶¶ 27–74. Moreover, in her complaint Rebecca alleges that CNY "is pivotal to the scheme as it is [ ] the central business entity through which [Andrew] perpetrated, and continues to perpetrate, the fraudulent scheme." *Id.* ¶ 46. Yet CNY is alleged to have its principal place of business in the Northern District. *Id.* ¶ 16. All of the other defendants, with the exception of LDA and Wojcik, *id.* ¶¶ 11, 26, are similarly located outside of the Southern District, with the vast majority located in the Northern District, *see id.* ¶¶ 9, 10, 12–25.

**\*7** Finally, the allegations of the complaint suggest that any misrepresentations were made in either the Northern District, *see id.* ¶¶ 68, 84, 85; Fiorito Aff. ¶¶ 7–9, 11, 12, or Connecticut, Compl. ¶¶ 35, 36, 55. The complaint alleges no operative facts that occurred within the Southern District. Therefore, this factor weighs strongly in favor of transfer. *See Ill. Union Ins. Co. v. NRG Energy, Inc.,* 2010 WL 5187749, at *2–3 (S.D.N.Y. Dec.6, 2010) (granting motion to transfer where no operative facts in complaint occurred in forum district); *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.,* 419 F.Supp.2d 395, 405 (S.D.N.Y.2005) (transferring case to Pennsylvania even where "it is unclear whether Pennsylvania is the locus of operative facts [because] it is clear that New York is not" and holding that "[w]here there is no material connection between the district and the operative facts, ... the interests

of justice require the transfer of [the] action") (citation and internal quotation marks omitted).

#### 4. *Availability of Process to Compel Unwilling Witnesses*

Here, neither party has presented evidence that any non-party witnesses would not be subject to process in the Northern District. Therefore, there is no reason to believe that one court is better situated than the other to compel the testimony of unwilling witnesses.

#### 5. *Relative Means of the Parties*

"Where disparity exists between the parties, such as an individual plaintiff suing a large corporation, the relative means of the parties may be considered." *Herman v. Informix Corp.,* 30 F.Supp.2d 653, 659 (S.D.N.Y.1998); *accord Zinky Elecs. LLC v. Victoria Amplifier Co.,* 2009 WL 2151178, at \*7–8 (D.Conn. June 24, 2009). However, this factor will be accorded "little or no significance" absent a showing of disparity of means between plaintiffs and defendants. *Hernandez,* 761 F.Supp. at 989; *accord Emblaze Ltd. v. Apple, Inc.,* 2011 WL 724275, at \*4 (S.D.N.Y. Feb.25, 2011). While Rebecca contends that the Court should take this factor into account, *see* Opp. Mem. at 6; Rebecca Aff. ¶¶ 3, 4, she has failed to provide the Court with any details of her financial status. Rebecca does contend that she will have to retain new counsel if the matter is transferred. *See* Opp. Mem. at 6. But it is more than likely that an attorney located in the Northern District would charge lower rates than an attorney in the Southern District. *See generally Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 185–86 (2d Cir.2008) (taking as established that attorneys in the Southern District charge "higher rates than those prevailing in the Northern District of New York"). In any event, there is no indication that current counsel would be unable to appear pro hac vice in the Northern District or that Rebecca would be unable to pay the incremental costs associated with a transfer, such as traveling expenses for her attorney.

#### 6. *Forum's Familiarity with the Governing Law*

 **\*8** Both the transferor and the transferee courts are located within New York and thus are familiar with New York law. Accordingly, this factor does not weigh in either party's favor.

#### 7. *Plaintiff's Choice of Forum*

District courts deciding transfer motions have noted that "[a] plaintiff's choice of forum is generally entitled to considerable weight and should not be disturbed unless the balance of the factors is strongly in favor of the defendant. Where the factors are equally balanced, the plaintiff is entitled to its choice." *Berman,* 30 F.Supp.2d at 659 (citations omitted); *accord In re Warrick,* 70 F.3d 736, 740–41 (2d Cir.1995) ("[Plaintiff's] choice of venue [is] entitled to substantial consideration.") (citation and internal quotation marks omitted); *WorldCare Ltd. v. World Ins. Co.,* 767 F.Supp.2d 341, 363 (D.Conn.2011). However, "plaintiffs' choice of forum is accorded less weight where the plaintiffs' chosen forum is neither their home nor the place where the operative facts of the action occurred." *Dwyer v. Gen. Motors Corp.,* 853 F.Supp. 690, 694 (S.D.N.Y.1994); *accord Emp'rs Ins. of Wausau v. News Corp.,* 2008 WL 4443899, at \*3 (S.D.N.Y. Sept.29, 2008) ("[W]here the plaintiff has chosen a forum that is neither the district of its residence, nor the locus of the operative facts in the case, this choice is given considerably less weight."); *Kwik Goal, Ltd. v. Youth Sports Publ'g Inc.,* 2006 WL 1517598, at \*2 (S.D.N.Y. Mar.31, 2006) (Plaintiff's choice of forum was entitled to "less deference" where the forum was not plaintiff's "home state" and "the case lack[ed] material or significant contacts with the forum state" because "no one involved in th[e] litigation [was] located in the SDNY" and the sales in the district "were minimal."); *ZPC 2000, Inc. v. SCA Grp., Inc.,* 86 F.Supp.2d 274, 280 (S.D.N.Y.2000) ("[W]hen a plaintiff brings a suit ... in a forum that has no material connection with the action, this factor should be given little weight.") (internal quotation marks and citations omitted) (alteration in original).

In the instant case, plaintiff does not reside in the Southern District. Nor. as previously discussed, did the operative facts occur in the Southern District. Accordingly, plaintiff's choice of forum is accorded little weight.

#### 8. *Trial Efficiency and Interest of Justice*

Defendants argue that the case is "likely to proceed to trial more rapidly in the [Northern District] than in this Court." Def. Mem. of Law at 8. In support of this argument, the defendants present statistics showing that the median time to trial in the Northern District is 25.8 months as opposed to 30.9 months in this Court. *Id.* at 8–9 (citing

Admin. Office of the U.S. Courts, *Fed. Judicial Caseload Statistics: March 31, 2010,* Table C–5 (2010)). Rebecca does not dispute this assertion. Accordingly, this factor weighs in favor of transfer.

### C. *Result of Balancing of the Factors*

 **\*9** A balancing of the factors easily leads to the conclusion that this case should be transferred to the Northern District. With respect to the most important factors, it would be more convenient to the parties and nonparty witnesses for this case to be litigated in the Northern District rather than the Southern District. Furthermore, the locus of operative facts is in the Northern District. None of the remaining factors weighs strongly in favor of plaintiff and most either weigh in favor of the defendants or are neutral. Therefore, defendants have shown by clear and convincing evidence that the balance of conveniences favors transferring this case to the Northern District.

### III. *CONCLUSION*

For the reasons stated above, the defendants have made a meritorious motion to transfer. The Court will delay issuing an order to transfer until after January 25, 2012, to allow plaintiff to move for a stay in the event she seeks review of this Opinion and Order pursuant to Federal Rule of Civil Procedure 72(a). In the absence of an order granting such a stay, however, the Court will direct the Clerk, by separate order, to effectuate the transfer on or after January 25, 2012.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 87616

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 494573
Only the Westlaw citation is currently available.
United States District Court, D. Montana,
Missoula Division.

Stanford Allen LEWIS, Jr., Plaintiff,

v.

EXTRADITION TRANSPORT
OF AMERICA, Defendant.

No. CV 13–138–M–DWM–JCL.
|
Feb. 5, 2014.

**Attorneys and Law Firms**

Stanford Allen Lewis, Jr., Missoula, MT, pro se.

ORDER

DONALD W. MOLLOY, District Judge.

**\*1** Findings and Recommendations of United States
Magistrate Judge Jeremiah C. Lynch (Doc. 40) are
now before the Court. Judge Lynch's report presents
his findings on the merits of Plaintiff's Complaint and
recommendation that default judgment be entered for the
Plaintiff in the amount of $75,000.00. (*Id.*)

Where no party objects, the Court reviews the findings and
recommendations of a United States Magistrate Judge for
clear error. *McDonnell Douglas Corp. v. Commodore Bus.
Mach., Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981). Clear
error is present only if the Court is left with a "definite
and firm conviction that a mistake has been committed."
*United States v. Syrax,* 235 F.3d 422, 427 (9th Cir.2000).

Judge Lynch's Findings and Recommendations are
without clear error. Lewis brings this case under 42
U.S.C. § 1983, asserting that Defendant Extradition
Transport of America violated his rights under the
Eighth and Fourteenth Amendments to the United States
Constitution when he allegedly was injured while in
transport from Arizona to Montana in May 2013. (Doc.
2.) The United States Marshals Service personally served
Lewis' Complaint on Extradition Transport Services on
November 4, 2013, (Doc. 21), but it failed to file an
answer or otherwise plead. Default was entered. (Doc.

26.) Judge Lynch held a hearing on the matter of default
judgment on January 9, 2014. (Doc. 37.) Lewis appeared
*pro se* and Extradition Transport Services did not appear.
(*Id.*) Judge Lynch found the Court to have both subject
matter and personal jurisdiction in this case and that the
Plaintiff's allegations regarding liability, taken as true in
light of the Clerk's entry of default, are sufficient and
entitle him to damages in the amount of $75,000.00. (Doc.
40 at 5, 10.) The Court concurs with these findings and
recommendations.

IT IS ORDERED that Judge Lynch's Findings and
Recommendations (Doc. 40) are ADOPTED IN FULL.
The Clerk of Court is directed to enter default judgment
in favor of Stanford Allen Lewis, Jr. and against Extradition
Transport of America in the amount of $75,000.00.

IT IS FURTHER ORDERED that the Clerk of Court
shall mail two certified copies of the judgment to Lewis
and close this case.

FINDINGS AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

JEREMIAH C. LYNCH, United States Magistrate
Judge.

Plaintiff Stanford Lewis, a pro se prisoner currently
incarcerated in the Missoula County Detention Facility,
has sued Defendant Extradition Transport of America
("Extradition Transport") pursuant to 42 U.S.C. § 1983
for injuries he allegedly suffered when he was transported
from Arizona to Montana in May 2013. The United
States Marshals Service personally served the Complaint
on Extradition Transport on November 4, 2013 (Proof of
Service, Doc. 21 at 2), but it failed to file an answer or
otherwise respond. Default was entered on December 2,
2013. (Doc. 26.) A hearing was held on January 9, 2014 on
the matter of default judgment. Lewis appeared pro se at
the hearing. Extradition Transport did not appear.

**A. Jurisdiction**

**\*2** Before considering the merits of default judgment, the
Court has an affirmative obligation to determine whether
or not it has subject matter jurisdiction over this action
and personal jurisdiction over Defendant. *See In re Tuli,*
172 F.3d 707, 712 (9th Cir.1999) ("To avoid entering a
default judgment that can later be successfully attacked as

void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place.").

Lewis alleges violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. As such, the Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

The Court also has personal jurisdiction over Defendant. "When subject matter jurisdiction is premised on a federal question, a court may exercise specific jurisdiction over a defendant if a rule or statute authorizes it to do so and the exercise of such jurisdiction comports with the constitutional requirement of due process." *AT & T Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 589 (9th Cir.1996). Federal Rule of Civil Procedure 4(k)(1)(A) provides that "serving a summons ... establishes personal jurisdiction over a defendant [ ] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed.R.Civ.P. 4(k)(1)(A). Therefore, to determine whether jurisdiction is authorized, the Court must consider Montana's long-arm statute. Rule 4(b)(1) of the Montana Rules of Civil Procedure, permits the exercise of personal jurisdiction to the maximum extent permitted by federal due process. *Davis v. American Family Mutual Ins. Co.,* 861 F.2d 1159, 1161 (9th Cir.1988) (citing *Decker Coal v. Commonwealth Edison Co.,* 805 F.2d 834, 839 (9th Cir.1986); *State of North Dakota v. Newberger,* 188 Mont. 323, 613 P.2d 1002, 1004 (Mont.1980)). Where the state and federal limits are coextensive, the jurisdictional analyses under state law and federal due process are the same. *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1320 (9th Cir .1998). Accordingly, the analysis before the Court collapses into one: whether the exercise of personal jurisdiction comports with due process. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir.2002). [1]

[1] The Federal Circuit has noted that when a federal court's subject matter jurisdiction is based on federal question jurisdiction, 28 U.S.C. § 1331, rather than diversity jurisdiction, 28 U.S.C. § 1332, the Due Process Clause of the Fifth Amendment, rather than the Due Process Clause of the Fourteenth Amendment, governs the court's assertion of personal jurisdiction. *Deprenyl Animal Health, Inc. v. Univ.*

*of Toronto Innovations Found.,* 297 F.3d 1343, 1350 (Fed.Cir.2002). *International Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny were decided under the Due Process Clause of the Fourteenth Amendment. *See id.* at 311. Nonetheless, the Federal Circuit applies the standards developed in *International Shoe* and its progeny to Fifth Amendment due process cases arising under federal law. *Deprenyl Animal Health,* 297 F.3d at 1350.

Due process requires "that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). Personal jurisdiction can be either general or specific. General jurisdiction exists and permits the court to hear all claims against a defendant "when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S.Ct. 2846, 2851 (2011) (internal quotations omitted). There is insufficient evidence to establish that Extradition Transport maintains such a presence in Montana that general jurisdiction exists.

**\*3** Specific jurisdiction exists when a defendant has sufficient minimum contacts with the forum state to warrant the exercise of jurisdiction. The Ninth Circuit Court of Appeals has established a three prong test for determining the existence of specific jurisdiction:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or a resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir.2004) (quoting *Lake v. Lake,* 817 F.2d 1416, 1421 (9th Cir.1987)).

Lewis has established that Extradition Transport was transacting the business of transporting prisoners in the

state of Montana. The company purposefully availed itself of the privilege of conducting activities in Montana; Lewis's claims, arise, at least in part, from actions committed in Montana; and the exercise of jurisdiction is reasonable.

Accordingly, the Court has both subject matter and personal jurisdiction.

### B. Default Judgment

The Ninth Circuit has set forth the following factors for a district court to consider before exercising its discretion to award a default judgment:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool,* 782 F.2d 1470, 1471–72 (9th Cir.1986). In its prior Order, the Court found that the first, third, and sixth factors have been met. (Doc. 25.) In addition, there is no indication that Extradition Transport's default is due to excusable neglect or that the material facts are subject to dispute since Extradition Transport has not presented a defense or otherwise communicated with the Court. Furthermore, even though strong public policy favors decisions on the merits, *Pena v. Seguros La Comercial, S.A.,* 770 F.2d 811, 814 (9th Cir.1985), it does not appear that litigation of the merits will be possible due to Extradition Transport's refusal to litigate.

The factual basis of Lewis's substantive claim is as follows: Lewis was arrested in Arizona on a warrant issued out of Missoula County for felony sexual intercourse without consent. For a six-day period ending on May 27, 2013, Lewis was transported from Florence, Pinal County, Arizona to the Missoula County Detention Center by two

employees of Defendant Extradition Transport. He was transported in a van with nine prisoners in total: five males and four females, one of which was pregnant. Lewis was the first prisoner to be picked up and the last to be dropped off. The van traveled through fifteen states. Starting in Arizona, the van traveled to New Mexico, Texas, Louisiana, Mississippi, Alabama, Tennessee, Kentucky, Illinois, Missouri, Arkansas, Oklahoma, and then back through Texas, New Mexico, Arizona, California, Idaho, Nevada, Idaho and Montana.

**\*4** During the six-day transport, Lewis was shackled continuously, he was not allowed to shower, not given proper hygiene, and was denied access to a restroom for up to eight hours at a time. There was no ventilation in the van. Lewis was given a small snack like a muffin and some water three times a day. On or about May 25, 2013, Lewis and the seven other inmates being transported were told to urinate in paper cups. When doing so, Lewis soiled himself and had to sit in soiled clothes for three days. The prisoner next to Lewis also had soiled clothing. The transport did not stop at any jail or other related facility to allow an opportunity for shower, sleep, or rest during the six-day transport. Lewis alleges Extradition Transport acted under color of state law for purposes of § 1983 based upon the company's contract with Missoula County Jail. (Doc. 2 at 7–8.)

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the United States Constitution or the laws of the United States was violated, and (2) that the violation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988); *Gomez v. Toledo,* 446 U.S. 635, 640 (1980). Although Extradition Transport is a private company, it was performing an "exclusive government function," something it could not have done without authorization from the state. *See Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 939 (1982). Therefore, it will be presumed that Extradition Transport was operating as a state actor in this situation. *See also Correctional Services Corp. v. Malesko,* 534 U.S. 61, 71 n.5 (2001) ("state prisoners ... already enjoy a right of action against private correctional providers under 42 U.S.C. § 1983"). [2]

[2]     Various district courts have allowed plaintiffs to proceed in claims brought pursuant to § 1983 against private corporations that provide prison transport services. *See, e.g., Schilling v. TransCor*

*America,* LLC, 2008 WL 3463510 (N.D.Cal. Aug. 11, 2008)(allowing constitutional claims against private transport company to proceed without deciding state action issue); *Dailey v. Hunter,* No. 04–392, 2006 WL 4847739 (M.D.Fla. March 22, 2006) (plaintiff sufficiently pleaded that the defendant transport company acted under color of state law for § 1983 purposes based on the transport company's alleged contract for prisoner transportation with county jail); *Irons v. TransCor America, Inc.,* No. 01–4328, 2006 WL 618856 (E.D.Pa. March 9, 2006) (denying summary judgment in § 1983 action because there existed a genuine issue of material fact as to whether the defendant transport company was a state actor since private prison companies obtain custody over prisoners only by way of state authorization and plaintiff established that "defendants exercised control over him comparable to incarceration"); *Wine v. Dep't of Corrs.,* No. 00–C–704–C, 2000 WL 34229819 (W.D.Wis. Dec. 27, 2000) (finding that it would be inappropriate to dismiss transport company as a defendant in § 1983 action because plaintiff had alleged facts sufficient to proceed against the transport company as a state actor).

Based upon the exhibits to Lewis's Motion for Summary Judgment, it appears that Lewis was serving a three-year sentence in the Arizona Department of Corrections prior to his transfer. (Doc. 5–1 at 5.) However, it is presumed that Lewis is a pretrial detainee at the Missoula County Detention Center. As a convicted prisoner, Lewis's claims arise under the Eighth Amendment of the United States Constitution. As a pretrial detainee, Lewis's claims arise under the Fourteenth Amendment. However, "even though the pretrial detainees' rights arise under the Due Process Clause, the guarantees of the Eighth Amendment provide a minimum standard of care for determining their rights." *Oregon Advocacy Center v. Mink,* 322 F.3d 1101, 1120 (9th Cir.2003). The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials take reasonable measures for the safety of inmates. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). An official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. *Id.* at 834. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (citation omitted).

**\*5** To determine whether an Eighth Amendment violation has occurred, a court should consider the circumstances, nature and duration of a deprivation of these necessities. *Johnson v. Lewis,* 217 F.3d 726, 731 (9th Cir.2000) (referring to necessities such as adequate shelter, food, clothing, sanitation, medical care, and personal safety); *see also Hoptowit v. Ray,* 682 F.2d 1237, 1258 (9th Cir.1982) ("in considering whether a prisoner has been deprived of his rights, courts may consider the length of time that the prisoner must go without these benefits ... The longer the prisoner is without such benefits, the closer it becomes to being an unwarranted infliction of pain.").

Lewis testified to deplorable conditions during his transport. Given the duration of these deprivations, the Court finds that Extradition Transport was deliberately indifferent to Lewis's safety and he was denied "the minimal civilized measure of life's necessities." *Wilson,* 501 U.S. 298. Lewis's well-pleaded allegations regarding liability, which are taken as true in light of the Clerk's entry of default, are sufficient to entitle Lewis to damages.

The Court should enter default judgment.

As a result of the transport, Lewis suffered wrist and ankle swelling and bruising, an open wound abrasion on his wrist which required antibiotic ointment, stress, anxiety, and mental anguish. He testified that he now has a bladder control problem which causes him to have to use the restroom four to five times a night. This condition becomes painful when he is not able to use the restroom frequently. He has not, however, sought treatment for this injury.

Lewis's Complaint requested $75,000.00 in compensatory damages and attorney's fees in the event that counsel was obtained or appointed. (Complaint, Doc. 2 at 9.) [3] The evidence presented by Lewis at the hearing clearly justifies the requested damages award of $75,000.00. As no attorney has appeared in this action, the request for attorneys fees should be denied.

[3]   Lewis's oral motion to amend the relief requested section of his Complaint has been withdrawn. (Doc. 39.)

Accordingly, the Court issues the following:

## RECOMMENDATION

Default judgment should be granted in favor of the Plaintiff in the amount of $75,000.00.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof. [4] 28 U.S.C. § 636. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

[4]    As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d). Therefore, three (3) days are added after the period would otherwise expire.

This order is not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 494573

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2256778
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Michael Hosea MCCORVEY, Sr.

v.

PRISON TRANSPORT SERVICES
OF AMERICA, LLC, et al.

CIVIL ACTION NO. 16-16993
|
Signed 05/23/2017

**Attorneys and Law Firms**

Michael Hosea McCorvey, Sr., New Orleans, LA, pro se.

SECTION: "A"(1)

ORDER

JAY C. ZAINEY, UNITED STATES DISTRICT
JUDGE

 **\*1**  The Court, having considered the complaint,
the record, the applicable law, the Report and
Recommendation of the United States Magistrate Judge,
and the failure of any party to file an objection to the
Magistrate Judge's Report and Recommendation, hereby
approves the Report and Recommendation of the United

States Magistrate Judge and adopts it as its opinion in this
matter. Therefore,

**IT IS ORDERED** that plaintiff's claims against Sheriff
Marlin Gusman are **DISMISSED WITH PREJUDICE**
as frivolous and/or for failure to state a claim on which
relief may be granted.

**IT IS FURTHER ORDERED** that the following
defendants and all claims against them are severed and
transferred to the United States District Court for the
Middle District of Tennessee, Nashville Division: Prison
Transport Services of America, LLC; the unidentified
president of that corporation; and Officers Jordan and
Davison.

**IT IS FURTHER ORDERED** that no ruling is made
as to the sufficiency of the complaint with respect to
the claims that have been severed and transferred to the
Middle District of Tennessee, Nashville Division, leaving
that determination to the receiving court.

**IT IS FURTHER ORDERED** that the Clerk of Court
shall advise the Clerk of the Middle District of Tennessee,
Nashville Division, in writing, of the entry of this Order
and provide the Clerk with a certified copy of this Order
and of the docket report for this action, together with all
information necessary for the Clerk of the receiving court
to electronically access the documents filed in this action.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2256778

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2270024
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Michael Hosea MCCORVEY, Sr.

v.

PRISON TRANSPORT SERVICES
OF AMERICA, LLC, et al.

CIVIL ACTION NO. 16-16993
|
Signed 04/25/2017

**Attorneys and Law Firms**

Michael Hosea McCorvey, Sr., New Orleans, LA, pro se.


SECTION: "A"(1)


**REPORT AND RECOMMENDATION**

JANIS VAN MEERVELD, UNITED STATES
MAGISTRATE JUDGE

**\*1** Plaintiff, Michael Hosea McCorvey, Sr., a state
inmate, filed this federal civil action pursuant to 42
U.S.C. § 1983. His claims in this lawsuit arise from events
which occurred on a van while he was being transported
from South Carolina to Louisiana. He has sued the van
operator, Prison Transport Services of America, LLC,
which he identifies as a corporation based in Nashville,
Tennessee. He has also sued the unidentified president of
that corporation and two officers, Jordan and Davison,
all of whom he alleges also reside in Nashville. Lastly, he
has sued Orleans Parish Sheriff Marlin Gusman.

To better understand the factual basis of plaintiff's
lawsuit, the Court held a Spears hearing on April 10,
2017. See Spears v. McCotter, 766 F.2d 179 (5th Cir.
1985). "[T]he Spears procedure affords the plaintiff an
opportunity to verbalize his complaints, in a manner of
communication more comfortable to many prisoners."
Davis v. Scott, 157 F.3d 1003, 1005-06 (5th Cir. 1998). The
United States Fifth Circuit Court of Appeals has observed
that a Spears hearing is in the nature of a Fed. R. Civ. P.
12(e) motion for more definite statement. Eason v. Holt,
73 F.3d 600, 602 (5th Cir. 1996). Spears hearing testimony

becomes a part of the total filing by the *pro se* applicant.
Id.

Based on the allegations of plaintiff's complaint, broadly
construed, [1] and his Spears hearing testimony, the Court
finds that he is making the following allegations in this
lawsuit.

[1]    The Court must liberally construe a *pro se* civil rights
       complaint. See Moore v. McDonald, 30 F.3d 616, 620
       (5th Cir. 1994).

In October of 2016, plaintiff was extradited from the
Anderson County Detention Center in Anderson, South
Carolina, to the Orleans Justice Center in New Orleans,
Louisiana. He was transported in a van operated by Prison
Transport Services of America, LLC. He alleges he was
subjected to unconstitutional conditions of confinement
during the seven-day journey. Specifically, he alleges that
the van was overcrowded and he was "not able to take
baths, or take care of personal hygiene for days." [2] He
further alleges that the van was involved in an "almost
fatal accident" in Atlanta, Georgia, when the van driver
hit another vehicle. [3] Plaintiff claims that he suffered a
leg injury, loss of balance, and a painful ear infection
during the journey. He further claims that he developed
arthritis in his right leg. Despite these physical problems,
he received no medical treatment until he arrived in New
Orleans.

[2]    Rec. Doc. 6-1, p. 10.

[3]    Rec. Doc. 17.

At the Spears hearing, plaintiff stated that, except for
periodic bathroom breaks, he was on the van continuously
for five days of the circuitous seven-day trip; the van
stopped for only one overnight break on the fifth day.
Also at the hearing, plaintiff was asked why he named
Sheriff Gusman as a defendant in this action. Plaintiff
responded that Gusman's only involvement was that he
"executed the extradition"; plaintiff testified that Gusman
was not involved in plaintiff's transportation from South
Carolina to Louisiana or the events of the seven-day
journey. Plaintiff stated that he requested and received
medical attention for both his leg injury and ear problem
upon his arrival in New Orleans. He testified that he has
not been denied medical care while in New Orleans, and
he stated that the medical care he has received has been
adequate.

**\*2** In that this action's connections to this judicial district are obviously tenuous, the Court will first address the issue of venue. Because 42 U.S.C. § 1983 contains no specific venue provision, venue is determined pursuant to 28 U.S.C. § 1391, the general venue statute. See Jones v. Bales, 58 F.R.D. 453, 458 (N.D. Ga. 1972), aff'd, 480 F. 2d 805 (5th Cir. 1973). That statute provides:

A civil action may be brought in—

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

The instant federal civil rights action challenges the conditions and events which occurred during an interstate prison transport. No substantial part of the events or omissions giving rise to plaintiff's claims occurred within this judicial district. Moreover, all but one of the defendants reside in Nashville, Tennessee. Although one defendant, Sheriff Gusman, does reside within this district and is subject to the court's personal jurisdiction, Gusman was not personally involved in the events giving rise to plaintiff's claims.

It is clear that the claims against Gusman are appropriate for immediate *sua sponte* dismissal under federal law. Specifically, federal law mandates that federal courts "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). [4] Regarding such lawsuits, federal law further requires:

On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—

(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or

(2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b).

[4]    "[T]he term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 28 U.S.C. § 1915A(c).

Additionally, with respect to actions filed *in forma pauperis*, such as the instant lawsuit, federal law similarly provides:

Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ...

(i) is frivolous or malicious;

(ii) fails to state a claim on which relief may be granted; or

(iii) seeks monetary damages against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B).

A complaint is frivolous "if it lacks an arguable basis in law or fact." Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). In making a determination as to whether a claim is frivolous, the Court has "not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." Neitzke v. Williams, 490 U.S. 319, 327 (1989); Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994).

**\*3** A complaint fails to state a claim on which relief may be granted when the plaintiff does not "plead enough facts to state a claim to relief that is plausible on its face.

Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re* Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007) (citation, footnote, and quotation marks omitted). The United States Supreme Court has explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted).

Here, plaintiff has no viable claim against Sheriff Gusman. As plaintiff conceded at the Spears hearing, Gusman was not personally involved in plaintiff's transportation from South Carolina to Louisiana or the events of the seven-day journey. Because "[p]ersonal involvement is an essential element of a civil rights cause of action," Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983), there is simply no basis for holding Gusman liable for the events and omissions during the trip which purportedly caused plaintiff's injuries. Therefore, the claims against Gusman should be dismissed as frivolous and/or for failure to state a claim on which relief may be granted.

The next question is whether it is appropriate for the Court to sever the claims against the remaining defendants and transfer them to Tennessee for adjudication. It is.

"Even when venue is proper, a court may determine that, in the interest of justice, an action between multiple defendants should be severed and certain claims transferred to a more convenient forum." Cain v. New York State Board of Elections, 630 F. Supp. 221, 225 (E.D.N.Y. 1986); accord Wyndham Associates v. Bintliff, 398 F.2d 614, 618-19 (2d Cir. 1968); Baez v. Ranjan, No. 9:16-CV-0661, 2016 WL 3566862, at *4 (N.D.N.Y. June 27, 2016). As the court explained in Cain:

> A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants.

Cain, 630 F. Supp. at 225-26; accord Wyndham Associates, 398 F.2d at 618; Baez, 2016 WL 3566862, at *4.

In the instant case, plaintiff's cognizable claims, if any, are against the van operator, Prison Transport Services of America, LLC, the unidentified president of that corporation, and/or Officers Jordan and Davison.[5] Plaintiff alleges that the corporation is based in Nashville, Tennessee, and that the named officers likewise reside in Nashville. The interests of justice dictate that the claims against the Tennessee defendants be transferred to the United States District Court for the Middle District of Tennessee, Nashville Division, for disposition. Not only do those defendants reside within that judicial district, but the majority of relevant witnesses and evidence will presumably also be located in Nashville. On the whole, it will be more convenient and less expensive for the parties to litigate the claims against the Tennessee defendants in Tennessee.

[5]    At first blush, it might seem as though the claims against those defendants would not be cognizable under § 1983 for lack of state action. However, jurisprudence indicates otherwise:

> Various district courts have allowed plaintiffs to proceed in claims brought pursuant to § 1983

against private corporations that provide prison transport services. See, e.g., Schilling v. TransCor America, LLC, 2008 WL 3463510 (N.D. Cal. Aug. 11, 2008) (allowing constitutional claims against private transport company to proceed without deciding state action issue); Dailey v. Hunter, No. 04-392, 2006 WL 4847739 (M.D. Fla. March 22, 2006) (plaintiff sufficiently pleaded that the defendant transport company acted under color of state law for § 1983 purposes based on the transport company's alleged contract for prisoner transportation with county jail); Irons v. TransCor America, Inc., No. 01-4328, 2006 WL 618856 (E.D. Pa. March 9, 2006) (denying summary judgment in § 1983 action because there existed a genuine issue of material fact as to whether the defendant transport company was a state actor since private prison companies obtain custody over prisoners only by way of state authorization and plaintiff established that "defendants exercised control over him comparable to incarceration"); Wine v. Dep't of Corrs., No. 00-C-704-C, 2000 WL 34229819 (W.D. Wis. Dec. 27, 2000) (finding that it would be inappropriate to dismiss transport company as a defendant in § 1983 action because plaintiff had alleged facts sufficient to proceed against the transport company as a state actor). Lewis v. Extradition Transport of America, No. CV 13-138, 2014 WL 494573, at *4 n.2 (D. Mont. Feb. 5, 2014); accord Nave v. Trans-Cor of America, C/A No. 8:06-1065, 2007 WL 2156670, at *4 (D.S.C. July 26, 2007).

## RECOMMENDATION

**\*4** It is therefore **RECOMMENDED** that the claims against Sheriff Marlin Gusman be **DISMISSED WITH PREJUDICE** as frivolous and/or for failure to state a claim on which relief may be granted.

It is **FURTHER RECOMMENDED** that the following defendants and all claims against them be severed and transferred to United States District Court for the Middle District of Tennessee, Nashville Division: Prison Transport Services of America, LLC; the unidentified president of that corporation; and Officers Jordan and Davison.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2270024

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2156670
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina.

Toby Scott NAVE, a/k/a Toby S. Nave, Plaintiff,
v.

TRANS–COR OF AMERICA[1]; Cpl.
Young; John Doe, Aiken County Detention
Center Administrator, Defendants.

[1]  Plaintiff identified this defendant by the name
"Trans–Cor of America"; however, according to the
corporation's website, the appropriate spelling of
the name is "TransCor America." *See* TransCor
America Home Page, http://www.transcor.com/
(last visited July 25, 2007). Throughout the
instant order, the court refers to this defendant as
"TransCor America" or "TransCor."

C/A No. 8:06–1065–MBS–BHH.
|
July 26, 2007.

**Attorneys and Law Firms**

Toby Scott Nave, Orlando, FL, pro se.

### ORDER

MARGARET B. SEYMOUR, United States District
Judge.

**\*1** Plaintiff Toby Scott Nave, appearing *pro se,*
brought this action pursuant to 42 U.S.C. § 1983.[2]
Plaintiff alleges that the defendants subjected him to
medical indifference after he sustained injuries in a
vehicle collision that occurred when Defendant TransCor
America ("TransCor"), a company that provides prisoner
transportation and extradition services, and one of its
bus drivers, Defendant Young, transported Plaintiff from
Florida to South Carolina.

[2]  At the time he brought this action, Plaintiff
was in the custody of the South Carolina
Department of Corrections ("SCDC") and housed
at Allendale Correctional Institution ("ACI") in
Fairfax, South Carolina. According to Plaintiff's
subsequent communications with the court, he was

released from ACI in November 2006 and currently
resides in Orlando, Florida. *See* Oct. 16, 2006 Letter
from Plaintiff (Entry 16); May 23, 2007 Letter from
Plaintiff (Entry 17).

In accordance with 28 U.S.C. § 636(b) and Local Rule
73.02, D.S.C ., this matter was referred to United
States Magistrate Judge Bruce Howe Hendricks for
pretrial handling. The Magistrate Judge filed a Report
and Recommendation on May 16, 2006, in which she
recommended that the complaint be summarily dismissed
without prejudice and without issuance and service of
process. Report and Recommendation, 5 (Entry 12). On
June 5, 2006, Plaintiff filed objections to the Report and
Recommendation. Objections (Entry 14).

The Magistrate Judge makes only a recommendation
to this court. The recommendation has no presumptive
weight. The responsibility for making a final
determination remains with this court. *Mathews v. Weber,*
423 U.S. 261, 270, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The
court is charged with making a *de novo* determination of
any portions of the Report of Magistrate Judge to which a
specific objection is made. The court may accept, reject, or
modify, in whole or in part, the recommendation made by
the Magistrate Judge or may recommit the matter to the
Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).
The district court need not conduct a *de novo* review when
a party makes only general and conclusory objections that
do not direct the court to a specific error in the Magistrate
Judge's proposed findings and recommendations. *Orpiano
v. Johnson,* 687 F.2d 44, 47–48 (4th Cir.1982).

### FACTS

According to Plaintiff, the Florida Department of
Corrections released him into the custody of Defendant
TransCor on December 26, 2003 for the purposes of
extraditing him to South Carolina pursuant to a fugitive
warrant pending in Aiken County. On December 28,
2003, TransCor loaded Plaintiff and twenty-two other
detainees onto one of its buses to be driven by Defendant
Young. Plaintiff states that he was "shackled to another
detainee ... [who] weighed in excess of 200 pounds."
Amended Complaint, 3 (Entry 13). According to Plaintiff,
no seatbelts or other safety devices were used to restrain
any of the detainees.

Plaintiff avers that Defendant Young operated the bus in an erratic manner as it headed north on Interstate–95 despite the large volume of cars on the highway due to the holiday season. Plaintiff states that Defendant Young "drove the bus at speeds in excess of the posted limits, passed vehicles on the right, weaved [sic] in traffic, and followed other vehicles at too close a distance." *Id.* Apparently, when the bus neared Brunswick, Georgia, Defendant Young again "attempted to move from the passing (left) lane to the right lane in order to pass slower traffic," at which point the bus "struck the vehicle in the right lane, swerved back to the left lane[,] ... slammed on the brakes to avoid striking a vehicle in front of the bus," and then "struck the retaining rail on the left side of the road." *Id.* Plaintiff states that the impact caused him to be "thrown forward into the cage that separates the passengers from the driver," and caused "the individual to whom the Plaintiff was shackled [to] land[ ] on Plaintiff's back." *Id.* at 4. Plaintiff and a number of the other detainees sustained injuries in the collision. Plaintiff's injuries include facial lacerations, as well as severe neck and back pains. *Id.*

 *2 Plaintiff states that the detainees—many of whom were injured—remained on the bus without medical assistance while state patrol officers investigated the incident and the bus's flat tires were repaired. *Id.* At some point, Defendant Young drove the bus to a truck stop, and then later to a local hospital, where six of the detainees including Plaintiff were taken to the emergency room. After Plaintiff received treatment, he and the other injured detainees were placed back onto the bus. Plaintiff states that he "remained shackled to the same individual and no seatbelts or other safety restraints were used." *Id.*

From December 29, 2003 to January 4, 2004, Plaintiff was held in Buncombe County Detention Center ("BCDC") in Asheville, North Carolina. Plaintiff avers that a representative of Defendant TransCor visited him at BCDC and that "Plaintiff was assured by the representative that he would receive follow-up care upon his arrival at the county facility which requested his extradition." *Id.* at 5. On January 4, Defendant TransCor transported Plaintiff to Aiken County Detention Center ("ACDC"). Plaintiff states that he informed the booking officers of the bus accident and "complained of the pain he was suffering." *Id.* "Eventually, Plaintiff was taken to Aiken Regional Medical Center for x-rays and ... was prescribed pain medication." *Id.* According to Plaintiff,

he did not receive any subsequent follow-up care despite being "told [that] he would be referred to a specialist for his neck and back injuries." *Id.* During the time Plaintiff was held at ACDC, he claims to have complained to various members of the medical staff "that he was experiencing extreme pain in his neck and back, had limited range of motion in his neck, numbness in his legs, and blurred vision." *Id.*

Plaintiff filed the instant complaint against Defendants TransCor and Young on December 23, 2005 in the Southern District of Georgia. Complaint, 1 (Entry –2). Plaintiff asserted that Defendants TransCor and Young acted negligently during Plaintiff's extradition. *Id.* at 9. Plaintiff also claimed that Defendant TransCor's failure to provide adequate medical treatment and follow-up care violated his Eighth and Fourteenth Amendment rights, thereby subjecting him to medical indifference and due process violations. *Id.* at 9–10. On March 30, 2006, United States District Judge Anthony A. Alaimo issued an order transferring the case to the District of South Carolina. Plaintiff filed an amended complaint on May 22, 2006, in which he named John Doe, ACDC Administrator, as a defendant. Amended Complaint, 1. Plaintiff's amended complaint also reasserted his claims of negligence and constitutional violations against Defendants TransCor and Young. *Id.* at 6–7.

### DISCUSSION

**A. Subject Matter Jurisdiction**
Plaintiff objects to the Report and Recommendation on the ground that the Magistrate Judge erred in finding that the court lacked subject matter jurisdiction. Plaintiff contends that the Magistrate Judge improperly characterized his claims as alleging only that Defendants were negligent in their transport of Plaintiff from Florida to South Carolina and that SCDC refused to treat Plaintiff's injuries. Plaintiff asserts that this inaccurate reading of the complaint precipitated the Magistrate Judge's recommendation that the case be summarily dismissed because negligence claims are not cognizable under § 1983 and the court lacked jurisdiction because the requirements of the diversity statute, 28 U.S.C. § 1332(a), were not satisfied. Plaintiff asserts that, to the contrary, he has raised constitutional claims, thus bringing the case within the court's federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). He further asserts that the

court may exercise supplemental jurisdiction over the state law negligence claims pursuant to 28 U.S.C. § 1367.

**\*3** Federal question jurisdiction is governed by 28 U.S.C. §§ 1331. Section 1331 provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. §§ 1331. "The presence or absence of federal-question jurisdiction is [determined] by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (internal citations omitted). Courts generally "look no further than the plaintiff's complaint in determining whether a lawsuit raises issues of federal law capable of creating federal-question jurisdiction under 28 U.S.C. § 1331." *King v. Marriott Int'l, Inc.,* 337 F.3d 421, 424 (4th Cir.2003) (citing *Custer v. Sweeney,* 89 F.3d 1156, 1165 (4th Cir.1996)). If federal law creates the plaintiff's cause of action, then federal courts have jurisdiction. *See Dixon v. Coburg Dairy, Inc.,* 369 F.3d 811, 816 (4th Cir.2004) ("The vast majority of lawsuits 'arise under the law that creates the cause of action.' Thus, we must 'first discern whether federal or state law creates the cause of action.... In cases where federal law *creates* the cause of action, the courts of the United States unquestionably have federal subject matter jurisdiction.' ") (internal citations omitted).

Plaintiff's claims meet the basic requirements of federal question jurisdiction. In both the initial complaint and the amended complaint, Plaintiff makes various allegations that Defendants violated his constitutional rights. *See* Complaint, 9 ("[TransCor] violated Plaintiff's 8th and 1 [3] Amendment rights to be free from cruel and unusual punishment and due process by failing to provide adequate medical care and follow-up care for Plaintiff's injuries and knowingly made [sic] an attempt to conceal such injuries by seizing and hiding Plaintiff for six days without any attempt to assist Plaintiff in the aid and care of his said injuries."); *id.* at 10 (alleging "deliberate indifference and denial of due process in that [TransCor] through it's [sic] employee Cpl. Young was directly responsible for any and all injuries incurred [by Plaintiff during the bus accident] ); Amended Complaint, 7 (alleging that "Plaintiff's right to due process under the Fourteenth Amendment was violated by the deliberate indifference of Plaintiff's serious medical needs on the part

of TransCor America, Corporal Young, and John Doe")? It is apparent that Plaintiff's allegations arise under the Constitution; thus, Plaintiff's allegations give rise to general federal question jurisdiction under 28 U.S.C. § 1331. *See Bell v. Hood,* 327 U.S. 678, 681–82, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("Where the complaint ... is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions ... must entertain the suit."). [4] Accordingly, the court declines to summarily dismiss Plaintiff's case for lack of subject matter jurisdiction. [5]

[3]     *See also* Complaint, 10 ("[TransCor] did wilfully deny me my civil rights and thus prevented the 8th and 14th Amendments to be used as they were constituted by law, by knowingly depriving me of the adequate care needed for injuries brought upon me by their driver and employee to whom they are responsible."); Amended Complaint, 6 ("Young demonstrated deliberate indifference to Plaintiff's serious medical needs following the ... bus crash by failing to immediately have Plaintiff transported to a hospital for treatment"); *id.* ("TransCor America demonstrated deliberate indifference to Plaintiff's serious medical needs following the ... bush crash by filing [sic] to provide any follow-up treatment for Plaintiff's injuries"; *id.* at 6–7 ("John Doe demonstrated deliberate indifference to Plaintiff's serious medical needs while in the custody of [ACDC] by failing to provide proper care for Plaintiff's injuries").

[4]     The "two possible exceptions" are allegations that are "immaterial and made solely for the purpose of obtaining jurisdiction" and claims that are "wholly insubstantial and frivolous." *Id.* at 682–83. In the court's view, neither exception applies in this case because Plaintiff's allegations of constitutional violations constitute the core of his complaint and do not appear to be frivolous.

[5]     Likewise, the court may exercise supplemental jurisdiction over Plaintiff's related negligence claims pursuant to 28 U.S.C. § 1367 when, as in this case, it possesses original jurisdiction over a federal question. *See* 28 U.S.C. § 1367(a) (providing that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

## B. Section 1983

**\*4** The question becomes, then, whether Plaintiff has asserted a claim upon which relief may be granted under 42 U.S.C. § 1983. In order to state a cause of action under § 1983, a plaintiff must allege that (1) the named defendant deprived him of a federal right, and (2) the defendant did so under color of state law. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The court finds that Plaintiff has articulated allegations sufficient to survive summary dismissal. As discussed *supra,* Plaintiff has alleged that Defendants deprived him of his Eighth and Fourteenth Amendment rights. Furthermore, Plaintiff's claims against Defendants TransCor and Young also indicate that they were functioning as state actors for purposes of surviving summary dismissal. *See DeBauche v. Trani,* 191 F.3d 499, 506 (4th Cir.1999) (setting out the "four exclusive circumstances" under which a private party could be deemed a state actor, including "when the state has sought to evade a clear constitutional duty through delegation to a private actor ... [or] delegated a traditionally and exclusively public function to a private actor"). Various district courts have allowed plaintiffs to proceed in claims brought pursuant to § 1983 against private corporations that provide prison transport services, including cases involving Defendant TransCor. *See, e.g., Dailey v. Hunter,* No. 04–392, 2006 U.S. Dist. LEXIS 82412, at \*12 (M.D.Fla. March 22, 2006) (finding that plaintiff had sufficiently pleaded that defendant TransCor acted under color of state law for § 1983 purposes based on TransCor's alleged contract for prisoner transportation with county jail); *Irons v. TransCor America, Inc.,* No. 01–4328, 2006 U.S. Dist. LEXIS 9685, \*12 (E.D.Pa. March 9, 2006) (denying summary judgment in § 1983 action because there existed a genuine issue of material fact as to whether defendants, including TransCor, were state actors since private prison companies obtain custody over prisoners only by way of state authorization and plaintiff established that "defendants exercised control over him comparable to incarceration"); *Wine v. Dep't of Corrs.,* No. 00–704, 2000 U.S. Dist. LEXIS 22555, at \*8–9 (W.D.Wis. Dec. 27, 2000) (finding that it would be inappropriate to dismiss TransCor as a defendant in § 1983 action because plaintiff had alleged facts sufficient to proceed against TransCor as a state actor). Likewise, this courts finds that it would be inappropriate to dismiss Plaintiff's case at the summary dismissal stage.

## *CONCLUSION*

The court has accepted all of Plaintiff's factual allegations as true. After thoroughly reviewing the Report and Recommendation in its entirety, the court declines to adopt the Magistrate Judge's recommendation that the case be summarily dismissed without prejudice and without issuance of service of process. The within action is recommitted to the Magistrate Judge for further pretrial handling.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2156670

1997 WL 176325
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

NELSON A. TAYLOR CO., INC., James
W. Taylor and John E. Taylor, Plaintiffs,

v.

TECHNOLOGY DYNAMICS GROUP
INC., d/b/a TDG Aerospace, Inc., David
Wensley and George Grauer, Defendants.

No. 95–CV–0431.
|
April 7, 1997.

**Attorneys and Law Firms**

ROEMER AND FEATHERSTONHAUGH, P.C.
Attorneys for Plaintiffs Capital Center, 99 Pine Street
Albany, N.Y. 12207–2781 OF COUNSEL: JAMES D.
FEATHERSTONHAUGH, ESQ. NADINE FEIDEN
SHADLOCK, ESQ.

NIXON, HARGRAVE, DEVANS & DOYLE Attorneys
for Defendants P.O. Box 1051, Clinton Square
Rochester, N.Y. 14603 OF COUNSEL: CAROLYN G.
NUSSBAUM, ESQ.

JACKSON, TUFTS, COLE & BLACK 650 California
Street San Francisco, CA 94108 ROSEMARY
S. POOLER, D.J. OF COUNSEL: DAVID T.
ALEXANDER, ESQ

MEMORANDUM-DECISION
AND ORDER INTRODUCTION

POOLER

**\*1** Plaintiffs Nelson A. Taylor, Inc. ("Taylor"), a New
York corporation, James Taylor, and John Taylor sued
defendants Technology Dynamics Group, Inc. ("TDG"),
a Delaware corporation qualified to do business in
California as TDG Aerospace, Inc., David Wensley, and
George Grauer, in an action filed in this district on March
29, 1995. The action grew out of a dispute concerning
a November 30, 1992, agreement ("the Agreement")
made among TDG, major shareholders of TDG including
Grauer and Wensley, and Taylor in which Taylor agreed

to lend TDG up to $200,000 in return for a convertible
revolving promissory note and other consideration. As
a condition precedent to Taylor's performance, TDG
agreed to use its reasonable best efforts to elect a Taylor
representative to TDG's Board.

Plaintiffs allege in their complaint that TDG and the
individual defendants breached the Agreement along with
a subsequent modification to the agreement and a stock
issuance agreement. Plaintiffs also accuse defendants
of securities fraud. Defendants move for dismissal
under Fed.R.Civ.P. 12(b)(2) alleging that this court
lacks personal jurisdiction over them. They also request
dismissal of plaintiffs' securities fraud claim pursuant
to both Rule 9 and Rule 12(b)(6). Finally, defendants
seek the transfer of any remaining claims to the
Northern District of California pursuant to 28 U.S.C. §
1404(a). After considering the motions and accompanying
documents, I deny defendants' motion for dismissal
pursuant to Rule 12(b)(2), grant defendants' motion to
dismiss the securities fraud claim, and deny defendants'
motion to transfer venue.

BACKGROUND

In February 1992 TDG's then president Gerald Bench
contacted James Taylor, the president and CEO of Taylor.
Bench told James Taylor that TDG was interested in
meeting to discuss an agreement between TDG and
Taylor, that would include a loan from Taylor to TDG.

TDG, a designer and developer of over-the-wing de-
icing systems for commercial aircraft, also sought a
long-term relationship with a complementary company.
According to Taylor, TDG representatives subsequently
visited Taylor's Gloversville, New York office to negotiate
the Agreement. Although defendants dispute both the
frequency and significance of discussions in New York,
it is not disputed that over the next several months
extensive telephone communications ensued between
the companies. In addition, James Taylor traveled to
California to pursue negotiations.

On November 30, 1992, the Agreement was executed.
Under the Agreement, Taylor agreed to lend TDG up
to $200,000. TDG and its majority shareholders, Bench,
Grauer, and Wensley, made several promises in return for
the anticipated loans. TDG agreed to deliver a convertible

revolving promissory note to Taylor and agreed that the amount due on the note could be converted into shares of TDG stock. TDG also agreed to give Taylor (1) the opportunity to purchase an additional 5% of TDG shares upon payment of a further $200,000 and (2) a right of refusal to manufacture most TDG products. TDG further guaranteed that it would not dilute the percentage of stock issued to Taylor to less than 5% of the outstanding common stock or to less than 10% of the common stock if Taylor exercised its option to purchase additional stock. Taylor was also given a first right of refusal on future share issuances. In a section headed "Conditions Precedent to Taylor's Performance," the Agreement stated: "The Company [TDG] shall use its reasonable best efforts to cause a representative of Taylor to be elected to the Company's Board of Directors."

**\*2** Two addenda were made to the Agreement, one dated November 1, 1992, and the other dated April 1, 1993. Only the April 1, 1993, addendum (the "April 1st Addendum") is significant in this litigation. The April 1st Addendum modified the original Agreement by providing that the conversion price of shares to be exchanged for advances under the original Agreement was $1.90 per share; that is, the $200,000 promissory note could be converted into 105,000 shares of common stock. In addition, the April 1st Addendum omitted the Agreement's language protecting against dilution and instead guaranteed Taylor that if at any time before October 1, 1997, TDG issued stock at less than $1.90 per share, TDG would issue shares to Taylor in an amount determined by a formula set forth in the addendum.

By an "Agreement Restricting Issuance of Common Stock" (the "Issuance Agreement") effective April 1, 1993, TDG, Wensley, Grauer, Bench, Taylor, and Bace Plastics Group Inc. ("Bace") agreed that in exchange for Bace and Taylor allowing TDG (1) to issue additional common stock and further (2) to issue 450,000 shares of stock to its officers, employees and consultants in the future, the TDG signatories would issue no further stock without the written permission of Taylor and Bace.

James Taylor was elected to the TDG Board of Directors on October 20, 1992. On April 24, 1994, with the written consent of TDG and its shareholders, Taylor assigned its interest under the Agreement and the addenda thereto to James and John Taylor.

In their complaint, Taylor and James and John Taylor allege that TDG and the individual defendants have breached the Agreement, the April 1st Addendum, and the Issuance Agreement. Specifically, the plaintiffs allege that on November 17, 1994, Wensley asked the Taylors to sign a third addendum that would restrict Taylor's right of first refusal of manufacturing opportunities. Wensley next asked James Taylor to sign a resolution that approved certain stock issuances. Because he believed these issuances would dilute the Taylors' position below 10%, James Taylor opposed the stock issuances. Thereafter, Wensley and Grauer, who then together controlled the majority of TDG's stock, held a meeting of shareholders at which they removed James Taylor from the Board of Directors.

Plaintiffs allege that TDG, Wensley, and Grauer breached the Agreement by voting James Taylor off the Board. They also allege, on information and belief, that TDG, Wensley and Grauer have issued additional shares or plan to issue additional shares. They claim that this issuance is (or would be) in violation of the anti-dilution provisions of the Agreement, April 1st Addendum, and Issuance Agreement. Furthermore, Plaintiffs allege that as majority shareholders and directors of TDG, a close corporation, Grauer and Wensley owe a fiduciary duty to the plaintiffs that those defendants breached. Plaintiffs also allege that the defendants breached Rule 10b–5 of the Securities Exchange Act of 1934 by inducing Taylor to enter into the Agreement with a promise that they would use their best efforts to place a Taylor representative on the Board although they did not intend to allow that representative to remain on the Board.

**\*3** In this opinion, I consider three requests from the defendants. First, defendants move for dismissal under Fed.R.Civ.P. 12(b)(2) alleging that this court does not possess personal jurisdiction over them. Second, they move for dismissal of the securities fraud claim pursuant to Rules 9 and 12(b)(6). Lastly, they seek the transfer of any remaining claims to the Northern District of California pursuant to 28 U.S.C. § 1404(a).

## DISCUSSION

I. Personal Jurisdiction over TDG

It is well established that a plaintiff must establish personal jurisdiction over a defendant by a preponderance of the

evidence. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). However, when jurisdiction is challenged prior to discovery, a plaintiff may rely solely upon good faith allegations provided these allegations create a prima facie showing that jurisdiction exists. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.) *cert. denied,* 498 U.S. 854 (1990).

Determining whether a plaintiff has established a prima facie showing of personal jurisdiction in a diversity action requires that I examine the law of the state in which the court sits. *Hoffitz For Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985). New York's relevant long arm statute is N.Y. Civ. Prac. L. & R. § 302(a)(1).

Section 302(a)(1) states:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state....

N.Y. Civ. Prac. L. & R. § 302(a)(1) (McKinney 1990).

In the first major New York decision concerning the scope of Section 302, *Longings–Wittnauer Watch Co. v. Banes & Reinecke, Inc.,* 15 N.Y.2d 443, *cert. denied,* 382 U.S. 905 (1965) the New York Court of Appeals made clear that any of a number of New York related activities, when viewed either independently or in conjunction with one another, can form the basis for jurisdiction. *Id.,* at 455–58.

Contract negotiations taking place in New York can be considered sufficient contacts even when the contract is not formally "made" in New York. In *Hi Fashion Wigs, Inc. v. Peter Hammond Advertising, Inc.,* 32 N.Y.2d 583, 586–87 (1973), the New York Court of Appeals found that an Oklahoma corporation that had, through its president, negotiated and executed a contract in New York was subject to New York jurisdiction. The court stated that it would "reach the same conclusion even if we were to assume that the contract ... was not made in New York." *Id.* at 587. Similarly, in *Hoffritz,* 763 F.2d at 60, the Second Circuit held that negotiations over a franchise agreement that took place largely in New York City, but also in Atlanta and Detroit, provided

a sufficient basis for jurisdiction under § 302(a)(1) even though the agreement was executed in Atlanta. *See also Rates Technology Inc. v. Diorio,* 626 F.Supp. 1295 at 1297–98 (E.D.N.Y.1986)(holding that one New York meeting, during which the parties concluded the substance of the agreement but failed to execute it sufficed to defeat motion to dismiss); *Xedit Corp. v. Harvel Industries Corp.,* 456 F.Supp. 725, 728–29 (S.D.N.Y.1978)(same).

 **\*4** Viewing the plaintiffs' allegations in the light most sympathetic to them, I find that plaintiffs describe sufficient contacts between TDG and New York. James Taylor claims, first of all, that he was contacted by Bench, the then President of TDG "on or about February, 1992," and that at this time Bench was "interested in meeting and discussing an agreement including loan of funds from Taylor, Inc. to TDG." Taylor Aff. ¶¶ 3–4. In addition, according to James Taylor, TDG was "looking ... to establish a long term relationship with a complementary entity." *Id.* ¶ 5. Discussions continued between the two companies via telephone calls and other "correspondence" for a "period of months." *Id.* ¶ 6. James Taylor also alleges that TDG representatives traveled to Gloversville on "four separate occasions to solicit, perfect and carry out the Agreement which is the subject of this litigation." *Id.* ¶ 7. Further, Taylor claims that the substance of the agreement was negotiated during the second of these meetings, which occurred in August 1992 and involved Bench and TDG's vice president of sales and marketing. Taking these allegations as true, which is required at this stage, it is clear that sufficient contacts have been made between TDG and Taylor, Inc. to satisfy Section 302(a)(1).

Under Section 302(a)(1) a cause of action must also "arise from" the transaction found to be sufficiently connected to the given jurisdiction. A "substantial nexus" between the cause of action and the transaction of business must be shown. *Hoffritz,* 763 F.2d at 60. For instance, in *Sacody Technologies. Inc. v. Avant. Inc.,* 862 F.Supp. 1152, 1155 (S.D.N.Y.1994), the court found that a breach of confidentiality agreement had a "substantial nexus" to defendant's representative's visit to New York—during which defendant requested a prototype of a machine and plaintiff requested a confidentiality agreement—and to defendant's representative's follow-up phone call from out-of-state agreeing to a confidentiality agreement. Similarly, Taylor's claims have a sufficient connection to the underlying negotiations, significant portions of which

took place in New York. When all doubts are resolved in favor of Taylor, the Agreement was made possible to a large extent by New York-based negotiations. A breach of this contract therefore arises from conduct which took place in New York.

Defendants have argued, however, that even if an alleged breach of the Agreement has a sufficient nexus to their New York contacts, breaches of the issuance agreement and the April 1st Addendum do not. This argument fails because the Issuance Agreement and April 1st Addendum are integrally related to the Agreement.

II. Personal Jurisdiction over Grauer and Wensley
Grauer and Wensley also argue that Bench did not act at their direction and therefore their contacts with New York cannot subject the two shareholders to jurisdiction. Prior to 1988 certain New York courts abided by the "fiduciary shield doctrine." This doctrine "shielded" an individual corporate employee from the power of a court to compel his presence if the employee acted solely in a corporate capacity within the forum state. *See, CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 287–88 (1987) (discussion of cases). However, in 1988 the New York Court of Appeals abolished the fiduciary shield doctrine in *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460 (1988). In that case, the court held:

 **\*5** a[p]laintiff need not establish a formal agency relationship between defendants and [the defendants' company]. [Plaintiff] need only convince the court that [such company] engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of [the individual defendants] and that they exercised some control over [the company] in the matter.
*Id.* at 467, 527 N.Y.S.2d at 199, 522 N.E.2d at 44 (citations omitted). *See also Retail Software Services. Inc. v. Lashlee,* 854 F.2d 18, 21–22 (2d Cir.1988)(relying on *Kreutter* in holding that because two individual employees had been primary actors in a New York transaction and their corporate employer transacted business in New York, the individual defendants were subject to jurisdiction in New York even though neither had visited New York in the process of making the transaction).[1]

Where corporate directors benefit from and consent to activities performed by a corporate agent in New York,

they may be subjected to jurisdiction here. *Retail Services,* 854 F.2d at 22. James Taylor and Robert Callen, the senior financial advisor for Taylor, both posit that Grauer and Wensley played a significant role in the negotiations even though neither of them ever traveled to New York for the negotiations. First, James Taylor alleges that Grauer and Wensley owned a combined 61.5% of the outstanding shares of TDG at the time of the execution of the Agreement and continued to own a majority of the outstanding shares on June 28, 1995, the date his affidavit was filed. Taylor Aff. ¶ 26. Taylor also alleges that Grauer and Wensley "have had absolute and total control of TDG since TDG's very first contact with Taylor, Inc." *Id.* In addition, Callen states that he had daily conversations with Grauer regarding the "exact terms and provisions of the Agreement." Callen Aff. ¶ 11. Callen also states that "virtually all correspondence received by Taylor, Inc." was authored by either Grauer or Wensley and therefore posits: "[t]hey obviously controlled the day to day activities of TDG and every detail of its relationship with Taylor, Inc." (*Id.* ¶ 16.) Although Grauer and Wensley both claim to have been ignorant of Bench's activities in New York, plaintiffs have shown, based on the two individual defendants' control of the corporation and their control of negotiations, that Grauer and Wensley may well have consented to Bench's activities for the benefit of the corporation and the corporation's controlling shareholders. Thus, at this stage, when all inconsistencies are resolved in a manner favorable to plaintiff, it is clear that Grauer and Wensley are subject to New York jurisdiction.

Grauer and Wensley also argue that subjecting them to New York's jurisdiction violates their Fourteenth Amendment Due Process rights. In general, a state may "legitimately exercise personal jurisdiction over a nonresident who 'purposefully directs' his activities" toward a resident of that state. *Burger King v. Rudzewicz,* 471 U.S. 462, 473 (1985). The defendant must purposefully avail himself of the "privilege of conducting activities within the forum state." *Hanson v. Dencla,* 357 U.S. 235, 253 (1958). Mail and wire contacts may be included in the assessment of whether the defendant has purposefully directed its activities at in-state residents. *Burger King,* 471 U.S. at 476. However, even where the defendant has had the necessary "minimum contacts" with the forum state, a consideration of several factors may preclude jurisdiction based on "fair play and substantial justice." *Id.* at 477. The

factors that a court should analyze to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice" include (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiffs interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and (5) the shared interests of the several States in furthering fundamental substantive social policies. *Id.*

**\*6** In *Burger King,* the defendant John Rudzewicz's only physical tie to Florida was a training course taken by his business associate, however Rudzewicz chose to reach out and negotiate with a Florida corporation for the purchase of a long term franchise. *Id.* at 479–80. By virtue of the agreement, he accepted the benefits of an association with the Florida corporation as well as long-term and exacting regulation of his company from Florida. *Id.* at 480–81. Moreover, the franchise agreement included a Florida choice-of-law clause. *Id. at* 481. These contacts with Florida sufficed to support personal jurisdiction in Florida. *Id.* at 482. In addition, the court found that the inconvenience to defendant of transporting his Michigan witnesses to Florida and the applicability of Michigan law to certain aspects of the franchise relationship did not make the exercise of jurisdiction unconstitutional. *Id.* at 483–84.

From the plaintiff's perspective, Grauer and Wensley—acting through Bench and through Grauer's own calls—reached out to gain the advantage of association with Taylor. Although the choice of law provision in the Agreement favors California rather than New York law, TDG's, Grauer's and Wensley's contacts with New York are otherwise more substantial than Rudzewicz's contacts with Florida in the *Burger King* case. As in *Rudzewicz,* the contracts defendants are alleged to have breached have a substantial connection with New York. Moreover, defendants have not demonstrated that "fair play and substantial justice" would be offended by holding defendants to answer for their actions in New York. *Id.* at 477. Therefore, jurisdiction is constitutionally permissible.

### III. Plaintiff's 10b–5 Claim

Plaintiffs' complaint alleges that the defendants fraudulently induced them into entering into the Agreement by promising to use their best efforts to place a representative of Taylor on the TDG board of directors

when the defendants did not, in fact, have any intention of keeping a Taylor representative on the TDG board. According to plaintiffs, defendants' promise violated Rule 10b–5.

To state a claim under Rule 10b–5, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiffs reliance on defendant's action caused [plaintiff] injury." *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 264 (2d Cir.1993)(internal citations omitted) (*cert. denied,* 114 S.Ct. 1397 (1994); *see also, Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986).

It is well settled that "making a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) when the promise is part of the consideration for the transfer of securities." *Luce,* 802 F.2d at 55 (citing *Pross v. Katz,* 784 F.2d 455, 457 (2d Cir.1986)); *see also, Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993); *Drexel Burnham Lambert Group v. Microgenesys,* 775 F.Supp. 660, 664 (S.D.N.Y.1991). Defendants contend, however, that plaintiffs have not pled facts tending to show an intent to defraud with sufficient particularity.

**\*7** Rule 9(b) of the Federal Rules of Civil Procedure requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." However, in the Second Circuit, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)(internal citations omitted). Therefore, a plaintiff is required to "allege facts that raise a strong inference of fraudulent intent." *Mills,* 12 F.3d at 1176; *see also Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1990)." In short, there must exist "an ample factual basis ... to support the charges." *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991).

In this circuit it is established that "to satisfy the dictates of Rule 9(b) a plaintiff may not simply allege nonperformance of a contract." *Drexel Burnham,* 775

F.Supp. at 664. Thus, "the mere allegation that defendants did not intend to honor the contract at issue does not alone create a basis for alleging fraud." *Zucker v. Katz,* 708 F.Supp. 525, 529 (S.D.N.Y.1989)(citing *Murray v. Xerox Corp.,* 811 F.2d 118, 122 (2d Cir.1987)). Therefore, although pleading scienter does not require great specificity, allegations that a party did not intend to perform an element of a contract which are not "accompanied with specific allegations of fact giving rise to a strong inference of fraud" or are "entirely conclusory" will fall short of Rule 9(b)'s requirements. *Finkel v. Stratton Corp.,* 754 F.Supp. 318, 329–30 (S.D.N.Y.1990), *aff'd in part on other grounds, rev'd in part, on other grounds,* 962 F.2d 169 (2d Cir.1992) *with Mills,* 12 F.3d at 1176.

For instance, in *Mills,* William Mills, a salesman, agreed to settlement of an employment dispute in exchange for stock and a representation that the stock would be registered "immediately." *Mills,* 12 F.3d at 1173. When Mills discovered six months later that the stock had not been registered, he filed a lawsuit that included a Rule 10b–5 claim. The Second Circuit upheld the district court's dismissal of Mills' 10b–5 claim, holding that the pleading was not sufficiently specific. The court stated: "Mills alleged no fact probative of [the representative's] intent at the time he made the promises to Mills.... We decline Mills' invitation to infer fraudulent intent from the fact that Polar made a number of contracts to register shares and never performed any of them." *Id.* at 1176.

Similarly, in *Finkel,* a group of investors (and stock purchasers) sued the developer/corporate parent of a recreational resort for violating Rule 10b–5 when it became clear that the plans laid out in a prospectus were not going to be completed. The court found that plaintiffs allegations merely "proceed[ed] from the proposition that since certain future acts did not come to pass, defendants never intended to accomplish them." *Finkel,* 754 F.Supp. at 329. The court found this proposition insufficient. Because such allegations "must be accompanied with specific allegations of fact giving rise to a strong inference of fraud," and the complaint "contain[ed] no such allegations," the court granted defendants' motion to dismiss the 10b–5 claim. *Id.* at 330. *See also Hayden v. Feldman,* 753 F.Supp. 116 (S.D.N.Y.1990) (strong inference of fraudulent intent insufficiently pled when it was alleged, without factual support, that defendants never intended to conduct certain partnership agreements in ways they stated they would); *compare Drexel Burnham,*

775 F.Supp. at 665–66 (fraudulent intent sufficiently pled where the sequence of events lent credibility to plaintiff's claim that defendant never intended to repay the note).

**\*8** Plaintiffs' complaint alleges only that "defendants Grauer and Wensley, as signatories of [the] document, did not intend to allow the Taylor Inc. representative to remain on the Board," and that, as a result, Plaintiffs were "knowingly and intentionally fraudulent[ly]" induced into entering the agreement. Compl. ¶ 70. The complaint makes no factual assertions to support its allegation. Because the complaint is wholly conclusory, it does not satisfy Rule 9(b). Accordingly, the defendants' motion to dismiss is granted.

### IV. TDG's Motion for Change of Venue

TDG has moved to transfer venue to the Northern District of California pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

First, a district court is empowered to exercise its sound discretion in deciding a motion to transfer pursuant to § 1404(a). *Minnette v. Time Warner,* 997 F.2d 1023, 1026 (2d Cir.1993); *Gilbert v. Wilson,* 821 F.Supp. 857, 860 (N.D.N.Y.1993) (Scullin, J.). Second, the moving party has the burden of establishing that there should be a change of venue. *Factors Etc, Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978), *cert. denied,* 440 U.S. 908 (1979); *Pellegrino v. Stratton Corp.,* 679 F.Supp. 1164, 1166 (N.D.N.Y.1988) (McCurn, C.J.). Furthermore, "[a] discretionary transfer under § 1404(a) will not be granted absent a clear cut and convincing showing by defendants that the balance of convenience weighs strongly in favor of the transferee court." *Gilbert,* 821 F.Supp. at 861 (citations omitted); *see also Schwartz v. R.H. Macy's, Inc.,* 791 F.Supp. 94, 95 (S.D.N.Y.1992).

The criteria relevant to the determination of whether a § 1404(a) motion should be granted include:

"(1) convenience of the parties; (2) convenience of the witnesses; (3) relative means of the parties; (4) locus of operative facts and relative ease of access to sources of proof; (5) attendance of witnesses; (6) the weight accorded the plaintiffs choice of forum; (7) calendar congestion; (8) the desirability of having the case tried by the forum familiar with the substantive law to be applied; (9) practical difficulties; and finally, (10) the Court should also consider how best to serve the interest of justice, based on an assessment of the totality of material circumstances."

*Wine Markets Int'l. Inc. v. Bass,* 939 F.Supp. 178, 181 (E.D.N.Y.1996).* Courts have also found that convenience of the witnesses is "probably the most important factor." *Filmline (Cross–Country) Prod. v. United Artists,* 865 F.2d 513, 520 (2d Cir.1989) (citations omitted); *Pellegrino,* 679 F.Supp. at 1166–67.

### Convenience and Means of Parties

Defendants argue that it would be inconvenient for them to try this case in New York because it would impose a substantial and expensive burden on TDG's operation. However, there is no reason to assume that this would not be equally true for the plaintiffs were the case transferred to California. Furthermore, it has been held that "the relative financial hardship a particular venue would have on ... litigants ... is usually only applicable to situations where an individual is suing a large corporation...." *Aquatic Amusement Assoc. v. Walt Disney World,* 734 F.Supp. 54, 59 (N.D.N.Y.1990) (McCurn, C.J.). In regard to overall convenience (and financial means insofar as the two are interrelated), the scales do not tip strongly in favor of either party.

**\*9** Defendants also argue that, if this case is tried in New York, TDG not only will be forced to pay travel expenses for its officers and witnesses but also will incur the expense of shipping all the relevant California

documents to New York. Quite simply, the burden of transporting documents from California to New York is not sufficiently handicapping to warrant a transfer. Even if defendants are correct in asserting that a majority of the pertinent documents are located in California, defendants have not estimated the cost of shipping the documents nor have they articulated why it would be so burdensome to ship the documents to New York. *See, e.g., O'Brien v. Goldstar Technology, Inc.,* 812 F.Supp. 383, 386 (W.D.N.Y.1993)* ("[d]ocumentary evidence can readily be transported [from California] to ... New York, if necessary ..."); *Herbst v. Able,* 278 F.Supp. 664, 666–67 (S.D.N.Y.1967)*(shipping an estimated 16 million pages of files from California to New York held insufficient to justify transfer). It is quite possible that, given the unpredictable nature of the discovery process, Plaintiffs might end up spending more in shipping documents to California were the transfer granted than defendants would were the transfer denied. Defendants have barely alleged, let alone proven that their burden might outweigh that of the plaintiffs were the case transferred.

### Location of Relevant Events

Defendants claim that few of the operative facts leading up to the instant action took place in New York. It is true that many of the pertinent incidents seem to have taken place over the telephone or in California. The Agreement was partially negotiated by telephone by representatives of the parties in their respective states, meetings of the TDG board of directors took place exclusively in California, and the breaches allegedly committed by defendants were committed in California. However, certain events did occur in New York. Bench traveled to New York to establish a relationship and promote an agreement with Taylor, and in 1992, TDG sent an employee to the Gloversville facility who then inspected Taylor's capabilities. Moreover, as intimated above, most of the pertinent evidence seems to be contained within documents which can be shipped across the country with relative ease. Nevertheless, the locus of operative facts analysis does weigh slightly in favor of transfer.

### Convenience/Attendance of Witnesses

As stated above, the location of relevant witnesses is a major factor to be considered in a transfer application. Defendants state that two non-party witnesses, Don Yost and Bench, in addition to the two named party-witnesses

Grauer and Wensley, will be inconvenienced by having to travel from California to New York. In order to use this argument successfully in support of their motion to transfer, defendants must describe what the testimony of these non-party witnesses would be, allege that the testimony would be material, and demonstrate that these witnesses are, in fact, unwilling or unable to appear. O'Brien, 812 F.Supp. at 387; see also Gilbert, 821 F.Supp. at 861; Pellegrino, 679 F.Supp. at 1167.

**\*10** Defendants discuss none of these things; instead they recite only that it would be inconvenient for Grauer and Wensley to testify and that Yost and Bench are two non-party witnesses. At the same time, Plaintiffs have specifically named eight New York based non-party witnesses whose testimony will be solicited. Defendants have failed to establish that the inconvenience of trial in New York to their necessary and material witnesses outweighs the inconvenience to plaintiffs witnesses of a trial in California.

*Choice of Law Provision*
The agreement provides that it is to be interpreted in accordance with California law. Such a provision is an important factor in the transfer analysis. *Van Dusen v. Barrack,* 376 U.S. 612, 645 (1964); *Gibbs & Hill. Inc. v. Harbert International, Inc.,* 745 F.Supp.993, 997 (S.D.N.Y.1990).* However, the parties' choice to apply a foreign state's law does not mandate transfer, nor is it necessarily more important than any other consideration. *Filmline,* 865 F.2d at 520 ("the district court was entitled to give some weight to the fact that the Agreement called for its construction ... in accordance with New York law"); *Viacom Int'l. v. Melvin Simon Productions,* 774 F.Supp. 858, 868 (S.D.N.Y.1991)(choice of law "is just one of several factors to consider on a motion to transfer and in some circumstances may be accorded little weight"); *Aquatic Amusement,* 734 F.Supp. 54, 59 ("this court, as a federal court, should not be overly concerned with which state law is applicable when deciding a motion to transfer

venue"). Thus, although the parties have expressly chosen California law to govern, this factor alone does not decisively tip the balance in favor of Defendants.

When all material factors are viewed in their entirety, defendants have not made a "clear cut and convincing showing ... that the balance of convenience weighs strongly in favor of the transferee court." *Gilbert,* 821 F.Supp. at 861 (citation omitted). The Defendants motion to transfer is thereby denied.

CONCLUSION

Defendants' 12(b)(2) motion is DENIED. Defendants' motion to dismiss Plaintiffs 10b–5 claim is GRANTED, and Defendant's motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is DENIED.

IT IS SO ORDERED.

1    Defendants attempt to distinguish *Retail Services* and *Kreutter* from the instant case in that both of those cases involved agents and/or corporate defendants who transacted business in New York, so that jurisdiction over the agent "was not based on long-arm jurisdiction" while the alleged jurisdiction over TDG *is* based on long-arm jurisdiction. Pl. Reply Mem. At 4. This distinction is wholly irrelevant. In neither case, do the courts indicate that an agent or corporate defendant must be "doing business" in New York or that if long-arm jurisdiction is established over a company the fiduciary shield doctrine remains effective. To the contrary, *Kreutter* held that "the fiduciary shield rule is not available to defeat jurisdiction under the New York long arm statute." *Id.* at 472.

**All Citations**

Not Reported in F.Supp., 1997 WL 176325

**WESTLAW**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.    8

2005 WL 3077654
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Derek OUBRE, Plaintiff-Counterclaim Defendant,
v.
CLINICAL SUPPLIES MANAGEMENT,
INC., Defendant-Counterclaim Plaintiff.

No. 05 Civ.2062(LLS).
|
Nov. 17, 2005.

OPINION AND ORDER

STANTON, J.

**\*1** Derek Oubre, a New York resident, [1] filed a complaint in New York Supreme Court, New York County, against his former employer, Clinical Supplies Management, Inc. ("CSM"), a North Dakota corporation with its principal place of business in Fargo, North Dakota. CSM removed the case to this court and asserted several counterclaims. CSM now moves pursuant to 28 U.S.C. § 1404(a) for a change of venue to the United States District Court for the District of North Dakota.

[1]    CSM asserts that, at times relevant to the lawsuit, Oubre was a resident of either Washington D.C. or New Jersey. However, CSM does not dispute that Oubre currently is, and at the commencement of this action was, a New York resident. (Def.'s Mem. L. Supp. Mot. Transfer at 13.)

I. *Background*
CSM assists pharmaceutical companies with clinical drug trials. Oubre alleges that he and CSM signed a written employment contract in November 2001, whereby CSM agreed to employ him as a financial consultant for thirty-six months at $50.00 per hour plus an annual stipend for board service and reimbursement of business expenses. CSM also allegedly granted him options to acquire 11,112 shares of CSM stock. Oubre claims CSM breached the 2001 employment agreement by firing him in March 2004 and by failing to pay him his salary and grant him the stock options.

CSM alleges that Oubre forged the signature of Gerald Finken, CSM's chief executive officer, on the employment and stock option contracts. According to CSM, Oubre worked for CSM from November 2001 to September 2003 pursuant to an unwritten agreement, which did not entitle him to stock options.

In November 2003, while still employed by CSM but allegedly without its knowledge, Oubre became a director and chief financial officer of LaGray Chemical Corp., an Illinois pharmaceutical company based in Chicago and Ghana.

Oubre and CSM acknowledge they made an employment agreement in December 2003, whereby Oubre became CSM's full-time chief financial officer and interim chief operating officer as of September 1, 2003, and CSM granted him ten percent of CSM stock. In turn, Oubre was to generate a business plan for CSM's packaging and labeling operation, and prepare CSM's financial statements, among other things. Oubre and CSM each claim that the other breached the 2003 employment agreement.

Oubre also signed non-competition and confidentiality agreements in September 2003. CSM claims he breached these agreements and diverted corporate opportunities from CSM, in violation of his fiduciary duty of loyalty, while he was employed by LaGray. Oubre contends that CSM officers were aware of his relationship with LaGray, and that LaGray does not compete with CSM.

II. *Motion to Transfer*
Section 1404(a) of title 28 of the United States Code provides that, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The action could have been brought in the District of North Dakota because venue would be proper and CSM would be subject to process there.

In determining whether venue should be transferred to the District of North Dakota for the convenience of parties and witnesses, the relevant factors include:

**\*2** (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Lewis v. CRI, Inc.,* No. 03 Civ. 651(MBM), 2003 WL 1900859, at \*2 (S.D.N.Y. Apr. 17, 2003). The court has broad discretion to balance these factors and to consider the evidence of convenience and fairness on a case-by-case basis. *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992), citing *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (1988).

"Absent a clear cut and convincing showing by defendant that the balance of convenience weighs strongly in favor of the transferee court, plaintiff's choice of forum will not be set aside." *Gen. State Auth. (of Pa.) for Benefit of Crompton-Richmond Co., Inc. v. Aetna Cas. & Sur. Co.,* 314 F.Supp. 422, 423 (S.D.N.Y.1970); *see also Ford Motor Co. v. Ryan,* 182 F.2d 329, 330 (2d Cir.1950) (defendant must make a strong case for transfer).

III. *Discussion*

A. *Convenience of Witnesses*

The convenience of witnesses is a major factor in evaluating a transfer motion. *800-Flowers, Inc. v. Intercontinental Florist, Inc.,* 860 F.Supp. 128, 134 (S.D.N.Y.1994). "When weighing the convenience of the witnesses, courts must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." *Royal & Sunalliance v. British Airways,* 167 F.Supp.2d 573, 577 (S.D.N.Y.2001). To enable the court to make that evaluation, a movant relying on the convenience of witnesses "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover ." *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978).

(1) *LaGray Witnesses*

Oubre and CSM both recognize the importance of testimony from LaGray employees Paul Lartey and Alexandra Graham. However, because they are both based in Ghana (Lartey Aff. ¶ 8; Graham Aff. ¶ 8) and will have to travel a long distance to either proposed venue, they are not considered in the venue transfer analysis. *Varsity Spirit v. I.I.P. Inc.,* No. 03 Civ.2069(LLS), 2003 WL 22772638, at \*2 (S.D.N.Y. Nov. 24, 2003) (convenience of witnesses who do not reside in either proposed forum does not significantly affect the transfer analysis).

(2) *CSM's Witnesses*

CSM's North Dakota witnesses are four of its officers and employees, one former officer, its outside counsel and two accountants from Eide Bailly, CSM's outside auditors. [2]

[2]   CSM also points out that three of Oubre's witnesses reside in North Dakota and eleven reside in California. CSM, however, cannot rely on the convenience of plaintiff's witnesses to support its motion to transfer. *Marks v. Fireman's Fund Ins. Co.,* 109 F.Supp. 800, 803 (S.D.N.Y.1953).

**\*3** Oubre and CSM both recognize the importance of testimony from at least one Eide Bailly witness regarding Oubre's claims to CSM stock. That witness will likely be Scott Swanholm, the accountant principally responsible for Eide Bailly's relationship with CSM. (Swanholm Aff. ¶ 2.) Since it is not clear what, if anything, the other Eide Bailly accountant would add to Swanholm's testimony, his testimony is discounted in the transfer analysis. *Factors Etc.,* 579 F.2d at 218.

The parties also recognize that Gerald Finken is an important witness, as is CSM's outside counsel, who was involved in the negotiation and signing of Oubre's employment contracts.

The testimony of four other CSM witness also seems material. Jessica Mather, executive assistant to Mr. Finken and Oubre, would testify to Oubre's alleged

failure to fulfill his financial planning and reporting responsibilities. (Mather Aff. ¶ 3.) Brian Moe, CSM's Vice President of Operations, would testify to Oubre's alleged unavailability to CSM staff, his pursuit of a packaging and labeling facility for CSM, and his work on behalf of LaGray. (Moe Aff. *passim.*) Brian Keller, CSM's former finance director, would address Oubre's alleged mishandling of CSM's finances. (G. Finken July 7, 2005 Aff. ¶ 10.) Kathleen Finken, a member of CSM's board of directors, would testify to whether Oubre and CSM entered the employment and stock option agreements in 2001. (K. Finken Aug. 30, 2005 Aff. ¶ 3.)

Thus, there are seven material CSM witnesses whose convenience favors transfer.

### (3) *Oubre's Witnesses*
Oubre himself is an essential witness. In addition, Oubre identifies two material New York witnesses to rebut CSM's claims that he neglected his duties to CSM and diverted opportunities from CSM: Phillip McKinley, a former CSM consultant who worked with Oubre pursuing packaging and labeling and sales opportunities in the New York area, and Margaret Bogdan, a former CSM employee who worked on CSM's financing, administration and contracting processes with Oubre from his New York apartment.

In sum, seven of CSM's material witnesses are located in North Dakota while only three of Oubre's material witnesses reside in New York. The disparity is less substantial than the numbers appear, however, because two of Oubre's witnesses are non-parties, while four of CSM's seven witnesses are its employees. *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.,* No. 05 Civ. 2564(PKL), 2005 U.S. Dist. LEXIS 17253, at *12 (S.D.N.Y. Aug. 17, 2005) (convenience of non-party witnesses is accorded more weight than that of party witnesses). Hence, the convenience of material witnesses only weakly favors transfer.

### B. *Location of Relevant Documents*
"In today's era of photocopying, fax machines[,] Federal Express", *Coker v. Bank of Am.,* 984 F.Supp. 757, 766 (S.D.N.Y.1997), and electronic document transmission, the location of documents is entitled to little weight unless the movant makes a detailed showing of the burden it would incur absent transfer. *Royal Ins. Co. of Am. v.*

*Tower Records, Inc.,* No. 02 Civ. 2612(PKL), 2002 U.S. Dist. LEXIS 20109, at *17 (S.D.N.Y. Oct. 22, 2002).

**\*4** There is no such showing here. CSM merely states that it has documents related to its packaging and labeling operation and to Oubre's performance at its North Dakota headquarters, and that Eide Bailly has three or four boxes of documents relevant to Oubre's damages in North Dakota. This factor is therefore neutral.

### C. *Convenience and Relative Means of the Parties*
"A transfer should not merely shift the burden of inconvenience from one party to the other." *Dwyer v. General Motors Corp.,* 853 F.Supp. 690, 693 (S.D.N.Y.1994). "Where a disparity exists between the means of the parties, such as in the case of an individual suing a large corporation, the court may consider the relative means of the parties in determining where a case should proceed." *800-Flowers,* 860 F.Supp. at 135; *USA Interactive v.. Savannah Air Ctr., LLC,* No. 02 Civ. 3659(LLS), 2002 WL 1808236, at *2 (S.D.N.Y. Aug. 7, 2002) (relative means of the parties is a more significant factor when one party is an individual).

Here, CSM is a corporation that does business worldwide (G. Finken Aug. 30, 2005 Aff. ¶ 21), while Oubre is an individual who has not been steadily employed since leaving CSM in March 2004. (Pl.'s Mem. L. Opp'n Mot. Transfer at 25.) Relative to their resources, Oubre's burden litigating in North Dakota would be heavier than CSM's burden litigating in New York. The convenience and relative means of the parties therefore weighs against transfer.

### D. *Locus of Operative Facts*
In determining the locus of operative facts, courts look to the "site of the events from which the claim arises." *800-Flowers,* 860 F.Supp. at 134. Contract disputes arise "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *Prudential Sec. Inc. v. Norcom Dev., Inc.,* No. 97 Civ. 6308(DC), 1998 WL 397889, at *4 (S.D.N.Y. July 16, 1998) (citations omitted).

The employment agreements were apparently negotiated and executed in both fora. (Oubre Sept. 12, 2005 Aff. ¶ 4; Oubre Aug. 8, 2005 Aff. ¶¶ 4, 15; G. Finken July 7, 2005 Aff. ¶ 4.) Similarly, Oubre was to work for

CSM in New York, [3] while CSM's performance, paying Oubre and issuing him stock and stock options, would naturally take place at CSM's headquarters in North Dakota. Thus, Oubre's alleged breach of the employment agreements occurred in New York, while CSM's alleged breach occurred in North Dakota.

[3]     The 2003 non-competition agreement provides, "This agreement shall be governed by and enforced to the fullest extent under the laws of the State of New York, where Derek Oubre will be living and working." (Affirmation of Russell Bogart Supp. Mot. Transfer Ex. M.) Further, while Oubre was undoubtedly present in North Dakota many times during his tenure with CSM (G. Finken Aug. 30, 2005 Aff. ¶¶ 16, 20), the bulk of his time seems to have been spent in New York. (Oubre Aug. 8, 2005 Aff. *passim.*)

CSM's counterclaims relate to Oubre's dealings with LaGray. Oubre likely conducted business with LaGray either at its Chicago offices or from his home in New York. In either case, there is no showing that he dealt with LaGray in North Dakota.

The locus of operative facts is not concentrated in either the transferor or transferee forum. Thus, this factor is neutral as to transfer.

### E. *Availability of Process to Compel Attendance of Unwilling Witnesses*
A party relying on this factor must show that non-party witnesses are unwilling to testify at trial. *Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 562 (S.D.N.Y.2000).

 **\*5**  The only witness whom either party asserts will be unwilling to testify at trial is Brian Keller, CSM's former finance director, who can be compelled to testify in North Dakota but not in New York. Although his testimony may be highly material (the alleged mishandling of CSM's finances), since both Mr. Finken and Ms. Mather may testify willingly on those matters, his testimony may not be essential. Furthermore, CSM acknowledges that Keller's deposition testimony will be available and gives no reason why his deposition or videotaped testimony would be insufficient at a trial in New York, aside from a general preference for live testimony. (Def.'s Mem. L. Supp. Mot. Transfer at 19-20.); *Dealtime.com v. McNulty,* 123 F.Supp.2d 750, 757 (S.D.N.Y.2000) (availability of compulsory process is neutral given the option of

videotaping testimony of witnesses unwilling to travel); *Citigroup,* 97 F.Supp.2d at 561-62. This factor somewhat favors transfer.

### F. *Forum's Familiarity with Governing Law*
Familiarity with the governing law is generally given little weight in considering motions to change venue. *AEC One Stop Group, Inc. v. CD Listening Bar, Inc.,* 326 F.Supp.2d 525, 531 (S.D.N.Y.2004). That is especially true where the applicable foreign law is settled. *Royal Ins. Co. of Am.,* 2002 U.S. Dist. LEXIS 20109, at \*24.

CSM asserts without contradiction that its counterclaim under the faithless servant doctrine, which seeks reimbursement of salary and expenses for Oubre's breach of his duty of loyalty, is a matter of first impression under North Dakota law. [4] Where, as here, the case involves unsettled law of the transferee forum, this factor weighs in favor of transfer to that forum as being more familiar with that body of law. However, it weighs only slightly in favor of transfer because (a) as noted above, the whole factor itself has little weight, and (b) if I retain the case, New York's substantive law on the point is clear, [5] and New York courts presume that the substantive law of another state (when it is unsettled) resembles New York's and other states' law. *See Rogers v. Grimaldi,* 875 F.2d 994, 1003 (2d Cir.1989).

[4]     The other claims and counterclaims are governed by the relevant agreements between the parties and by settled North Dakota or New York law, which either court could readily apply.

[5]     *See e.g., Phansalkar v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184 (2d Cir.2003) (clarifying the faithless servant doctrine under New York law).

### G. *Plaintiff's Choice of Forum*
On a motion to transfer venue, a plaintiff's choice of forum will not be disturbed unless the movant makes a clear and convincing showing that the balance of convenience favors an alternate forum. *Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D .N.Y.1995).

CSM asserts that plaintiff's choice of forum should be given less deference than usual, because none of the pertinent facts took place in New York. Oubre alleges, however, that he executed both employment agreements

and negotiated the 2003 agreement in New York and that he worked for CSM from his New York apartment. The 2003 non-competition agreement provides that "Derek Oubre will be living and working" in New York. *See* fn.3. These contacts, coupled with the fact that Oubre resides in this district, give weight to plaintiff's choice of forum.

 **\*6** CSM argues that Oubre's choice of forum should be accorded less weight because he originally filed suit in New York state court, rather than this federal court to which CSM removed it. Plaintiff's choice of forum is given deference because it is presumed to be a convenient geographic location in which to litigate. That presumption is no less valid when, as here, the plaintiff files suit in state court and the defendant later removes the case to a federal court in the same venue. *Innovations Enter. Ltd. v. Haas-Jordan Co ., Inc.,* No. 99 Civ. 1681(EHN), 2000 WL 263745, at \*2 (E.D.N.Y. Jan. 4, 2000) ("[V]enue is primarily an issue of geography, and plaintiff has clearly expressed a preference for litigating within the [federal district that] encompasses the county in which plaintiff originally filed the action.").

Therefore, plaintiff's choice of forum weighs heavily against transfer.

### H. *Trial Efficiency and the Interests of Justice*
CSM argues that North Dakota has a superior local interest in adjudicating the case because it involves North Dakota corporate governance laws and a locally owned North Dakota corporation. New York also has an interest in adjudicating the case, however, because the alleged breach of the non-competition agreement will be decided under New York law and the outcome of the case will affect the rights of a New York resident under employment agreements signed and to be performed in New York.

CSM asserts that dockets are less congested in the District of North Dakota than here. While there may be greater overall docket congestion in this district than in the District of North Dakota, under our individual calendar system I could likely try this case as soon or sooner than it would be tried in North Dakota. *See Dwyer,* 853 F.Supp. at 695 (Motley, J.) (relative trial calendar congestion did not favor transfer where "this particular court's docket is not nearly as back-logged as the majority of the dockets in this District.").

Hence, those factors are neutral as to transfer.

### IV. *Conclusion*
In sum, the convenience and ready availability of material witnesses and the forum's familiarity with the governing law weigh somewhat in favor of transfer. The convenience of the parties favors retaining the action. The decisive factor is plaintiff's choice of forum. "Absent a clear cut and convincing showing by defendant that the balance of convenience weighs strongly in favor of the transferee court, plaintiff's choice of forum will not be set aside." *Gen. State Auth. (of Pa.) for Benefit of Crompton-Richmond,* 314 F.Supp. at 423. There is not the requisite clear cut and convincing showing that plaintiff's choice of forum should be set aside.

Defendant's motion to transfer the action to North Dakota is denied.

So ordered.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 3077654

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 9325623
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Central Division.
at Lexington.

Rose M. PHILLIPS, et al., Plaintiffs,

v.

PTS OF AMERICA, LLC, et al., Defendants.

Civil No. 16-466-DCR-CJS
|
Signed 09/12/2017

**Attorneys and Law Firms**

Camille Bathurst, Gregory Allen Belzley, Belzley
Bathurst, Attorneys, Prospect, KY, Paul A. Brizendine,
Brizendine Law Office, LLC, Jeffersonville, IN, for
Plaintiffs.

Chris J. Gadansky, McBrayer, McGinnis, Leslie &
Kirkland, PLLC, J. Denis Ogburn, Pence & Ogburn,
PLLC, Gregory Lucas Finch, Megan Pullem O'Reilly,
Blackburn, Domene & Burchett PLLC, Louisville, KY,
Jaron P. Blandford, McBrayer, McGinnis, Leslie &
Kirkland, PLLC, Lexington, KY, Albert M. Spradling,
III, Spradling & Spradling, Cape Girardeau, MO, for
Defendants.

**REPORT AND RECOMMENDATION**

Candace J. Smith, United States Magistrate Judge

**\*1** This matter is before the Court on: 1) Motion of
Defendants Louisville Metro Government ("LMG") and
Mark E. Bolton, in his individual capacity, to dismiss
for failure to state a claim upon which relief can be
granted (R. 37); and 2) Motion of Defendants Mississippi
County, Missouri ("Mississippi Co.") and William Dorris
to dismiss for lack of venue (R. 40). Plaintiffs have filed
Responses to the Motions (R. 44; R. 45). Defendants
LMG and Bolton have filed a Reply (R. 47). Defendants
Mississippi Co. and Dorris have not filed a Reply and
their time to do so has expired. These Motions have
been referred to the undersigned for preparation of a
Report and Recommendation pursuant to 28 U.S.C. §
636(b)(1). (R. 9). For the reasons that follow, it will

be recommended that the Motion to Dismiss filed by
Defendants Mississippi Co. and Dorris (R. 40) be **denied.**
It will be further recommended that this matter be
**transferred** to the United States District Court for the
Western District of Kentucky, and that the Motion to
Dismiss filed by Defendants LMG and Bolton (R. 37) be
adjudicated by that court after transfer.

**I. Factual and Procedural Background**
In their Second Amended Complaint, Plaintiffs Rose
M. Phillips, administrator of the estate of William
Culpepper, Jr.; Michelle Meyer, as parent and next
friend of W.C., minor daughter of William Culpepper,
Jr. ("Culpepper"); and Brandon Green, the adult son
of Culpepper, who was a minor at the time of William
Culpepper, Jr.'s death, claim pursuant to 42 U.S.C. § 1983
that Defendants violated Culpepper's rights under the
Eighth and Fourteenth Amendments to the United States
Constitution. (R. 29, at 3). Plaintiffs also allege several
state law claims. (*Id.*).

Culpepper was arrested in Louisville, Kentucky on
December 20, 2015, on an outstanding warrant issued
by the State of Mississippi. (*Id.* at 8). He was housed
at the Louisville Metro Department of Corrections
("LMDC") pending transport to Mississippi. (*Id.*) At
approximately 10:00 a.m. on January 29, 2016, a PTS of
America, LLC ("PTS") van arrived at LMDC to transport
Culpepper. (*Id.*). PTS is a company that provides prisoner
transportation services. (*Id.* at 4). The van was operated
by three PTS employees, Defendants Richard Haskins,
James Crook, and Elva Earnhart. (*Id.* at 8). While
Culpepper's intended destination was Central Mississippi
Correctional Facility in Pearl, Mississippi, there was
one overnight stop planned at the Mississippi County
Detention Center ("MCDC") located in Mississippi
County, Missouri. (*Id.*).

Before Culpepper was released from LMDC custody into
the custody of PTS for transport, Culpepper allegedly
reported to Defendants Haskins, Crook, and Earnhart
that he had a bleeding ulcer and was experiencing
abdominal pain. (*Id.*). Defendants Haskins, Crook, and
Earnhart spoke with Defendant McKinney, a LMDC
nurse and employee of Defendant Correct Care Solutions,
LLC, regarding Culpepper's complaints. (*Id.*). Nurse
McKinney responded that Culpepper had no medical
history to support his complaint and directed Culpepper
be given antacids during the trip. (*Id.* at 8-9). Defendants

Haskins, Crook, and Earnhart were also informed, prior to transport, that Culpepper was a diabetic and had been non-compliant with his medications. (*Id.* at 9).

**\*2** During transport to MCDC, Culpepper continued to complain about abdominal pain. (*Id.*). At one point, Defendants Haskins, Crook, and Earnhart claim they contacted a nurse at LMDC about Culpepper's complaints, who allegedly directed them to continue to administer antacids. (*Id.*). Defendants also took Culpepper's blood sugar twice during the trip and, on both occasions, his blood sugar was high—in excess of 600 mg/dl. (*Id.*).

The PTS van arrived at MCDC around midnight that night. (*Id.*). Defendants Haskins, Crook, and Earnhart escorted two other inmates from the van into MCDC, wherein they told an officer and employee of the Jail, Defendant Dorris, and other MCDC employees that Culpepper was still in the van, "refusing to come in." (*Id.*). Defendant Dorris went to the van to help move Culpepper into the jail and found Culpepper barely responsive. (*Id.*).

After Culpepper was taken inside MCDC around 12:18 a.m., Dorris and the Administrator at MCDC, Defendant Cory Hutcheson, refused to admit Culpepper to the Jail "until he was stable and medically cleared." (*Id.* at 10). By approximately 12:25 a.m., Culpepper was unconscious. (*Id.*). An ambulance was called at approximately 12:40 a.m. and Defendants Hutcheson, Dorris, and other MCDC employees placed Culpepper into a wheelchair and transported him to the MCDC lobby to await arrival of the ambulance. (*Id.*). When the ambulance arrived at 12:50 a.m., Culpepper was unresponsive, had no pulse, and could not be revived. (*Id.*). The coroner subsequently determined that Culpepper died due to a perforated duodenal ulcer. (*Id.*).

## II. Analysis

As pointed out above, Defendants LMG and Bolton, in his individual capacity, have now filed a Motion to Dismiss for failure to state a claim upon which relief can be granted (R. 37) and Defendants Mississippi Co. and Dorris have filed a Motion to Dismiss for lack of venue (R. 40). In the Motion to Dismiss for lack of venue, Defendants submit that the Eastern District of Kentucky is not the proper venue for this action under 28 U.S.C. § 1391 and, as a result, the Court should dismiss the Second Amended Complaint against Defendants Mississippi Co.

and Dorris. (*Id.* at 2). The Court's analysis reveals that venue is improper under 28 U.S.C. § 1391, but as explained below, transfer rather than dismissal is the appropriate remedy under the circumstances here.

### A. Venue in the Eastern District of Kentucky is Improper

There is no special venue statute for § 1983 civil rights actions. *Gamble v. Whitmer*, No. 3:12-cv-P481-H, 2012 WL 4460460, at \*1 (W.D. Ky. Sept. 25, 2012); *Schaeffer v. Kentucky*, No. 3:11-cv-P516-R, 2011 WL 5975380, at \*1 (W.D. Ky. Sept. 21, 2011). Looking therefore to the general venue statute, a civil action may be brought in:

> (1) a judicial district where any defendant resides, if all defendants are residents of the State in which the district is located, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) if there is no district in which an action may otherwise be brought in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). Based on the above language, subsection (3) of the venue statute is not applicable unless both subsections (1) and (2) do not provide a judicial district in which an action may be brought. *Schultz v. Ary*, 175 F.Supp.2d 959, 965 (W.D. Mich. 2001) (stating "subsection (3) only applies 'if there is no district in which the action may otherwise be brought' "); *see also Maisano v. Corizon Health, Inc.*, No. 3:13-cv-0947, 2013 WL 5376559, at \*3, 2013 U.S. Dist. LEXIS 137502, at \*8 (M.D. Tenn. Sept. 25, 2013) (referring to 28 U.S.C. § 1391(b)(3) as a "last-resort venue provision"). "Once venue is challenged by a defendant, plaintiff has the burden of proof to establish that venue is proper in the district in which the claim has been brought." *Medquist MRC, Inc. v. Dayani*, 191 F.R.D. 125, 127 (N.D. Ohio 1999) (citations omitted).

**\*3** In their Motion, Defendants Mississippi Co. and Dorris argue that venue is improper in the Eastern District of Kentucky because, under § 1391(b)(2), it is "clear that the Eastern District of Kentucky is not the district where [a] substantial part of the events occurred as alleged in Plaintiffs' Second Amended Complaint, but rather the State of Missouri is where a substantial part of the events are alleged to have occurred." (R. 41, at 2). These Defendants further contend that the majority of the witnesses and parties reside in Missouri. (*Id.* at 3). Thus, according to Mississippi Co. and Dorris, suit could have been properly instituted against them in the United States District Court for the Eastern District of Missouri, Southeastern Division, and venue is improper in the Eastern District of Kentucky.

In Response to Defendants' Motion to Dismiss for improper venue, Plaintiffs argue that the first two sections of 28 U.S.C. § 1391(b) do not apply in this matter. (R. 45, at 4). Specifically, Plaintiffs argue that § 1391(b)(1) does not apply because there are named Defendants residing in Missouri, Tennessee, and Kentucky. Plaintiffs also contend that "it is unquestionable that this case does not meet the criteria set forth in 28 U.S.C. § 1391(b)(2)—the events in this case stretch from Louisville, Kentucky to Charleston, Missouri and involve all points in between." (*Id.*). Accordingly, Plaintiffs claim § 1391(b)(3) determines the appropriate venue in this case. Plaintiffs argue that Defendant PTS does business in Kentucky, and its registered office is located in Lexington, Kentucky, which is within the Eastern District of Kentucky. (*Id.*). Plaintiffs contend that this fact renders PTS subject to personal jurisdiction in this Court, and thus, the Eastern District of Kentucky is one of the districts where this action could be brought for purposes of venue under § 1391(b)(3). (*Id.* at 6).

Notwithstanding Plaintiffs' position that venue is proper in this Court, Plaintiffs state that they would have no objection were Defendants to agree to a transfer of this case to an appropriate division of the Western District of Kentucky for the convenience of the parties. (*Id.*) Plaintiffs cite to 28 U.S.C. § 1404(a), which statute permits a district court, for the convenience of the parties, to transfer any civil action to any other district where it might have been brought or to which all parties have consented. (*Id.*).

Review of the parties' arguments raises the question of which subsection of 28 U.S.C. § 1391(b)—(2) or (3)—applies here to determine proper venue. Under subsection (2), proper venue lies in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, but what if the events or omissions occurred in more than one judicial district? If subsection (2) does not apply in such circumstances, then subsection (3) provides that venue is proper in any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to the action. Plaintiffs rely upon and point to subsection (3) as the reason why they filed in this District and why this District is therefore proper.

In rendering these determinations in the context of a § 1983 action, a factually similar case from the District of Colorado, *Gwynn v. TransCor America, Inc.*, 26 F.Supp.2d 1256, 1261 (D. Colo. Oct. 21, 1998), is instructive. In *Gwynn*, defendant TransCor, an extradition transport company, transported plaintiff and then-inmate Gwynn from Oregon to Colorado. *Gwynn*, 26 F.Supp.2d at 1260. The trip took 145 hours and the route passed through Oregon, California, Nevada, Utah, Wyoming, Idaho, and Colorado. *Id.* During the trip, Gwynn was under the custody and control of two TransCor employees operating a van owned by TransCor. *Id.* At the end of the trip, these two employees delivered Gwynn to the custody of a jail in Jefferson County, Colorado. *Id.*

**\*4** Gwynn filed suit against TransCor and the two employees, asserting *inter alia* that one of the employees raped and sexually assaulted her repeatedly during the trip, and the other employee failed to report or prevent these assaults. *Id.* According to Gwynn, specific acts occurred in Caldwell, Idaho, Vale, Oregon, and at a rest stop in an unspecified state. *Id.* Gwynn also alleged the employee fondled and assaulted her in every state through which he transported her. *Id.* Gwynn claimed that these actions constituted violations of 42 U.S.C. § 1983. *Id.* at 1259.

These two employees filed a motion to dismiss the case against them, arguing, among other things, that venue was improper in Colorado. *Id.* at 1260. Specifically, defendants argued that venue was improper under 28 U.S.C. § 1391 because insufficient events leading to Gwynn's claim occurred in Colorado to render Colorado the proper venue. *Id.* at 1261. Defendants pointed to the fact that less than two hours of the 145-hour trip occurred

in Colorado, a substantial portion of the employee's alleged sexual assaults did not occur in Colorado, and no rape occurred in Colorado. *Id.* Thus, argued defendants, Gwynn had not established a substantial portion of the events leading to her claim occurred in Colorado where she filed suit. *Id.*

In its analysis of the defendants' motion, the court cited to [28 U.S.C. § 1391(b)](), which permits a civil action to "be brought ... in (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ..." *Id.* The court explained, "[u]nder this provision, several districts may qualify as the location of substantial events. 'The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as 'substantial' activities took place in A, too.' " *Id.* (quoting David D. Siegel, "Commentary on the 1988 and 1990 Revisions of [Section 1391, Subdivision (a),]() Clause (2)," *printed in* [28 U.S.C.A. § 1391]() at 13 (West 2006) ). The court further provided, "[e]ven if a more substantial portion of the activities giving rise to the claim occurred in other districts, venue is proper if the district the plaintiff chose had a substantial connection to the claim. *Id.* (citing *[Setco Enters. Corp. v. Robbins,]()* [19 F.3d 1278, 1281 (8th Cir. 1994)]() ).

In making its determination on whether a substantial portion of the events giving rise to Gwynn's claim occurred in Colorado, and thus whether venue was proper in Colorado, the court looked to the substantive law underlying Gwynn's claim. *Id.* (citing *[Merchants National Bank v. Safrabank,]()* [776 F.Supp. 538, 541 (D. Kan. 1991)]() ). In particular, the court stated that "[t]he essential elements of any claim under [§ 1983]() are that 'the conduct complained of was committed by a person acting under color of state law,' and the 'conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.' " *[Id.]()* at 1262 (quoting *[Parratt v. Taylor,]()* [451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981),]() *overruled on other grounds by [Daniels v. Williams,]()* [474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)]() ).

Applying the substantive law to the facts as alleged by Gwynn, the court first found that there was no question that the alleged acts of TransCor and its two employees constituted action under color of state law. *Id.* The court then found the events that allegedly took place in Colorado—Gwynn alleged she was sexually assaulted in each state along the route—could support Gwynn's [§ 1983]()

claim because they form a substantial portion of the events giving rise to her claim even without the events alleged to have occurred in other states. *Id.* (citing *[United States v. Hartbrodt,]()* [773 F.Supp. 1240, 1242 (S.D. Iowa 1991)]() ). As a result, the court found that venue in Colorado was proper and denied the defendants' motion to dismiss for improper venue. *[Id.]()* at 1267.

**\*5** Applying the analysis set forth in *[Gwynn,]()* substantial parts of the events giving rise to Plaintiffs' claim here occurred in both the Western District of Kentucky and the Eastern District of Missouri pursuant to [28 U.S.C. § 1391(b)(2).]() Here, like in *[Gwynn,]()* "The essential elements of any claim under [§ 1983]() are that 'the conduct complained of was committed by a person acting under color of state law,' and the 'conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.' " It is undisputed that each of the Defendants in this matter are individuals or entities that were acting under color of state law—either Kentucky or Missouri. Further, the alleged events or omissions that form the basis of Plaintiffs' claim of deprivation of constitutional rights all took place either in the Western District of Kentucky, prior to and during Culpepper's transport to MCDC, or in the Eastern District of Missouri where MCDC is located and to which Culpepper was transported.

In particular, Plaintiffs claim that LMG and Bolton violated Culpepper's constitutional rights by surrendering Culpepper—who was in need of medical care—to the custody of PTS at the LMDC in Louisville, Kentucky. (R. 29, at 11-12). Plaintiffs also allege that Defendants PTS, Haskins, Crook and Earnhart violated Culpepper's constitutional rights by accepting custody of Culpepper at LCDC and yet failing to seek needed medical attention for Culpepper during the over 13-hour commute through Kentucky to Missouri. *Id.* 9. Finally, Plaintiffs contend that Culpepper was deprived of his constitutional rights when, upon arrival at MCDC, the officers and employees at that facility failed to immediately procure medical treatment for Culpepper, ultimately resulting in his death. *Id.* at 12.

Because the events and/or omissions that allegedly took place in either the Western District of Kentucky or the Eastern District of Missouri, standing alone, could support Plaintiffs' [§ 1983]() claim, the events occurring in both states constitute events forming a substantial portion

of the events giving rise to Plaintiffs' claim. As substantial parts of the events giving rise to Plaintiffs' claims occurred in both the Western District of Kentucky and the Eastern District of Missouri, the next question is whether venue would be potentially proper in either state or in both.

In this regard, the legal principles applied by the court in *Gwynn* would support a finding that venue lies in either the Western District of Kentucky or the Eastern District of Missouri. "Under [28 U.S.C. § 1391(b)(2) ], several districts may qualify as the location of substantial events. 'The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as 'substantial' activities took place in A, too.' " *Gwynn*, 26 F.Supp.2d at 1260. Indeed, the Sixth Circuit, in *First of Michigan Corp. v. Bramlet*, also looked to this interpretation of § 1391(b)(2) when considering challenges to venue. 141 F.3d 260 (6th Cir. 1998). Specifically, the Sixth Circuit reasoned, "[t]he fact that substantial activities took place in district B does not disqualify district A as proper venue as long as 'substantial' activities took place in A, too. Indeed, district A should not be disqualified even if it is shown that the activities in district B were more substantial, or even the most substantial." 141 F.3d at 263 (quoting David D. Siegel, "Commentary on the 1988 and 1990 Revisions of Section 1391, Subdivision (a), Clause (2)," *printed in* 28 U.S.C.A. § 1391 at 13 (West 2006) ). Looking to *Bramlet* and *Gwynn* in this case, venue would be proper in both the Western District of Kentucky and the Eastern District of Missouri because substantial events occurred, or failed to occur, in both districts pursuant to 28 U.S.C. § 1391(b)(2). Thus, subsection (b)(3) is not implicated because subsection (b)(2) applies. Without application of 28 U.S.C. § 1391(b)(3), venue is not proper in this District.

#### B. Dismissal is not the appropriate remedy here

**\*6** After determining that venue is improper in this District, the analysis turns to Defendants' requested remedy of dismissal. In their Motion, Defendants Mississippi Co. and Dorris argue "[b]ecause Plaintiffs' Second Amended Complaint fails to meet any of the three requirements pursuant to 28 U.S.C. § 1391(b), the Second Amended Complaint against the Missouri Defendants should be dismissed." (R. 41, at 3). Defendants cite a pair of cases in support of their argument to dismiss, but neither of the cases analyzes why dismissal, rather than transfer of the case would be a proper remedy. (R. 41, at 3). In one of the cases cited by Defendants, the court

ultimately decided to transfer the case to a proper venue rather than dismiss the case. *See Pisani v. Diener*, No. 7-cv-5118, 2009 WL 749893, at \*10 (E.D.N.Y. 2009). [1] While Plaintiffs' position is that venue is proper in this Court, which as addressed above is incorrect, Plaintiffs also state they have no objection to transfer of this matter to the Western District of Kentucky. (R. 45, at 5-6).

[1]     Defendants also cite to *Young v. Ellis*, in which the United States District Court for the District of Kansas dismissed the plaintiff's claim "under Rule 12(b)(3) for improper venue." No. 2:13-cv-2558, 2014 U.S. Dist. LEXIS 74654 (D. Kan. 2014). Although not binding on this Court, *Young* is nevertheless distinguishable from the case at hand because the court never addressed the possibility of transferring the case, and the court noted that there was a proper district in which the action could be brought even after dismissal. *Id.* at \*3.

The statute applicable under these circumstances is 28 U.S.C. § 1406(a), which provides:

> (a) The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a). Although the statute does say that dismissal is an option when venue is laid in the wrong district, the court has broad discretion in ruling on whether dismissal or transfer would be the appropriate remedy. *See Stanifer v. Brannan*, 564 F.3d 455, 457 (6th Cir. 2009). Dismissal rather than transfer of a case may be appropriate in instances where the plaintiff misuses the court process, or makes such an obvious error that transfer is inappropriate as it would reward plaintiff's lack of diligence. *Id.* at 460 (citing *Cote v. Wadel*, 796 F.2d 981, 985 (7th Cir. 1986); *Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2nd Cir. 1992) ). Plaintiffs here had a seemingly well-founded reason to file their case in the Eastern District of Kentucky based on their assessment of the venue statute. Doing so was not a misuse of the court process, and the error was not an obvious one. Therefore, dismissal is not recommended in this instance.

In exercising its authority under § 1406, "a district court has the power to *sua sponte* transfer a case." *Cosmichrome, Inc. v. Spectra Chrome, LLC*, 504 F. App'x 468, 472 (6th Cir. 2012). Although Defendants Mississippi Co. and Dorris request dismissal of the claims against them in lieu of transfer, this does not prohibit this Court from considering whether transfer is the more appropriate remedy in the interests of justice here. In considering whether the interests of justice dictate transfer of a case instead of dismissal, courts are guided by the policy "of allowing cases to be decided on their substantive merits, as opposed to being decided on procedural grounds." *Flynn v. Greg Anthony Constr. Co., Inc.*, 95 F. App'x 726, 741 (6th Cir. 2003) (citing *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466-67, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) ); *see also Marsh v. Genetech Inc.*, No. 11-11462, 2011 WL 2600641, at *1 (E.D. Mich. 2011) (stating "[i]t is in the interest of justice that Plaintiff's case be decided on its merits").

As a result, "the reasons for transferring a case to a proper forum rather than dismissing are especially compelling if the statute of limitations has run since the commencement of the action, so that dismissal might prevent the institution of a new suit by the plaintiff and a resolution on the merits." *Jackson v. L & F Martin Landscape*, 421 F. App'x 482, 484 (6th Cir. 2009). Here, Plaintiffs have filed their claims pursuant to 42 U.S.C. § 1983 (R. 29, at 3), which does not contain a statute-of-limitations period. Therefore, federal courts are to "turn to state law for statutes of limitations in actions brought under [this] civil rights [statute]." *Burnett v. Grattan*, 468 U.S. 42, 49, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). In Kentucky, the applicable statute of limitations is one year, as provided in K.R.S. § 413.140(1)(a). *Bowden v. City of Franklin, Ky.*, 13 F. App'x 266, 272 (6th Cir. 2001); *see also Collard v. Kentucky Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990) (stating that "section 1983 actions in Kentucky are limited by the one-year statute of limitations found in section 413.140(1)(a).").

**\*7** The allegations giving rise to Plaintiffs' claims in this matter occurred in January of 2016 (R. 29, at 8-9), and this action was commenced in December of 2016. (R. 1). Thus, it appears that dismissal of Plaintiffs' claims against the Missouri Defendants would preclude Plaintiffs from obtaining an adjudication of their claims on the merits. As it is in the interest of justice that Plaintiffs' claims be decided on their merits, rather than dismissed

on procedural grounds, transfer of this case to a District where venue is proper, rather than dismissal of the case, would better serve the interests of justice.

### C. Transfer to the Western District of Kentucky is appropriate

As the appropriate remedy is transfer of this matter to a district in which it could have been brought, the question now before the Court is to which jurisdiction this matter should be transferred. As discussed above, venue lies in both the Western District of Kentucky and the Eastern District of Missouri, so either forum would be appropriate under 28 U.S.C. § 1406. Prior to the 1990 amendment to § 1391(a)(2),[2] when choosing *the* appropriate forum, courts considered "the availability of the witnesses, the accessibility of other relevant evidence, and the convenience of the defendant." *N. Ky. Welfare Rights Ass'n v. Wilkinson*, No. 90-6268, 933 F.2d 1009, 1991 U.S. App. LEXIS 11472, at *14 (6th Cir. 1991) (citing *Leroy v. Great Western United Corporation*, 443 U.S. 173, 185, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) ). Looking generally at such considerations here suggests the Western District of Kentucky is an appropriate forum to which to transfer this action. Regarding the witnesses, while there is an identifiable group of persons located in Missouri who witnessed Culpepper's death and the circumstances leading up to his death, there are also a number of witnesses located in the Western District of Kentucky that can likely attest to Culpepper's condition while incarcerated and in the time leading up to and during his transport and ultimate death.

2      The subsection previously laid venue in *the* judicial district "in which a substantial part of the acts, events or omissions occurred that gave rise to the claim for relief," but after the amendment, venue was proper in *a* judicial district "in which a substantial part of the events giving rise to the claim arose." *First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998). The new language removed the requirement that plaintiffs pinpoint the one and only forum in which the claim arose. *See* David D. Siegel, "Commentary on the 1988 and 1990 Revisions of Section 1391, Subdivision (a), Clause (2)," *printed in* 28 U.S.C.A. § 1391 at 13 (West 2006).

As for accessibility of other relevant evidence, Culpepper was arrested in Louisville, Kentucky, and held at LMDC for over a month. (R. 29, at 8). Therefore, much of the physical evidence, including Culpepper's inmate

records and medical records regarding his time spent at LMDC, are located in the Western District of Kentucky. Culpepper's historical medical records and other relevant personal documents and information about him prior to his death will also be located in the Western District of Kentucky. And Plaintiff Phillips was appointed administrator of Culpepper's estate by the Jefferson County, Kentucky, District Court (*see* R. 29, at 4), which is located in the Western District of Kentucky.

Finally, in considering convenience of a defendant, Defendants in this case are from both the Western District of Kentucky and the Eastern District of Missouri, as well as Tennessee. (R. 29, at 4-6). Therefore neither district is more convenient than the other in that aspect. In summary, the Western District of Kentucky is an appropriate forum for transfer purposes because numerous potential witnesses and parties as well as significant physical evidence are located in that District.

### III. Conclusion and Recommendation
 **\*8** Because this case was improperly filed in the Eastern District of Kentucky, the matter should be transferred to an appropriate forum in the interest of justice under 28 U.S.C. § 1406(a), the Western District of Kentucky being an appropriate forum.

Accordingly, **IT IS RECOMMENDED** that:

1) The Motion to Dismiss filed by Defendants Mississippi Co. and Dorris (R. 40) be **denied.**

2) This matter be **transferred** in its entirety, including the pending Motion to Dismiss filed by Defendants LMG and Bolton (R. 37), to the United States District Court for the Western District of Kentucky.

Particularized objections to this Report and Recommendation must be filed with the Clerk of Court within **fourteen (14) days** of the date of service or further appeal is waived. Fed. R. Civ. P. 72(b)(2); *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 150 (1985). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) (citing *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991) ). Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal. *Howard*, 932 F.2d at 509. A party may file a response to another party's objection within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2).

**All Citations**

Slip Copy, 2017 WL 9325623

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3334889
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Kevin M. SCHILLING, on behalf of himself
and all others similarly situated, Plaintiff,
v.
TRANSCOR AMERICA, LLC, et al., Defendants.

No. C 08–941 SI.
|
Oct. 14, 2009.

**Attorneys and Law Firms**

Andrew Charles Schwartz, Casper Meadows Schwartz & Cook, Walnut Creek, CA, Joshua Kaizuka, Mark E. Merin, Esq., Law Office of Mark E. Merin, Sacramento, CA, Karen Leigh Snell, Attorney at Law, San Francisco, CA, for Plaintiff.

Justus C. Spillner, III, McCormick Barstow Sheppard Wayte & Carruth LLP, Matthew Edward Fletcher, Attorney at Law, Fresno, CA, Daniel P. Struck, Lisa S. Wahlin, Rachel Love, Jones, Skelton & Hochuli, P.L.C., Phoenix, AZ, for Defendants.

**ORDER DENYING DEFENDANTS'
MOTION TO TRANSFER VENUE;
GRANTING PLAINTIFFS' LEAVE TO
FILE SECOND AMENDED COMPLAINT**

SUSAN ILLSTON, District Judge.

*\*1* Defendants' motion to transfer venue and plaintiffs' motion to amend the complaint are scheduled for a hearing on October 16, 2009. Pursuant to Civil Local Rule 7–1(b), the Court determines that the matters are appropriate for resolution without oral argument, and VACATES the hearing. For the reasons set forth below, the Court DENIES defendants' motion to transfer venue, and GRANTS plaintiff leave to amend the complaint.

**BACKGROUND**

On February 14, 2008, plaintiff Kevin Schilling filed this lawsuit against TransCor America, LLC ("TransCor"), Sergeant John Smith, "Officer Blanden," and Does 1–100.[1] On August 21, 2008, plaintiffs filed an amended complaint adding two additional named plaintiffs, John Pinedo and William Tellez, and correcting a typographical error. The amended complaint alleges that TransCor is a for-profit Tennessee corporation licensed to do business in California whose business entails the transportation of pretrial detainees and prisoners throughout the United States on behalf of federal, state and local governments. First Amended Complaint ("FAC") ¶ 13. The complaint also alleges that at all material times, each of the defendants was acting under color of state and federal law. *Id.* ¶ 17.

[1] The complaint incorrectly named defendant Jeff Brummett as Officer Blanden. Plaintiffs' motion to amend the complaint seeks to correct this error, and defendants have no objection to this amendment. This order will refer to defendant by his correct name, Brummett.

The FAC alleges that TransCor transports pretrial detainees and prisoners in conditions that amount to cruel and unusual punishment. The FAC alleges that TransCor's policies, practices or customs include but are not limited to transporting pretrial detainees and prisoners in small metal cages in which a person can neither stand up nor lie down, for more than 24 hours at a time, while the person is handcuffed, chained, and in shackles, and failing to provide pretrial detainees and prisoners with adequate food, fluids, exercise, hygiene, and medical care. *Id.* ¶ 2. According to the FAC, plaintiff Schilling was picked up at a detention facility in Fairfield, California, by agents and/or employees of TransCor. *Id.* ¶ 21. The complaint alleges that Schilling was strip searched before boarding the transport van, and that he "was then handcuffed, a restraint was applied that secured his hands to his waist, and he was shackled. After boarding the transport van, plaintiff was seated on a metal bench in a small, locked metal cage in which it was impossible for him to stand up or sit down." *Id.* The complaint alleges that for the next several days, plaintiff remained in the transport van, restrained and shackled in the metal cage, while the van "meandered around California—from Fairfield through counties within the Northern District of the United States Court and then back, once again through counties within the Northern District of the United States District Court, to Fairfield—picking up and dropping

off pretrial detainees and/or prisoners." *Id.* ¶ 22. Plaintiff Schilling alleges that during the time in the transport van, he was provided with only two meals per day; he was not permitted to lie down, stand up, bathe, shave, brush his teeth or change his clothes; he was forced to use the on-board toilet at defendants' convenience; and aside from the steps from his cage to the toilet and back, he was allowed no physical activity. *Id.* ¶ 23. The FAC also alleges that after being in the van for several days, Schilling realized that the van was headed back to Fairfield and he demanded to speak to the warden. *Id.* ¶ 24. The complaint alleges that in response, and while he was detained as described above, defendants Brummett and Smith grabbed him, sprayed pepper spray in his face, purposely walked him into poles, and along with an unknown TransCor employee, punched him. *Id.* Plaintiff alleges that he was not allowed to see a doctor or a nurse until the transport van reached Imperial County Jail. *Id.*

**\*2** The FAC alleges that plaintiff Pinedo was picked up by TransCor at Kern Valley State Prison in Delano, California, and transported to Santa Barbara County Jail. *Id.* ¶ 26. The FAC alleges that the trip took more than 27 hours, and that during the entire time Pinedo was in TransCor's vehicle, he was handcuffed, shackled, and restrained with a belly chain and chained to other inmates in a metal cage, unable to lie down or sleep during the entire time of his transport. *Id.* ¶ 27. The FAC also alleges that Pinedo was permitted only two opportunities to urinate, but could not sit to use the toilet to defecate because TransCor personnel would not remove any of the restraints. *Id.* ¶ 28. Pinedo also alleges that he was fed only three "fast food" meals, and not permitted to wash, shower or change his clothes before being delivered to Santa Barbara County Jail. *Id.* ¶ 29.

The FAC alleges that plaintiff Tellez was picked up by TransCor at the Federal Penitentiary in Atwater, California. *Id.* ¶ 30. Tellez was transported to Clark County Detention Center in a trip that took six days, and then approximately six months later, TransCor transported Tellez from Clark County Detention Center back to Atwater, California. *Id.* ¶ 33. The FAC alleges that Tellez experienced conditions similar to those experienced by Schilling and Pinedo. *Id.* ¶¶ 30–33.

Plaintiffs filed this action on behalf of a class consisting of "all pretrial detainees and prisoners who were transported by TRANSCOR AMERICA, LLC, its agents and/or

employees, and forced to remain in the transport van for more than 24 hours, from two years preceding the filing of this Complaint to the date this case is resolved." *Id.* ¶ 39. The complaint also alleges a similar subclass of all pretrial detainees and prisoners transported in California. *Id.* ¶ 40. The complaint alleges claims under 42 U.S.C. § 1983 for violations of the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution, and the California State Bane Civil Rights Act. Plaintiffs seek declaratory and injunctive relief, as well as monetary damages.

## DISCUSSION

### I. Defendants' motion to transfer venue

Defendants move to transfer venue to the Middle District of Tennessee, or alternatively to the Eastern District of California. Defendants contend that transfer is appropriate pursuant to 28 U.S.C. § 1406(a) because a substantial part of the events giving rise to this lawsuit occurred in Tennessee, where TransCor is headquartered and thus where the TransCor policies and procedures were developed, or the Eastern District of California, because a large portion of the route that plaintiff Schilling traveled on when he was transported from Fairfield, California to Las Vegas, Nevada, is in the Eastern District. Alternatively, defendants contend that venue should be transferred to Tennessee pursuant to 28 U.S.C. § 1404(a) because it is more convenient for the parties and witnesses.

### A. 28 U.S.C. § 1406(a)

**\*3** In general, venue is covered by 28 U.S.C. § 1391. Under 29 U.S.C. 1391(b), where federal subject matter jurisdiction is not based solely on diversity of citizenship, venue is proper in the following districts: (1) a judicial district where any defendant resides, if all defendants reside in the same State; (2) a judicial district in which a "substantial part of the events or omissions" giving rise to the claim occurred, or a "substantial part of the property" that is the subject of the action is situated; or (3) if there is no district in which the action may otherwise be brought, a judicial district in which any defendant may be found. 28 U.S.C. § 1391(b). Here, the defendants do not all reside in the same state,[2] and there are districts in which the action may be brought, and thus the question is whether a "substantial part of the events or omissions" giving rise to plaintiffs' claims occurred in this district.

2

Defendants Brummett and Smith reside in Oklahoma.

As an initial matter, plaintiffs contend that defendants have waived an improper venue defense because Federal Rule of Civil Procedure 12(b)(3) provides that any motion asserting the defense of improper venue must be made before pleading if a responsive pleading is allowed. Plaintiffs note that TransCor filed a motion to dismiss pursuant to Rule 12(b) in 2008, and that it has since appeared at three different case management conferences and has represented in case management conference statements that "there are no issues regarding personal jurisdiction or venue." TransCor argues that it has not waived a venue challenge because it was only recently that TransCor's counsel learned that plaintiff Schilling's transport only traveled into the Northern District momentarily. Defendants also argue that defendants Smith and Brummett were only recently served with the complaint, and that these defendants preserved their venue objection by asserting it in their answer and by filing the instant motion.

The Court finds that defendants Smith and Brummett have not waived their venue objection since these defendants were only recently served and have raised improper venue in their answer. Given the procedural history of this case and the fact that this action has been pending since February 2008, it is a much closer call as to whether TransCor has waived its right to challenge venue. However, because all defendants raise identical arguments regarding venue, the Court will consider the motion as to all defendants.

The events or omissions on which plaintiffs' claims are based occurred in several judicial districts, including the Northern and Eastern Districts of California, Nevada, and Tennessee. Section 1391(b) "do[es] not require that a majority of the 'events or omissions' occur in the district where suit is filed; nor that the events there predominate. It is sufficient that a 'substantial part' occur there." Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial*, ¶ 4:316 (2009). The "substantiality" requirement is "intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Cottman Transmission Systems, Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994).

**\*4** The parties dispute how much of plaintiff Schilling's transport route went through the Northern District versus the Eastern District .[3] The Court finds it unnecessary to resolve this factual question—which in any event cannot be conclusively determined upon this record—because it is undisputed that at least some portion of Schilling's route was in the Northern District. In addition, plaintiffs assert, and defendants do not deny, that discovery has revealed that during the class period TransCor had contracts with seven law enforcement agencies in the Northern District to transport prisoners and pretrial detainees. In contrast, TransCor has closed the Fresno "hub," and TransCor did not have any contracts to transport prisoner and pretrial detainees in the Middle District of Tennessee. Thus, it is likely that putative class members were transported throughout the Northern District of California. The Court concludes that based upon these facts, venue is proper in this District. Moreover, any suggestion by defendants that litigating in this District is unfair or burdensome is undercut by their willingness to litigate in the Eastern District, which is equally remote from either Oklahoma, where the individual defendants reside, or Tennessee, where TransCor is headquartered.

3

The parties do not discuss the other named plaintiffs' transport routes.

### B. 28 U.S.C. § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil matter to any other district or division where it might have been brought." 28 U .S.C. § 1404(a). The purpose of § 1404(a) is to "prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (internal citations and quotation omitted). A motion for transfer lies within the broad discretion of the district court, and must be determined on an individualized basis. *See Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498 (9th Cir.2000).

To support a motion for transfer, the moving party must establish: (1) that venue is proper in the transferor district; (2) that the transferee district is one where the action might have been brought; and (3) that the transfer will serve the convenience of the parties and witnesses, and will promote the interests of justice. *See Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp.,* 820 F.Supp.

503, 506 (C.D.Cal.1992). A motion for transfer lies within the broad discretion of the district court, and must be determined on an individualized basis. *See Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498 (9th Cir.2000).

Defendants contend that the Middle District of Tennessee is more convenient because TransCor witnesses and documents are located there. However, given the procedural posture of this case, the Court finds that transfer would be both inefficient and not in the interest of justice. This case has been pending since February 2008, the parties have engaged in motion practice, and the Court has held three case management conferences. Under the current pretrial schedule, plaintiffs are scheduled to file a motion for class certification in December 2009, and the Court will hold a hearing on the motion in February 2010. According to plaintiffs' counsel, document discovery is virtually complete, and the parties have cooperated to schedule depositions at convenient times and places, including in Tennessee and Oklahoma. Thus, the only inconvenience to non-California witnesses will be if they are required to testify at trial. Given defendants' willingness to litigate in the Eastern District of California, any incremental inconvenience caused by traveling to the Northern District is marginal at best.

**\*5** Accordingly, the Court DENIES defendants' motion to transfer venue.

## II. Plaintiffs' motion to file second amended complaint

Plaintiffs seek to amend the complaint in several ways. Plaintiffs seek to correct the name of defendant Brummett, and to change the place of plaintiff Schilling's residence as well as the date of his transport. Plaintiffs also wish to amend the definition of the class to include pretrial detainees and prisoners whose claims were timely as of February 14, 2006, despite having accrued more than two years before plaintiffs filed their original complaint, based on the tolling provisions of California Code of Civil Procedure section 352 (limitations period tolled due to the disability of minority or insanity) or 352.1 (limitations period tolled for a maximum of two years due to the disability of imprisonment). Finally, plaintiffs wish to allege with additional particularity the facts showing that the tolling provisions of California Code of Civil Procedure section 352.1 apply to plaintiff Tellez. Defendants only oppose the proposed amendment to the class definition.

Plaintiffs state that through pre-class certification discovery they have learned that a substantial number of the prisoners and detainees transported by TransCor were juveniles and state hospital inmates. Plaintiffs state that in preparing to move for class certification, it has come to their attention that the complaint unintentionally excludes potential class members with timely claims. Plaintiffs argue that there is no prejudice to defendants because the additional class members have the same claims as the original class, and that the proposed amendment does not affect the schedule for filing and hearing the motion for class certification.

Defendants oppose amending the class definition on several grounds. First, defendants argue that plaintiffs have unreasonably delayed in seeking the current amendment, and they emphasize that plaintiffs have long known through discovery that TransCor transported juveniles and state hospital inmates. However, delay alone is not a basis for denying leave to amend. See *Owens v. Kaiser Foundation Health Plan Inc.,* 244 F.3d 708, 712–713 (9th Cir.2001) ( "Assuming arguendo that Kaiser had unreasonably delayed the filing of the motion to amend its answer, undue delay by itself is insufficient to justify denying a motion to amend.") (internal citation and quotation omitted). Moreover, while defendants assert that the delay is unjustified, there is no suggestion of bad faith on the part of plaintiffs.

Defendants also contend that the revised class definition will cause them prejudice because discovery has been limited to the class period alleged in the complaint— February 14, 2006 to February 14, 2008—and extending the class period may require that eight witnesses will have to be re-deposed to ascertain if TransCor's policies and procedures were different prior to February 14, 2006. Defendants also assert that they will be required to "scour" through literally thousands of pages of documents a second time if the class period is expanded. However, as plaintiffs note, defendants have not offered any evidence in support of their speculation that the witnesses identified by defendants—all of whom are TransCor employees—would need to be re-deposed. Plaintiffs argue that if any witness needs to be re-deposed, that burden falls on plaintiffs, not defendants. Moreover, plaintiffs state that they believe there will be little if any additional discovery required. Plaintiffs have submitted the deposition testimony of Sondra Pedrigo, who was designated by defendants as the "person most

knowledgeable about any and all policies and procedures of TransCor relating to transportation of prisoners," "the nutrition provided to prisoners during transportation," "prisoner complaints," etc., and who has worked for TransCor for eleven years. *See* Snell Reply Decl. Ex. A. During her testimony, Ms. Pedrigo testified about certain practices that have been in place since at least 2001 (such as use of black boxes over handcuffs), and she gave no indication that TransCor's policies and practices had changed in material ways over the years. If, in fact, there are material differences pre-and postFebruary 2006 with regard to TransCor's policies and procedures, defendants can easily ascertain that fact because Ms. Pedrigo is a TransCor employee. With regard to document discovery, plaintiffs state that in August 2008, plaintiffs requested transport records from TransCor's computer system dating back to February 2004, and that plaintiffs do not anticipate requiring any discovery other than that already served or noticed prior to filing the class certification motion.

**\*6** Defendants also argue that the proposed amendment would be futile because the additional class members will be difficult to identify, and individual tolling-issue inquiries will predominate over common questions. However, as defendants recognize in their opposition, those are questions for class certification, and the Court finds it premature to resolve those questions at this stage. Defendants may renew those arguments in opposition to class certification.

Finally, the parties dispute whether the proposed amended class definition should relate back to the original complaint. Defendants argue that the amendment should not relate back because the claims of the additional class members arise out of different transports in a different time period. Defendants also assert that the original complaint only gave them notice that plaintiffs were challenging TransCor's policies and procedures from February 2006 to February 2008. These arguments are not persuasive. While the additional class members' claims would arise from an earlier time period, the claims are substantively similar to those of the existing putative class, and defendants have not identified any meaningful difference between the pre- and post-February 2006 class members. See *Immigrant Assistance Project of the Los Angeles County Federation of Labor v. INS,* 306 F.3d 842, 858 (9th Cir.2002) (addition of new plaintiffs who were similarly situated to original plaintiffs did not prejudice defendants, claims related back). In addition, since the filing of the FAC in August 2008, defendants have been aware that plaintiff Tellez's claims arose in August 2005, prior to the asserted class period. *See* FAC ¶¶ 30–34 (alleging that Tellez was incarcerated at Federal Penitentiary in Atwater, California, and that transports occurred in August 2005 and February 2006).

### CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion to transfer venue and GRANTS plaintiffs' motion to file a second amended complaint. (Docket Nos. 69, 70). Plaintiff shall file an amended complaint no later than **October 19, 2009**

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3334889

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Starr v. Michael Stars, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12291517

2013 WL 12291517
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael STARR, Plaintiff,

v.

MICHAEL STARS, INC., Defendant.

5:12-CV-860 (NAM/ATB)
|
Signed 03/21/2013

**Attorneys and Law Firms**

Office of Howard D. Leib, Howard D. Leib, Esq., of counsel, 1861 Hanshaw Road, Ithaca, New York 14850, Attorney for Plaintiff.

Hancock Estabrook, LLP, Ashley D. Hayes, Esq., of counsel, Robert J. Thorpe, Esq., of counsel, Zachary M. Mattison, Esq., of counsel, 1500 AXA Tower I, 100 Madison Street, Syracuse, New York 13221, and Ezra Brutzkus Gubner LLP, J. Alison Grabell, Esq., of counsel, Mark D. Brutzkus, Esq., of counsel, 21650 Oxnard St., Suite 500, Woodland Hills, California 91367-4911, Attorneys for Defendant.

## MEMORANDUM-DECISION AND ORDER

Honorable Norman A. Mordue, U.S. District Judge

**\*1** In this action alleging trademark infringement, defendant moves (Dkt. No. 13) to dismiss for improper venue under 28 U.S.C. § 1406(a) and Fed.R.Civ.P. 12(b)(3), or to transfer venue to the Central District of California under 28 U.S.C. § 1404(a). The Court grants the motion to the extent that the case is transferred to the Central District of California; the motion is otherwise denied.

## BACKGROUND

The complaint alleges jurisdiction under 15 U.S.C. § 1121(a) (granting original jurisdiction to district court over all actions "arising under" 15 U.S.C. Chapter 22, "Trademarks"). Plaintiff is an individual residing in the State of California. Defendant Michael Stars, Inc. is

a corporation organized under California law, with its principal place of business in California. Defendant is a manufacturer and retailer of casual women's apparel and accessories. It is undisputed that defendant is registered with the New York Secretary of State as a foreign corporation authorized to do business in the state. *See* N.Y. Business Corp. Law ("BCL") §§ 1301 *et seq.*

Defendant moves to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3), based on 28 U.S.C. § 1406(a), which states: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." In the alternative, defendant requests that, if the Court denies dismissal under section 1406(a), the case be transferred to the Central District of California in the Court's discretion "for the convenience of parties and witnesses, in the interest of justice" under 28 U.S.C. § 1404(a).

In support of its contention that venue lies in the Northern District of New York, plaintiff relies on the following allegations: defendant is authorized to do business in New York State; defendant sells its products on its website; and nine independent retailers in the Northern District sell defendant's products.

## DISCUSSION

The pertinent portions of 28 U.S.C. § 1391 provide:

(b) Venue in general.—A civil action may be brought in —

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; [or]

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred [.]

* * *

(c) Residency.—For all venue purposes—

* * *

Starr v. Michael Stars, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12291517

(2) an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question[.]

* * *

(d) Residency of corporations in States with multiple districts.—For purposes of venue under this chapter, in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State....

**\*2** Plaintiff relies primarily on section 1391(b)(1) venue, arguing that defendant is deemed to reside in the Northern District of New York by operation of section 1391(d), because defendant is subject to personal jurisdiction here under sections 301 and/or 302(a)(1) of New York Civil Practice Law and Rules ("C.P.L.R."). The parties have not engaged in discovery; thus, plaintiff has only the burden of making a *prima facie* showing that jurisdiction exists, and all pleadings and affidavits are construed in his favor. *See Hoffritz for Cutlery, Inc. v Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

Authorization to do business in New York and designation of a registered agent for service of process amount to consent to personal jurisdiction in New York State. *See Weisman Celler Spett & Modlin, P.C. v. Trans-Lux Corp.*, 2012 WL 5512164, \*2 (S.D.N.Y. Nov. 14, 2012); *Rockefeller Univ. v. Ligand Pharms.*, 581 F.Supp.2d 461, 467 (S.D.N.Y. 2008) (cited with approval in *STX Panocean (UK) Co., Ltd. v. Glory Wealth Shipping PTE Ltd.*, 560 F.3d 127, 131 (2d Cir. 2009)). It is undisputed that defendant is registered with the New York Secretary of State pursuant to BCL § 1304 and is thereby authorized to do business in the state. As a result, by operation of New York law, defendant is deemed to have designated the New York Secretary of State as its agent for service of process, thus consenting to suit in New York. *See* BCL § 304. Defendant is subject to personal jurisdiction in New York State, based on its consent.

The recently-enacted subdivision (d) of section 1391 provides that where, as here, a defendant corporation is subject to personal jurisdiction in a state having multiple judicial districts, the corporation "shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." [1] The Court reads section 1391(d) as applying not only where personal jurisdiction in New York is based on contacts with the state, but also where, as here, it is based on implied consent under BCL § 304. Therefore, the Court must conduct a personal jurisdiction analysis, treating the Northern District as a state and defendant as a corporation that has not consented to jurisdiction here. *See generally ICA Group, LLC v. Taggart Global, LLC*, 2013 WL 159936, \*1 (E.D. Pa. Jan. 15, 2013); *Schneider v. Bishop*, 2012 WL 5948465, \*3 (S.D. Cal. Nov. 27, 2012); *Garnet Digital, LLC v. Apple, Inc.*, 2012 WL 4465260, \*1 (E.D. Tex. Sept. 27, 2012).

[1]      *See* Federal Courts Jurisdiction and Venue Clarification Act of 2011, PL 112-63, 125 Stat 758, Dec. 7, 2011.

In arguing that defendant's contacts with the Northern District of New York would be sufficient to subject it to personal jurisdiction if this district were a separate state, plaintiff relies on two New York jurisdictional provisions: C.P.L.R. § 301 (defendant is doing business here); and C.P.L.R. § 302(a)(1) (defendant transacts business here and plaintiff's cause of action arises from defendant's transaction of business). If a statutory basis for jurisdiction exists, the Court must then consider whether the exercise of jurisdiction comports with the Due Process Clause of the United States Constitution. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

Plaintiff has not made a *prima facie* showing that the Northern District, if it were a state, could assert general jurisdiction over defendant under C.P.L.R. § 301. Section 301 provides for general jurisdiction over a foreign corporation that "does business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (internal quotes and citation omitted) (quoted in *Xiu Feng Li v. Hock*, 371 Fed.Appx. 171, 174 (2d Cir. 2010)). The Court analyzes defendant's connections to this district "not for

Starr v. Michael Stars, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12291517

the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (quoting Weinstein, Korn & Miller, *New York Civil Practice*, ¶ 301.16, at 3-32). Among the factors bearing on section 301 jurisdiction are "the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York." *Id.* "The shipment of goods into New York does not *ipso facto* constitute 'doing business.' " *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 763 (2d Cir. 1983) (finding that defendant's "cease and desist" letter to plaintiff and an unspecified number of mail order sales of defendant's products in New York are insufficient to satisfy the "doing business" test). Solicitation of business does not satisfy section 301 unless it is "substantial and continuous," and "defendant engages in other activities of substance in the state." *Landoil*, 918 F.2d at 1043 (citing *Beacon*, 715 F.2d at 763); *accord Xiu Feng Li*, 371 Fed.Appx. at 174-75. Courts generally hold that the fact that an out-of-state corporation has a website accessible in New York—even one from which internet users can purchase products to be shipped into the state—is insufficient to confer section 301 jurisdiction unless the website is "purposefully directed towards" the state or amounts to solicitation of "substantial amounts of business from the state on a continuous basis." *Biro v. Nast*, 2012 WL 3262770, *5-6 (S.D.N.Y. Aug. 10, 2012); *accord Holey Soles Holdings, Ltd. v. Foam Creations, Inc.*, 2006 WL 1147963, *4 (S.D.N.Y. May 1, 2006). As the Southern District observed: "If such a website gave rise to general jurisdiction, then millions of retailers located throughout the globe could be haled into New York courts for any claim brought against them by any party; such a finding would contravene the purposefully narrow reach and long-standing stringent application of C.P.L.R. § 301." *Holey Soles*, 2006 WL 1147963 at *4.

 **\*3** Plaintiff does not claim that defendant has a retail store, office, bank account, property, employee, or agent in the Northern District. Plaintiff does not allege any contacts in this district except the following: solicitation of sales through a website accessible in every district in the country; the possibility that, through the website, defendant may have sold and shipped products to consumers in the Northern District; and the fact that nine independent retailers in this district carry defendant's

products. Defendant's website, www.michaelstars.com, provides information about defendant's products, lists defendant's retail stores, and allows the purchase of products online. The website shows that defendant owns eleven retail stores, none of which are located in New York, and a seasonal store in East Hampton, Suffolk County, New York, which is in the Eastern District of New York. [2] Nothing in this record suggests that defendant's online sales in this district or its sales through nine retailers in this district constitute substantial and continuous solicitation or that they constitute a significant percentage of defendant's business. Indeed, a search of defendant's website shows that its products are carried by, *inter alia*, 91 independent retailers in New York State; 150 in California; 70 in Florida; 60 in New Jersey; 58 in Illinois; 46 in Massachusetts; 36 in Alabama; 36 in Georgia; 26 in Michigan; 23 in Connecticut, 22 in Arizona; and 19 in Maryland. Thus, the independent retailers offering defendant's products in the Northern District of New York amount to less than 1.5% of the independent retailers throughout the nation that offer its products. Defendant also sells its products through department stores such as Bloomingdale's, and online sites such as www.bloomingdales.com, www.nordstrom.com, www.zappos.com and www.amazon.com. This Court holds that internet sales on websites available throughout the nation, and the location in the Northern District of New York of a minuscule proportion of the independent retailers that carry defendant's products, without more, do not support a finding of solicitation of substantial amounts of business on a continuous basis sufficient to satisfy section 301. As the *Holey Soles* court observed, to hold otherwise would mean that "millions of retailers located throughout the globe could be haled into New York courts for any claim brought against them by any party." Plaintiff has failed to make a *prima facie* showing that section 301 jurisdiction would exist in the Northern District so as to support venue here.

[2]   According to defendant, less than four percent of its total national United States sales from January 1, 2011 through June 30, 2012 was derived from sales to customers in the State of New York, with a vast majority of those sales being in the New York City area and from its seasonal store in East Hampton. Defendant also submits evidence that it has conducted a review of its internet sales records and has not identified any internet sales to customers in the Northern District of New York. Defendant

Starr v. Michael Stars, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12291517

adds: "To the extent any of those sales may have been made to customers in the Northern District of New York, they would have been *de minimis.*" Defendant's evidence is consistent with record before the Court. Because the parties have not engaged in discovery, however, plaintiff is at a disadvantage in this regard. The Court need not rely on this evidence to decide this motion.

The Court next considers "transaction of business" jurisdiction under C.P.L.R. § 302(a)(1), which provides:

(a) ... As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state[.]

To evaluate specific jurisdiction under this section, the Court must decide "(1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006)). Courts consider the totality of the defendant's activities within the forum in determining whether a defendant has transacted business here. *Id.* A defendant need not be physically present in New York to transact business here under section 302(a) (1), as long as it engages in "purposeful activities" through which it "avails itself of the privilege of conducting activities within the ... State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (citations and internal quotation marks omitted). In the context of internet commerce, the Second Circuit has held that "the single act of an out-of-state defendant employee shipping an item into New York, combined with his employer's extensive business activity involving New York" demonstrates transaction of business under section 302(a)(1). *Chloé*, 616 F.3d at 165. Because it found additional activity in New York, the *Chloé* court did not decide whether a single act of shipping an item into New York could be sufficient, without more, to support section 302(a)(1) jurisdiction. *Id.* at 170. District courts following *Chloé* generally hold that section 302(a)(1) jurisdiction in internet sales cases requires additional contacts beyond a single sale into New York. *See, e.g., RVDirect.com v. Worldwide*

*RV*, 2010 WL 5391535, *5-6 (N.D.N.Y. Dec 21, 2010); *Research Foundation of State Univ. of N.Y. v. Bruker Corp.*, 2010 WL 981304, *6 (N.D.N.Y. 2010) (citing cases). Retail sales of a defendant's products in the state may constitute transaction of business here, depending on the underlying business arrangement. *See generally Iovate Health Sciences, Inc. v. Masuda*, 2009 WL 2878526, *3 (W.D.N.Y. Sept. 2, 2009).

**\*4** In support of his assertion that defendant transacts business in the Northern District of New York within the meaning of C.P.L.R. § 302(a)(1), plaintiff relies on the facts that nine independent retailers offer defendant's products in this district, and that defendant operates a website accessible to internet users anywhere, from which a resident of the Northern District can order defendant's products for shipment into this district. Defendant submits evidence that it has reviewed its internet sales records and has not been able to identify internet sales to customers in the Northern District. [3] The nature of defendant's business arrangement with the independent retailers in this district is undisclosed. Evidence regarding these matters is in defendant's control, and plaintiff has not had an opportunity for discovery. In the absence of discovery on the issue, the Court cannot determine whether venue in the Northern District of New York would be proper on the ground that section 302(a) (1) jurisdiction would exist here if this district were a state.

[3]      Plaintiff's evidence that, after defendant made the instant motion, plaintiff's counsel ordered an item from defendant's website that was shipped into the Northern District of New York does not aid plaintiff in establishing that venue was proper at the time the complaint was filed.

Assuming that a venue inquiry under 28 U.S.C. § 1391(d) requires a due process analysis, the Court notes that, in the absence of discovery, the record does not enable it to determine whether the exercise of jurisdiction over defendant would offend the Due Process Clause. The due process analysis has two components "(1) the minimum contacts inquiry and (2) the reasonableness inquiry." *Chloé*, 616 F.3d at 171. The minimum contacts inquiry, which concerns whether defendant has purposely availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws, *id.*, would involve essentially the same issues as the transaction of business inquiry under C.P.L.R. § 302(a) (1). The second component, the reasonableness inquiry,

Starr v. Michael Stars, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12291517

depends on whether the exercise of jurisdiction "offend[s] traditional notions of fair play and substantial justice" such that it is not reasonable under the Due Process Clause. *Id.* at 173. Among the factors to be considered are the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. The present record contains insufficient information regarding these issues.

Plaintiff also argues that the Court has venue under 28 U.S.C. § 1391(b)(2), on the ground that the Northern District of New York is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Plaintiff's allegations do not support venue under this provision.

Having found that the present record contains insufficient information to enable the Court to decide whether section 302(a)(1) jurisdiction would exist if the Northern District of New York were a state, the Court turns to consider whether to direct discovery on the question of whether venue here is proper. Under the circumstances of this case, if defendant were to demonstrate after discovery that venue here was improper, the Court would not dismiss the case, but would transfer it to the Central District of California in the interest of justice, as permitted by 28 U.S.C. § 1406(a). It is undisputed that venue would be proper in the Central District of California, where plaintiff resides and defendant maintains its principal place of business. Transfer rather than dismissal would benefit plaintiff, who would be spared the necessity of refiling the action, and it would not prejudice defendant, which acknowledges that venue in the Central District of California would be proper.

On the other hand, if the Court were to find after discovery that venue here was proper, the Court would then consider whether to grant defendant's request for a discretionary transfer to the Central District of California "[f]or the convenience of parties and witnesses, in the interest of justice" under 28 U.S.C. § 1404(a). As explained below, upon an analysis of the factors bearing on a section 1404(a) transfer, the Court concludes that it would exercise its discretion to grant such a transfer. Plainly, then, discovery on the question of venue is pointless, since the case will be transferred regardless of the outcome of discovery. Therefore, the Court transfers the case without ordering venue discovery.

**\*5** The Court now proceeds to set forth its analysis of the factors bearing on a discretionary transfer under section 1404(a). As the Second Circuit explains:

> District courts have broad discretion in making determinations of convenience under Section 1404(a), and notions of convenience and fairness are considered on a case-by-case basis. Some of the factors a district court is to consider are, *inter alia*: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties.

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006) (citations and internal quote omitted). As a general rule, a plaintiff's choice of forum "is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer." *Hershman v. UnumProvident Corp.*, 658 F.Supp.2d 598, 601 (S.D.N.Y. 2009) (quoting *Royal & Sunalliance v. British Airways*, 167 F.Supp.2d 573, 576 (S.D.N.Y. 2001)); *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."). The level of deference given to a plaintiff's choice of forum depends, however, "on the *bona fide* connection the plaintiff has with that forum." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003). To overcome the presumption in favor of a plaintiff's choice of forum, the defendant "must make a clear showing that the proposed transferee district is a more convenient one, and that the interests of justice would be better served by a trial there." *Hershman*, 658 F.Supp.2d at 601 (citation and internal quotation marks omitted).

Regarding the convenience of witnesses, defendant submits a declaration from Jeffrey Paul Busse, its

Starr v. Michael Stars, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12291517

Controller, stating that it expects to call the following witnesses, all of whom are located in the Central District of California: defendant's President Michael Cohen; defendant's Controller Mr. Busse; defendant's Vice President of Human Resources Jennifer Needham; defendant's former CEO Michael Rosen; a former officer of defendant Simon Cohen; and defendant's former Director of Licensing, Jennifer Gross. Busse's declaration briefly summarizes the testimony each witness is expected to give. Plaintiff points out that three of defendant's witnesses are its officers and employees, and argues that their convenience should not be given great weight. The other three of defendant's witnesses are former officers or employees, to whom this argument would not apply. In any event, plaintiff makes no showing whatsoever that the convenience of any of his witnesses would favor the Northern District of New York. Plaintiff states only that he expects to call witnesses located in New Jersey and/ or North Carolina. Moreover, plaintiff does not name these witnesses or set forth the testimony which they are expected to give. The convenience of witnesses weighs heavily in defendant's favor.

 **\*6** As for the location of relevant documents and relative ease of access to sources of proof, defendant argues that this factor favors transfer, because all of defendant's documents are in the Central District of California. Plaintiff does not contend that documents and sources of proof are located in the Northern District; rather, he argues that in this digital age the factor is neutral. This factor favors defendant.

The convenience of the parties clearly will be served by transfer to the Central District of California, inasmuch as both plaintiff and defendant are located there. As noted, the level of deference given to a plaintiff's choice of forum depends "on the *bona fide* connection the plaintiff has with that forum." *Pollux Holding*, 329 F.3d at 71 ("[W]hen a plaintiff sues in his home forum, that choice is generally entitled to great deference, because it is presumed to be convenient." (citation omitted)). Here, although plaintiff evidently prefers the Northern District to his home district, his submissions are devoid of any showing that he has a *bona fide* connection with the Northern District, and his choice is not entitled to strong deference. Plaintiff presents no explanation why being required to attend trial in the district in which he resides would be inconvenient or unfair. The convenience of the parties heavily favors defendant.

Regarding the locus of operative facts, plaintiff argues that, inasmuch as he has shown that defendant has offered infringing products for sale in this district, the locus of operative facts favors him. Defendant's products are sold in many other districts, as well, however, including the Central District of California. Moreover, defendant's business is located in the Central District of California, and plaintiff resides there. The locus of operative facts favors defendant.

With respect to the availability of process to compel the attendance of unwilling witnesses, defendant has identified three non-party witnesses, all of whom could be compelled to attend in the Central District of California but not in the Northern District. The unidentified non-party witnesses whom plaintiff may call are located in New Jersey and/or North Carolina; their attendance cannot be compelled in either the Northern District of New York or the Central District of California. Plaintiff has not identified a single witness whose attendance could be compelled in the Northern District. This factor strongly favors defendant.

Plaintiff offers mere speculation that judicial economy and trial efficiency favor the Northern District of New York. Defendant points to United States Government statistics showing that, due to overcrowding of the Northern District's docket, the average time from filing of a civil action until trial is 35.6 months, while the Central District of California's average time from filing to trial is 20.1 months. This factor favors defendant.

On consideration of the relevant factors, the Court finds that notions of convenience and fairness heavily favor transfer to the Central District of California. Defendant has made a clear showing that the Central District of California is a more convenient venue for the parties and witnesses, and that the interests of justice would be better served by a trial there, thus carrying its burden of overcoming the presumption in favor of plaintiff's choice of venue. Plaintiff offers no reason why transfer to his home venue would be inconvenient or unfair. Accordingly, the defendant's motion to transfer venue to the Central District of California is granted under 28 U.S.C. §§ 1404(a) and 1406(a).

**Starr v. Michael Stars, Inc., Not Reported in Fed. Supp. (2013)**

2013 WL 12291517

## CONCLUSION

**\*7** It is therefore

ORDERED that defendant's motion (Dkt. No. 13) is granted to the extent that the case is transferred to the Central District of California; the motion is otherwise denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12291517

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP, Not Reported in Fed. Supp....

2017 WL 7411022

2017 WL 7411022
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph STERN, et al., Plaintiffs,
v.
WESTERMAN BALL EDERER MILLER
& SHARFSTEIN, LLP, et al., Defendants.

Civil Action No. 1:17-CV-0034 (FJS/DEP)
|
Signed 03/23/2017

**Attorneys and Law Firms**

FOR PLAINTIFFS: ROSENBLUM & PARTNERS, LLP, OF COUNSEL: SANFORD ROSENBLUM, ESQ., RICHARD B. ANCOWITZ, ESQ., 110 Great Oaks Blvd., Albany, NY 12203.

FOR DEFENDANT TOLCHIN: THE BERKMAN LAW OFFICE, LLC, OF COUNSEL: ROBERT J. TOLCHIN, ESQ., 111 Livingston Street, Suite 1928, Brooklyn, NY 11201.

FOR MINTZ LEVIN DEFENDANTS: MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC, OF COUNSEL: DOMINIC J. PICCA, ESQ., 666 Third Avenue, New York, NY 10017.

FOR DEFENDANT WESTERMAN BALL EDERER MILLER & SHARFSTEIN, LLP: WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP, OF COUNSEL: LAURA A. GILLEN, ESQ., JEFFREY A. MILLER, ESQ., 1201 RXR Plaza, Uniondale, NY 11556.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** This is an action in which the plaintiffs seek court guidance concerning entitlement to attorney's fees for representing plaintiffs Joseph Stern, Shaul Stern, and Yocheved Kushner (collectively the "Stern Family") in their efforts to recover damages resulting from the death of their mother, Leah Stern, in 1997 during a terrorist attack. The Stern Family has now recovered over $1 million from a fund established by federal statute to compensate victims of terrorists acts. Under that statutory provision, attorneys representing victims eligible for compensation from the fund are entitled to charge a fee of up to twenty-five percent of the amount recovered. It is the recovery of this attorney's fee that forms the basis for the instant dispute.

This action was initially commenced in New York State court, but was subsequently removed by two defendants to this court. Currently pending before the court are two motions. In the first, plaintiffs seek an order remanding the matter to state court, arguing that, despite the federal underpinnings of the legal proceedings leading to the Stern Family's recovery, the issues now being litigated are inherently matters of state concern, relating to the appropriate allocation of attorney's fees and the existence of charging liens against any recovery by the Stern Family. Plaintiffs also argue that defendants' removal to federal court was procedurally improper because it was not sought on behalf, or with the consent, of all defendants served in the action. Defendants have opposed plaintiffs' motion to remand, and have moved for an order finding that venue is improper in this district and directing that the action be transferred to the United States District Court for the District of Columbia, where the judgment awarding the Stern Family damages was entered. For the reasons set forth below, I recommend that plaintiffs' motion to remand be granted, and defendants' motion be denied as moot.

### I. BACKGROUND [1]

A tragic terrorist bombing that occurred on July 30, 1997, in Jerusalem, Israel, and killed Leah Stern serves as the genesis for this action. Dkt. No. 2 at 3; Dkt. No. 12-5 at 8. [2] Since that time, the Stern Family has been engaged in litigation to pursue damage claims against the Republic of Iran, at whose direction the bombing took place. *See generally* Dkt. No. 2. To that end, the Stern Family entered into a written retainer agreement with defendant Westerman Ball Ederer Miller & Sharfstein, LLP ("Westerman"), on or about May 11, 2000, to represent them in the matter. [3] Dkt. No. 2 at 6-7; Dkt. No. 12-1 at 4-5; Dkt. No. 12-5 at 8-9; Dkt. No. 12-6 at 32-34. The retainer agreement stated that defendant Nitsana

Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP, Not Reported in Fed. Supp....

2017 WL 7411022

Darshan-Leitner & Associates ("Darshan-Leitner"), an Israeli law firm, had been retained to assist defendant Westerman in representing the Stern Family. [4] Dkt. No. 2 at 7; Dkt. No. 12-5 at 9. The retainer agreement also reflects that defendants Westerman and Darshan-Leitner were to receive thirty-three percent of any recovery by the Stern Family up to the first $10 million, and eight percent of any sum recovered over that amount. *See* Dkt. No. 12-6 at 35.

[2]      Many of the documents submitted by plaintiffs in support of their motion to remand, including Dkt. No. 12-5, are duplicative of those submitted in opposition to defendants' motion to change venue. For the sake of simplicity, where duplicates exist in the record, I have cited only to those exhibits submitted in connection with plaintiffs' motion to remand.

[3]      The retainer agreement was subsequently modified on July 10, 2001. Dkt. No. 12-6 at 35-37.

[4]      A legal representation and fee-sharing agreement governing their joint representation of the Stern Family was executed by defendants Darshan-Leitner and Westerman in late February or early March 2000. Dkt. No. 12-6 at 39-41.

**\*2** After engaging local counsel in Washington, D.C., defendant Westerman commenced an action on behalf of the Stern Family in the United States District Court for the District of Columbia pursuant to the Foreign Sovereign Immunities Act of 1986, [28 U.S.C. §§ 1330, 1441, 1602-1611](), seeking compensation for the injuries to and death of Leah Stern. Dkt. No. 2 at 8; Dkt. No. 12-1 at 5; Dkt. No. 12-5 at 9; Dkt. No. 12-7 at 2-21. The defendants in that action, which included the Republic of Iran and other related parties, failed to answer the plaintiffs' complaint, resulting in the entry of their default on February 13, 2002. Dkt. No. 2 at 8; Dkt. No. 12-1 at 5; Dkt. No. 12-5 at 9. Following the submission of evidence, District Judge Royce C. Lamberth issued a decision and order on July 17, 2003, awarding $1 million in compensatory damages for Leah Stern's pain and suffering prior to her death, and $3 million to each of the four members of the Stern Family, for a total compensatory damage award of $13 million against all of the defendants. Dkt. No. 2 at 8-9; Dkt. No. 12-6 at 12-13; Dkt. No. 25-1 at 25-30. The court also awarded punitive damages in the amount of $300 million against the individual defendants. Dkt. No. 12-6 at 13.

In or about November 2003, defendant Westerman withdrew from representation of the Stern Family after certain conflicts of interest between defendants Darshan-Leitner and Westerman surfaced and could not be resolved. Dkt. No. 2 at 9; Dkt. No. 12-5 at 10. Thereafter, the judgment secured on behalf of the Stern Family languished, uncollected, for a period of five years. Dkt. No. 2 at 10.

On May 9, 2008, the Stern Family entered into a retainer agreement with defendant Darshan-Leitner and the law firm of Jaroslawicz and Jaros, [5] providing for legal representation to enforce the judgment against reported assets of the Republic of Iran held by UBS AG. Dkt. No. 2 at 10; Dkt. No. 12-5 at 10-11; Dkt. No. 12-7 at 46-47. That retainer agreement was signed by defendant Robert Tolchin ("Tolchin") on behalf of Jaroslawicz and Jaros. Dkt. No. 2 at 10. The retained attorneys thereafter took steps to enforce the judgment to no avail. [6] Dkt. No. 2 at 10.

[5]      Jaroslawicz and Jaros is not a party to this action.

[6]      The measures taken by defendant Tolchin and others on behalf of the Stern Family following their retention in 2008 are briefly outlined in defendants' memorandum in support of their motion to change venue. Dkt. No. 6 at 2. Although that memorandum is not sworn, and thus does not constitute evidence, the court is permitted to take judicial notice of defendant Tolchin's attempt to enforce the judgment in *Stern v. Islamic Rep. of Iran*, [73 F. Supp. 3d 46 (D. D.C. 2014)](), aff'd, *[Weinstein v. Islamic Rep. of Iran](), [831 F.3d 470 (D.C. Cir. 2016)](). [Fed. R. Evid. 201](); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767m 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts ... to establish the fact of such litigation and related filings.").

On April 2, 2015, the Stern Family retained Kreindler and Kreindler LLP ("Kreindler") and the Silverman Law Firm PLLC ("Silverman") to represent them in their continuing efforts to enforce their judgment. Dkt. No. 2 at 10-11; Dkt. No. 12-5 at 11; Dkt. No. 12-7 at 49-51. Kreindler subsequently engaged the Perles Law Firm, P.C. ("Perles"), to assist in that regard. [7] Dkt. No. 2 at 11. Kreindler and Silverman were subsequently discharged by the Stern Family in June 2016. *Id.* at 11.

Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP, Not Reported in Fed. Supp....

2017 WL 7411022

[7]    Kreindler, Silverman, and Perles were all named as defendants in plaintiffs' complaint, but have been dismissed from this action by stipulation. Dkt. No. 19.

In December 2015, hope for at least partial recovery of the 2003 judgment was provided to the Stern Family and other victims of state-sponsored terrorism through passage of the Justice for United States Victims of State Sponsored Terrorism Fund Act ("USVSST"). 42 U.S.C. § 10609. Dkt. No. 2 at 12; Dkt. No. 12-5 at 12. The USVSST was enacted to create a fund to compensate victims of state-sponsored terrorism. Dkt. No. 2 at 12. Victims, like the Stern Family, with judgments against state-sponsors of terrorism, such as the Republic of Iran, are eligible to file claims for recovery of fund moneys in accordance with the USVSST. 42 U.S.C. § 10609(c)(1). According to defendant Tolchin, a Special Master has been appointed to oversee the administration of the USVSST fund pursuant to 42 U.S.C. § 10609(b). Dkt. No. 6 at 2-3.

**\*3** In or about August 2016, the Stern Family retained plaintiffs Richard B. Ancowitz, Esq., and Sanford Rosenblum, Esq., two attorneys with offices in Albany County, New York, to represent them in their efforts to enforce their judgment pursuant to the USVSST. [8] Dkt. No. 12-5 at 11; Dkt. No. 12-6 at 23. With the assistance of Attorneys Ancowitz and Rosenblum, the Stern Family applied to the USVSST fund on October 6, 2016, for recovery. Dkt. No. 2 at 15. Attorneys Ancowitz and Rosenblum contend that their efforts to make an earlier application on behalf of the Stern Family were hindered by defendants—principally defendant Tolchin—through their failure to provide vital information necessary to make and support the Stern Family's claim. [9] *Id.* at 13. According to defendant Tolchin, plaintiffs' USVSST application has been accepted by the Special Master, Dkt. No. 6 at 2-3, and the parties recently represented to the court that plaintiff Ancowitz has now received the funds from the USVSST fund on behalf of the Stern Family. Dkt. Nos. 32, 33.

[8]    Plaintiffs' complaint does not specify precisely when those attorneys were retained by the Stern Family. Dkt. No. 2 at 11.

[9]    Plaintiffs do not allege that the Stern Family suffered any prejudice as a result of defendant Tolchin's alleged failure to cooperate.

## II. PROCEDURAL HISTORY

This action was filed on or about December 14, 2016, in Albany County Supreme Court, by the Stern Family and Attorneys Ancowitz and Rosenblum. Dkt. No. 1 at 2. Named as defendants in plaintiffs' complaint are (1) Westerman; (2) Darshan-Leitner; (3) Greenberg Traurig, LLP; (4) Kreindler; (5) Silverman; (6) Perles; (7) Mitz Levin, LLP, and its successor, Mintz Levin Cohn Ferris Glovsky and Popeo, PC (collectively referred to as "Mintz"); (8) Tolchin; and (9) Raines Feldman LLP. Dkt. No. 2 at 4-6.

In their complaint, plaintiffs request judgment adjudicating the rights of the parties to monies that have now been received by the Stern Family pursuant to the USVSST, and declaring that none of the defendants have a claim of entitlement to, or a charging lien against, that recovery. Dkt. No. 2 at 16-18. Following commencement of the action, an order was issued by New York State Supreme Court Justice Christina L. Ryba on January 10, 2017, directing defendants to show cause why the court should not grant the relief requested, and setting the matter down for a hearing. Dkt. No. 12-5 at 1-4.

The action was removed to this court on January 10, 2017. Dkt. No. 1. The removal notice was signed by defendant Tolchin and by Dominic Picca, Esq., an attorney with defendant Mintz. *Id.* at 3-4. A consent to the removal was subsequently filed on behalf of defendant Westerman on January 25, 2017. [10] Dkt. No. 17.

[10]    A declaration from Attorney Picca was filed on February 10, 2017, confirming that defendant Mintz joined in the notice of removal and "continued to consent to removal." Dkt. No. 20.

On January 12, 2017, defendant Tolchin filed a motion seeking a transfer of this action to the United States District Court for the District of Columbia. Dkt. Nos. 5-7. Plaintiff subsequently moved, on January 18, 2017, for an order remanding the action to New York State Supreme Court. Dkt. No. 12. Both motions are opposed. Dkt. Nos. 21, 23. The pending motions have been referred to me by Senior District Judge Frederick J. Scullin for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(B)(1)(b). [11] Dkt. No. 14. Oral argument in connection with the parties' motions was heard on February 27, 2017, at which time decision was reserved.

Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP, Not Reported in Fed. Supp....

2017 WL 7411022

11    The referral by Judge Scullin references only the
      motion to remand. Dkt. No. 14. Ordinarily, a
      motion to transfer venue would fall within my non-
      consensual jurisdiction. *See, e.g., Salzman v. Travelers
      Home & Marine Ins. Co.*, No. 16-CV-4008, 2016 WL
      3951206, at *1 (S.D.N.Y. July 20, 2016). In light
      of the interplay between the two motions, however,
      and my recommendation that the motion to remand
      be granted and the motion for a change of venue
      be denied as moot, I have formatted this opinion
      as a report and recommendation addressing both
      motions. *See Williams v. Beemiller, Inc.*, 527 F.3d
      259, 266 (2d Cir. 2008) ("A motion to remand is not
      a 'pretrial matter' under [28 U.S.C.] § 636(b)(1)(A),
      and a magistrate judge presented with such a motion
      should provide a report and recommendation to the
      district court[.]").

## III. DISCUSSION

### A. Motion to Remand [12]

12    The parties agree that the court should address
      plaintiffs' remand motion first before turning to
      defendants' motion to transfer venue.

**\*4** Plaintiffs contend that this action should be remanded
because (1) the removal was procedurally improper and
(2) federal question jurisdiction, which served as the
predicate for defendants' removal notice, does not exist.
Dkt. No. 12-2 at 4-10.

### 1. The Rule of Unanimity

Removal of an action to federal court is governed by 28
U.S.C. § 1446. In relevant part, that statute provides as
follows:

(b) Requirements; generally.—(1) The notice of
removal of a civil action ... shall be filed within 30 days
after the receipt by the defendant, through service or
otherwise, of a copy of the initial pleading setting forth
the claim for relief upon which such action ... is based,
or within 30 days after the service of summons upon the
defendant if such initial pleading has then been filed in
court and is not required to be served on the defendant,
whichever period is shorter.

(2)(A) When a civil action is removed solely under
section 1441(a), all defendants who have been properly

joined and served must join in or consent to the removal
of the action.

(B) Each defendant shall have 30 days after receipt by
or service on that defendant of the initial pleading or
summons described in paragraph (1) to file the notice
of removal.

(C) If defendants are served at different times, and a
later-served defendant files a notice of removal, any
earlier-served defendant may consent to the removal
even though that earlier-served defendant did not
previously initiate or consent to removal.

28 U.S.C. § 1446.

In this case, defendant Tolchin was served on December
20, 2016. Dkt. No. 1 at 2. He thereafter filed a notice of
removal to federal court on January 10, 2017, and thus
within the thirty-day period allotted by section 1446(b)
(1). Plaintiffs do not contest the timeliness of defendant
Tolchin's notice of removal. *See generally* Dkt. No. 12-2.

The so-called "rule of unanimity," which was originally
created under the common law and later loosely woven
into a 2011 amendment of section 1446, requires that
the remaining defendants "*who have been properly joined
and served* must join in or consent to the removal of
the action." 28 U.S.C. § 1446(b)(2)(A) (emphasis added).
Significantly, section 1446(b)(2)(C) sets no time limit for
an earlier-served defendant to file its consent after the
notice of removal is filed by the later-served defendant.
*See* 28 U.S.C. § 1446(b)(2)(C) ("If defendants are served at
different times, and a later-served defendant files a notice
of removal, any earlier-served defendant may consent to
the removal even though that earlier-served defendant did
not previously initiate or consent to removal.").

At the time defendant Tolchin filed the notice of
removal, four other defendants had been served, including
defendants Kreindler, Silverman, Westerman, and Mintz.
Dkt. No. 12-8. Because Kreindler and Silverman are no
longer parties to this action, their consent is immaterial.
Dkt. No. 19. As for defendant Mintz, it was served with
a summons and complaint on December 15, 2016, Dkt.
No. 12-8 at 2, and it joined defendant Tolchin's notice of
removal. Dkt. No. 1 at 4. In addition, defendant Mintz
later filed a declaration reaffirming its consent to removal.
Dkt. No. 20. Defendant Westerman filed its notice of
consent to removal on January 25, 2017. Dkt. No. 17.

**Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP,** Not Reported in Fed. Supp....

2017 WL 7411022

**\*5** As for the remaining defendant in this matter, defendant Darshan-Leitner, there is no proof in the record that service upon that defendant has been effectuated. Although plaintiffs contend that defendant Darshan-Leitner was served the state court summons, complaint, and order to show cause issued by the New York State Supreme Court Justice Ryba by Federal Express, Dkt. No. 27 at 6, Dkt. No. 27-1, such service of process does not comply with New York Civil Practice and Law ("CPLR") § 312-a, which provides for service by mail. Specifically, section 312-a(a) permits, as an alternative to the methods of personal service prescribed by the CPLR, service of the summons and complaint to be "served by the plaintiff ... by first class mail ..., together with two copies of a statement of service by mail and acknowledgement of receipt." N.Y. C.P.L.R. § 312-a(a). There is no evidence before the court that plaintiffs mailed defendant Darshan-Leitner a statement of service by mail and/or an acknowledgement of receipt. Dkt. No. 27-1. Moreover, service of process by mail is not complete until "the date the signed acknowledgement of receipt is mailed or delivered to the sender." N.Y. C.P.L.R. § 312-a (b). There is no evidence that plaintiffs have received the signed acknowledgment of receipt from defendant Darshan-Leitner. Accordingly, based on the record now before the court, I find that defendant Darshan-Leitner has not yet been served. For that reason, there is no requirement under section 1446 that it consent to removal. 28 U.S.C. § 1446(b)(2)(A).

Having determined that defendants have complied with the relevant mechanisms provided for in section 1446 in removing this action to federal court, remand is not appropriate based upon plaintiffs' argument that removal of the action was not effectuated in accordance with the governing procedural requirements.

## 2. Federal Question Jurisdiction

A state court action over which a federal district court would have original jurisdiction may be removed by the defendants to a district in which the court where the action is pending is located. 28 U.S.C. § 1441(a); *see also Calif. Public Emp.'s Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 102 (2d Cir. 2004). In support of their removal of this action, defendants argue that original jurisdiction over plaintiffs' claims lies in federal court pursuant to 28

U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see Debevoise v. Rutland Ry. Corp.*, 291 F.2d 379, 380 (2d Cir. 1961) ("Under the removal statue, where there is no diversity, a defendant's power to remove turns upon whether the plaintiff's claim arises under federal law within the meaning of [section] 1331." (citation omitted)).

Federal district courts are courts of limited jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). In accepting matters for adjudication, district courts must ensure that the subject matter requirement is met, and they may raise the question of jurisdiction *sua sponte* at any point in the litigation. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 107 (2d Cir. 1997). A party seeking to invoke the jurisdiction of a federal court must shoulder the burden of demonstrating that its claims are properly brought in that forum. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *see also Gonzalez v. Red Hook Container Terminal LLC*, No. 16-CV-5104, 2016 WL 7322335, at \*1 (E.D.N.Y. Dec. 15, 2016) ("On a motion to remand, the party seeking removal bears the burden of establishing to a reasonable probability that removal is proper." (quotation marks omitted)). When removal based upon federal question jurisdiction is challenged, any doubts should be resolved against removability "out of respect for the limited jurisdiction of the federal courts and the rights of states[.]" *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 488 U.S. 112, 124 (2d Cir. 2007); *accord, Gonzalez*, 2016 WL 7322335, at \*1.

To implicate federal question jurisdiction, a plaintiff's pleading must set forth a cause of action created by federal law. *Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)); *see also Gonzalez*, 2016 WL 7322335, at \*2. A careful reading of plaintiffs' complaint in this case reflects that their claims arise out of a dispute among the various attorneys that currently or previously served as counsel for the Stern Family. *See generally* Dkt. No. 2. More specifically, the attorneys disagree with respect to the apportionment of any attorney's fees for work performed pursuant to the retainer agreements entered into between them and the Stern Family, and whether the

Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP, Not Reported in Fed. Supp....

2017 WL 7411022

Stern Family's failure to compensate their lawyers gives rise to a charging lien under New York Judiciary Law § 475. [13] *Id.* at 15-16. It would thus appear, at least at first glance, that plaintiffs' claims implicate New York State law principles of contract and charging liens and do not arise under federal law. [14]

[13] Section 475 provides as follows:

> From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of an answer containing a counterclaim, or the initiation of any means of alternative dispute resolution including, but not limited to, mediation or arbitration, or the provision of services in a settlement negotiation at any stage of the dispute, the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

> N.Y. Judiciary L. § 475.

[14] While plaintiffs' complaint cites New York law, it may ultimately be determined that principles relating to attorney liens from another jurisdiction, including potentially the District of Columbia, should apply. This potential conflict of laws issue does not affect my determination that federal jurisdiction over plaintiffs' claims does not lie.

**\*6** Federal question jurisdiction may "also extend[, however,] to state-law claims that 'turn on substantial questions of federal law.' " *Gonzalez*, 2016 WL 7322335, at \*2 (quoting *Grable & Sons Metal Prods., Inc.*, 545 U.S. at 312). As the Supreme Court has said, "[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc.*, 545 U.S. at 314; *see also Gunn v. Minton*, 133 S. Ct. 1059, 1065 (2013) ("[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of

resolution in federal court without disrupting the federal-state balance approved by Congress. Where all four of these requirements are met, we held, jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum, which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." (quotation marks omitted)); *accord, Jacobson*, 824 F.3d at 315.

In this case, plaintiffs' complaint asks the court to determine the parties' rights to the distribution of the funds anticipated to be received by the Stern Family pursuant to the USVSST. Dkt. No. 2 at 16-17. To render such a determination, a court must examine the conduct of the parties with respect to obtaining the judgment rendered by Judge Lamberth. *Id.* at 16-17. Plaintiffs' complaint alleges that all defendants, with the exception of defendant Perles, are not entitled to a charging lien or fee because of their "misconduct and/or ethical violations[.]" *Id.* at 17-18. In addition, plaintiffs contends that, except for defendant Perles, defendants did "not obtain a 'final order' on behalf of the [Stern Family]" in light of the defendants' failure (specifically defendant Tolchin's) to properly serve the judgment upon the Republic of Iran. *Id.* at 14. Although plaintiffs' complaint does not cite legal authority for their allegation that defendant Tolchin failed to properly served the Republic of Iran, defendants contend the provision on which plaintiffs rely for this proposition is 28 U.S.C. § 1608(e). Dkt. No. 21 at 9. Plaintiffs do not explicitly dispute defendants' contention. Dkt. No. 27 at 3. Plaintiffs do, however, maintain that the primary authority on which they rely in contending that defendants are not entitled to a charging lien is defendants' alleged violations of the New York Rules of Professional Conduct. *See id.* at 2-4 (accusing defendants of violating Rules 1.1, 1.16, and 7.3 of the New York Rules of Professional Conduct).

Based on my review of plaintiffs' complaint and the parties' submissions, I am inclined to agree with plaintiffs that this matter does not raise a substantial federal question. Though it is true that one of the allegations in plaintiffs' complaint involves an accusation that defendant Tolchin failed to properly serve Judge Lamberth's judgment upon the Republic of Iran, and, therefore, did not obtain a final order on behalf of the Stern Family pursuant to 28 U.S.C. § 1608(e), I agree with plaintiffs that the thrust of their complaint accuses

Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP, Not Reported in Fed. Supp....

2017 WL 7411022

defendants, albeit vaguely, of ethical misconduct that, in turn, breached their obligations to the Stern Family under the respective retainer agreements. For example, in their complaint, plaintiffs accuse defendant Darshan-Leitner of "improperly solicit[ing] the Stern family to sign a retainer with [defendant] WESTERMAN[.]" Dkt. No. 2 at 7. Defendants Darshan-Leitner and Westerman are also accused of abandoning the Stern Family. *Id.* at 7, 9. In addition, plaintiffs accuse all defendants of breaching their fiduciary responsibilities to the Stern Family and pursuing their own self-interests above their clients'. *Id.* at 12. These concerns, as described in plaintiffs' complaint, do not implicate substantial federal questions. Rather, they involve questions of state law that arise either under the retainer agreements entered into between defendants and the Stern Family or the code of ethics governing attorney practice. While the parties may dispute whether the laws of New York State or District of Columbia govern, the questions of attorney liens and recovery under retainer agreements are matters of local concern over which federal courts have little or no interest.

 *7 In sum, while the legal representation provided by defendants that is at issue in this case was rendered in connection with efforts to enforce a federal court judgment, such matters inherently present questions of local concern. Accordingly, I recommend a finding that defendants have failed to carry their burden of establishing that the court possesses subject matter jurisdiction over plaintiffs' claims, and that the matter was therefore improperly removed to this court.

### 3. Attorney's Fees

In their motion to remand, plaintiffs request that the court award attorney's fees against defendant Tolchin for improperly removing the matter to this court. Dkt. No. 12-2 at 11. Defendants have responded by opposing that request and asking the court for attorney's fees to compensate them for having to oppose plaintiffs' motion. *See* Dkt. No. 21 at 18 ("The plaintiffs request ... attorney's fees for their expense in bringing their motion. Had they not done so, the undersigned would not have requested fees. But since they requested fees, the undersigned makes a reciprocal request.").

The provision governing the procedures after removal to federal court, including a motion to remand, permits a

district court to "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). A district court may award attorney's fees where "the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). "Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin*, 546 U.S. at 141.

In this case, it was reasonable for defendants to believe that there was a basis for federal jurisdiction in this matter. Not only did the underlying matter arise under federal law, but plaintiffs' complaint also—albeit implicitly—invokes 28 U.S.C. § 1608(e) by accusing defendant Tolchin of failing to properly serve Judge Lamberth's judgment upon the Republic of Iran. Accordingly, I recommend against an award of attorney's fees to either party under section 1447(c). [15]

[15]     It follows, from the previously discussed finding that removal was not proper, that there is no basis to recommend that defendants' request for an award of costs and attorney's fees be granted.

### B. Change of Venue

Defendants assert that venue in the Northern District of New York is improper and request that the matter be transferred to the United States District Court for the District of Columbia. [16] Dkt. No. 6 at 4. Plaintiffs oppose defendants' motion, arguing that venue in this district is proper because a substantial part of the events or omissions giving rise to the action occurred in this district. Dkt. No. 23 at 2. If my recommendation concerning plaintiffs' motion for remand is adopted, there will be no need to address defendants' change of venue motion, which will thereby be rendered moot. In the event the motion to remand is denied and the matter remains in federal court, however, the question then becomes whether it should be transferred to the District of Columbia.

[16]     At oral argument, defendant Tolchin confirmed that defendants do not seek a transfer of this matter to the District of Columbia under 28 U.S.C. § 1404(a). Instead, they argue that venue in the action does not lie in the Northern District of New York, and that the matter should therefore be transferred to the District of Columbia pursuant to 28 U.S.C. § 1406.

Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP, Not Reported in Fed. Supp....

2017 WL 7411022

**\*8** The venue statute that controls in this case provides that an action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that it is the subject of the action is situated[.]" 28 U.S.C § 1391(b)(2). In the event a court in which an action is pending finds that venue is improper, a court "shall dismiss, or if it be in the interest of justice, transfer [the] case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

In 2005, the Second Circuit joined several other circuits in clarifying that the phrase "a substantial part" does not mean "the substantial part," and, accordingly, venue may properly lie in more than one district pursuant to section 1391(b)(2). *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356-57 (2d Cir. 2005). The court cautioned, however, that the venue statute must be strictly construed, and the term "significant" implies that "for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Glasbrenner*, 417 F.3d at 357 (emphasis in original).

In this case, it appears that the conduct giving rise to the liens that plaintiffs now seek to extinguish occurred both in New York, though not in this district, and elsewhere. *See generally* Dkt. No. 2. Many of the legal services giving rise to any alleged charging lien occurred in connection with a federal court action and resulting judgment in 2003, rendered in the United States District Court for the District of Columbia. *Id.* Some of defendants' efforts, including defendant Tolchin's, to enforce the judgment also occurred in the District of Columbia. *Id.*

Conversely, it does not appear that any of the acts giving rise to defendants' alleged liens occurred within this district. *Id.* Instead, the sole connection with this district appears to be that the law offices of plaintiff-attorneys Ancowitz and Ronseblum are located within the County of Albany, and thus within the Northern District of New York. Dkt. No. 2 at 4. To be sure, plaintiffs' complaint alleges that those two attorneys engaged in efforts to obtain information from the various defendants to support an application on behalf of the Stern Family for recovery from the USVSST fund. *Id.* at 15. Defendants' failures to perform pursuant to their retainer agreements and their alleged breaches of the applicable rules of professional conduct—the conduct that forms the basis of

plaintiffs' action—however, all appear to have occurred outside of this district.

Plaintiffs' attempt to rely upon the portion of section 1391(b)(2) providing for proper venue where "a substantial part of property that is the subject of the action is situated" is unpersuasive. Prior to the receipt distribution form the USVSST fund, plaintiffs specifically argued that when a distribution was made from the fund, which has now occurred, the subject monies would be transferred to the escrow account for plaintiff Ancowitz, and therefore would be located within the Northern District of New York. Dkt. No. 23 at 4. Because venue is judged at the time an action is commenced, *Sullivan v. Tribley*, 602 F. Supp. 795, 799 (E.D. Mich. 2009); *Technograph Printed Circuits, Ltd. v. Packard Bell Elecs. Corp.*, 290 F. Supp. 308, 326 (C.D. Calif. 1968) (citing *Hoffman v. Blaski*, 363 U.S. 335 (1960)), plaintiffs' argument is unavailing and does not provide a basis for venue.

**\*9** In sum, I am unable to conclude that a substantial portion of the events giving rise to plaintiffs' claims in this case occurred in the Northern District of New York, and therefore find that venue here is improper. Accordingly, in the event that plaintiffs' motion to remand is denied and this case remains pending in federal court, I recommend that the action be transferred to the United States District Court for the District of Columbia.

## IV. SUMMARY AND RECOMMENDATION

Plaintiffs commenced this action seeking judicial determination of the parties' entitlement to attorney's fees in connection with the Stern Family's recovery of damages following their mother's death. Although the underlying matter giving rise to the entitlement to attorney's fees involved federal statutory provisions, the apportionment of the fees is disputed in light of plaintiffs' allegations that defendants, who formerly served as attorneys for the Stern Family, breached their obligations to their client in violation of both the retainer agreements governing the attorney-client relationship and ethical codes governing an attorney's practice—neither of which implicate federal law. Accordingly, I recommend that the matter be remanded to state court, but that the parties' cross-requests for costs and attorney's fees be denied. In the event that this recommendation is adopted, defendants' motion for change of a venue will be moot. If the portion of this report and recommendation addressing

plaintiffs' remand motion is not adopted, however, then I recommend that the action be transferred to the United States District Court for the District of Columbia. Based upon the foregoing it is hereby respectfully

RECOMMENDED that plaintiffs' motion to remand this action to New York State Supreme Court. (Dkt. No. 12)

be GRANTED, without an award of costs or attorney's fees, and that defendants' motion for a change of venue (Dkt. No. 5) be DENIED as moot.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 7411022

---

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

2013 WL 12130430
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

VIEW 360 SOLUTIONS LLC, Plaintiff,

v.

GOOGLE, INC., Defendant.

1:12-CV-1352(GTS/TWD)
|
Signed 08/13/2013

**Attorneys and Law Firms**

INNOVALAW, P.C., 1900 Ravinia Place, OF COUNSEL: TIMOTHY E. GROCHOCINSKI, ESQ., AARON W. PURSER, ESQ., Orland Park, IL 60462, Counsel for Plaintiff.

THE SIMON LAW FIRM, P.C., 800 Market Street, Suite 1700, OF COUNSEL: ANTHONY G. SIMON, ESQ., BENJAMIN A. ASKEW, ESQ., Saint Louis, MO 63101, Counsel for Plaintiff.

LAW OFFICES OF DANIEL M. SLEASMAN, One Crumitie Road, OF COUNSEL: DANIEL M. SLEASMAN, ESQ., Albany, NY 12211, Counsel for Plaintiff.

AKIN GUMP STRAUSS HAUER & FELD, LLP, 1333 New Hampshire Avenue, N.W., OF COUNSEL: CONO. A. CARRANO, ESQ., DAVID C. VONDLE, ESQ., Washington, D.C. 20036, Counsel for Defendant.

HISCOCK & BARCLAY, LLP, One Park Place, 300 South State Street, OF COUNSEL: DOUGLAS J. NASH, ESQ., Syracuse, NY 13202, Counsel for Defendant.

**MEMORANDUM-DECISION and ORDER**

HON. GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court in this patent infringement action are Defendant's objections to the March 13, 2013 Order of Magistrate Judge Thérèse Wiley Dancks denying Defendant's motions to transfer venue to the United States District Court for the Northern District of California and to stay this action pending a decision on its venue motion ("the Order"). For the reasons set forth below, Defendant's objections are denied and Magistrate Judge Dancks' Order is affirmed in its entirety.

**I. RELEVANT BACKGROUND**

**A. Procedural History**

Plaintiff, View 360 Solutions, Inc., commenced this action against Defendant, Google, Inc., on August 31, 2012. Plaintiff's Complaint alleges eight counts of direct and induced infringement of eight separate patents, regarding which Plaintiff has an exclusive license to enforce and sue infringers. (Dkt. No. 1.) Generally, the Complaint alleges that Defendant's product, Google Street View, infringes the underlying patents. In its Answer, Defendant asserts sixteen counter-claims seeking a declaratory judgment of non-infringement, invalidity and unenforceability regarding each of the patents. (Dkt. No. 19.)

In January 2013, the parties submitted a case management plan wherein Defendant indicated its intent to file a motion to transfer venue of this action to the Northern District of California pursuant to 28 U.S.C. § 1404(a) as well as a motion to stay this action pending resolution of the venue motion. (Dkt. No. 21.) Two weeks later, Defendant filed its motions to transfer venue and to stay this action. Plaintiff opposed both motions and, with permission of Magistrate Judge Dancks, Defendant replied. (Dkt. Nos. 25, 26, 28, 30, 34.) On March 13, 2013, Magistrate Judge Dancks denied both motions. (Dkt. No. 35.) This timely appeal followed. (Dkt. No. 38.)

**B. Factual Background**

Plaintiff is a New York limited liability company with its principal place of business in Frisco, Texas. Defendant is a Delaware corporation with its principal place of business in Mountain View, California. The sole named inventor of each of the patents underlying this action is Ford Oxaal ("Oxaal"), who currently resides in Cohoes, New York.

Oxaal declares that he has resided in the Northern District of New York for twenty-two years, which is where he conceived of and reduced to practice all of the inventions claimed in the patents underlying this action. (*See* Dkt. No. 30-1 [Decl. of Ford Oxaal, Feb. 19, 2013].) Oxaal formed and operates Minds-Eye View, Inc. ("MEV") in

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

the Northern District of New York, of which he and his wife are the only employees. MEV has developed and sold software applications that were marked as being covered by several of the patents-in-suit underlying this action. Oxaal granted Plaintiff an exclusive licence to enforce the underlying patents and sue infringers. Plaintiff incorporated in New York on August 7, 2012.

Oxaal declares that, if this matter proceeds in the Northern District of New York, he intends to testify at trial. Oxaal further declares that travel to the Northern District of California would be very burdensome and inconvenient to him and to MEV. According to Oxaal, he possesses hard copy and electronic documents pertaining to the patents-in-suit and MEV. In addition to these documents, Oxaal also possesses models, drawing and paintings that may pertain to the patents-in-suit, which are very difficult to transport. Oxaal further declares that shipping of these materials to the Northern District of California would be very difficult and may result in damage to them.

 **\*2** Defendant's engineering manager, Allen Hutchinson ("Hutchinson") declares generally that the teams responsible for research, design and development for Google Street View are primarily led by Defendant's employees at its facilities in Mountain View, California, which is located in the Northern District of California. Hutchinson specifically identifies four such employees, including himself, that Defendant expects to provide testimony in this case. Hutchinson also declares that Defendant's business documents and records related to the research, design and development of Google Street View are either physically present or electronically accessible in Mountain View, California. Hutchinson goes on to declare that "[a]ll or nearly all of the documents and highly proprietary information and source code relating to Google Street View are stored in [Defendant's] various data centers, which are accessible and ultimately managed from Mountain View, California." (Dkt. No. 25-3, at ¶ 5 [Decl. of Allen Hutchinson, Jan. 24, 2013].)

### C. Defendant's Motion to Transfer Venue

Generally, in support of its motion to transfer venue to the Northern District of California, Defendant argued that (1) this case could have been brought in the Northern District of California and (2) the balance of convenience and justice favors transfer to that district. Specifically, Defendant argued, among other things, that Plaintiff's

choice of forum should not be given any weight in the transfer analysis because it incorporated in New York less than four weeks before it commenced this action and none of the operative facts or events giving rise to Plaintiff's claims occurred in the Northern District of New York. Defendant also argued that the convenience of witnesses, the convenience of the parties, the location of relevant documents and the relative ease of access to those sources of proof, the location of operative events, and judicial efficiency all weigh in favor of transferring this action to the Northern District of California. (*See* Dkt. No. 25-1, at 5-15 [Def.'s Mem. of Law].)

Generally, in response to Defendant's motion, Plaintiff argued that Defendant's motion to transfer venue should be denied because (1) Plaintiff's choice of forum is entitled to great weight, (2) the convenience of parties, availability of process to compel attendance of non-party witnesses and judicial efficiency weigh against transfer of this action to the Northern District of California, and (3) the remainder of the factors are neutral to the transfer analysis. (Dkt. No. 30, at 3-12 [Pl.'s Mem. of Law].)

Generally, in its reply memorandum of law, Defendant argued that its motion to transfer venue should be granted because (1) Plaintiff's choice of venue should be afforded little weight, (2) all of the witnesses except one are located outside of the Northern District of New York, (3) Defendant is significantly more inconvenienced by litigating in the Northern District of New York than Plaintiff would be in the Northern District of California, (4) most of the relevant proof is located in the Northern District of California, (5) nearly all of the operative facts are in the Northern District of California, (6) the majority of non-party witnesses could be compelled to attend trial in the Northern District of California, and (7) judicial efficiency and the Northern District of California's interest in this case weigh in favor of transfer. (Dkt. No. 34, at 1-9 [Def's. Reply Mem. of Law].)

### D. Defendant's Motion to Stay This Action

Generally, in support of its motion to stay this action pending resolution of its motion to transfer venue to the Northern District of California, Defendant argued that the Federal Circuit Court of Appeals' recent order in *In re Fusion-IO, Inc.*, 489 Fed.Appx. 465 (Fed. Cir. 2012) recommends that a short stay of proceedings is the proper vehicle to limit prejudice and inconvenience to the parties

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

while they await a decision on threshold issues such as proper venue. (*See* Dkt. No. 26-1 [Def.'s Mem. of Law.])

**\*3** Generally, in response to Defendant's motion, Plaintiff argued that Defendant failed to meet its burden to demonstrate that a stay is necessary. (*See* Dkt. No. 28 [Pl.'s Mem. of Law.])

### E. The Order

Generally, in deciding the motions to transfer venue and to stay this action, Magistrate Judge Dancks concluded that this action might have been brought in the Northern District of California and that the balance of convenience and justice weighs against transfer. In weighing the balance of convenience and justice, Magistrate Judge Dancks concluded that while the location of relevant proof weighs slightly in favor of transfer, judicial efficiency and the weight afforded to Plaintiff's choice of forum weigh against transfer and the remaining factors are neutral to the analysis. Accordingly, Magistrate Judge Dancks denied Defendant's motion to transfer venue. Having denied Defendant's motion to transfer venue, Magistrate Judge Dancks denied the motion to stay this action as moot. (Dkt. No. 35, at 3-14 [the Order].)

The pending objections followed.

## II. Defendant's Objections

Generally, in support of its objections to the Order, Defendant argues that Magistrate Judge Dancks committed legal error in her analysis of the following five transfer factors: (1) the convenience of the parties, (2) the convenience of the witnesses, (3) the locus of operative facts, (4) the location of relevant documents, and (5) Plaintiff's choice of forum, all of which weigh in favor of transferring this action to the Northern District of California. Defendant also argues that the judicial efficiency factor weighs in favor of transfer, relying on its argument in its papers in support of its motion to transfer venue. Regarding its motion to stay this action, Defendant argues that a stay is warranted to prevent prejudice and promote judicial economy while the motion to transfer is pending. (*See* Dkt. No. 38-1, at 1-20 [Def.'s Mem. of Law.])

In response, Plaintiff argues generally that Defendant's objections should be denied because (1) Plaintiff's choice of forum is entitled to great weight and weighs against

transfer, (2) the location of relevant proof at best weighs only slightly in favor of transfer and at the very least is neutral to the analysis, and (3) the convenience of witnesses, convenience of the parties, loci of operative facts and availability to compel attendance of non-party witnesses are neutral to the analysis. (*See* Dkt. No. 39, at 1-8 [Pl.'s Mem. of Law.])

## III. Relevant Legal Standards

### A. Legal Standard Governing Objections to the Order of a Magistrate Judge

In reviewing timely objections to a magistrate judge's non-dispositive order, [1] the court "must modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). A finding is clearly erroneous if " ' on the entire evidence,' [the reviewing court] is 'left with the definite and firm conviction that a mistake has been committed.' " *Snyder v. Louisiana*, 552 U.S. 472, 487, 128 S. Ct. 1203, 1213 (2008) (citing *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S. Ct. 1452 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525 (1948))). An order is contrary to law "if it fails to apply or misapplies relevant statutes, case law or rules of procedure." *New York v. Salazar*, No. 6:08-CV-644, 2011 WL 1938232, at \*4 (N.D.N.Y. Mar. 8, 2011).

[1]     Courts in this District view orders on motions to transfer venue as non-dispositive. *See Glover v. Goord*, No. 06-CV-1037, 2007 WL 2454193 (N.D.N.Y. Aug. 22, 2007) (Kahn, J.); *White Mop Wringer Co. of Canada Ltd. v. BT Capital Partners, Inc.*, No. 95-CV-565, 1997 WL 222380, at \*1 (N.D.N.Y. Apr. 29, 1997) (Pooler, J.); *Pemrick v. Stracher*, No. 90-CV-849, 1992 WL 697636, at \*1 (N.D.N.Y. Mar. 27, 1992) (McAvoy, C.J.).

### B. Legal Standard Governing a Motion to Transfer Venue

**\*4** A district court may decide to transfer an action to another district in the interest of justice and for the convenience of the parties and witnesses. *See* 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."); *see also Ferens v. John Deere Co.*, 494 U.S. 516, 530 (1990); *Lead Indus. Ass'n v. Occupational Safety & Health Admin.*, 610 F.2d 70, 79

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

n.17 (2d Cir. 1979) (citing cases); *Kelly v. Kelly*, 911 F. Supp. 70, 71 (N.D.N.Y. 1996). "The purpose of section 1404(a) is to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Flaherty v. All Hampton Limousine, Inc.*, 01-CV-9939, 2002 WL 1891212, at *1 (S.D.N.Y. Aug. 16, 2002) (internal quotation marks omitted). When considering whether to transfer a case, a district court must conduct "a two-part test: (1) whether the action to be transferred might have been brought in the transferee venue; and (2) whether the balance of convenience and justice favors transfer." *Advanced Fiber Tech. Trust v. J & L Fiber Serv. Inc.*, 07-CV-1191, 2008 WL 4890377, at *1 (N.D.N.Y. Nov. 12, 2008) (Homer, M.J.).

## IV. Analysis

### A. Whether Magistrate Judge Dancks' Order Denying Defendant's Motion to Transfer This Action to the Northern District of California Is Clearly Erroneous or Contrary to Law

The Court answers this question in the negative, in part for the reasons stated in Plaintiff's abbreviated memorandum of law. (Dkt. No. 39, at 1-8 [Pl.'s Mem. of Law].) The Court would add the following analysis.

Neither party disputes that this action might have been brought in the Northern District of California. However, the parties disagree regarding whether the balance of convenience and justice favors transfer. To that end, Defendant argues that Magistrate Judge Dancks misapplied the law when she weighed six of the factors in the transfer analysis: (1) convenience of witnesses, (2) convenience of parties, (3) location of relevant documents and relative ease of access to those sources of proof, (4) locus of the operative events in issue, (5) weight accorded to Plaintiff's choice of forum, and (6) judicial efficiency and interests of justice. Defendant argues that each of these factors weighs in favor of transfer, and that, since Magistrate Judge Dancks found that the remaining three factors are neutral, a balance of the factors warrants transfer of this action to the Northern District of California.

Once it has been established that the action might have been brought in the transferee district, the resolution of a motion to transfer venue lies "within the broad discretion of the district court and [is] determined upon notions of convenience and fairness on a case-by-case basis."

*Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 11 F. Supp. 2d 729, 730 (S.D.N.Y. 1998). A non-exclusive list of factors courts routinely consider in making this determination include the following:

> (1) the convenience of witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to those sources of proof; (4) the situs of the operative events in issue; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) judicial efficiency and the interests of justice.

*Amersham Pharmacia Biotech, Inc.*, 11 F. Supp. 2d at 730. "No individual factor is determinative and a court has discretion to weigh each factor to reach a fair result." *Id.* Moreover, it is important to note that the party requesting transfer bears the burden of making a clear and convincing showing that transfer is warranted in light of these factors. *See EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 348 (E.D.N.Y. 2012) (citing *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978), abrogated on other grounds by, *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir. 1990)). *See also Hubbell Inc. v. Pass & Seymour, Inc.*, 883 F. Supp. 955, 962 (S.D.N.Y. 1995).

### 1. Convenience of Witnesses

*5 "Convenience of both party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." *In re Bennett Funding Group, Inc.*, 259 B.R. 243, 249 (N.D.N.Y. 2001). While the convenience of party witnesses is certainly relevant, courts may weigh more heavily the convenience of non-party witnesses in conducting this analysis. *See CYI, Inc. v. Ja-Ru, Inc.*, No. 12-CV-2230, 2012 WL 6646188, at *5 (S.D.N.Y. Dec. 21, 2012);

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

*Pecorino v. Vutec Corp.*, No. 11-CV-6313, 2012 WL 5989918, at *8 (E.D.N.Y. Nov. 30, 2012). An evaluation of this factor involves "more than a mere tally of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum." *Advanced Fiber*, 2008 WL 4890377, at *2. Rather, the Court should "qualitatively evaluate the materiality of the testimony that witnesses may provide." *Id.*; *see also The Research Found. of State Univ. of New York v. Luminex Corp.*, No. 07-CV-1260, 2008 WL 4822276, at *3 (N.D.N.Y. Nov. 3, 2008) ("Courts should consider both the number of witnesses located in a given venue and the relative salience of their testimony."). "Generally, the moving party submits an affidavit explaining why the transferee forum is more convenient, which includes 'the potential principal witnesses expected to be called and the substance of their testimony.' " *EasyWeb Innovations*, 888 F. Supp. 2d at 350 (citing *Pall Corp. v. PTI Techs., Inc.*, 992 F. Supp. 196, 198 (E.D.N.Y. 1998) (quoting *Laumann Mfg. Corp. v. Castings USA Inc.*, 913 F. Supp. 712, 720 (E.D.N.Y. 1996)).) *See also Factors Etc.*, 579 F.2d at 218 ("When a party seeks the transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover.")

In support of its motion to transfer venue, Defendant offers the Declaration of Allen Hutchinson. (*See* Dkt. No. 25-3, at [Decl. of Allen Hutchinson, Jan. 24, 2013].) In his declaration, Hutchinson, an engineering manager for Defendant, specifically identifies only four potential party witnesses that are knowledgeable regarding various specific aspects of Google Street View. (*Id.* at ¶ 4a-d.) Each of the witnesses are located in the Northern District of California. (*Id.*) In its memorandum of law in support of transfer, Defendant identifies "two prior art references that appear to be relevant to [its] invalidity defense at companies located in the Northern District of California." (Dkt. No. 25-1, at 9 [Def.'s Mem. of Law].) Defendant also asserts that there are four non-party prosecuting attorneys who are located in Texas, Virginia and Florida. In Plaintiff's opposition to Defendant's motion, Plaintiff specifically identifies only one non-party witness, the sole inventor of the patents-in-suit, Mr. Oxaal. By declaration, Oxaal states that he resides in the Northern District of New York and operates his business there, of which Oxaal and his souse are the only employees. Oxaal further declares that he conceived of and reduced to practice all of the inventions underlying the

patents-in-suit. Finally, Oxaal declares that he intends to testify at trial in this matter and that travel to the Northern District of California would be very burdensome and inconvenient to him and MEV.

In finding that this factor is neutral to the transfer analysis, Magistrate Judge Dancks relied on this Court's decision in *Defenshield Inc. v. First Choice Armor & Equipment, Inc.*, No. 10-CV-1140, 2012 WL 1069088, at *12 (N.D.N.Y. Mar. 29, 2012). In *Defenshield*, the defendant identified only two potential witnesses and the plaintiff identified nine witnesses, including the named inventor of the underlying patent. However, keeping in mind that "this factor is 'more than a mere tally of witnesses,' " the Court in *Defenshield* found this factor to be neutral, "because the parties' potential witness appear to offer equally material information." *Defenshield*, 2012 WL 1069088, at *12 (quoting *Advanced Fiber Techn. Trust*, 2008 WL 4890377, at *2). Defendant argues that here, Magistrate Judge Dancks erroneously found that one non-party witness in this District neutralized numerous party and non-party witnesses outside the District. Defendant goes on to note the rule of law that "analysis of this factor requires both a tallying of witnesses and a qualitative evaluation of the materiality of the witness[e]s' testimony" but then argues that "[b]ased solely on the number of witnesses identified by the parties, this factor clearly warrants transfer." (Dkt. No. 38-1, at 9.) To be sure, Defendant also argues that a qualitative analysis of these witnesses favors transfer, relying on argument in its original moving papers that in a patent infringement action, the key witnesses are those who are involved in the design, production and sale of products. However, as Magistrate Judge Dancks noted, Mr. Oxaal, the only non-party witness identified with specificity, conceived of and reduced to practice the inventions underlying each of the patents-in-suit. In contrast, Defendant only specifically identified four witnesses, each of whom is a party-witness.

**\*6** Keeping in mind that courts have broad discretion in balancing the transfer factors, that courts may weigh the convenience of non-party witnesses more heavily than party witnesses, that the moving party bears the burden of a clear and convincing showing that transfer is warranted, and that both a tallying of witnesses and a qualitative evaluation of the materiality of their testimony is required, Magistrate Judge Dancks' finding in this case that the convenience of witnesses factor is neutral to the transfer analysis was not clearly erroneous or contrary to law.

### 2. Convenience of Parties

Defendant is a Delaware corporation, with offices in Mountain View, California and Plaintiff is a New York corporation, with its principal place of business in Frisco, Texas. Magistrate Judge Dancks found that this factor is neutral because for the same reason it would be inconvenient for Plaintiff to travel to the Northern District of California, it would be inconvenient for Defendant to travel to the Northern District of New York. Defendant argues that because transfer would alleviate unnecessary inconvenience to it without any additional inconvenience to Plaintiff, Magistrate Judge Dancks committed legal error when she weighed this factor in favor of transfer. Defendant cites *In re Microsoft Corp.*, 630 F.3d 1361 (Fed. Cir. 2011) for support. However, in that case, the plaintiff was a company that was operated in part by the co-inventor of the patent it sought to enforce against Microsoft. While the principal place of plaintiff's business was in the United Kingdom, it maintained an office in Tyler, Texas. The court in *In re Microsoft* held that plaintiff's transfer of documents to its Texas office in anticipation of litigation, where the Texas office staffed no employees and was established recently and in anticipation of litigation, was merely an attempt to manipulate venue. *See In re Microsoft*, 630 F.3d at 1364-65. Here, Plaintiff is a company whose purpose is to enforce patent rights. Oxaal, the sole inventor of each of the patents that Plaintiff seeks to enforce here, resides in this District and maintains documents and models regarding his conception and reduction to practice of the underlying inventions in this District. Accordingly, Judge Dancks' finding that the convenience of the parties factor is neutral to the transfer analysis is not clearly erroneous or contrary to law.

### 3. Location of Relevant Documents and Relative Ease of Access to Those Sources of Proof

"The location of relevant documents once carried significant weight in this analysis and in patent infringement cases is usually produced from the accused infringer." *Advanced Fiber Techn. Trust*, 2008 WL 4890377, at *4 (internal quotation marks omitted). "Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that

location." *Id.* (internal quotation marks omitted). In evaluating the significance of the location of relevant documents, the location of the defendant's documents weighs in favor of venue being laid in that location, because in a patent infringement action, the bulk of the relevant evidence is in the possession of the accused infringer. *See In re Genentech, Inc.,* 566 F.3d 1338, 1345 (Fed. Cir. 2009).

Magistrate Judge Dancks found this factor weighs only slightly in favor of transfer, relying on *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342 (E.D.N.Y. 2012). In *EasyWeb*, the court noted that this factor is not "particularly significant given the technological age in which we live, with the widespread use of, among other things, electronic document production." *EasyWeb*, 888 F. Supp. 2d at 352 (citing *Am. S.S. Owners Mut. Prot. and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007)) ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."); *Distefano v. Carozzi N. Am., Inc.*, No. 98 Civ. 7137(SJ), 2002 WL 31640476, at *4 (E.D.N.Y. Nov. 16, 2002) ("Although the location of relevant documents is entitled to some weight when determining whether a case should be transferred, modern photocopying technology deprives this issue of practical or legal weight." (citations omitted)). Defendant argues that this was legal error since the Federal Circuit "expressly rejected" this rationale in *In re TS Tech USA Corp.*, 551 F.3d 1315 (Fed. Cir. 2008) (applying Fifth Circuit law). In *In re TS Tech*, the Federal Circuit noted that the Court of Appeals for the Fifth Circuit, whose law governed the underlying District Court's decision, explained that the fact "that access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous." *In re TS Tech*, 551 F.3d at 1321 (quoting *In re Volkswagen of America, Inc.*, 545 F.3d 304, 316 (5th Cir. 2008)). The court went on to conclude that, because all of the physical evidence, including some automobile equipment and documentary evidence, are far more conveniently located near the transferee district, the district court erred in not weighing this factor in favor of transfer. *See In re TS Tech*, 551 F.3d at 1321. Here, Defendant, who has the burden to show that a transfer is warranted, did not clearly show that any physical evidence exists in the Northern District of California. In contrast, Plaintiff has shown that the sole inventor possesses hard copy documents, models, drawings and

*View 360 Solutions LLC v. Google, Inc.*, Not Reported in Fed. Supp. (2013)

2013 WL 12130430

paintings pertaining to the patents-in-suit in this District. Accordingly, Magistrate Judge Dancks' finding that this factor weighs only slightly in favor of Defendant is not clearly erroneous or contrary to law.

#### 4. Locus of the Operative Events in Issue

**\*7** Operative facts in a patent infringement action include those relating to the design, development, and production of a patented product. *See Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006); *Invivo Research, Inc. v. Magnetic Resonance Equipment Corp.*, 119 F. Supp. 2d 433, 439 (S.D.N.Y. 2000) (citing *Bionx Implants, Inc. v. Biomet, Inc.*, No. 99-CV-0740, 1999 WL 342306, at \*4 (S.D.N.Y. May 27, 1999)). Similar information regarding the allegedly infringing product is also vital in adjudicating an infringement suit. *See Amersham Pharmacia Biotech, Inc.*, 11 F. Supp. 2d at 730. Also relevant to consideration of this factor is the area in which the allegedly infringing device was sold or offered for sale. *See Invivo Research, Inc.*, 119 F. Supp.2d at 439. However, "[w]here a party's products are sold in many states, sales alone are insufficient to establish a material connection to the forum and to override other factors favoring transfer." *Id.* (quoting *Bionx Implants*, 1999 WL 342306, at \*4 (citations omitted)). As a result, venue analysis may demonstrate that there are multiple loci of operative facts. *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 696-97 (S.D.N.Y. 2009); *Adams v. Key Tronic Corp.*, No. 94-CV-0535, 1997 WL 1864, at \*4, n.1 (S.D.N.Y. Jan. 2, 1997); *Kwatra v. MCI, Inc.*, No. 96-CV-2491, 1996 WL 694444, at \*3-4 (S.D.N.Y. Dec. 3, 1996). Thus, while certainly an important factor, the situs of development of the infringing device is not alone determinative. *See Defenshield*, 2012 WL 1069088, at \*13 (citing *Amersham Pharmacia Biotech, Inc.*, 11 F. Supp. 2d at 730).

Magistrate Judge Dancks found that this factor is neutral, noting that both this District and the transferee District are loci of operative facts. Defendant argues that this was error because the Magistrate Judge was required to weigh the connection of operative events and facts to each district and determine which is stronger, citing *Wagner v. New York Marriott Marquis*, 502 F. Supp. 2d 312, 316 (N.D.N.Y. 2007) (finding that stronger connection between the operative facts and the transferee district "cannot be denied"). However, in reaching her conclusion

that this factor is neutral, Magistrate Judge Dancks considered both Defendant's assertion that the transferee District is the situs of operative events because that is where the design and development of Google Street View took place and Plaintiff's assertion that this District is the situs of operative events because this is where Oxaal conceived of and reduced to practice the inventions underlying the patents-in-suit. While the court in *Wagner* found that the facts of that case warranted a finding that there was a stronger connection to the transferee District, other courts have found that where there are loci of operative events that equally favor both districts, the factor is neutral to the analysis. *See Defenshield*, 2012 WL 1069088, at 13; *EasyWeb*, 888 F. Supp. 2d at 354. Accordingly, Magistrate Judge Dancks' finding that this factor is neutral to the transfer analysis was not clearly erroneous or contrary to law.

#### 5. Weight Accorded to Plaintiff's Choice of Forum

Generally, "[a] plaintiff's choice of forum is entitled to considerable weight and should not be disturbed unless other factors weight strongly in favor of transfer." *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 333 (E.D.N.Y. 2006); *see also Iragorri v. United Techs. Corp.*, 274 F.3d 65, 70-71 (2d Cir. 2001) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." (internal quotation marks omitted).). "However plaintiff's choice of forum is not entitled to great weight when the operative facts have little or no connection with the transferor forum, or when the plaintiff does not reside in his chosen forum." *Neil Bros. Ltd.*, 425 F. Supp. 2d at 333.

**\*8** Magistrate Judge Dancks found that this factor weighs against transfer because Plaintiff is incorporated in this state, maintains a preference for litigating in this forum, and the patents-in-suit were designed in this forum by Mr. Oxaal, who resides here. Moreover, Magistrate Judge Dancks noted that the place where an invention was developed is considered a locus of operative facts. Defendant argues that Magistrate Judge Dancks committed legal error in affording deference to Plaintiff's choice of forum because, according to prevailing caselaw and the facts of this case, Plaintiff is not entitled to such deference.

**View 360 Solutions LLC v. Google, Inc.**, Not Reported in Fed. Supp. (2013)

2013 WL 12130430

While it is true that the Plaintiff's choice of forum is no longer decisive, it is entitled to great weight unless the operative facts have little or no connection to Plaintiff's chosen forum or the Plaintiff does not reside in the forum. Here, while the latter may be true, that Plaintiff, a corporation with its principal place of business in Texas, does not reside in this forum, for the same reasons that Magistrate Judge Dancks found that this District is a locus of operative events, there is a connection between this forum and the underlying facts of this action. Given the broad discretion afforded the Court in weighing the balance of convenience and justice, Magistrate Judge Dancks' finding that the Plaintiff's choice of forum weighs against transfer was not clearly erroneous or contrary to law.

### 6. Judicial Efficiency and Interests of Justice

Finally, Defendant objects to Magistrate Judge Dancks' finding that judicial efficiency and the interests of justice do not weigh in favor of transfer relying on, and incorporating by reference, its argument in its papers in support of its underlying motion to transfer venue. The Court finds that Magistrate Judge Dancks correctly noted that Defendant failed to meet its burden to show that the interests of justice weigh in favor of a transfer. Accordingly, this finding is not clearly erroneous or contrary to law.

### 7. The Remaining Factors

Magistrate Judge Dancks found that the remaining three factors – the availability of process to compel attendance of unwilling witnesses, the relative means of the parties, and the comparative familiarity of each district with governing law – are all neutral to the transfer analysis, and Defendant fails to object to those findings. Moreover, after a review of the Magistrate Judge's Order, the Court finds that her findings in this regard are not clearly erroneous or contrary to law.

After weighing all of the factors, the Court finds that Magistrate Judge Dancks correctly concluded that the balance of convenience and interests of justice favor venue in the Northern District of New York. Accordingly, Magistrate Judge Dancks' Order denying Defendant's motion to transfer venue to the Northern District of California is not clearly erroneous or contrary to law.

### B. Whether Magistrate Judge Dancks' Order Denying Defendant's Motion to Stay This Action is Clearly Erroneous or Contrary to Law

The Court answers this question in the negative. Because Magistrate Judge Dancks' denial of Defendant's motion to transfer venue to the Northern District of California is not clearly erroneous or contrary to law, her denial of Defendant's motion to stay this action pending resolution of its motion to transfer venue as moot is likewise not clearly erroneous or contrary to law.

Accordingly, it is

**ORDERED** that Defendant's objections to the March 13, 2013, Order of Magistrate Judge Dancks denying Defendant's motions to transfer venue and for a stay (Dkt. No. 38) are **DENIED**, and it is further

**ORDERED** that the March 13, 2013, Order of Magistrate Judge Dancks (Dkt. No. 35) is **AFFIRMED**.

DATED: August 13, 2013.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12130430

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

2013 WL 12130430
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

VIEW 360 SOLUTIONS LLC, Plaintiff,

v.

GOOGLE, INC., Defendant.

1:12-CV-1352(GTS/TWD)
|
Signed 08/13/2013

**Attorneys and Law Firms**

INNOVALAW, P.C., 1900 Ravinia Place, OF COUNSEL: TIMOTHY E. GROCHOCINSKI, ESQ., AARON W. PURSER, ESQ., Orland Park, IL 60462, Counsel for Plaintiff.

THE SIMON LAW FIRM, P.C., 800 Market Street, Suite 1700, OF COUNSEL: ANTHONY G. SIMON, ESQ., BENJAMIN A. ASKEW, ESQ., Saint Louis, MO 63101, Counsel for Plaintiff.

LAW OFFICES OF DANIEL M. SLEASMAN, One Crumitie Road, OF COUNSEL: DANIEL M. SLEASMAN, ESQ., Albany, NY 12211, Counsel for Plaintiff.

AKIN GUMP STRAUSS HAUER & FELD, LLP, 1333 New Hampshire Avenue, N.W., OF COUNSEL: CONO. A. CARRANO, ESQ., DAVID C. VONDLE, ESQ., Washington, D.C. 20036, Counsel for Defendant.

HISCOCK & BARCLAY, LLP, One Park Place, 300 South State Street, OF COUNSEL: DOUGLAS J. NASH, ESQ., Syracuse, NY 13202, Counsel for Defendant.

### MEMORANDUM-DECISION and ORDER

HON. GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court in this patent infringement action are Defendant's objections to the March 13, 2013 Order of Magistrate Judge Thérèse Wiley Dancks denying Defendant's motions to transfer venue to the United States District Court for the Northern District of California and to stay this action pending a decision on its venue motion ("the Order"). For the reasons set forth below, Defendant's objections are denied and Magistrate Judge Dancks' Order is affirmed in its entirety.

## I. RELEVANT BACKGROUND

### A. Procedural History

Plaintiff, View 360 Solutions, Inc., commenced this action against Defendant, Google, Inc., on August 31, 2012. Plaintiff's Complaint alleges eight counts of direct and induced infringement of eight separate patents, regarding which Plaintiff has an exclusive license to enforce and sue infringers. (Dkt. No. 1.) Generally, the Complaint alleges that Defendant's product, Google Street View, infringes the underlying patents. In its Answer, Defendant asserts sixteen counter-claims seeking a declaratory judgment of non-infringement, invalidity and unenforceability regarding each of the patents. (Dkt. No. 19.)

In January 2013, the parties submitted a case management plan wherein Defendant indicated its intent to file a motion to transfer venue of this action to the Northern District of California pursuant to 28 U.S.C. § 1404(a) as well as a motion to stay this action pending resolution of the venue motion. (Dkt. No. 21.) Two weeks later, Defendant filed its motions to transfer venue and to stay this action. Plaintiff opposed both motions and, with permission of Magistrate Judge Dancks, Defendant replied. (Dkt. Nos. 25, 26, 28, 30, 34.) On March 13, 2013, Magistrate Judge Dancks denied both motions. (Dkt. No. 35.) This timely appeal followed. (Dkt. No. 38.)

### B. Factual Background

Plaintiff is a New York limited liability company with its principal place of business in Frisco, Texas. Defendant is a Delaware corporation with its principal place of business in Mountain View, California. The sole named inventor of each of the patents underlying this action is Ford Oxaal ("Oxaal"), who currently resides in Cohoes, New York.

Oxaal declares that he has resided in the Northern District of New York for twenty-two years, which is where he conceived of and reduced to practice all of the inventions claimed in the patents underlying this action. (See Dkt. No. 30-1 [Decl. of Ford Oxaal, Feb. 19, 2013].) Oxaal formed and operates Minds-Eye View, Inc. ("MEV") in

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

the Northern District of New York, of which he and his wife are the only employees. MEV has developed and sold software applications that were marked as being covered by several of the patents-in-suit underlying this action. Oxaal granted Plaintiff an exclusive licence to enforce the underlying patents and sue infringers. Plaintiff incorporated in New York on August 7, 2012.

Oxaal declares that, if this matter proceeds in the Northern District of New York, he intends to testify at trial. Oxaal further declares that travel to the Northern District of California would be very burdensome and inconvenient to him and to MEV. According to Oxaal, he possesses hard copy and electronic documents pertaining to the patents-in-suit and MEV. In addition to these documents, Oxaal also possesses models, drawing and paintings that may pertain to the patents-in-suit, which are very difficult to transport. Oxaal further declares that shipping of these materials to the Northern District of California would be very difficult and may result in damage to them.

 **\*2** Defendant's engineering manager, Allen Hutchinson ("Hutchinson") declares generally that the teams responsible for research, design and development for Google Street View are primarily led by Defendant's employees at its facilities in Mountain View, California, which is located in the Northern District of California. Hutchinson specifically identifies four such employees, including himself, that Defendant expects to provide testimony in this case. Hutchinson also declares that Defendant's business documents and records related to the research, design and development of Google Street View are either physically present or electronically accessible in Mountain View, California. Hutchinson goes on to declare that "[a]ll or nearly all of the documents and highly proprietary information and source code relating to Google Street View are stored in [Defendant's] various data centers, which are accessible and ultimately managed from Mountain View, California." (Dkt. No. 25-3, at ¶ 5 [Decl. of Allen Hutchinson, Jan. 24, 2013].)

### C. Defendant's Motion to Transfer Venue

Generally, in support of its motion to transfer venue to the Northern District of California, Defendant argued that (1) this case could have been brought in the Northern District of California and (2) the balance of convenience and justice favors transfer to that district. Specifically, Defendant argued, among other things, that Plaintiff's

choice of forum should not be given any weight in the transfer analysis because it incorporated in New York less than four weeks before it commenced this action and none of the operative facts or events giving rise to Plaintiff's claims occurred in the Northern District of New York. Defendant also argued that the convenience of witnesses, the convenience of the parties, the location of relevant documents and the relative ease of access to those sources of proof, the location of operative events, and judicial efficiency all weigh in favor of transferring this action to the Northern District of California. (*See* Dkt. No. 25-1, at 5-15 [Def.'s Mem. of Law].)

Generally, in response to Defendant's motion, Plaintiff argued that Defendant's motion to transfer venue should be denied because (1) Plaintiff's choice of forum is entitled to great weight, (2) the convenience of parties, availability of process to compel attendance of non-party witnesses and judicial efficiency weigh against transfer of this action to the Northern District of California, and (3) the remainder of the factors are neutral to the transfer analysis. (Dkt. No. 30, at 3-12 [Pl.'s Mem. of Law].)

Generally, in its reply memorandum of law, Defendant argued that its motion to transfer venue should be granted because (1) Plaintiff's choice of venue should be afforded little weight, (2) all of the witnesses except one are located outside of the Northern District of New York, (3) Defendant is significantly more inconvenienced by litigating in the Northern District of New York than Plaintiff would be in the Northern District of California, (4) most of the relevant proof is located in the Northern District of California, (5) nearly all of the operative facts are in the Northern District of California, (6) the majority of non-party witnesses could be compelled to attend trial in the Northern District of California, and (7) judicial efficiency and the Northern District of California's interest in this case weigh in favor of transfer. (Dkt. No. 34, at 1-9 [Def's. Reply Mem. of Law].)

### D. Defendant's Motion to Stay This Action

Generally, in support of its motion to stay this action pending resolution of its motion to transfer venue to the Northern District of California, Defendant argued that the Federal Circuit Court of Appeals' recent order in *In re Fusion-IO, Inc.*, 489 Fed.Appx. 465 (Fed. Cir. 2012) recommends that a short stay of proceedings is the proper vehicle to limit prejudice and inconvenience to the parties

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

while they await a decision on threshold issues such as proper venue. (*See* Dkt. No. 26-1 [Def.'s Mem. of Law].)

**\*3** Generally, in response to Defendant's motion, Plaintiff argued that Defendant failed to meet its burden to demonstrate that a stay is necessary. (*See* Dkt. No. 28 [Pl.'s Mem. of Law].)

#### E. The Order

Generally, in deciding the motions to transfer venue and to stay this action, Magistrate Judge Dancks concluded that this action might have been brought in the Northern District of California and that the balance of convenience and justice weighs against transfer. In weighing the balance of convenience and justice, Magistrate Judge Dancks concluded that while the location of relevant proof weighs slightly in favor of transfer, judicial efficiency and the weight afforded to Plaintiff's choice of forum weigh against transfer and the remaining factors are neutral to the analysis. Accordingly, Magistrate Judge Dancks denied Defendant's motion to transfer venue. Having denied Defendant's motion to transfer venue, Magistrate Judge Dancks denied the motion to stay this action as moot. (Dkt. No. 35, at 3-14 [the Order].)

The pending objections followed.

## II. Defendant's Objections

Generally, in support of its objections to the Order, Defendant argues that Magistrate Judge Dancks committed legal error in her analysis of the following five transfer factors: (1) the convenience of the parties, (2) the convenience of the witnesses, (3) the locus of operative facts, (4) the location of relevant documents, and (5) Plaintiff's choice of forum, all of which weigh in favor of transferring this action to the Northern District of California. Defendant also argues that the judicial efficiency factor weighs in favor of transfer, relying on its argument in its papers in support of its motion to transfer venue. Regarding its motion to stay this action, Defendant argues that a stay is warranted to prevent prejudice and promote judicial economy while the motion to transfer is pending. (*See* Dkt. No. 38-1, at 1-20 [Def.'s Mem. of Law].)

In response, Plaintiff argues generally that Defendant's objections should be denied because (1) Plaintiff's choice of forum is entitled to great weight and weighs against

transfer, (2) the location of relevant proof at best weighs only slightly in favor of transfer and at the very least is neutral to the analysis, and (3) the convenience of witnesses, convenience of the parties, loci of operative facts and availability to compel attendance of non-party witnesses are neutral to the analysis. (*See* Dkt. No. 39, at 1-8 [Pl.'s Mem. of Law].)

## III. Relevant Legal Standards

### A. Legal Standard Governing Objections to the Order of a Magistrate Judge

In reviewing timely objections to a magistrate judge's non-dispositive order,[1] the court "must modify or set aside any part of the order that is clearly erroneous or is contrary to law." [Fed. R. Civ. P. 72(a).](#) A finding is clearly erroneous if " 'on the entire evidence,' [the reviewing court] is 'left with the definite and firm conviction that a mistake has been committed.' " *[Snyder v. Louisiana](#)*, [552 U.S. 472, 481, 128 S. Ct. 1203, 1213 (2008)](#) (citing *[Easley v. Cromartie](#)*, [532 U.S. 234, 242, 121 S. Ct. 1452 (2001)](#) (quoting *[United States v. United States Gypsum Co.](#)*, [333 U.S. 364, 395, 68 S. Ct. 525 (1948)](#))). An order is contrary to law "if it fails to apply or misapplies relevant statutes, case law or rules of procedure." *[New York v. Salazar](#)*, [No. 6:08-CV-644, 2011 WL 1938232, at \*4 (N.D.N.Y. Mar. 8, 2011).](#)

[1] Courts in this District view orders on motions to transfer venue as non-dispositive. *See [Glover v. Goord](#)*, [No. 06-CV-1037, 2007 WL 2454193 (N.D.N.Y. Aug. 22, 2007)](#) (Kahn, J.); *[White Mop Wringer Co. of Canada Ltd. v. BT Capital Partners, Inc.](#)*, [No. 95-CV-565, 1997 WL 222380, at \*1 (N.D.N.Y. Apr. 29, 1997)](#) (Pooler, J.); *[Pemrick v. Stracher](#)*, [No. 90-CV-849, 1992 WL 697636, at \*1 (N.D.N.Y. Mar. 27, 1992)](#) (McAvoy, C.J.).

### B. Legal Standard Governing a Motion to Transfer Venue

**\*4** A district court may decide to transfer an action to another district in the interest of justice and for the convenience of the parties and witnesses. *See* [28 U.S.C. § 1404(a)](#) ("For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."); *see also [Ferens v. John Deere Co.](#)*, [494 U.S. 516, 530 (1990)](#); *[Lead Indus. Ass'n v. Occupational Safety & Health Admin.](#)*, [610 F.2d 70, 79](#)

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

n.17 (2d Cir. 1979) (citing cases); *Kelly v. Kelly*, 911 F. Supp. 70, 71 (N.D.N.Y. 1996). "The purpose of section 1404(a) is to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Flaherty v. All Hampton Limousine, Inc.*, 01-CV-9939, 2002 WL 1891212, at *1 (S.D.N.Y. Aug. 16, 2002) (internal quotation marks omitted). When considering whether to transfer a case, a district court must conduct "a two-part test: (1) whether the action to be transferred might have been brought in the transferee venue; and (2) whether the balance of convenience and justice favors transfer." *Advanced Fiber Tech. Trust v. J & L Fiber Serv. Inc.*, 07-CV-1191, 2008 WL 4890377, at *1 (N.D.N.Y. Nov. 12, 2008) (Homer, M.J.).

### IV. Analysis

#### A. Whether Magistrate Judge Dancks' Order Denying Defendant's Motion to Transfer This Action to the Northern District of California Is Clearly Erroneous or Contrary to Law

The Court answers this question in the negative, in part for the reasons stated in Plaintiff's abbreviated memorandum of law. (Dkt. No. 39, at 1-8 [Pl.'s Mem. of Law].) The Court would add the following analysis.

Neither party disputes that this action might have been brought in the Northern District of California. However, the parties disagree regarding whether the balance of convenience and justice favors transfer. To that end, Defendant argues that Magistrate Judge Dancks misapplied the law when she weighed six of the factors in the transfer analysis: (1) convenience of witnesses, (2) convenience of parties, (3) location of relevant documents and relative ease of access to those sources of proof, (4) locus of the operative events in issue, (5) weight accorded to Plaintiff's choice of forum, and (6) judicial efficiency and interests of justice. Defendant argues that each of these factors weighs in favor of transfer, and that, since Magistrate Judge Dancks found that the remaining three factors are neutral, a balance of the factors warrants transfer of this action to the Northern District of California.

Once it has been established that the action might have been brought in the transferee district, the resolution of a motion to transfer venue lies "within the broad discretion of the district court and [is] determined upon notions of convenience and fairness on a case-by-case basis."

*Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 11 F. Supp. 2d 729, 730 (S.D.N.Y. 1998). A non-exclusive list of factors courts routinely consider in making this determination include the following:

> (1) the convenience of witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to those sources of proof; (4) the situs of the operative events in issue; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) judicial efficiency and the interests of justice.

*Amersham Pharmacia Biotech, Inc.*, 11 F. Supp. 2d at 730. "No individual factor is determinative and a court has discretion to weigh each factor to reach a fair result." *Id.* Moreover, it is important to note that the party requesting transfer bears the burden of making a clear and convincing showing that transfer is warranted in light of these factors. *See EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 348 (E.D.N.Y. 2012) (citing *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978), abrogated on other grounds by, *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir. 1990)). *See also Hubbell Inc. v. Pass & Seymour, Inc.*, 883 F. Supp. 955, 962 (S.D.N.Y. 1995).

#### 1. Convenience of Witnesses

**\*5** "Convenience of both party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." *In re Bennett Funding Group, Inc.*, 259 B.R. 243, 249 (N.D.N.Y. 2001). While the convenience of party witnesses is certainly relevant, courts may weigh more heavily the convenience of non-party witnesses in conducting this analysis. *See CYI, Inc. v. Ja-Ru, Inc.*, No. 12-CV-2230, 2012 WL 6646188, at *5 (S.D.N.Y. Dec. 21, 2012);

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

*Pecorino v. Vutec Corp.*, No. 11-CV-6313, 2012 WL 5989918, at \*8 (E.D.N.Y. Nov. 30, 2012). An evaluation of this factor involves "more than a mere tally of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum." *Advanced Fiber*, 2008 WL 4890377, at \*2. Rather, the Court should "qualitatively evaluate the materiality of the testimony that witnesses may provide." *Id.*; *see also The Research Found. of State Univ. of New York v. Luminex Corp.*, No. 07-CV-1260, 2008 WL 4822276, at \*3 (N.D.N.Y. Nov. 3, 2008) ("Courts should consider both the number of witnesses located in a given venue and the relative salience of their testimony."). "Generally, the moving party submits an affidavit explaining why the transferee forum is more convenient, which includes 'the potential principal witnesses expected to be called and the substance of their testimony.' " *EasyWeb Innovations*, 888 F. Supp. 2d at 350 (citing *Pall Corp. v. PTI Techs., Inc.*, 992 F. Supp. 196, 198 (E.D.N.Y. 1998) (quoting *Laumann Mfg. Corp. v. Castings USA Inc.*, 913 F. Supp. 712, 720 (E.D.N.Y. 1996)).) *See also Factors Etc.*, 579 F.2d at 218 ("When a party seeks the transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover.")

In support of its motion to transfer venue, Defendant offers the Declaration of Allen Hutchinson. (*See* Dkt. No. 25-3, at [Decl. of Allen Hutchinson, Jan. 24, 2013].) In his declaration, Hutchinson, an engineering manager for Defendant, specifically identifies only four potential party witnesses that are knowledgeable regarding various specific aspects of Google Street View. (*Id.* at ¶ 4a-d.) Each of the witnesses are located in the Northern District of California. (*Id.*) In its memorandum of law in support of transfer, Defendant identifies "two prior art references that appear to be relevant to [its] invalidity defense at companies located in the Northern District of California." (Dkt. No. 25-1, at 9 [Def.'s Mem. of Law].) Defendant also asserts that there are four non-party prosecuting attorneys who are located in Texas, Virginia and Florida. In Plaintiff's opposition to Defendant's motion, Plaintiff specifically identifies only one non-party witness, the sole inventor of the patents-in-suit, Mr. Oxaal. By declaration, Oxaal states that he resides in the Northern District of New York and operates his business there, of which Oxaal and his souse are the only employees. Oxaal further declares that he conceived of and reduced to practice all of the inventions underlying the patents-in-suit. Finally, Oxaal declares that he intends to testify at trial in this matter and that travel to the Northern District of California would be very burdensome and inconvenient to him and MEV.

In finding that this factor is neutral to the transfer analysis, Magistrate Judge Dancks relied on this Court's decision in *Defenshield Inc. v. First Choice Armor & Equipment, Inc.*, No. 10-CV-1140, 2012 WL 1069088, at \*12 (N.D.N.Y. Mar. 29, 2012). In *Defenshield*, the defendant identified only two potential witnesses and the plaintiff identified nine witnesses, including the named inventor of the underlying patent. However, keeping in mind that "this factor is 'more than a mere tally of witnesses,' " the Court in *Defenshield* found this factor to be neutral, "because the parties' potential witness appear to offer equally material information." *Defenshield*, 2012 WL 1069088, at \*12 (quoting *Advanced Fiber Techn. Trust*, 2008 WL 4890377, at \*2). Defendant argues that here, Magistrate Judge Dancks erroneously found that one non-party witness in this District neutralized numerous party and non-party witnesses outside the District. Defendant goes on to note the rule of law that "analysis of this factor requires both a tallying of witnesses and a qualitative evaluation of the materiality of the witness[e]s' testimony" but then argues that "[b]ased solely on the number of witnesses identified by the parties, this factor clearly warrants transfer." (Dkt. No. 38-1, at 9.) To be sure, Defendant also argues that a qualitative analysis of these witnesses favors transfer, relying on argument in its original moving papers that in a patent infringement action, the key witnesses are those who are involved in the design, production and sale of products. However, as Magistrate Judge Dancks noted, Mr. Oxaal, the only non-party witness identified with specificity, conceived of and reduced to practice the inventions underlying each of the patents-in-suit. In contrast, Defendant only specifically identified four witnesses, each of whom is a party-witness.

**\*6** Keeping in mind that courts have broad discretion in balancing the transfer factors, that courts may weigh the convenience of non-party witnesses more heavily than party witnesses, that the moving party bears the burden of a clear and convincing showing that transfer is warranted, and that both a tallying of witnesses and a qualitative evaluation of the materiality of their testimony is required, Magistrate Judge Dancks' finding in this case that the convenience of witnesses factor is neutral to the transfer analysis was not clearly erroneous or contrary to law.

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

### 2. Convenience of Parties

Defendant is a Delaware corporation, with offices in Mountain View, California and Plaintiff is a New York corporation, with its principal place of business in Frisco, Texas. Magistrate Judge Dancks found that this factor is neutral because for the same reason it would be inconvenient for Plaintiff to travel to the Northern District of California, it would be inconvenient for Defendant to travel to the Northern District of New York. Defendant argues that because transfer would alleviate unnecessary inconvenience to it without any additional inconvenience to Plaintiff, Magistrate Judge Dancks committed legal error when she weighed this factor in favor of transfer. Defendant cites *In re Microsoft Corp.*, 630 F.3d 1361 (Fed. Cir. 2011) for support. However, in that case, the plaintiff was a company that was operated in part by the co-inventor of the patent it sought to enforce against Microsoft. While the principal place of plaintiff's business was in the United Kingdom, it maintained an office in Tyler, Texas. The court in *In re Microsoft* held that plaintiff's transfer of documents to its Texas office in anticipation of litigation, where the Texas office staffed no employees and was established recently and in anticipation of litigation, was merely an attempt to manipulate venue. *See In re Microsoft*, 630 F.3d at 1364-65. Here, Plaintiff is a company whose purpose is to enforce patent rights. Oxaal, the sole inventor of each of the patents that Plaintiff seeks to enforce here, resides in this District and maintains documents and models regarding his conception and reduction to practice of the underlying inventions in this District. Accordingly, Judge Dancks' finding that the convenience of the parties factor is neutral to the transfer analysis is not clearly erroneous or contrary to law.

### 3. Location of Relevant Documents and Relative Ease of Access to Those Sources of Proof

"The location of relevant documents once carried significant weight in this analysis and in patent infringement cases is usually produced from the accused infringer." *Advanced Fiber Techn. Trust*, 2008 WL 4890377, at *4 (internal quotation marks omitted). "Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that

location." *Id.* (internal quotation marks omitted). In evaluating the significance of the location of relevant documents, the location of the defendant's documents weighs in favor of venue being laid in that location, because in a patent infringement action, the bulk of the relevant evidence is in the possession of the accused infringer. *See In re Genentech, Inc.,* 566 F.3d 1338, 1345 (Fed. Cir. 2009).

Magistrate Judge Dancks found this factor weighs only slightly in favor of transfer, relying on *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342 (E.D.N.Y. 2012). In *EasyWeb*, the court noted that this factor is not "particularly significant given the technological age in which we live, with the widespread use of, among other things, electronic document production." *EasyWeb*, 888 F. Supp. 2d at 352 (citing *Am. S.S. Owners Mut. Prot. and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007)) ( "The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."); *Distefano v. Carozzi N. Am., Inc.*, No. 98 Civ. 7137(SJ), 2002 WL 31640476, at *4 (E.D.N.Y. Nov. 16, 2002) ("Although the location of relevant documents is entitled to some weight when determining whether a case should be transferred, modern photocopying technology deprives this issue of practical or legal weight." (citations omitted)). Defendant argues that this was legal error since the Federal Circuit "expressly rejected" this rationale in *In re TS Tech USA Corp.*, 551 F.3d 1315 (Fed. Cir. 2008) (applying Fifth Circuit law). In *In re TS Tech*, the Federal Circuit noted that the Court of Appeals for the Fifth Circuit, whose law governed the underlying District Court's decision, explained that the fact "that access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous." *In re TS Tech*, 551 F.3d at 1321 (quoting *In re Volkswagen of America, Inc.*, 545 F.3d 304, 316 (5th Cir. 2008)). The court went on to conclude that, because all of the physical evidence, including some automobile equipment and documentary evidence, are far more conveniently located near the transferee district, the district court erred in not weighing this factor in favor of transfer. *See In re TS Tech*, 551 F.3d at 1321. Here, Defendant, who has the burden to show that a transfer is warranted, did not clearly show that any physical evidence exists in the Northern District of California. In contrast, Plaintiff has shown that the sole inventor possesses hard copy documents, models, drawings and

View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12130430

paintings pertaining to the patents-in-suit in this District. Accordingly, Magistrate Judge Dancks' finding that this factor weighs only slightly in favor of Defendant is not clearly erroneous or contrary to law.

#### 4. Locus of the Operative Events in Issue

**\*7** Operative facts in a patent infringement action include those relating to the design, development, and production of a patented product. *See Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006); *Invivo Research, Inc. v. Magnetic Resonance Equipment Corp.*, 119 F. Supp. 2d 433, 439 (S.D.N.Y. 2000) (citing *Bionx Implants, Inc. v. Biomet, Inc.*, No. 99-CV-0740, 1999 WL 342306, at \*4 (S.D.N.Y. May 27, 1999)). Similar information regarding the allegedly infringing product is also vital in adjudicating an infringement suit. *See Amersham Pharmacia Biotech, Inc.*, 11 F. Supp. 2d at 730. Also relevant to consideration of this factor is the area in which the allegedly infringing device was sold or offered for sale. *See Invivo Research, Inc.*, 119 F. Supp.2d at 439. However, "[w]here a party's products are sold in many states, sales alone are insufficient to establish a material connection to the forum and to override other factors favoring transfer." *Id.* (quoting *Bionx Implants*, 1999 WL 342306, at \*4 (citations omitted)). As a result, venue analysis may demonstrate that there are multiple loci of operative facts. *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 696-97 (S.D.N.Y. 2009); *Adams v. Key Tronic Corp.*, No. 94-CV-0535, 1997 WL 1864, at \*4, n.1 (S.D.N.Y. Jan. 2, 1997); *Kwatra v. MCI, Inc.*, No. 96-CV-2491, 1996 WL 694444, at \*3-4 (S.D.N.Y. Dec. 3, 1996). Thus, while certainly an important factor, the situs of development of the infringing device is not alone determinative. *See Defenshield*, 2012 WL 1069088, at \*13 (citing *Amersham Pharmacia Biotech, Inc.*, 11 F. Supp. 2d at 730).

Magistrate Judge Dancks found that this factor is neutral, noting that both this District and the transferee District are loci of operative facts. Defendant argues that this was error because the Magistrate Judge was required to weigh the connection of operative events and facts to each district and determine which is stronger, citing *Wagner v. New York Marriott Marquis*, 502 F. Supp. 2d 312, 316 (N.D.N.Y. 2007) (finding that stronger connection between the operative facts and the transferee district "cannot be denied"). However, in reaching her conclusion

that this factor is neutral, Magistrate Judge Dancks considered both Defendant's assertion that the transferee District is the situs of operative events because that is where the design and development of Google Street View took place and Plaintiff's assertion that this District is the situs of operative events because this is where Oxaal conceived of and reduced to practice the inventions underlying the patents-in-suit. While the court in *Wagner* found that the facts of that case warranted a finding that there was a stronger connection to the transferee District, other courts have found that where there are loci of operative events that equally favor both districts, the factor is neutral to the analysis. *See Defenshield*, 2012 WL 1069088, at 13; *EasyWeb*, 888 F. Supp. 2d at 354. Accordingly, Magistrate Judge Dancks' finding that this factor is neutral to the transfer analysis was not clearly erroneous or contrary to law.

#### 5. Weight Accorded to Plaintiff's Choice of Forum

Generally, "[a] plaintiff's choice of forum is entitled to considerable weight and should not be disturbed unless other factors weight strongly in favor of transfer." *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 333 (E.D.N.Y. 2006); *see also Iragorri v. United Techs. Corp.*, 274 F.3d 65, 70-71 (2d Cir. 2001) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." (internal quotation marks omitted)). "However plaintiff's choice of forum is not entitled to great weight when the operative facts have little or no connection with the transferor forum, or when the plaintiff does not reside in his chosen forum." *Neil Bros. Ltd.*, 425 F. Supp. 2d at 333.

**\*8** Magistrate Judge Dancks found that this factor weighs against transfer because Plaintiff is incorporated in this state, maintains a preference for litigating in this forum, and the patents-in-suit were designed in this forum by Mr. Oxaal, who resides here. Moreover, Magistrate Judge Dancks noted that the place where an invention was developed is considered a locus of operative facts. Defendant argues that Magistrate Judge Dancks committed legal error in affording deference to Plaintiff's choice of forum because, according to prevailing caselaw and the facts of this case, Plaintiff is not entitled to such deference.

**View 360 Solutions LLC v. Google, Inc., Not Reported in Fed. Supp. (2013)**

2013 WL 12130430

While it is true that the Plaintiff's choice of forum is no longer decisive, it is entitled to great weight unless the operative facts have little or no connection to Plaintiff's chosen forum or the Plaintiff does not reside in the forum. Here, while the latter may be true, that Plaintiff, a corporation with its principal place of business in Texas, does not reside in this forum, for the same reasons that Magistrate Judge Dancks found that this District is a locus of operative events, there is a connection between this forum and the underlying facts of this action. Given the broad discretion afforded the Court in weighing the balance of convenience and justice, Magistrate Judge Dancks' finding that the Plaintiff's choice of forum weighs against transfer was not clearly erroneous or contrary to law.

#### 6. Judicial Efficiency and Interests of Justice

Finally, Defendant objects to Magistrate Judge Dancks' finding that judicial efficiency and the interests of justice do not weigh in favor of transfer relying on, and incorporating by reference, its argument in its papers in support of its underlying motion to transfer venue. The Court finds that Magistrate Judge Dancks correctly noted that Defendant failed to meet its burden to show that the interests of justice weigh in favor of a transfer. Accordingly, this finding is not clearly erroneous or contrary to law.

#### 7. The Remaining Factors

Magistrate Judge Dancks found that the remaining three factors – the availability of process to compel attendance of unwilling witnesses, the relative means of the parties, and the comparative familiarity of each district with governing law – are all neutral to the transfer analysis, and Defendant fails to object to those findings. Moreover, after a review of the Magistrate Judge's Order, the Court finds that her findings in this regard are not clearly erroneous or contrary to law.

After weighing all of the factors, the Court finds that Magistrate Judge Dancks correctly concluded that the balance of convenience and interests of justice favor venue in the Northern District of New York. Accordingly, Magistrate Judge Dancks' Order denying Defendant's motion to transfer venue to the Northern District of California is not clearly erroneous or contrary to law.

#### B. Whether Magistrate Judge Dancks' Order Denying Defendant's Motion to Stay This Action is Clearly Erroneous or Contrary to Law

The Court answers this question in the negative. Because Magistrate Judge Dancks' denial of Defendant's motion to transfer venue to the Northern District of California is not clearly erroneous or contrary to law, her denial of Defendant's motion to stay this action pending resolution of its motion to transfer venue as moot is likewise not clearly erroneous or contrary to law.

Accordingly, it is

**ORDERED** that Defendant's objections to the March 13, 2013, Order of Magistrate Judge Dancks denying Defendant's motions to transfer venue and for a stay (Dkt. No. 38) are **DENIED**, and it is further

**ORDERED** that the March 13, 2013, Order of Magistrate Judge Dancks (Dkt. No. 35) is **AFFIRMED**.

DATED: August 13, 2013.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12130430

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 998379
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

VIEW 360 SOLUTIONS LLC, Plaintiff,

v.

GOOGLE, INC., Defendant.

No. 1:12–CV–1352 (GTS/TWD).
|
March 13, 2013.

**Attorneys and Law Firms**

Innovalaw, P.C., Timothy E. Grochocinski, Esq., Aaron W. Purser, Esq., of Counsel, Orlando Park, IL, for Plaintiff.

Simon Law Firm, Benjamin R. Askew, Esq., Michael P. Kella, Esq., Anthony G. Simon, Esq., of Counsel, St. Louis, MO, for Plaintiff.

Office of Daniel M. Sleasman, Daniel M. Sleasman, Esq., of Counsel, Albany, NY, for Plaintiff.

Akin, Gump Law Firm, Cono A. Carrano, Esq., David C. Vondle, Esq., of Counsel, Washington, D.C., for Defendant.

Hiscock & Barclay, LLP, Douglas J. Nash, Esq., of Counsel, Syracuse, NY, for Defendant.

### DECISION and ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** Plaintiff View 360 Solutions, LLC, a New York limited liability company with its principal place of business in Texas, brings this action for patent infringement under Title 35 of the United States Code. Currently before the Court is Defendant's motion to transfer venue. (Dkt. No. 25–1.) Plaintiff opposed the motion. (Dkt. No. 30.) Defendant filed a reply brief in support of its motion. (Dkt. No. 34.) Defendant also filed a motion to stay proceedings while this motion to transfer venue is pending. (Dkt. No. 26.) Plaintiff opposed the motion to stay. (Dkt. No. 28.) For the reasons set forth below, I deny the motion to transfer, as well as the motion to stay.

## I. FACTUAL AND PROCEDURAL SUMMARY

View 360 Solutions, LLC ("Plaintiff") filed a complaint against Google, Inc. ("Defendant") for infringement of eight U.S. patents on August 31, 2012. (Dkt. No. 1 at 1.) In its complaint, Plaintiff asserts that Google Street View directly infringed upon its rights to the patents-in-suit; as such, the complaint lists eight counts of direct and indirect patent infringement. (*See* Dkt. No. 1.) Plaintiff further accuses Defendant of inducing end users of Google Street View to infringe the patents-in-suit. *Id.*

Mr. Ford Oxaal is the sole inventor listed on the eight patents-in-suit, and he conceived of and reduced to practice the claimed inventions in the patents in the Northern District of New York. (Dkt. No. 30–1 at ¶¶ 2– 6.) Plaintiff claims that Mr. Oxaal granted it an exclusive license to the patents-in-suit. (Dkt. No. 30 at 1. [1])

[1]     Page numbers in citations to Plaintiff's memorandum of law in opposition to Defendant's motion to transfer venue refer to the page numbers in the original document.

Defendant filed the motion to transfer venue to the Northern District of California and motion to stay on March 7, 2013. (Dkt. No. 25 at 1; Dkt. No. 26 at 1.)

## II. ANALYSIS

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U .S.C. § 1404(a) (West Supp.2012). The purpose of section 1404(a) "is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Blechman v. Ideal Health, Inc.,* 668 F.Supp.2d 399, 403 (E.D.N.Y.2009) (quoting *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964)). "[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992) (citing *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988)).

"Motions to transfer venue are governed by a two-part test: (1) whether the action to be transferred 'might have been brought' in the transferee venue; and (2) whether the balance of convenience and justice favors transfer." *Rescuecom Corp. v. Chumley,* 522 F.Supp.2d 429, 448–49 (N.D.N.Y.2007). The moving party has the burden of demonstrating the desirability of transfer, and a court should not disturb a plaintiff's choice of forum "unless Defendants make a clear and convincing showing that the balance of convenience favors [their] choice." *Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y.1995).

### A. "Might Have Been Brought"
**\*2** To establish that an action "might have been brought" in the transferee venue, the moving party must establish that (a) venue is proper in the transferee venue; and (b) the transferee venue had personal jurisdiction over the defendant on the date the action was commenced. *Anglo Am. Ins. Grp., P.L. C. v. CalFed Inc.,* 916 F.Supp. 1324, 1330 (S.D.N.Y.1996).

The relevant federal venue statute provides, in pertinent part:

> A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b) (West Supp.2012). A defendant corporation is deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question...." 28 U.S.C. § 1391(c) (West Supp.2012).

Pursuant to 28 U.S.C. § 1391(c), Defendant contends that Plaintiff could have filed suit in the Northern District of California. (Dkt. No. 25–1 at 5.) Plaintiff concedes this point in its opposition papers. (Dkt. No. 30 at 3 n. 2.)

Defendant, a corporate entity, "resides" in the Northern District of California, because it is headquartered in and is subject to personal jurisdiction in the judicial district. *Id.* Moreover, "any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b) (West Supp.2012). In the instant case, Plaintiff brought a suit alleging direct and indirect infringement of eight separate patents. (*See* Dkt. No. 1.)

For the foregoing reasons, Defendant has met its burden of showing that the suit "might have been brought" in the Northern District of California at the outset of litigation.

### B. The Balance of Convenience and Justice
Because this case "might have been brought" in the proposed transferee district, the decision of whether to transfer depends on the balance of convenience and justice. As noted above, the Court has considerable discretion and determines this balance on a case-by-case basis. *In re Cuyahoga Equip. Corp.,* 980 F.2d at 117. A non-exclusive list of factors to consider includes:

> (1) the convenience of witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to those sources of proof; (4) the situs of the operative events in issue; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded a plaintiff's choice of

forum; and (9) judicial efficiency and the interests of justice.

**\*3** *Rescuecom,* 522 F.Supp.2d at 449. "No individual factor is determinative and a court has discretion to weigh each factor to reach a fair result." *Id.* (citations omitted).

The burden of establishing that transfer is appropriate is on the moving party. *Anglo Am. Ins. Grp.,* 916 F.Supp. at 1327. The moving party "must support the application with an affidavit containing detailed factual statements relevant to the factors [to be considered by the court in its transfer decision], including the potential principal witnesses expected to be called and a general statement of the substance of their testimony." *Hernandez v. Graebel Van Lines,* 761 F.Supp. 983, 987 (E.D.N.Y.1991).

### 1. *Convenience of Non–Party Witnesses*

"The convenience of party and nonparty witnesses is usually the most important consideration in deciding a motion to transfer venue." *AEC One Stop Grp., Inc. v. CD Listening Bar, Inc.,* 326 F.Supp.2d 525, 529 (S.D.N.Y.2004). In assessing the convenience of witnesses, courts routinely examine the residence of witnesses. *Argent Funds Grp., LLC v. Schutt,* No. 3:05CV01456 (SRU), 2006 U .S. Dist. LEXIS 60469, at \*14, 2006 WL 2349464, at \*5 (D. Conn. June 27, 2006) (citing *Golconda Min. Corp. v. Herlands,* 365 F.2d 856, 857 (2d Cir.1966)). Moreover, the Court should "qualitatively evaluate the materiality of the testimony that witnesses may provide ." *Defenshield, Inc. v. First Choice Armor & Equipment, Inc.,* No. 5:10–CV–1140 (GTS/DEP), 2012 U.S. Dist. LEXIS 44276, at \*36, 2012 WL 1069088, at \*11 (N.D.N.Y. Mar. 29, 2012) (quoting *Advanced Fiber Tech. Trust v. J & L Fiber Servs., Inc.,* No. 07–CV–1191 (LEK/DRH), 2008 U.S. Dist. LEXIS 91795, at \*7, 2008 WL 4890377, at\*3 (N.D.N.Y. Nov. 12, 2008)).

In support of its motion to transfer venue, Defendant offers a declaration from Allen Hutchinson. (Dkt. No. 25–3.) In his declaration, Mr. Hutchinson, an Engineering Manager for the Street View team for the Defendant, identifies four potential witnesses "who have relevant knowledge about the development, structure, function, and operation of Google Street View." *Id.* at 2. Each of these witnesses is located in the Northern District of California. *Id.* In Plaintiff's opposition to Defendant's

motion, Plaintiff specifically notes that the only non-party witness identified to be called at trial is Ford Oxaal, the sole named inventor of all eight patents-in-suit. (Dkt. No. 30 at 5.)

Defendant replied to Plaintiff's argument and contends that "all but one of the identified witnesses are located in the Northern District of California or outside this district." (Dkt. No. 34 at 4. [2]) Furthermore, Defendant contends that "Plaintiff only identifies limited and narrow issues" to which Oxaal would testify at trial. *Id.*

[2]    Page numbers in citations to Defendant's reply brief in support of its motion to transfer venue refer to the page numbers in the original document.

The facts of the instant case are comparable to those in *Defenshield,* 2012 WL 1069088. There, the defendant named "only two" potential non-party witnesses outside the District. *Id.* at \*11. The plaintiff named "nine potential witnesses, including the inventor of [the patent-in-suit], all of which [were] located in [this District]." *Id.* As a result, this Court found that these facts served to neutralize one another. *Id.* In the instant case, Defendant has named four witnesses who are located outside this District and has listed the possibility of others. (Dkt. No. 25–1 at 8. [3]) The Plaintiff has named one material witness, the sole inventor of the patents-in-suit, who is located within the district. (Dkt. No. 30 at 5.)

[3]    Page numbers in citations to Defendant's memorandum of law in support of motion to transfer venue refer to the page numbers in the original document.

**\*4** For the foregoing reasons, I find that this factor is neutral to venue transfer analysis.

### 2. *Convenience of the Parties*

The convenience of the parties is another consideration in determining whether transfer is appropriate. Here, Defendant is headquartered in the Northern District of California. (Dkt. No. 25–1 at 10.) Defendant asserts that "the persons with knowledge of the technical research, design, and development of Google Street View work at Google's Northern California headquarters." *Id.* Moreover, Allen Hutchinson stated in his declaration in support of the defendant's motion to transfer venue that "the Google teams responsible ... for Google Street

View are primarily led by personnel that have been, and are, located in Google's facilities in Mountain View, California." (Dkt. No. 25–3 at ¶ 4.)

Plaintiff is a subsidiary of Acacia Research Corporation, whose principal place of business is in Texas. (Dkt. No. 30 at 1 n. 1; Dkt. No. 25–2 at 119) Plaintiff is incorporated in New York as of October 9, 2012. (Dkt. No. 25–2 at 6.) Plaintiff relies upon *Easy Web Innovations, LLC v. Facebook, Inc.,* such that where transfer would merely shift the inconvenience from one party to the other, the Court should leave plaintiff's choice of venue undisturbed. No. 11–CV–5121 (JFB)(ETB), 2012 U.S. Dist. LEXIS 123833, at *25, 2012 WL 3755410, at *8 (E.D.N.Y. Aug. 30, 2012). [4]

[4]    "However, 'transfer of venue may be appropriate where inconvenience for the party moving for transfer could be completely eliminated without substantially adding to the nonmoving party's inconvenience.' " *EasyWeb,* 2012 WL 3755410, at *8 (quoting *Frame v. Whole Foods Mkt., Inc.,* No. 06 Civ. 7058(DAB), 2007 U.S. Dist. LEXIS 72720, at *16, 2007 WL 2815613, at *6 (S.D.N.Y. Sept. 24, 2007)).

Here, for the same reason that it would be inconvenient for Plaintiff to travel to the Northern District of California, it would be inconvenient for Defendants to travel to the Northern District of New York. *Defenshield,* 2012 WL 1069088, at *12. As a result, I find that this factor is neutral.

### 3. *Location of Relevant Documents*

"Access to documents and other proof is not a persuasive factor in favor of transfer without proof that documents are particularly bulky or difficult to transport, or proof that it is somehow a greater imposition for defendant to bring its evidence to New York than for plaintiff to bring" its evidence to California. *Sunshine Cellular v. Vanguard Cellular Sys., Inc.,* 810 F.Supp. 486, 500 (S.D.N.Y.1992).

Defendant contends that this factor weighs substantially in its favor. Defendant states that "all or nearly all of the documents and highly proprietary information relating to Google Street View are stored in Google's various data centers, which are accessible and ultimately managed from Mountain View, California." (Dkt. No. 25–1 at 11.) As such, Defendant contends that "the burden associated with accessing and transporting documentary and other

evidence is far greater if the case remains [in this District]." *Id.*

Plaintiff contends that this factor "weighs slightly against transfer, or at a minimum, is neutral." (Dkt. No. 30 at 8.) Many documents relevant to this matter, "including those pertaining to the conception of and reduction to practice of the claimed inventions," are located in this District at the residence of Mr. Oxaal, the sole inventor named on the patents-in-suit. *Id.* Plaintiff also relays the possibility that "several models and drawings," which cannot be converted into electronic format and may be damaged by shipping, may relate to this action. *Id.*

 **\*5** Furthermore, Plaintiff contends that Defendant's statement that pertinent documents are "stored in Google's various data centers, which are accessible and ultimately managed from Mountain View, California" was ambiguous and does not assert that the relevant documents are actually (or physically) located in Mountainview. *Id.* Moreover, Plaintiff contends that Defendant fails "to account for the fact that all of these documents will be produced electronically in this matter." *Id.*

In patent infringement cases, the location of relevant documents "once carried significant weight in this analysis." *Defenshield,* 2012 WL 1069088, at *12 (citing *Advanced Fiber Tech.,* 2008 WL 4890377, at *4). This factor weighs in favor of a defendant's argument for venue transfer, because in a patent infringement case, the bulk of the relevant evidence is in possession of the accused infringer. *Defenshield,* 2012 WL 1069088, at *12. However, this factor is not accorded significant weight "given the technological age in which we live, with the widespread use of, among other things, electronic document production." *EasyWeb,* 2012 WL 3755410, at *7.

For the foregoing reasons, I find that this factor only slightly weighs in favor of Defendant's motion to transfer.

### 4. *Situs of Operative Events in Issue*

"The situs of the operative facts is an important factor in deciding motions to transfer.... Where a cause of action arises from claims of alleged wrongdoing in the proposed transferee district, transfer is appropriate. Transfer is not precluded where the operative facts have some connection to the initial forum if the transferee district

has a stronger connection with the operative facts raised in the pleadings." *Sheet Metal Workers' Nat'l Pension Fund v. Gallagher,* 669 F.Supp. 88, 92–93 (S.D.N.Y.1987) (citations omitted).

"Operative facts in a patent infringement action include those relating to the design, development, and production of a patented product." *Defenshield,* 2012 WL 1069088, at *13 (citing *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.,* 415 F.Supp.2d 370, 375 (S.D.N.Y.2006); *Invivo Research, Inc. v. Magnetic Resonance Equipment Corp.,* 119 F.Supp.2d 433, 439 (S.D.N.Y.2000)). "Similar information regarding the allegedly infringing product is also vital in adjudicating an infringement case." *Defenshield,* 2012 WL 1069088, at *13 (citing *Amersham Pharmacia Biotech, Inc. v. Perkin–Elmer Corp.,* 11 F.Supp.2d 729, 730 (S.D.N.Y.1998)). "As a result, venue analysis may demonstrate that there are multiple loci of operative facts." *Defenshield,* 2012 WL 1069088, at *13 (internal citations omitted).

Defendant contends that "the operative events and facts related to Google Street View include its design and development, both of which occurred in the Northern District of California." (Dkt. No. 25–1 at 12.) Furthermore, Defendant contends that, "although the alleged conception and reduction to practice of the Patents–in–Suit may have occurred in this District," the persons with significant, relevant knowledge are located outside of this District. *Id.* For these reasons, Defendant asserts that this factor weighs in favor of transfer.

**\*6** Plaintiff contends that this factor is neutral to the analysis and relies upon *Easy Web.* 2012 WL 3755410, at *9. There, the Court stated that "in patent cases, the locus of operative facts can include the district where either the patent-in-suit *or* the allegedly infringing product was designed, developed, and produced." *Id.* (emphasis in original). The Court ultimately held that "because both districts in this case are loci of operative events, this factor is neutral in this case." *Id.*

Here, the facts mirror those of *Easy Web.* As such, the two loci of operative events offset each other, rendering this factor neutral to the analysis.

5. *Availability of Process to Compel Attendance*
The court can compel the attendance of witnesses who are served within the district or at any other place

that is within 100 miles of the place specified in the subpoena. Federal Rule of Civil Procedure Rule 45(b)(2). "In determining whether a change of venue is appropriate, the Court will ... examine the ability to compel the attendance of witnesses." *Neil Bros. Ltd. v. World Wide Lines, Inc.,* 425 F.Supp2d 325, 332–33 (E.D.N.Y.2006). "However, 'this factor is generally relevant only with respect to third-party witnesses, since employees of the parties will as a practical matter be available in any venue by virtue of the employment relationship.' " *Defenshield,* 2012 WL 1069088, at *13 (quoting *Ripmax Ltd. v. Horizon Hobby, Inc.,* No. 07–CV–386 (JCH), 2007 U.S. Dist. LEXIS 50047, at *13, 2007 WL 204933, at *4 (D. Conn. June 25, 2007)).

Here, Plaintiff stated concern regarding the availability to compel attendance of its only non-party witness, Mr. Oxaal, who is the inventor of the patent-in-suit. (Dkt. No. 30 at 10.) However, Plaintiff noted that it "expects that Mr. Oxaal will voluntarily appear at trial in this matter." *Id.* at n. 9. Defendant stated concern regarding this Court's subpoena power over "all prosecuting attorneys of the Patents–in–Suit." (Dkt. No. 25–1 at 13.) However, Defendant fails to identify non-party witnesses it intends to depose or have testify during future proceedings.

Although Defendant notes that potential witnesses would be outside of this District's ability to be subpoenaed, they have not indicated that such witnesses would be unwilling to appear. As such, there is no indication that any non-party witnesses would refuse to appear. Thus, this factor is neutral to the venue transfer analysis.

6. *Relative Means of the Parties*
"Where a disparity exists between the means of the parties ..., the Court may consider the relative means of the parties in determining whether to transfer." *Miller v. Bombardier Inc.,* No. 93–CV–0376 (PLK), 1993 U.S. Dist. LEXIS 13319, at *13, 1993 WL 378585, at *5 (S.D.N.Y. Sept. 23, 1993). In the instant case, both parties concede that this factor is neutral to the analysis. (Dkt. No. 25–1 at 13; Dkt. No. 30 at 10.) Defendant and Plaintiff both have significant resources at their disposal. For the foregoing reasons, I agree that this factor is neutral.

7. *Comparative Familiarity of Each District with the Governing Law*

**\*7** "This case involves questions of federal law, and 'any district court may handle a patent case with equal skill.' " *Defenshield, Inc.,* 2012 WL 1069088, at \*14 (quoting *Bionix Implants, Inc. v. Biomet, Inc.,* No. 99 Civ. 740(WHP), 1999 U.S. Dist. LEXIS 8031, at \*15, 1999 WL 342306, at \*4 (S.D.N.Y. May 27, 1999). As a result, both parties concede that this factor is neutral to transfer analysis, and I agree.

8. *Weight Accorded a Plaintiff's Choice of Forum*
A plaintiff's choice of forum "should not be disturbed unless the balance of several factors is strongly in favor of defendant." *Fuji Photo Film Co. v. Lexar Media, Inc.,* 415 F.Supp.2d 370, 376 (S.D.N.Y.2006) (citation omitted).

Here, Plaintiff properly filed this action in the Northern District of New York, is incorporated in this state, and maintains a preference for litigating in this forum. (*See* Dkt. No. 30.) Moreover, the patents-in-suit were designed in the Northern District of New York by Ford Oxaal, who currently resides in this forum. *Id.* at 1. These facts are significant to an action for patent infringement and support Plaintiff's choice of forum. *Defenshield,* 2012 WL 1069088, at \*15 (citing *Advanced Fiber Tech. Trust,* 2008 WL 4890377, at \*6).

Moreover, while Defendant contends that this Court should give little deference to Plaintiff's choice of forum because "none of the operative facts or events giving rise to the infringement allegations occurred in this District, other than the named inventor appearing to reside in this District," Defendant's argument is inconsistent with relevant case law. (Dkt. No. 25–1 at 6.)

"The place where the patented invention was developed and the place where the allegedly infringing products are developed are both loci of operative facts." *Easy Web,* 2012 WL 3755410, \*5 (finding that Plaintiff's choice of venue was entitled great deference as there was a "clear connection to the District as the place where the patents-in-suit were designed, developed and patented ... although operative facts also occurred in California) (citing *Defenshield,* 2012 WL 1069088, at \*13).

For all of these reasons, I find that this factor weighs against transfer.

9. *Judicial Efficiency and the Interests of Justice*
Even if Defendants had shown a difference in speed of cases to final disposition in the two districts, "docket congestion is not considered a dispositive factor...." *Dow Jones & Co., Inc. v. Bd. of Trade,* 539 F.Supp. 190, 192–93 (S.D.N.Y.1982).

Despite Defendant's argument regarding the parties' lack of "a meaningful connection with this District," and the relative "Judicial Caseload Statistics" for the two forums, it has not met its burden in showing that "the interests of justice" factor weighs in favor of transfer. This Court is fully capable of adjudicating Plaintiff's claims in a timely manner. For these reasons, I find that this factor does not weigh in favor of transfer.

**C. Conclusion**
**\*8** Of the nine factors considered above, only one factor weighs in favor of transferring venue to the Northern District of California, two factors weigh in favor of maintaining venue in the Northern District of New York, and the remaining six factors are neutral to transfer analysis. As a result, I find that none of the factors heavily outweigh the deference accorded to Plaintiff's choice of forum. For this reason, Defendant's motion to transfer venue is denied.

Based on the above analysis of the relevant factors, I find the balance of convenience and the interests of justice favors venue in the Northern District of New York. Since Defendant's motion to stay was requested pending a ruling on its motion to transfer venue, there is no reason to stay the action.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to transfer venue (Dkt. No. 25) is **DENIED;** and it is further

**ORDERED** that Defendant's motion to stay (Dkt. No. 26) is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 998379

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1234930
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kevin WALKER, Plaintiff,

v.

Dora B. SCHRIRO, et al., Defendants.

No. 11 Civ. 9299(JPO).
|
March 26, 2013.

*MEMORANDUM AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** This civil rights case, brought by Plaintiff Kevin Walker against a number of prison officials, arises from a course of events that pivot around Plaintiff's efforts to obtain medically authorized supportive footwear while incarcerated. The Second Amended Complaint, filed *pro se* and therefore interpreted to allege the strongest claims it suggests, alleges due process, equal protection, First Amendment retaliation, access to courts, Eighth Amendment, and products liability violations. Defendants have moved to dismiss all claims. For the reasons that follow, this motion is granted in part and denied in part.

**I. Background**

The facts stated in this background section are drawn from allegations made in Plaintiff's Second Amended Complaint. For purposes of this motion, these allegations are presumed to be true. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). [1]

[1] Plaintiff filed his original complaint on December 16, 2011. He filed an amended complaint on June 6, 2012. Defendants filed a motion to dismiss the amended complaint on August 30, 2012. On November 20, 2012, the Court informed Plaintiff that he had until December 7, 2012 to file opposition papers. The Court added that Plaintiff "may also file on that date his proposed second amended complaint, to which defendants may respond in their reply brief." In their reply brief, Defendants have asked the

Court to reject Plaintiff's proposed second amended complaint. Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave" to amend the complaint "when justice so requires." The principal reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Here, there is no evidence of undue delay, bad faith, prejudice, or repeated failure to cure deficiencies. The futility of amendment is a question best addressed by actually deciding the pending motion to dismiss. Recognizing that the Court indicated that Plaintiff could file a proposed second amended complaint, and that the pleadings filed by *pro se* litigants merit "special solicitude," *Ruotolo v. I.R.S.,* 28 F.3d 6, 8 (2d Cir.1994), the Court therefore accepts Plaintiff's Second Amended Complaint ("the Complaint") as the operative pleading in the case.

On August 10, 2011, Plaintiff was placed in the New York City Department of Correction V.C.B.C. (also known as "the Boat"). While being processed into the facility, Plaintiff was informed by Defendant Daly that a prison order prevents inmates from wearing any personal footwear. Plaintiff objected to Daly and explained that he has a medical condition that necessitates special footwear. Specifically, Plaintiff requires custom sneakers with extra support, cushioned soles, ankle support, and special arch support. In contrast, D.O.C. standard-issue sneakers lack these features. Daly responded by telling Plaintiff to sign up for sick call.

On August 15, 2011, Plaintiff saw a doctor and explained this situation. The doctor examined Plaintiff, determined that Plaintiff has flat feet and weighs over 350 pounds, and stated that if Plaintiff did not wear suitable sneakers he would experience pain and swelling in his feet and back. Plaintiff returned to sick call several times due to extreme pain from his deficient footwear and was given Tylenol, even though he explained to the doctor that this medicine was inadequate. The doctor indicated that Plaintiff would soon receive different pain medication.

On August 29, 2011, Plaintiff was moved to G.R.V.C. (known as "the Beacon"). He signed up for sick call and planned on seeing a foot and back specialist on September 6, 2011, but this never happened (for reasons unspecified in the Complaint) and Plaintiff remained in "extreme

pain." The doctor continued to prescribe only Tylenol, even after indicating that Plaintiff would receive more effective medication.

On September 13, 2011, Plaintiff spoke with Dr. Pravin Nanjan, who indicated that the medicine had not arrived because the order had been placed incorrectly. Ranjan prescribed Plaintiff stronger medication, provided permits for a double mattress to alleviate Plaintiff's severe back pain, and provided a permit for Plaintiff to wear his supportive sneakers. Around this time, Plaintiff spoke with Defendant Washington, explained his situation and his receipt of a permit, and was informed by Washington that Plaintiff's wife could bring custom sneakers to the prison for Plaintiff. Also around this time, Plaintiff learned from his wife that she had sent a pair of permissible sneakers and they had been returned—even though Plaintiff had never been notified of this package. When Plaintiff asked Defendant Hart about this package, "in hopes that defendant would understand because she too is a big person," she "became very abusive and stated 'maybe your fatass need to loose [sic] weight and your feet would not bother you!' "

**\*2** On September 17, 2011, Plaintiff's wife brought Plaintiff's custom sneakers. Defendant Lespinasse prohibited Plaintiff from keeping the sneakers, adding that Washington had told her not to allow the sneakers. She "laughed" when Plaintiff presented her with the medical permit.

Several days later, Plaintiff explained his situation to Defendants Lemon and Fraizer. Lemon stated that he would look into it, but that he had told the doctors to stop giving out permits for sneakers. A week later, Lemon confirmed to Plaintiff that he told the doctors to stop issuing medical permits for prisoners and added that he "runs G.R.V.C., not the warden, not the doctors, me! Deputy of security!" Lemon and Frazier then discussed their desire to set a precedent that would prevent all inmates from obtaining medically prescribed footwear. Lemon added that Plaintiff could get his sneakers by offering information on what was happening in the jail, an offer that Plaintiff refused by telling Lemon "that he was losing his fucking mind!"

On September 19, 2011, Plaintiff asked Defendants Williams and Best for help with his footwear situation. Williams called someone and then told Plaintiff that he

had "pissed someone off" and "there was nothing he could do to help." When Plaintiff spoke to Best, she replied that "nobody in this building (GRVC) get their personal footwear regardless of a medical or not, it's the building rules, if it's a problem we ship your ass out to another jail, its just that simple."

After these events, Plaintiff's unit was subjected to a routine search. Harris arrived at his cell, explained that Plaintiff had "pissed someone off" and, without any process known to Plaintiff, gave him a "green Id ICR card; ICR is the acronym for Inmate Contraband Receiver." Harris cursed at Plaintiff and promised that Plaintiff would never get his custom footwear. Receipt of an ICR card entails a number of onerous disciplinary consequences, including more extensive searches of an inmate's cell, prohibitions on work outside one's housing unit, and more thorough searches during visits by family.

Several days later, Plaintiff explained his medical and ICR situation to Defendant Garcia. Garcia replied that nobody gets to wear special footwear and that corrections officers "do what we want." Garcia reiterated that Plaintiff had "pissed someone off" and referred to prior litigation involving Plaintiff before Judge William H. Pauley of this District.

In the middle of October 2011, Defendant Anku and other officers searched Plaintiff's housing unit. The inmates were told to get down on their knees. Plaintiff told Anku that Plaintiff's medical condition would cause severe pain if he remained in that position; Anku replied by cursing at Plaintiff and emphasizing that he did not care about Plaintiff's medical condition. This caused Plaintiff "extreme pain" for 30–45 minutes.

On October 17, 2011, Plaintiff was called to appear concerning his grievances against Lemon arising from denial of medically appropriate footwear notwithstanding a medical permit. Defendant Moultre told Plaintiff that his request for a hearing had been denied and that the grievance had been rejected. Moultre stated "I don't give a fuck about no medical." As they argued, Defendants Smith and Hines arrived. Plaintiff explained his footwear situation and medical permit. Smith replied that "we are setting standards throughout Rikers Island that in the Beacon (GRVC) nobody gets to wear their personal sneakers, regardless of a medical." Smith added that he would speak to Lemon about Plaintiff's concerns. Plaintiff

returned to his cell and wrote to Defendant Agro about his problems.

 **\*3** Ten to twenty minutes later, Lemon came by and told Plaintiff that his subordinates would be dealing with the situation. Thirty minutes later, Plaintiff was "packed up and removed from the housing unit to a waiting bus to C–95." Plaintiff objected to non-defendant Captain Carter that he could not go to C–95; Carter replied that he had his orders. Upon arrival at C–95, Plaintiff explained to non-defendant C.O. Jacobs that he wasn't supposed to be on Rikers Island, "especially this building per O. S.I.U. (security)." Jacobs sent for security. Ten minutes later, Defendant Williams "came to the bullpens ... and stated 'I know who the fuck you are, you got a lot of balls even coming in this building'!" At Williams' order, Plaintiff was confined to the intake bullpens for two days without food, shower, linen, running water, or a bathroom. Plaintiff believes this conduct was in retaliation for a civil rights lawsuit filed by Plaintiff in 2008 against Williams and several other guards. The next morning, Plaintiff's wife called security and spoke with Defendant Letizia, "who told her, 'don't worry we will take care of him and laughed.' " Plaintiff and his wife interpreted this as a threat.

On October 19, 2011, Plaintiff was moved to M.D.C., where the corrections personnel similarly refused to honor his medical permit. At M.D.C., Plaintiff was told to see a foot specialist, but this appointment was cancelled because Plaintiff could not fit into any of the orange jumpsuits prerequisite to trips outside the prison facility. Plaintiff grieved this situation several times, but has not yet been fitted for a jumpsuit. Many of his medical appointments and physical therapy sessions have been cancelled as a result.

Plaintiff has seen two podiatrists, one at West Facility and one at M.D.C., both of whom agreed that he should wear supportive sneakers. At this point, non-defendant Deputy of Security Colon stated that Plaintiff could wear custom sneakers only if they are "PUMA" brand. Plaintiff's wife set out in search of suitable Puma brand sneakers and sent them to Plaintiff, but Plaintiff was denied access to the sneakers for 30–45 days while Colon inspected them. In total, Plaintiff suffered 7–8 months of "extreme pain in [his] foot and ankles," and his lower back, with only Tylenol to alleviate this condition.

On March 28, 2012, Plaintiff was returned to the Boat. Upon his arrival, Daly—who was not at the time a named defendant in this action—learned of Plaintiff's lawsuit and threatened Plaintiff, adding that he had "something" for Plaintiff upstairs. Plaintiff immediately spoke to Defendant Morris and explained his fear of Daly's threat. Morris replied "don't worry about it, just go to your housing area." Even though his classification did not merit such treatment, Plaintiff was sent to a high classification housing unit.

The next morning, Plaintiff called the Inspector General office and reported Daly's threat. He also called the Board of Corrections and filed a complaint. At 2 p.m., Defendant Bacote arrived at Plaintiff's housing unit to discuss the matter. At Becote's request, Plaintiff showed Becote the initial complaint in this case and noted where it mentioned Daly. Becote told Plaintiff and another inmate who witnessed this whole course of events to remain by the officer station. An hour later, Becote arrived with a team of officers clad in riot gear. Plaintiff was handcuffed and taken to the intake bullpens, where he remained for five hours.

 **\*4** Non-defendant Captain Calise took statements from Plaintiff and the other inmate, and Plaintiff was then led by Morris to the medical clinic. Upon leaving the clinic, Morris, Bacote, Daly, and two other officers "tried to take [P]laintiff in a secluded area by the elevators and [P]laintiff to walk in the area with all five (5) officers, which (3) are defendants." Morris then ordered Plaintiff to "play the wall" while Daly applied tight handcuffs. Plaintiff was returned to a high classification house, threatened by Bacote and Daly, and released from the handcuffs.

On April 2, 2012, Plaintiff was called to the security office and given a ticket by Bacote, who told Plaintiff to "shut the fuck up." The next day, Bacote walked by Plaintiff in a threatening manner. On April 5, 2012, Bacote and two other officers taunted and threatened Plaintiff in the housing unit. The Warden of V.C.B.C. did not respond to Plaintiff's request that she intervene in this course of events. Plaintiff received a ticket for disciplinary charges fabricated by Bacote. At the hearing on this ticket, Bacote successfully urged the hearing officer to give Plaintiff the maximum penalty of forty days. Plaintiff believes that throughout this period, Bacote, Morris, and Daly were retaliating against plaintiff. In August 2012—several months after these events—Bacote

continued to retaliate against Plaintiff by stealing his legal papers, breaking Plaintiff's personal glasses, arranging for repeated searches of Plaintiff's cell, threatening Plaintiff, and interfering with Plaintiff's personal mail.

Plaintiff reports that he remains in extreme pain due to improper footwear, that he has been rushed to Bellevue Hospital on one occasion because of swelling in his ankles, and that he is still taking Tylenol with codeine twice per day. Plaintiff has sued Defendant Barker, the supplier of standard inmate footwear to the New York City Department of Correction, for "failure to notify the public that the product that he is selling has not only a defect in the design but that it would cause serious injuries to those that wear it for an extended period of time ... and that it is not suggested that these sneakers be [worn] for a specific period of time." Plaintiff adds that Barker has failed to warn the public that his sneakers are not suitable for extended wear or for use by people who weigh a certain amount and have certain foot problems.

## II. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus,* 433 F.3d 248, 250 (2d Cir.2006) (quotations omitted). That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citation omitted).

**\*5** "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest." Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006)

(citations omitted). The pleadings filed by pro se litigants thus merit "special solicitude." *Ruotolo,* 28 F.3d at 8.

## III. Discussion

In the Complaint, Plaintiff identifies five causes of action: (1) violations of Plaintiff's due process and equal protection rights by Agro, Lemon, Fraizer, Garcia, Harris, and Schriro when Plaintiff was placed on ICR status without appropriate procedure; (2) retaliation against Plaintiff by Bacote, Morris, Daly, Garcia, Lemon, Harris, and Williams for filing a civil complaint and numerous grievances, retaliation against Plaintiff by Williams for Plaintiff's prior civil complaint before Judge Pauley, and retaliation against Plaintiff by Bacote for the filing of this civil action; (3) violations of Plaintiff's Eighth Amendment rights by Williams, who kept Plaintiff locked in the intake area for two days, and by Bacote, who forced Plaintiff to sleep in the intake area on a number of occasions while moving Plaintiff out of the building; (4) violations of Plaintiff's Eighth Amendment rights by Schriro, Agro, Lemon, Fraizer, Williams, Best, Smith, Garcia, Washington, Lespinasse, Hart, Hines, Aknu, and Moultrie through deliberate indifference to Plaintiff's need for medical treatment, and by Barker through deliberate indifference to the public's medical need in warning of design defects in his products; and (5) a products liability claim against Barker for design flaws and failure to warn. The Court generally agrees with Plaintiff that the facts alleged in the Complaint are best interpreted as alleging this set of claims. However, in recognition of the special solicitude afforded to pro se litigants, the Court clarifies the doctrinal basis and appropriate defendants for some of Plaintiff's claims.

### A. Due Process and Equal Protection

Plaintiff alleges that he was assigned a "Green ID, ICR card" while at G.R.V.C. without proper procedure or an opportunity to contest that designation. He adds that the defendants associated with the claim—Agro, Lemon, Fraizer, Garcia, Harris, and Schriro—acted in specific disregard of standard disciplinary procedures. He argues that these defendants thereby violated his due process and equal protection rights. Neither claim succeeds.

To establish a due process claim with respect to a prison disciplinary proceeding, "a plaintiff must establish (1) possession of a liberty interest and (2) deprivation by defendants of that interest as a result of insufficient

process." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009). "Prison discipline [does] implicate[ ] a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). However, "[t]he Supreme Court has stated ... that prisoners do not have a liberty interest under the Federal Constitution in 'prisoner classifications and eligibility for rehabilitative programs in the federal system.' " *Green v. Armstrong,* 189 F.3d 460, 460 (2d Cir.1999) (quoting *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976)). As Judge Castel has explained:

> **\*6** In assessing whether a prison facility has afforded its inmates adequate procedural due process, courts acknowledge that prison administrators have wide discretion to adopt and execute policies and procedures that are in the best interest of the institution. Regarding classification procedures, prison officials have "full discretion" to control conditions of confinement, which include prisoner classification, and prisoners have no legitimate statutory or constitutional entitlement sufficient to invoke due process in connection with such conditions. Consequently, prisoners have no liberty interest that protects them from security classification or mis-classification.

*Walker v. City of New York,* No. 11 Civ. 9611, 2012 WL 3037308, at *2 (S.D.N.Y. July 25, 2012) (quotation marks and citations omitted); *see also Taylor v. New York Dept. of Corr.,* No. 10 Civ. 3819, 2012 WL 2469856, at *3 (S.D.N.Y. June 27, 2012). Because Plaintiff has failed to identify a liberty interest protected by the Due Process Clause, his claim cannot succeed.

Plaintiff's equal protection claim also fails. The Second Circuit has explained that:

> To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender. Such intentional discrimination can be demonstrated in several ways. First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender. In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect.

*Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d Cir.1999) (citations omitted). Here, Plaintiff does not allege that he was mistreated or treated differently than his colleagues on the basis of a protected classification. He does not identify any law or policy as the source of the alleged violation, nor does he adequately allege discriminatory enforcement of any law or policy. Thus, Plaintiff cannot prevail as a matter of law on any equal protection claim.

**B. Retaliation and Access to Courts**

Plaintiff alleges three distinct claims styled as "retaliation": the first claim focuses on actions by Bacote, Morris, Daly, Garcia, Lemon, Harris, and Williams against Plaintiff motivated by Plaintiff's filing of a civil complaint and numerous grievances; the second claim concerns actions taken by Williams and Letizia as punishment for Plaintiff's prior civil case before Judge Pauley; and the third claim focuses on actions taken by Bacote in response to Plaintiff's decision to file this civil action. [2] The Court interprets Plaintiff's Complaint to raise claims under the First Amendment for retaliation and under the constitutional right of access to courts.

2    Plaintiff's prior case before Judge Pauley is denoted
     1:08–cv–00284–WHP on ECF.

### 1. First Amendment Retaliation

**\*7** "[O]therwise constitutional acts may be actionable
if taken in retaliation for the exercise of First
Amendment rights." *Soto v. Iacavino,* No. 01 Civ.
5850, 2003 WL 21281762, at \*2 (S.D.N.Y. June
4, 2003). To survive dismissal, "a plaintiff asserting
First Amendment retaliation claims must advance non-
conclusory allegations establishing: (1) that the speech or
conduct at issue was protected, (2) that the defendant
took adverse action against the plaintiff, and (3) that there
was a causal connection between the protected speech and
the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492
(2d Cir.2001), *overruled on other grounds, Swierkiewicz v.
Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1
(2002).

It is well established that "a prisoner's filing of both
lawsuits and administrative grievances is constitutionally
protected ." *Collins v. Goord,* 438 F.Supp.2d 399, 419
(S.D.N.Y.2006) (citations omitted). In other words,
"[s]ince access to the courts is an established constitutional
right," *Smith v. City of New York,* No. 03 Civ. 7576,
2005 WL 1026551, at \*3 (S.D.N.Y. May 3, 2005) (citing
*Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52
L.Ed.2d 72 (1977)), speech undertaken for the purpose
of accessing courts—extending from civil litigation to the
administrative grievances ordinarily prerequisite to civil
litigation under the Prison Litigation Reform Act—is
"protected" for purposes of First Amendment retaliation
analysis.

The adverse action inquiry is "objective" and is "tailored
to the different circumstances in which retaliation claims
arise." *Dawes,* 239 F.3d at 493 (citation omitted). "Only
retaliatory conduct that would deter a similarly situated
individual of ordinary firmness from exercising his or her
constitutional rights constitutes an adverse action for a
claim of retaliation." *Dawes,* 239 F.3d at 493 (citations
omitted). "Otherwise, the retaliatory act is simply *de
minimis* and therefore outside the ambit of constitutional
protection." *Id.* (citing *Davidson v. Chestnut,* 193 F.3d 144,
150 (2d Cir.1999) (per curiam)); *see also id.* ("Prisoners
may be required to tolerate more than public employees,
who may be required to tolerate more than average
citizens, before a [retaliatory] action taken against them
is considered adverse." (citation omitted)). Thus, "[u]nder

some circumstances, verbal threats may constitute adverse
action, depending on their degree of specificity and
the context in which they are uttered ... [but] vague
intimations of some unspecified harm generally will not
rise to the level of adverse action for the purpose of a First
Amendment retaliation claim." *Bumpus v. Canfield,* 495
F.Supp.2d 316, 326 (W.D.N.Y.2007).

Courts also recognize a doctrine of retaliatory transfer. As
Judge Swain has explained:

> Prisoners normally have no
> constitutional right to remain in
> any particular state prison facility,
> absent a state statute or policy
> conditioning transfers on proof of
> specific acts of misconduct. Prison
> officials thus have broad discretion
> in making transfer determinations.
> They may not, however, transfer
> [prisoners] solely in retaliation for
> the exercise of constitutional rights.
> Where, as here, an adverse action
> (such as a transfer) is challenged
> as retaliatory in violation of the
> First and Fourteenth Amendments,
> the plaintiff has the burden in
> the first instance of demonstrating
> that the underlying conduct that
> precipitated the adverse action was
> constitutionally protected and that
> said conduct was a substantial or
> motivating factor in the defendant's
> subsequent adverse conduct. If the
> plaintiff meets that burden, the
> defendants have the opportunity to
> demonstrate by a preponderance
> of the evidence that they would
> have reached the same decision even
> in the absence of the protected
> conduct.

**\*8** *Salahuddin v. Perez,* No. 99 Civ. 10431, 2006 WL
266574, at \*5 (S.D.N.Y. Feb.2, 2006) (quotation marks
and internal citations omitted).

The third and final requirement of a retaliation claim is a causal connection between the protected speech and adverse action. *Dawes,* 239 F.3d at 492. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part in the employer's adverse employment action.' " *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. NYC Health & Hospitals Corp.,* 940 F.2d 775, 780 (2d Cir.1991)). A combination of direct and circumstantial evidence can support such an inference. *Smith,* 2005 WL 1026551, *4. Even at the motion to dismiss stage, "the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must [allege facts] from which retaliation may plausibly be inferred." *Crenshaw v. Hartman,* 681 F.Supp.2d 412, 416 (W.D.N.Y.2010) (quotation marks and citations omitted). In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, courts may consider "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citation omitted).

"[P]rison officials have broad administrative and discretionary authority over the institutions they manage." *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (citation omitted). Accordingly, courts approach First Amendment retaliation claims brought by inmates "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 491.

Here, Plaintiff alleges several different retaliation claims. The Court addresses each in turn, granting in part and denying in part Defendants' motion to dismiss.

First, Plaintiff alleges that Letizia retaliated against him for his prior civil suit before Judge Pauley. Specifically, he alleges that Letizia mocked Plaintiff's wife with the promise that "we will take care of [Plaintiff]." Plaintiff adds that "I know this comment [referred] to the treatment plaintiff was receiving in retaliation for the suit in 2008, in

which defendant Williams was a defendant with [several] of his colleagues also." This claim fails even at the motion to dismiss stage because Plaintiff has inadequately pleaded a connection between the protected activity (his civil suit) and the adverse action (threatening Plaintiff while on the phone with Plaintiff's wife). This critical element is merely asserted, but none of the facts contained in the Complaint adequately support it. *See Crenshaw,* 681 F.Supp.2d at 416. Further, even if the claim did not fail on this ground, the Court would still dismiss it due to the requirement of an adverse action that rises above the threshold of a vague verbal threat. *See Bumpus,* 495 F.Supp.2d at 326 ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim.").

**\*9** Second, Plaintiff alleges that Garcia retaliated against him for his prior civil suit before Judge Pauley. The protected activity here is Plaintiff's prior civil suit. The adverse action is denial of supportive footwear notwithstanding a medical permit. As the Court explains below, this constitutes an independent constitutional violation—but that does not preclude it from doing double—duty as the adverse action prerequisite to a finding of First Amendment retaliation. Denial of medical care that could address "extreme pain" surely qualifies as an action "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493. The causal connection is based on Plaintiff's recollection that Garcia "stated that he was notified by an officer in the 3 building (GMDC) and 5 building (AMKC) that you were back in the system ... and that you [were] involved in something back in 2006, (a settled suit with Honorable William H. Pauley[ ] ), and for us to put you on ICR status. Defendant Garcia stated that plaintiff pissed someone off, so, I can't help you." Plaintiff has adequately alleged the factual predicate of a causal connection between the protected activity and the adverse action. This claim therefore survives Defendants' motion to dismiss.

Third, Plaintiff alleges that Lemon engineered a retaliatory transfer. The protected activity for this claim is Plaintiff's filing of a grievance against Lemon for denial of medical care. The adverse action is the transfer of Plaintiff at Lemon's instigation to C–95—a facility that Plaintiff immediately recognized as a dangerous location, as evidenced by his objections to Carter that "I could not go to C–95." Plaintiff explains that C–95

was "the same facility that defendant Lemon threaten[ed] to send plaintiff if he don't leave it alone (obtaining his supportive footwear) even though defendant Lemon knew that a few officers tried to have physical injury done to plaintiff." The causal connection is based on this explicit threat by Lemon, coupled with the fact that Plaintiff filed a grievance against Lemon (thereby not "leav[ing] it alone") and the fact that Lemon "told plaintiff that his underlings will be dealing with me." Applying the standard that Judge Swain articulated in *Salahuddin,* which includes the proviso that prison officials may not transfer prisoners "solely in retaliation for the exercise of constitutional rights," 2006 WL 266574, at *5 (citations omitted), the Court concludes that Plaintiff's claim of retaliatory transfer survives this motion to dismiss.

Fourth, Plaintiff alleges that Williams locked him in an intake area without food, water, showers, linens, running water, or a bathroom as retaliation for Plaintiff's 2008 civil case against Williams. The protected activity is Plaintiff's prior civil case. The adverse action is Williams' decision to confine Plaintiff to an intake area without basic necessities for two days. The causal connection is based on Williams' statement that "I know who the fuck you are, you got a lot of balls coming to this building!" This claim survives Defendants' motion to dismiss.

**\*10** Finally, Plaintiff alleges that Becote, Morris, and Daly threatened him in several ways on and after March 28, 2012, and that Bacote gave Plaintiff a ticket without any other justification that resulted in Plaintiff being punished for 40 days. The protected activity is Plaintiff's decision to litigate this case. The adverse actions consist of verbal and physical threats and a handcuffing by Becote, Morris, and Daly, as well as the forty days of punishment that resulted from Becote's trumped-up charges. The causal connection is based on the facts that Daly learned of this case and told Plaintiff that Daly had "something" for Plaintiff upstairs, that Becote reviewed the initial complaint in this case after Plaintiff complained of Daly's threat, and that Daly and Becote (joined by Morris) commenced their allegedly adverse actions almost immediately afterwards. A retaliation claim based on the threats and handcuffing described by Plaintiff cannot succeed because these actions do not rise to the level of severity prerequisite to a finding of adverse action. Thus, the retaliation claim against Daly, Morris, and Becote based on their threats and handcuffing must be dismissed. However, forty days of punishment for a charge fabricated

to punish an inmate for filing a civil lawsuit does qualify as an adverse action under retaliation doctrine. [3] Given that Plaintiff also described facts that support a finding of causal connection, Defendants' motion to dismiss the retaliation claim against Becote arising from the ticketing incident is denied.

[3]    Defendants argue that Plaintiff should be required specifically to allege that he did not engage in the behavior charged by the ticket. In the Second Amended Complaint, however, Plaintiff plainly states that "Up until that point plaintiff have not had one single problem that would warrant a misbehavior report, nor have plaintiff ever refused to lock-in." He adds that "both charges [were] fabricated by defendant Bacote." These facts, taken as true for purposes of this motion, negate Defendants' argument.

In sum, Plaintiff's retaliation claims against Garcia, Lemon, Williams, and Becote survive this motion to dismiss. All other retaliation claims are dismissed.

### 2. Access to Courts

"It is well established that all persons enjoy a constitutional right of access to the courts, although the source of this right has been variously located in the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments." *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) (collecting cases). "The right of access to courts extends beyond mere physical access to a courtroom and a judge." *Id.* "Prisoners must have a 'reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Smith,* 2005 WL 1026551, at *6 (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Thus, the active interference of prison officials in the preparation, filing, or exchange of legal documents may constitute denial of access to the courts. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

"In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." *Monsky,* 127 F.3d at 247 (quotation marks and

citations omitted). "Interference with legal mail implicates a prison inmate's rights to access to the courts ... [t]o state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (quotation marks and citations omitted); *see also id.* ("In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment.") (citations omitted)). Accordingly, "[i]n balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (collecting cases).

**\*11** "To state a valid § 1983 claim that he has been denied reasonable access to the courts, [an inmate] must show that the alleged deprivation actually interfered with his access to the courts or prejudiced an existing action." *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995); *see also Davis,* 320 F.3d at 352 ("[Plaintiff] fails to state a constitutional claim for violating his right to send and receive legal mail because he alleges neither the establishment of an ongoing practice by prison officials of interfering with his mail nor any harm suffered by him from the tampering."). "A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen,* 877 F.Supp. at 871. "In other words the plaintiff must show that a non-frivolous legal claim had been frustrated or was being impeded due to the actions of prison officials." *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001) (citations omitted); *see also Smith,* 2005 WL 1026551, at \*6; *Bartley v. Artuz,* No. 95 Civ. 10161, 1999 WL 942425, at \*9 (S.D.N.Y. Oct.19, 1999).

Plaintiff alleges at multiple points that certain defendants interfered with his mail, including his legal mail, and took action against him in retaliation for his grievances and civil lawsuits (including this suit).[4] Most of Plaintiff's legal claims arising from this course of events are covered by First Amendment retaliation doctrine. Regardless, because Plaintiff has not alleged facts that reveal a substantial delay or interruption in his ability to communicate with the Court, and has not alleged facts

that could support a finding that he has been prejudiced or impeded in his legal actions, Defendants' motion to dismiss must be granted as to any access to court claim suggested by the Complaint. *See Cancel,* 2001 WL 303713, at \*4.

4        Plaintiff's opposition to the motion to dismiss the First Amended Complaint contains additional facts of this sort, some of which are addressed by Defendants in their briefs. Those allegations are not considered in this opinion, which addresses only the now-operative Second Amended Complaint and Defendants' motion to dismiss.

### C. Eighth Amendment

The Eighth Amendment to the U.S. Constitution provides that "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. That rule, applicable to the states through the Fourteenth Amendment, *see Estelle v. Gamble,* 429 U.S. 97, 101–02, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), is violated by unnecessary and wanton inflictions of pain and suffering, *see Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

Plaintiff alleges Eighth Amendment violations under two distinct theories: inadequate medical treatment and unconstitutional conditions of confinement.[5] In 1976, the Supreme Court explained that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment ... whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05 (quotation marks and internal citations omitted). The Court has since clarified that "we see no significant distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement .... Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the deliberate indifference standard articulated in *Estelle.*" *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quotation marks and citations omitted).

5   The Complaint also suggests an instance of tight handcuffing by Daly while Morris ordered Plaintiff to "play the wall" after Plaintiff's visit to the medical clinic. To the extent that Plaintiff alleges an Eighth Amendment excessive force claim based on this incident, that claim does not succeed on these facts. As this Court has noted:

> [S]ome degree of injury is ordinarily required to state a claim of excessive use of force in violation of the Eighth Amendment. A plaintiff need not prove significant injury to make out an excessive force claim, but a *de minimis* use of force will rarely suffice to state a constitutional claim. *De minimis* force, even if clearly unpleasant to endure, does not violate the Eighth Amendment where the use of force is not of a sort repugnant to the conscience of mankind.

*Taylor v. New York Dept. of Corr.,* No. 10 Civ. 3819, 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012); *see also id.* at *3–5 (discussing Eighth Amendment excessive force doctrine). Here, Plaintiff does not allege any serious injury, nor does he allege that he protested that the handcuffs were too tight or that the officers acted abusively. *Cf. Sachs v. Cantwell,* No. 10 Civ. 1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012) (discussing the legal standard for excessive force claims under the Fourth Amendment for claims based on tight handcuffing).

**\*12** To state an Eighth Amendment claim, a prisoner must allege both (1) that he suffered a sufficiently, objectively serious deprivation and (2) that officials who caused the harm acted or failed to act with a sufficiently culpable state of mind, *i.e.,* with deliberate indifference to inmate health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The objective prong of this analysis requires an assessment of the allegedly cruel and unusual conditions. "[T]he Constitution does not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). However, prisoners may not be deprived of "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Helling,* 509 U.S. at 35). "Ultimately, to establish the objective element of an Eight Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary

standards of decency." *Id.* (citations omitted); *see also Carr v. Canty,* No. 10 Civ. 3829, 2012 WL 3578742, at *3 (S.D.N.Y. Aug.16, 2012) ("[T]o establish the deprivation of a basic human need such as reasonable safety, an inmate must show actual or imminent harm." (quotation marks and citations omitted)).

"To establish the second element, deliberate indifference, a plaintiff must show something more than mere negligence ...." *Id.* (internal quotation marks and citation omitted). An official cannot be found liable on a conditions of confinement theory "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. The Second Circuit has noted that "[t]his deliberate indifference element is equivalent to the familiar standard of recklessness as used in criminal law." *Phelps v. Kapnolas,* 308 F.3d at 186 (quotation marks omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842.

Plaintiff's conditions of confinement claims against Williams and Bacote for confining him in intake areas do not succeed. Plaintiff's claim against Williams is based on the fact that Plaintiff was confined to an intake bullpen for two days and denied access to food, shower, linens, running water, and a bathroom. Plaintiff's claim against Bacote is based on the fact that, on the 5–7 occasions that Plaintiff was moved out of V.C.B.C. at Bacote's command, Plaintiff was forced to sleep in an intake area with "a constant air-condition system" that blew "extreme cold air" onto Plaintiff, who lacked blankets, sheets, running water, and a toilet.

**\*13** Addressed individually, none of these conditions suffices to state an Eighth Amendment violation. It is well established that deprivation of food, *see Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983), denial of toilet paper and toiletries, *see Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003), exposure to the bitter cold, *see Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001), exposure to the cold without bed linens, *see Maguire v. Coughlin,* 901

F.Supp. 101, 105 (N.D.N.Y.1995), and confinement in a cell without a toilet, *see LaReau v. MacDougall,* 473 F.2d 974, 977 (2d Cir.1972), can result in an Eighth Amendment violation when severe enough or sustained over a long enough period of time. Moreover,

> *[s]ome* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.

*Wilson,* 501 U.S. at 304 (citations omitted). In this case, however, the Court cannot conclude that the deprivations that Plaintiff experienced rise to the level of cruel and unusual punishment. This determination hinges largely on the fact that none of Plaintiff's confinements in the intake areas lasted more than two days. Given that none of these deprivations rose to an acute and conscience-shocking level, either alone or in combination, the relative brevity of Plaintiff's mistreatment precludes a finding that Plaintiff can satisfy the requirement of an objectively serious deprivation.

The Court reaches a different conclusion, however, with respect to Plaintiff's claim based on denial of medical care. At this early stage in the case, drawing all inferences in Plaintiff's favor, the Court concludes that Plaintiff has sufficiently alleged a serious medical need.

It is well established that not every claim made by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment; neither negligence nor medical malpractice is sufficient. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). To the contrary, a plaintiff must show conduct that is "repugnant to the conscience" or "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102, 105 (citations omitted). [6]

[6] Moreover, inmates are not entitled to the medical treatment of their choice. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ( "[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth

Amendment violation." (citation omitted)); *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986).

Defendants cite a number of cases that have rejected Eighth Amendment claims based on denial of footwear. Most of these cases are off-point or address the issue only with stray lines of *obiter dictum.* While the Court agrees that the legal principles articulated by these cases would defeat a conditions of confinement claim in this case based on shoddy footwear, it parts ways with Defendants on the significance of these cases for Plaintiff's denial of medical care claim. [7] Although these claims are analyzed under the same doctrinal framework, the presence of a medical treatment issue calls upon the Court to assess with particularity the nature and quality of the medical deprivation that Plaintiff endured. As the Second Circuit has explained,

[7] Nearly all of the cases cited by Defendants either address this point in brief dicta or discuss only a conditions of confinement claim where the plaintiff lacked a medical condition, medically advised footwear, or prescription medication. In *Edwards v. Quinones,* Judge Pauley held that a plaintiff could not satisfy the deliberate indifference element—and then added in a single sentence of dicta that the plaintiff, who had not alleged such facts as medical need, prescribed painkillers, or extreme pain, "[bore] the hallmarks of a recreational litigant." No. 10 Civ. 314 1, 2010 WL 4669110, at * 1, *3 (S.D.N.Y. Nov.17, 2010). *Walker v. Clemson,* presented by Defendants as their principal case, similarly misses the mark. No. 11 Civ. 9623, 2012 WL 2335865 (S.D.N.Y. June 20, 2012) *report and recommendation adopted,* No. 11 Civ. 9623, 2012 WL 3714449 (S.D.N.Y. Aug.28, 2012). In *Walker,* the plaintiff was denied use of personal sneakers even after a doctor recommended that he be provided with supportive footwear to remedy a foot spur; this injury, coupled with the prison-issued sneakers, caused the plaintiff "to suffer pain, chronic fungus, [and] a painful gait which in turn warranted the use of a cane to correct" and resulted in a possible need for surgery. *Id.* at * 1. Magistrate Judge Cott recommended denial of a conditions of confinement claim based on deprivation of basic human needs, noting that "[w]hile the prison-issued footwear may not have been as supportive as [the plaintiff's] personal sneakers, the Constitution does not require that prisons provide high-quality footwear." *Id* . at *4. However, when Judge Cott turned to the plaintiff's separate claim of inadequate medical care, he concluded that an absence of

information about "how much time passed from [ ] the date Walker was seen by the facility doctor, to the date his personal sneakers were returned to him" prevented any "determination from the pleadings as to the particular risk of harm faced by Walker due to the alleged deprivation." *Id.* at *6. Judge Cott nonetheless recommended denial of the plaintiff's claim due to failure to satisfy the deliberate indifference requirement. *Id.* Several of Defendants' other citations fare little better because Defendants rely on cases that deal with ordinary conditions of confinement claims, not denial of medical care claims. *See, e.g., Martin v. City of New York,* No. 11 Civ. 600, 2012 WL 1392648, at *9 (S.D.N.Y. Apr. 20, 2012) (finding no Eighth Amendment violation where inmate slipped and fell on a wet shower floor while wearing poorly constructed shoes); *Williams v. Dep't of Corr.,* No. 11 Civ. 1515, 2011 WL 3962596, at *4 (S.D.N.Y. Sept.7, 2011) (denying conditions of confinement claim where poorly constructed shoes caused slip and falls, and pain in inmate's calves and feet).

**\*14** if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citations omitted). While this standard most certainly includes "condition[s] of urgency that may produce death, degeneration, or extreme pain," *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted), it has also been interpreted to include "less serious denials [of medical attention] which cause or perpetuate pain." *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Thus, courts "will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain." *Id.* Accordingly, when presented with denial of medical treatment claims, courts do not "require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one." *See id.* (disagreeing with district court determination that chronic pain somewhere between

'annoying' and 'extreme' could not suffice to support a denial of treatment violation under the Eighth Amendment).

Here, Plaintiff states that he experienced months of "extreme pain," including intense pain in his feet, severely swollen ankles, and chronic bouts of lower back pain, as the direct result of Defendants' allegedly malicious refusal to allow him access to supportive footwear. These symptoms, he reports, resulted in a visit to the hospital to examine his swollen ankles and difficulties engaging in certain prerequisites to prison life, such as "playing the wall" and kneeling on the ground during a search. Significantly, this situation persisted despite several recommendations from prison physicians that Plaintiff be allowed to wear supportive footwear, despite official permits from these physicians, and despite the fact that Plaintiff was prescribed painkillers to deal with the pain that resulted from non-treatment. Plaintiff is thus differently situated than the plaintiffs in other cases that lacked medical advice and medical prescriptions. [8]

[8]   Further, unlike cases where courts addressed somewhat analogous facts with the precision made possible by fully developed factual records, this Court can rely only on the pleadings. *Cf. Cole v. Scully,* No. 93 Civ.2066, 1995 WL 231250, at *3 (S.D.N.Y. Apr.18, 1995)

While "[i]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," *Chance,* 143 F.3d at 702–03 (citations omitted), the Court concludes that this claim must survive Defendants' motion to dismiss. Plaintiff has described a form of near-chronic suffering that, by his own account, far exceeds the threshold of merely annoying and rises to the level of extreme pain. *Brock,* 315 F.3d at 163. Notably, physicians found this condition "worthy of comment" and treatment—namely, prescription painkillers and medical permits—and Plaintiff has explained that this condition "significantly affects [his] daily activities." *See Salahuddin,* 467 F.3d at 280. While this case is in some respects a close one, the Court cannot conclude as a matter of law that Plaintiff's injuries fall below the relevant threshold of objective severity for purposes of an Eighth Amendment denial of medical treatment claim. The settled fact that "the Constitution does not mandate comfortable prisons," *Rhodes,* 452 U.S. at 349, simply

does not mean that the Eighth Amendment abides the wanton infliction of months of "extreme" pain through the allegedly arbitrary denial of medically authorized footwear by prison guards. Recalling that "[m]obility is fundamental to our continued health," the Court concludes that "discovery could shed light on whether Plaintiff's medical need was of such seriousness and urgency that the failure to address it ... amounted to a violation of Plaintiff's constitutional rights." *Giambalvo v. Sommer,* No. 10 Civ. 6774, 2012 WL 4471532, at *5 (S.D.N.Y. Sept.19, 2012). [9]

[9] Defendants argue that this claim must be dismissed on the basis of a single Inmate Grievance Form (IGF) from October 12, 2011, which Defendants argue is incorporated into the Complaint by reference. Even assuming that this IGF is, in fact, incorporated by reference, it would not constitute a basis to dismiss this Complaint. This form states that, as a resolution of Plaintiff's grievance, "the [Inmate Grievance Resolution Committee] was informed that if your medical note is current, you are advised to bring your medical note to the clothes box and you will be issued supportive footwear." The IGF indicates that Plaintiff refused to sign. Nothing about this document plainly contradicts Plaintiff's own account of events. It is entirely possible that the Committee took that permissive position in response to his grievance, but that Defendants nonetheless maliciously and willfully disregarded that instruction from the Committee. The fact that Plaintiff refused to sign the form says little on its own; it certainly does not contradict Plaintiff's allegations that Defendants denied him access to his supportive footwear notwithstanding a medical permit, nor does it prove that Plaintiff actually received supportive footwear.

**\*15** Because Defendants have not moved to dismiss these claims on any ground other than Plaintiff's supposed failure to demonstrate a sufficiently serious deprivation, the Court does not examine whether Plaintiff satisfies the other requirements of a denial of medical treatment claim (including the requirement of a culpable mental state on Defendants' part).

In the Complaint, Plaintiff identifies Schriro, Agro, Lemon, Fraizer, Williams, Best, Smith, Garcia, Washington, Lespinasse, Hart, Hines, Anku, and Moultrie as the defendants associated with the deliberate indifference claim. Because the Complaint was filed by a *pro se* litigant, it must be interpreted to raise the strongest claims it suggests against the set of named defendants. The Court has independently examined the Complaint and concludes that Plaintiff's Eighth Amendment claim is alleged against Hart, Lespinasse, Washington, Lemon, Fraizer, Best, Williams, Harris, Garcia, Moultre, Smith, and Hines. For the reason set forth *infra,* Plaintiff's claims against Schriro and Agro are dismissed for failure adequately to allege their supervisory liability. Further, Plaintiff's allegations against Aknu involve only conditions of confinement; to wit, being required to kneel uncomfortably for 30–45 minutes during a search. Because the Complaint does not allege that Aknu participated in the denial of Plaintiff's request for medical treatment, the Eighth Amendment claim against him must be dismissed.

### D. Claims Against Defendants Schriro and Agro

"It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." *McCoy v. Goord,* 255 F.Supp.2d 233, 258 (S.D.N.Y.2003) (quotation marks and citations omitted). Under § 1983, supervisory liability "depends on a showing of some personal responsibility, and cannot rest on *respondeat superior." Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citing *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989)). "[P]roof of 'linkage in the prison chain of command' is insufficient." *Id.* (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). "Absent some personal involvement by [an official] in the allegedly unlawful conduct of his subordinates," he cannot be liable under section 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987); *see also Hernandez,* 341 F.3d at 145 (specifying some of the forms of involvement that would support supervisory liability). A defendant's status as warden or commissioner of a prison, standing alone, is thus insufficient to support a finding of supervisory liability. *See Collins,* 438 F.Supp.2d at 420. Further, merely "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* No. 01 Civ. 5178, 2007 WL 162476, at *10 (S.D.N.Y. Jan.19, 2007). "Broad, conclusory allegations that a high-ranking defendant was informed of an incident are also insufficient." *Gonzalez v. Sarreck,* No. 08 Civ. 3661, 2011 WL 5051341, at *14 (S.D.N.Y. Oct.24, 2011) (citation omitted).

**\*16** Applying these rules, the Court concludes that Plaintiff has not alleged facts that could support a finding of supervisory liability against Agro and Schriro. All claims against these defendants are therefore dismissed.

#### E. Claims Against Barker

Plaintiff alleges that Barker violated the Eighth Amendment by virtue of deliberate indifference to the public's medical needs and that Barker should be held liable under the tort law doctrine of products liability for defective design and failure to warn. These claims do not succeed. As a provider of shoes to the prison, Barker could not plausibly be described as one of the officials acting under color of law "who caused the harm" or did so with the requisite state of mind—namely, deliberate indifference. *See Farmer,* 511 U.S. at 834. This defeats any Eighth Amendment claim against him. Plaintiff has not alleged and this Court cannot imagine any other claim under § 1983 against Barker. Thus, there is no federal claim in this case against Barker.

Absent such a federal claim, this Court could only consider a state law products liability claim against Baker as a matter of supplemental jurisdiction. Given the early stage of this litigation and the markedly distinct nature of the state law claims as compared to Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the varied products liability claims alleged in the Complaint. *See Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 102–03 (2d Cir.1998) (noting that "when all federal claims are eliminated in the early stages of the litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice").

All claims against Barker are therefore dismissed.

#### IV. Summary of Remaining Claims

All claims in this case are dismissed except for First Amendment retaliation claims against Garcia, Lemon, Williams, and Becote, and Eighth Amendment denial of medical treatment claims against Hart, Lespinasse, Washington, Lemon, Fraizer, Best, Williams, Harris, Garcia, Moultre, Smith, and Hines.

#### V. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. The Clerk of Court is directed to close the motion at Dkt. No. 32.

SO ORDERED.

#### All Citations

Not Reported in F.Supp.2d, 2013 WL 1234930

© 2019 Thomson Reuters. No claim to original U.S. Government Works.